United States District Court
Middle District of Florida
Jacksonville Division

**UNITED STATES OF AMERICA,**

> *Plaintiff,*

v.                                                           **NO. 3:17-cv-965-J-PDB**

**PARVEZ MANZOOR KHAN,**
**A/K/A MOHAMMAD AKHTAR,**
**A/K/A JAWEED KHAN,**

> *Defendant.*

---

### Order

The United States seeks denaturalization of Parvez Manzoor Khan, bringing three causes of action under 8 U.S.C. § 1451(a), Doc. 1, supported by an affidavit of good cause, Doc. 1-1. Khan raises affirmative defenses of laches, estoppel, and waiver due to asserted undue delay in bringing the lawsuit.[1] Doc. 10 at 4. Before the Court are cross-motions for summary judgment. Docs. 20, 30. The case is scheduled for a nonjury trial to begin April 2, 2019. Doc. 38.

---

[1]Under the title "Affirmative Defenses" in his answer, Khan contends he "is being denied due process of law by not being given a complete copy of his A records for his review and review by possible expert witnesses." Doc. 10.

An affirmative defense is "'one that admits to the complaint, but avoids liability, wholly or partly, by new allegations of excuse, justification, or other negating matters.'" *VP Props. & Devs., LLLP v. Seneca Specialty Ins. Co.*, 645 F. App'x 912, 916 (11th Cir. 2016) (*quoting Royal Palm Sav. Ass'n v. Pine Trace Corp.*, 716 F. Supp. 1416, 1420 (M.D. Fla. 1989)). Laches, estoppel, and waiver are affirmative defenses. Fed. R. Civ. P. 8(c)(1).

Khan's due-process contention is in the nature of a discovery complaint rather than an affirmative defense. Since his filing of the answer, the government has provided him a copy of his Alien Files (A-Files), *see* Docs. 25, 40, rendering the matter moot.

## I. Asserted Facts

The government submits parts of Khan's Alien Files (A-Files) or Certificate Files (C-Files), Docs. 20-1–20-19, 20-21; a declaration of Lisa Pellechia, an officer with United States Citizenship and Immigration Services (USCIS), Doc. 20-20; a deposition of Eduardo Reveles, an officer with United States Customs and Border Protection (CBP), Doc. 20-22; a deposition of Xiomara Flores, an officer with USCIS (formerly with CBP), Doc. 20-23; a deposition of Sarah Wescott, a manager with CBP (formerly an officer with CBP), Doc. 20-24; fingerprint cards, Docs. 20-25–20-27; a fingerprint comparison report, Doc. 20-28; and a stipulation of fact, Doc. 20-29.

Khan submits parts of his A-Files,[2] Doc. 25; an affidavit by him, Doc. 24;[3] an affidavit by his brother, Suhail Khan, Doc. 23; California Bar records concerning attorney Howard George Johnson, Doc. 26; a United States Department of Justice (DOJ) press release, Doc. 27; and a report by the United States Department of Homeland Security (DHS), Office of Inspector General (OIG), Doc. 28.

The following asserted facts are from the parties' submissions and Khan's admissions through the answer, Doc. 10, to the complaint, Doc. 1.

---

[2]In its response to Khan's motion for summary judgment, the government asks the Court to remove from the public docket the parts of Khan's A-Files he filed. Doc. 31 at 8 n.4. The request was granted to the extent the Court (1) directed Khan to redact third-party information and file the redacted version through CM/ECF and (2) directed the clerk's office to place the unredacted version under seal. Doc. 39 at 1. The government may file a motion and supporting legal memorandum if it seeks a different course of action under the protective order, Doc. 14.

[3]Khan twice filed his affidavit and, as a result, the affidavit is designated as both document 22 and document 24 on the docket. For simplicity, this order refers to document 24 only.

## A. *Entry, Asylum Request, and Exclusion*

1.     In his affidavit, Khan states his real name is Parvez Manzoor Khan, his family name is Khan, and he was born in 1957.[4] Doc. 24 ¶¶ 11, 22, 48.

2.     On December 7, 1991, Khan arrived in Los Angeles, California, aboard Korean Airlines Flight KE002. Doc. 1 ¶ 8; Doc. 10 ¶ 8; Doc. 20-1; Doc. 24 ¶ 4; Doc. 25 at 36.

3.     Khan's Form I-94 (Arrival Record) provides his name is Mohammad Akhtar and his birthyear is 1958.[5] Doc. 20-1; Doc. 25 at 36.

4.     Khan presented a Pakistani passport bearing a United States B-2 (tourism) visa. Doc. 1 ¶ 9; Doc. 10 ¶ 9; Doc. 20-2; Doc. 25 at 4, 43, 45–51, 54, 65, 67.

5.     Immigration officers determined the passport had been altered. Doc. 1 ¶ 10; Doc. 10 ¶ 10; Doc. 20-2; Doc. 25 at 4, 43, 54, 65. According to a memorandum prepared at the time:

> The photograph on page 03 was substituted into the passport that the subject presented for inspection. The wet seal located on the page runs under the photo and is of uneven dimension, the inside line is smaller than the line outside the picture. The signature of the issuing officer on the subject's picture was tampered with and a different ink was used which is easily detected when compared to the original signature on the cover page and page 32. On page 19 the maceration "PHOTOGRAPH ATTACHED FOREIGN SERVICE UNITED STATES OF AMERICA" which is placed from the photo onto the page has no similarities and are not uniformed [sic].

Doc. 20-2 (emphasis in original); Doc. 25 at 4, 43, 54, 65 (emphasis in original).

---

[4]The government takes no position on Khan's real name. Doc. 20 at 13 n.5.

[5]The I-94 also provides a month and day of birth. Doc. 20-1; Doc. 25 at 36. For privacy, the month and day are omitted here.

6.    The memorandum provides Khan speaks Punjabi and explains, "No statement was taken from subject due to the subject[']s inability to speak and understand sufficient English, and the lack of a translator." Doc. 20-2; Doc. 25 at 4, 43, 54, 65.

7.    Another memorandum prepared at the time repeats that Khan speaks Punjabi. Doc. 25 at 5, 61.

8.    In his affidavit, Khan observes Hindi and Punjabi are languages spoken in India. Doc. 24 ¶ 10.

9.    In their affidavits, Khan and Suhail Khan state when Khan arrived in the United States, he could not speak, read, or write in English and needed an interpreter and translator in Urdu, Pakistan's official language and Khan's native language. Doc. 23 ¶ 7; Doc. 24 ¶¶ 4, 6, 9.

10.    In his affidavit, Khan states Suhail Khan "knows [Khan's] English was very bad when [he] first time to the US [sic]." Doc. 24 ¶ 31.

11.    In his affidavit, Khan states immigration officers did not interview him because they had no Urdu interpreter or translator. Doc. 24 ¶ 5.

12.    On the day of his arrival, Khan was personally served with a Form I-122 (Notice to Applicant Detained for Hearing Before Immigration Judge), which initiated exclusion proceedings against him. Doc. 1 ¶ 11; Doc. 10 ¶ 11; Doc. 20-3; Doc. 25 at 52–53, 63–64.

13.    The notice provides, "You do not appear to me to be clearly and beyond a doubt entitled to enter the United States as you may come within the exclusion provisions of Section[s] 212(a)(5)(A)(i); 212(a)(6)(C)(i) and 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act[.]"[6] Doc. 20-3 at 2; Doc. 25 at 52, 63.

_____

[6]The notice set forth the cited provisions: § 212(a)(5)(A)(i) ("Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor, unless

14.     The notice continues, "Therefore you are detained under the provisions of Section 235(b) … for a hearing before [an] Immigration Judge to determine whether or not you are entitled to enter the United States or whether you shall be excluded and deported." Doc. 20-3 at 2; Doc. 25 at 52, 63.

15.     Khan was detained and "transported in custody for exclusion proceeding[s] in [the] Los Angeles District Office." Doc. 20-2; Doc. 25 at 4, 6, 43, 44, 54–55, 65–66.

16.     Khan was fingerprinted under the name Mohammad Akhtar. Doc. 20-25; Doc. 25 at 7–9.

17.     In his affidavit, Khan states the following about his detention:

    a.   He was detained for a month in a jail cell with at least eight others who were from India and did not speak Urdu. Doc. 24 ¶¶ 8, 12.

    b.   While in a cell, he met attorney Howard George Johnson, who was there helping others. Doc. 24 ¶ 13.

---

the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of aliens who are members of the teaching profession or who have exceptional ability in the sciences or the arts), and are available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (II) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."); § 212(a)(6)(C)(i) ("Any alien who, by fraud of willfully representing a material fact, seeks to procure, or has sought to procure or has procured a visa, other documentation, or entry into the United States or other benefit provided under this Act is excludable."); § 212(a)(7)(A)(i)(I) ("Except as otherwise specifically provided in the Act, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or other document of identity and nationality, if such document is required under the regulations issued by the Attorney General[.]"). Doc. 20-3 at 3; Doc. 25 at 53, 64.

    c.   To help him communicate with Johnson, a detainee offered to translate as best he could from English to Hindi or Punjabi. Doc. 24 ¶ 14.

    d.   He (Khan) paid Johnson to be his attorney to interact with immigration authorities. Doc. 24 ¶ 15.

    e.   A detainee provided his (Khan's) personal information to Johnson so Johnson could help him (Khan). Doc. 24 ¶ 16.

    f.   He has a hard time remembering everything from 25 years ago but remembers giving Johnson his full name, Parvez Manzoor Khan. Doc. 24 ¶¶ 20, 48.

18.    On December 22, 1991, Johnson submitted a Form G-28 (Notice of Entry of Appearance as Attorney or Representative) providing he would be representing Suhail Khan in the matter of "Jaweed Khan a/k/a Mohammad Akhtar." Doc. 25 at 17–18, 20–21.

19.    On December 23, 1991, Khan, through Johnson, submitted a Form I-589 (Request for Asylum in the United States) seeking political asylum. Doc. 1 ¶ 12; Doc. 10 ¶ 12; Doc. 20-4; Doc. 25 at 10–13.

20.    The I-589:

    a.   is under the name Jaweed Khan, Doc. 20-4 at 2; Doc. 25 at 10;

    b.   provides as "all other names used at any time" only the name Mohammad Akhtar, Doc. 20-4 at 2; Doc. 25 at 10;

    c.   provides the birthyear 1958,[7] Doc. 20-4 at 2; Doc. 25 at 10;

---

[7]The I-589 also provides a month and day of birth. Doc. 20-4 at 2; Doc. 25 at 10. For privacy, those are omitted here.

d.  provides, "Punjabi, Urdu," as "Languages spoken," Doc. 20-4 at 2; Doc. 25 at 10;

e.  provides a Miami 33126 address as his "Address in United States,"[8] Doc. 20-4 at 2; Doc. 25 at 10;

f.  provides Lahore, Pakistan, as his "Address abroad prior to coming to the United States,"[9] Doc. 20-4 at 2; Doc. 25 at 10;

g.  provides December 7, 1991, as his last arrival in the United States, Doc. 20-4 at 2; Doc. 25 at 10;

h.  provides Los Angeles as his place of last arrival, Doc. 20-4 at 2; Doc. 25 at 10;

i.  leaves blank boxes indicating he arrived as a "Visitor," "Student," "Stowaway," or "Crewman," and checks a box indicating he arrived as an "Other (Specify)" and specifies, "Deferred Inspection," Doc. 20-4 at 2; Doc. 25 at 10;

j.  identifies Suhail Khan in Miami as a relative in the United States other than an immediate family member, Doc. 20-4 at 3; Doc. 25 at 11; and

k.  provides he was an active worker for a movement and political organization and was imprisoned for two years due to political activities, Doc. 20-4 at 6–9.

---

[8]The I-589 provides a full address in Miami. Doc. 20-4 at 2; Doc. 25 at 10. For privacy, the street number and name are omitted here.

[9]The I-589 provides a full address in Pakistan. Doc. 20-4 at 2; Doc. 25 at 10. For privacy, the street number and name are omitted here.

21.     Khan signed the I-589 under penalty of perjury, declaring "that the … [information] and all accompanying documents are true and correct to the best of my knowledge and belief." Doc. 20-4 at 5; Doc. 25 at 13.

22.      Khan signed the I-589, "Mohammad Akhtar":



(Signature of Applicant)

Doc. 20-4 at 5; Doc. 25 at 13.

23.     In his affidavit, Khan states Johnson told him to sign the I-589 with the name Mohammad Akhtar. Doc. 24 ¶ 18; Doc. 20-4 at 5; Doc. 25 at 13.

24.     An attachment to the I-589 provides, "Applicant's Name: Jaweed Khan." Doc. 20-4 at 6.

25.     The last paragraph of the attachment provides, in typewritten font, "I certify under penalty of perjury that the above is true and correct, and that [sic] has been read to me in my native language. Signed at San Pedro, California on December 16, 1991. Jaweed Khan[,] Declarant." Doc. 20-4 at 9.

26.     With the I-589, Khan submitted a Form G-325A (Biographic Information). Doc. 20-5; Doc. 25 at 14.

27.     The G-325A:

 a. is under the name Jaweed Khan and provides as "all other names used" only the name Mohammad Akhtar, Doc. 20-5; Doc. 25 at 14;

 b. provides the birthyear 1958,[10] Doc. 20-5; Doc. 25 at 14;

---

[10] The G-325A also provides a month and day of birth. Doc. 20-5; Doc. 25 at 14. For privacy, those are omitted here.

c.  provides, "Lahore, Punbjab [sic], Pakistan," as his city and country of birth, Doc. 20-5; Doc. 25 at 14;

d.  provides his father's name is Ahmad Khan Manzoor and his mother's name is Rehana Begum, Doc. 20-5; Doc. 25 at 14; and

e.  provides his residency is "INS Custody," Doc. 20-5; Doc. 25 at 14.

28.  In his affidavit, Khan states the following about the I-589 and G-325A:

a.  The G-325 has his and his mother's name wrong. Doc. 24 ¶ 47.

b.  "[His] mother's name on the G-325A is misspelled. It is Razia Begum, not Rehana Begum. Again, since [he] could not read or speak English at the time the G-325 was prepared on December 17, 1991, [he] could not check it for spelling or typographical errors." Doc. 24 ¶ 49.

c.  He does not know why the name is incorrect. Doc. 24 ¶ 21. He has a twin brother in Pakistan named Javed Khan, and that might account for the error. Doc. 24 ¶ 21.

d.  Johnson's office completed the I-589, he did not. Doc. 24 ¶¶ 21, 23.

e.  He did not read the I-589 before he signed it because he did not understand English and it had not been translated for him. Doc. 24 ¶ 23.

f.  He was never given a copy of immigration papers he signed for Johnson and only recently saw copies through this lawsuit. Doc. 24 ¶¶ 17, 27.

29. Suhail Khan gave Johnson $2500 for bond so Khan could be released to Suhail Khan. Doc. 23 ¶ 4; Doc. 24 ¶ 28; Doc. 25 at 15–16, 19, 22–24.

30. In his affidavit, Suhail Khan states, after he gave Johnson the bond money, he never heard from Johnson again. Doc. 23 ¶ 13.

31. On January 7, 1992, Khan was released on bond, with Suhail Khan as the obligor, pending exclusion proceedings.[11] Doc. 1 ¶ 14; Doc. 10 ¶ 14; Docs. 20-1, 20-6; Doc. 24 ¶¶ 28, 29; Doc. 25 at 15–16, 19, 22–24, 32, 42.

32. A memorandum concerning Khan, dated January 8, 1992, to Evelyn Diaz Brown, Executive Office for Immigration Review, Office of the Immigration Judge, from Robert M. Moschorak, District Director, regarding "Change of Custody Condition and Address of Record," states, "Below named subject who is under proceedings with your office has been bonded or otherwise released from custody of this service as of January 7, 1992." Doc. 20-6; Doc. 25 at 23, 35. The memorandum names Akhtar, Mohammad, "AKA Khan, Jaweed," and provides as his new address of record, "c/o Howard George Johnson[,] 1406 South Union Ave[.,] LA, CA 90015." Doc. 20-6; Doc. 25 at 25, 35.

33. In contrast, the I-589 and bond application provide the Miami 33126 address of Suhail Khan where Khan would be staying. Doc. 20-4 at 2; Doc. 23 ¶¶ 4, 5; Doc. 24 ¶ 24; Doc. 25 at 10, 22, 24.

34. In his affidavit, Khan states the following about his release:

    a. He was released in the middle of the night, placed in a van

---

[11]In its motion for summary judgment, the United States states, "The undisputed facts show Defendant was detained for approximately fifteen days upon his initial entry into the United States[.]" Doc. 20 at 12. In his affidavit, Khan states he was detained for a month. Doc. 24 ¶ 12. To the extent Khan was detained from his arrival on December 7, 1991, until his parole on January 7, 1992, *see* Doc. 20-1, Khan's estimate is more accurate. In any event, whether he was detained fifteen days or a month is immaterial here.

with other releasees, and given only a white card when he exited. Doc. 24 ¶ 29.

b. He followed other releasees to a hotel, where someone who spoke Urdu helped him get a cab. Doc. 24 ¶ 29.

c. He stayed overnight in a motel and, the next day, one of the releasees helped him get a cab to a Greyhound bus station and helped him buy a ticket to Miami for the next day. Doc. 24 ¶ 29.

d. Once he arrived in Miami, he lived with Suhail Khan at the Miami 33126 address. Doc. 24 ¶ 30.

e. Miami was the last United States city he went to in 1992. Doc. 24 ¶ 32.

f. "[He] thought [he] was granted asylum since [he] was released from custody on January 7, 1992 after [his] brother posted a $2,500 bond." Doc. 24 ¶ 51.

g. He appeared before an immigration judge only once. Doc. 24 ¶ 11.

h. The judge had no Urdu interpreter or translator and did not ask him questions or give him an opportunity to say his full name, Parvez Manzoor Khan. Doc. 24 ¶ 11.

i. Immigration authorities never provided him a translator, interpreter, or opportunity to speak to an immigration officer in Urdu in December 1991 or January 1992. Doc. 24 ¶¶ 7, 14.

j. No one explained the process to him, and he did not know he would need to go to immigration court. Doc. 24 ¶ 23.

35.     On February 3, 1992, an immigration court clerk sent Johnson at Johnson's Los Angeles 90015 address a United States Department of State advisory opinion on Khan's application for political asylum and advised Johnson that a hearing would be conducted on February 18, 1992. Doc. 25 at 27–29.

36.     On February 26, 1992, Immigration Judge Roy J. Daniel entered an "IN ABSENTIA DECISION AND ORDER" in which he ordered Khan excluded and deported from the United States based on his failure to appear at a hearing or reasonably explain the failure after having been "duly notified" of the date, time, and place. Doc. 20-7; Doc. 25 at 26.

37.     On the same day, a copy of Judge Daniel's deportation order was mailed to Johnson at Johnson's Los Angeles 90015 address with a notice that the decision was final unless an appeal was taken by March 10, 1992. Doc. 25 at 39.

38.     One year later, on February 8, 1993, a Form I-166 (Notice to Appear for Removal), was issued. Doc. 20-8; Doc. 25 at 30. The notice was addressed to Jaweed Khan at Johnson's Los Angeles 90015 address and includes a stamp, "CERTIFIED RETURN RECEIPT REQUESTED." Doc. 20-8; Doc. 25 at 30–31.

39.     The I-166 explained that, based on Judge Daniel's order, Immigration and Naturalization Services (INS)[12] had arranged for Khan's departure to Pakistan by commercial transportation on February 19, 1993. Doc. 20-8; Doc. 25 at 31.

40.     Khan failed to report for his departure, causing breach of the bond on which he had been released. Doc. 20-9; Doc. 25 at 40–41, 57.

---

[12]On March 1, 2003, the INS ceased existence as an independent agency of the DOJ and most of its functions were transferred to the newly formed DHS. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451, 471, 116 Stat. 2135 (Nov. 25, 2002). The INS was divided into three agencies within DHS: USCIS, CBP, and U.S. Immigration and Customs Enforcement (ICE). USCIS assumed from the INS asylum and naturalization authority. *See id.* at § 451.

41.     The notice of the breach of the bond was sent to Johnson at Johnson's Los Angeles 90015 address. Doc. 25 at 56.

42.     In his affidavit, Khan states the following about notice of the immigration court proceedings:

  a.  He never received a notice to appear in immigration court from the immigration court or Johnson and received no translation of any warning about what would happen if he failed to appear in immigration court. Doc. 24 ¶¶ 11, 25.

  b.  "[He] never received any letters or communications from immigration court or Howard Johnson for [him] to attend an Immigration Court hearing or to report to immigration to leave the U.S. under an order of deportation." Doc. 24 ¶ 52.

  c.  He did not know about Judge Daniel's deportation order until this lawsuit. Doc. 24 ¶ 26.

43.     In his affidavit, Suhail Khan states the following about Khan's post-release activities and Johnson:

  a.  Khan lived with him at the Miami 33126 address from 1992 to 1995. Doc. 23 ¶ 10.

  b.  He (Suhail Khan) helped Khan learn to speak and write in English. Doc. 23 ¶ 8.

  c.  He (Suhail Khan) has served as an Urdu translator and interpreter for the United States Department of Defense (DOD) and therefore is "proficient" in translation and interpretation of the languages. Doc. 23 ¶ 9.

d. He "know[s] for a fact" neither he nor Khan received any notice or letter to appear after Khan's release. Doc. 23 ¶ 6.

e. Johnson did not notify him (Suhail Khan) that INS had "revoked or cancelled the bond." Doc. 23 ¶ 11.

f. If he had known about the "reasons to revoke bond," he would have had Khan move to reopen his asylum application. Doc. 23 ¶ 12.

44.     On March 25, 1998, the California Bar suspended Johnson from the practice of law for one year, stayed the suspension, and placed him on probation for three years. Doc. 26 at 3.

45.     The suspension and probation were initiated with a "Notice to Show Cause" alleging four counts of wrongful conduct based on Johnson's representation of four clients (not Khan or Suhail Khan) in 1991 and 1992. Doc. 26 at 58–64.

46.     Ultimately, the suspension and probation were for "misconduct in two client matters involving the failure to perform legal services competently and the failure to communicate with clients." Doc. 26 at 3.

47.     The first matter involved a personal injury case for which Johnson's representation began in April 1991. Doc. 26 at 5. His client complained that from around April 1991 to May 1992, Johnson had not responded to many attempts to communicate with him and had not informed her he had changed his address. Doc. 26 at 5–6.

48.     The second matter involved a landlord/tenant case for which Johnson's representation began in December 1991. Doc. 26 at 7. Johnson failed to appear at a court proceeding and failed to keep his client informed. Doc. 26 at 7–9.

49.     Johnson is deceased. Doc. 24 ¶ 38.

## B.    Adjustment of Status

50.    On January 7, 1998 (approximately six years after his arrival in the United States), in Miami, Khan married Betty Louise Pope, a United States citizen by birth. Doc. 20-16; Doc. 23 ¶ 16; Doc. 24 ¶ 54.

51.    One week later, on January 14, 1998, Mrs. Khan filed a Form I-130 (Petition for Alien Relative), seeking to classify Khan as her immediate relative. Doc. 1 ¶ 18; Doc. 10 ¶ 18; Docs. 20-10–20-13; Doc. 25 at 68.

52.    The I-130:

   a.   is under the name Parvez Manzoor Khan, Docs. 20-10, 20-12, 20-13; Doc. 25 at 68;

   b.   uses the birthyear 1957,[13] Docs. 20-10, 20-12, 20-13; Doc. 25 at 68;

   c.   provides "NONE" under "Other Names Used," Doc. 20-10; Doc. 25 at 68;

   d.   uses December 1990 as the date of arrival, Doc. 20-10; Doc. 25 at 68;

   e.   provides Khan arrived as a "Visitor," Doc. 20-10; Doc. 25 at 68;

   f.   provides the I-94 is "LOST," Doc. 20-10; Doc. 25 at 68; and

   g.   provides Khan has worked for Yellow Cab Company since 1992, Doc. 20-10; Doc. 25 at 68.

---

[13]The I-130 also provides a month and day of birth. Doc. 20-10 at 2; Doc. 25 at 68. For privacy, the month and day are omitted here.

53. In his affidavit, Khan states the following about the I-130 and I-94:

    a. "[He] correctly put in [his] wife's I-130 … that [he had] lost [his] I-94 card and arrived as a visitor." Doc. 24 ¶ 44.

    b. He did not have the I-94 given to him when he was released in January 1992 because he had lost it. Doc. 24 ¶ 33.

54. Mrs. Khan signed the I-130 under penalty of perjury, declaring that "the foregoing is true and correct." Doc. 20-11.

55. On the same day, Khan filed a Form I-485 (Application to Register Permanent Residence or Adjust Status), seeking to adjust his status to that of a lawful permanent resident. Doc. 1 ¶ 19; Doc. 10 ¶ 19; Docs. 20-14–20-15; Doc. 25 at 70–72.

56. The information in the boxes on the I-485 is typed, but there are marks in red ink on the I-485, and some of the typed words are crossed through and replaced with handwriting in red ink. Docs. 20-14–20-15; Doc. 25 at 70–72.

57. The I-485:

    a. is under the name Parvez M. Khan, Doc. 1 ¶ 19; Doc. 10 ¶ 19; Doc. 20-14 at 4; Doc. 20-15 at 2; Doc. 25 at 70;

    b. uses the birth year 1957,[14] Doc. 20-14 at 4; Doc. 25 at 70;

    c. provides Khan's father's first name is Manzoor and his mother's first name is Razia, Doc. 20-14 at 5; Doc. 25 at 71;

    d. provides, "Miami, Florida," as the "Place of last entry into the U.S.," Doc. 20-14 at 5; Doc. 25 at 71;

---

[14]The I-485 also provides a month and day of birth. Doc. 20-14 at 4; Doc. 25 at 70. For privacy, those are omitted here.

e. uses December 1990 as the date of arrival, Doc. 20-14 at 4, 5; Doc. 25 at 70–71;

f. marks "Yes" with a typed "xx" next to, "Were you inspected by a U.S. Immigration Officer," and provides in typed words Khan arrived as a "Visitor," but "Visitor" is crossed through and replaced in red handwriting, "EWI" (Entry without Inspection), Doc. 20-14 at 4, 5; Doc. 25 at 70–71;

g. has a typewritten "x" next to "No" for the question, "Have you ever, in or outside the U.S.: a. knowingly committed any crime of moral turpitude or a drug-related offense for which you have not been arrested?" "b. been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations?" "c. been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action?" and "d. exercised diplomatic immunity to avoid prosecution for a criminal offense in the U.S." (question 1), Doc. 20-15 at 1; Doc. 25 at 72;

h. has a handwritten "x" next to "Yes" for that question and with it, in red handwriting, "Claims one arrest," Doc. 20-15 at 1; Doc. 25 at 72;

i. has a typewritten "x" next to "No" for the question, "Have you ever been deported from the U.S. or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings" (question 9), Doc. 20-15 at 1; Doc. 25 at 72;

j. has a typewritten "x" next to "No" for the question, "Are you under a final order of civil penalty for violating section 274C

of the Immigration Act for use of fraudulent documents, or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit" (question 10), Doc. 20-15 at 1; Doc. 25 at 72; and

k.  has a red handwritten "x" next to "Applicant Interviewed" and red handwriting, "11-07-01," indicating Khan was interviewed for the I-485 on November 7, 2001, Doc. 20-14 at 4; Doc. 25 at 70.

58.  Khan signed the I-485 under penalty of perjury, declaring that "this application, and the evidence submitted with it, is all true and correct":



Doc. 20-15 at 2.

59.  In his affidavit, Khan states the following about the I-485:

a.  "[He] did not remember the name on the passport [he] used in December 1991 when [he] filed [his] I-485[.]" Doc. 24 ¶ 34.

b.  "[He] did not knowingly fail to disclose any aliases on [his] I-485 ... since [he] did not remember the name on the passport[.]" Doc. 24 ¶ 48.

c.  "[He] did not know when [he] filed [his] ... I-485 that [he] had been ordered deported." Doc. 24 ¶ 37.

d.  "The ... I-485 form[] [has] written changes not made by [him]. Any changes in red were done by the immigration officer, not

[him]. Some changes are not accurate. [He] was misquoted." Doc. 24 ¶ 46; *accord* Doc. 24 ¶ 44 ("INS made incorrect changes to the forms.")

e. He wrote "Visitor" and did not suggest he had entered without inspection (EWI). Doc. 20-14 at 5; Doc. 24 ¶¶ 44–45; Doc. 25 at 71.

f. For the interview, the immigration officer "spent little time" with him "because she was supposed to go some where [sic]." Doc. 24 ¶ 43.

g. "[His] I-485 was delayed by USCIS for over 2 years." Doc. 24 ¶ 39; *see also* Doc. 25 at 77–79 (letters from Khan's lawyer asking about the status of the proceedings).

60. With the I-485, Khan submitted a new G-325A (Biographical Information). Doc. 20-16; Doc. 25 at 69.

61. The G-325A:

a. is under the name Parvez Manzoor Khan, Doc. 20-16; Doc. 25 at 69;

b. provides the birthyear 1957,[15] Doc. 20-16; Doc. 25 at 69;

c. provides "NONE" under "All Other Names Used," Doc. 20-16; Doc. 25 at 69; and

d. provides Khan's father's name is Manzoor Khan and his mother's name is Razi Begum, Doc. 20-16; Doc. 25 at 69.

---

[15]The G-325A also provides a month and day of birth. Doc. 20-16; Doc. 25 at 69. For privacy, those are omitted here.

62. On November 7, 2001, the I-130 and I-485 were approved, granting Khan permanent residence status. Doc. 1 ¶ 20; Doc. 10 ¶ 20; Doc. 20-10; Doc. 20-14 at 4; Doc. 25 at 68, 70.

63. For the I-485 and resulting Form I-551 (Permanent Residence Card/Green Card), Khan was fingerprinted under the name Parvez Manzoor Khan. Docs. 20-26, 20-27.

## C.  *Naturalization*

64. On December 12, 2005 (approximately four years after having been granted permanent residence status), Khan submitted a Form N-400 (Application for Naturalization). Doc. 1 ¶ 21; Doc. 10 ¶ 21; Doc. 20-17; Doc. 20-19; Doc. 25 at 73–74, 82–91.

65. The N-400:

    a. is under the name Parvez M. Khan, Doc. 20-17 at 4; Doc. 25 at 82;

    b. includes lines or strikethroughs indicating none under, "If you have ever used other names, provide them below," Doc. 20-17 at 4; Doc. 25 at 82;

    c. has a mark in a box under "Part 2. Information About Your Eligibility" indicating, "I have been a Lawful Permanent Resident of the United States for at least 3 years, AND I have been married to and living with the same U.S. citizen for the last 3 years, AND my wife has been a U.S. citizen for the last 3 years," Doc. 20-17 at 4; Doc. 25 at 82; and

d.  provides the birthyear 1957,[16] Doc. 20-17 at 5; Doc. 25 at 83.

66.  The N-400 has marks in "No" boxes next to:

a.  "Have you EVER been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or any other place?" (Part 10, Section B, Question 8.a). Doc. 20-19 at 1.

b.  "Have you EVER been in jail or prison?" (Part 10, Section D, Question 21). Doc. 20-19 at 2; Doc. 25 at 73, 89.

c.  "Have you EVER been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?" (Part 10, Section D, Question 16). Doc. 20-19 at 2; Doc. 25 at 73, 89.

d.  "Have you EVER given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" (Part 10, Section D, Question 23). Doc. 20-19 at 2; Doc. 25 at 73, 89.

e.  "Have you EVER lied to any U.S. government official to gain entry or admission into the United States?" (Part 10, Section D, Question 24). Doc. 20-19 at 2; Doc. 25 at 73, 89.

---

[16]The N-400 also provides a month and day of birth. Doc. 20-17 at 5; Doc. 25 at 83. For privacy, those are omitted here.

     f.   "Have you EVER been ordered to be removed, excluded, or deported from the United States?" (Part 10, Section E, Question 27). Doc. 20-19 at 3; Doc. 25 at 74, 90.

     g.   "Have you EVER applied for any kind of relief from removal, exclusion, or deportation?" (Part 10, Section E, Question 28). Doc. 20-19 at 3; Doc. 25 at 74, 90.

67.    On December 1, 2005, Khan signed the N-400 under penalty of perjury, affirming "that this application, and the evidence submitted with it, are all true and correct":



Doc. 20-19 at 4; Doc. 20-20 ¶ 7; Doc. 25 at 90.

68.    In his affidavit, Khan states:

     a.   "[He] did not remember the name on the passport [he] used in December 1991 when [he] filed [his] … N-400." Doc. 24 ¶ 34.

     b.   "[He] did not knowingly fail to disclose any aliases on [his] … N-400 since [he] did not remember the name on the passport[.]" Doc. 24 ¶ 48.

     c.   "[He] did not know when [he] filed [his] N-400 … that [he] had been ordered deported." Doc. 24 ¶ 37.

69.    The following year, on May 31, 2006, Lisa Pellechia with USCIS (or INS) since 1985, interviewed Khan. Doc. 20-20 ¶¶ 1, 4.

70.    In her affidavit, Pellechia states the following about standard agency procedures when she interviewed Khan:

a. She began interviews by confirming the applicant's identity with documentation such as a driver's license, state identification card, alien registration card, or passport. Doc. 20-20 ¶ 5.

b. Before asking questions, she placed the applicant under oath to tell the truth during the interview. Doc. 20-20 ¶ 5. If the applicant did not understand the oath or did not take the oath, she ended the interview for rescheduling. Doc. 20-20 ¶ 5.

c. After placing an applicant under oath, she questioned the applicant about the written information on the applicant's N-400. Doc. 20-20 ¶ 6.

d. With the applicant, she went through each part of the N-400 and asked the applicant to verify the written information on the N-400. Doc. 20-20 ¶ 6.

e. Next to each question she asked the applicant, she made a mark in red ink. Doc. 20-20 ¶ 6.

f. If the applicant answered consistently with the written information, she made a checkmark. Doc. 20-20 ¶ 6.

g. If the applicant answered differently from or needed to change or clarify the written information, she annotated the change or correction. Doc. 20-20 ¶ 6.

h. She numbered any changes or corrections and wrote the total number of the changes or corrections on the last page of the N-400. Doc. 20-20 ¶ 6.

71.    In her affidavit, Pellechia states she reviewed the A-File for Khan and found nothing suggests he did not understand the requirement to testify truthfully. Doc. 20-20 ¶ 5.

72.    In her affidavit, Pellechia states the following about questions and answers during the interview and what would have happened had Khan answered differently:

    a.   She asked him his current legal name (Part 1, Section A). Doc. 20-17 at 4; Doc. 20-20 ¶ 8; Doc. 25 at 82.

    b.   He responded Parvez Manzoor Khan. Doc. 20-17 at 4; Doc. 20-20 ¶ 8.

    c.   She corrected the N-400 to include the full middle name rather than just "M." Doc. 20-17 at 4; Doc. 20-20 ¶ 8; Doc. 25 at 82.

    d.   Had he told her he had used a name not disclosed on the N-400, she would have written that name on the N-400 and inquired further to determine his current legal name and whether he was the person named in the N-400. Doc. 20-20 ¶ 16.[17]

    e.   She asked him his date of birth (Part 3, Section B). Doc. 20-17 at 5; Doc. 20-20 ¶ 9.

    f.   He responded 1957.[18] Doc. 20-17 at 5; Doc. 20-20 ¶ 9; Doc. 25 at 83.

---

[17]There is no red mark next to, "If you have ever used other names, provide them below," Doc. 20-17 at 4; Doc. 25 at 82, suggesting Pellechia did not ask him about that statement during the interview, Doc. 20-20 ¶ 6.

[18]Khan also provided a month and day of birth. Doc. 20-17 at 5; Doc. 20-20 ¶ 9; Doc. 25 at 83. For privacy, those are omitted here.

g.  Had he told her his date of birth was incorrect, she would have corrected it on the N-400 and inquired further to determine his true date of birth. Doc. 20-20 ¶ 17.

h.  She asked him, "Have you EVER been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?" (Part 10, Section D, Question 16). Doc. 20-19 at 2; Doc. 20-20 ¶ 10; Doc. 25 at 73, 89.

i.  He orally changed his written "No" to convey he had been arrested in Miami-Dade County for procuring a prostitute in April 1995, but the charge had been nolle prossed. Doc. 20-19 at 2; Doc. 20-20 ¶ 10; Doc. 25 at 73, 89. He told her there were "no others." Doc. 20-19 at 2; Doc. 20-20 ¶ 10; Doc. 25 at 73, 89.

j.  Had he told her he had been detained by INS when he first arrived in the United States, she would have inquired further to determine what happened next, including whether any removal, deportation, or exclusion proceedings had been initiated and why the information was not in his A-File. Doc. 20-20 ¶ 18. His case would have been continued to obtain any other related files that could have led to denial of the N-400. Doc. 20-20 ¶ 18.

k.  She asked him, "Have you EVER given false or misleading information to any U.S. government official while applying for any information benefit or to prevent deportation, exclusion, or removal?" (Part 10, Section D, Question 23). Doc. 20-19 at 2; Doc. 20-20 ¶ 11; Doc. 25 at 73, 89.

l. He told her he had not. Doc. 20-19 at 2; Doc. 20-20 ¶ 11; Doc. 25 at 73, 89.

m. Had he told her he had, she would have inquired further and ended the interview so the N-400 could be further reviewed because that information could have led to denial of the N-400. Doc. 20-20 ¶ 19.

n. She asked him, "Have you EVER lied to any U.S. government official to gain entry or admission in the United States?" (Part 10, Section D, Question 24). Doc. 20-19 at 2; Doc. 20-20 ¶ 12; Doc. 25 at 73, 89.

o. He told her he had not. Doc. 20-19 at 2; Doc. 20-20 ¶ 12; Doc. 25 at 73, 89.

p. Had he told her he had, she would have inquired further and ended the interview so the case could be reviewed because that information could have led to denial of the N-400. Doc. 20-20 ¶ 20.

q. She asked him, "Have you EVER been ordered to be removed, excluded, or deported from the United States?" (Part 10, Section E, Question 27). Doc. 20-19 at 3; Doc. 20-20 ¶ 13; Doc. 25 at 74, 90.

r. He told her he had not. Doc. 20-19 at 3; Doc. 20-20 ¶ 13; Doc. 25 at 74, 90.

s. Had he told her he had, she would have ended the interview to search for any related files to decide whether he was eligible for naturalization. Doc. 20-20 ¶ 21.

t.  She asked him, "Have you EVER applied for any kind of relief from removal, exclusion, or deportation?" (Part 10, Section E, Question 28). Doc. 20-19 at 3; Doc. 20-20 ¶ 14; Doc. 25 at 74, 90.

u.  He told her he had not. Doc. 20-19 at 3; Doc. 20-20 ¶ 14; Doc. 25 at 74, 90.

v.  Had he told her he had, she would have ended the interview and inquired further to determine whether his application and status were consistent with his application and prior status. Doc. 20-20 ¶ 22.

73.  In her affidavit, Pellechia states at the end of the interview, consistent with standard practice, she presented the N-400 with annotations to Khan and asked him if anything else needed to be added or corrected. Doc. 20-20 ¶ 15.

74.  In her affidavit, Pellechia states she witnessed Khan sign the N-400 under penalty of perjury, swearing and affirming "that I know that the contents of this application for naturalization subscribed by me, including corrections number 1 through 11 … are true and correct to the best of my knowledge and belief" (Part 13):

Complete Signature of Applicant

*Parvez Khan*

Doc. 1 ¶ 30; Doc. 10 ¶ 30; Doc. 20-19 at 4; Doc. 20-20 ¶ 15; Doc. 25 at 91.

75.  In his affidavit, Khan states, "The N-400 … form[] ha[s] written changes not made by [him]. Any changes in red were done by an immigration officer, not [him]. Some changes are not accurate. [He] was misquoted." Doc. 24 ¶ 46.

76.  On May 31, 2006, the N-400 was approved. Doc. 20-17 at 4; Doc. 25 at 82.

77.    On July 3, 2006, based on the approval of the N-400, Khan was administered the oath of allegiance, admitting him to United States citizenship, and was issued Certificate of Naturalization Number 29940612. Doc. 1 ¶ 32; Doc. 10 ¶ 32; Doc. 20-21.

78.    Khan remains a naturalized United States citizen. Doc. 1 ¶ 6; Doc. 10 ¶ 6.

79.    In their affidavits, Khan and Suhail Khan state Khan remains married to Mrs. Khan and has two children born in the United States. Doc. 23 ¶ 16; Doc. 24 ¶¶ 54, 55.

80.    In his affidavit, Khan states he is a truck driver and lives in Branford, Florida. Doc. 24 ¶¶ 56, 57.

## D.    Interview at San Francisco International Airport

81.    On November 13, 2013 (approximately seven years after obtaining citizenship), Khan arrived at San Francisco International Airport aboard United Airlines Flight 838 and presented a valid United States passport. Doc. 1 ¶ 33; Doc. 10 ¶ 33.

82.    As Khan passed through the immigration area, CBP enforcement officers determined he matched several identities. Doc. 20-23 at 9 (depo. at 27:19–23).

83.    Eduardo Reveles and Xiomara Flores, CBP enforcement officers, interviewed Khan. Doc. 20-23 at 8 (depo. at 21–22).

84.    In accordance with standard procedure, Reveles and Flores determined Khan understood English and was physically well enough to answer their questions, and completed a health questionnaire. Doc. 20-22 at 7, 25 (depo. at 19–27; depo. ex. 2); Doc. 20-23 at 24 (depo. ex. 2); *accord* Doc. 20-23 at 9 (depo. at 25:15–20).

85.     Reveles explained, "Generally at the international airport a lot of our passengers are coming, you know, from a long flight. They're tired. Perhaps they're hungry; so we address that. We address if they need the restroom, water, et cetera. … Are they on medication? We just want to make sure that they're feeling okay. Ultimately the person's health and safety is [sic] more important than, you know, any question we may have[.]" Doc. 20-22 at 7 (depo. at 19:15–20:2).

86.     Khan told the officers he was not taking medication, had not been drinking alcohol, had not been using narcotics or illicit drugs, and had no health problems. Doc. 20-22 at 8, 25 (depo. at 23:18–24:24; depo. ex. 2); Doc. 20-23 at 8–9, 24 (depo. at 22:17–23:17; depo. ex. 2).

87.     Reveles checked responses on the health questionnaire conveying Khan appeared alert and coherent, answered questions rationally, and did not appear to be under the influence of alcohol or narcotics, and then Reveles signed the questionnaire. Doc. 20-22 at 9, 25 (depo. at 25:3–26:4; depo. ex. 2); Doc. 20-23 at 8, 24 (depo. at 24:9–15; depo. ex. 2).

88.     Khan also signed the health questionnaire:

AND I UNDERSTAND WHA

Signature

Doc. 20-22 at 8–9, 25 (depo. at 24:25–25:2; depo. ex. 2); Doc. 20-23 at 8, 24 (depo. at 23:18–20; depo. ex. 2).

89.     Khan waived his right to remain silent, and the officers witnessed him sign a waiver form. Doc. 20-22 at 9, 24 (depo. at 28:8–11; depo. ex. 2); Doc. 20-23 at 9, 23 (depo. at 25:1–7; depo. ex. 2).

90.     After being apprised of his *Miranda* rights, Khan admitted he had tried to enter the United States with an altered passport in 1991 and had been detained for fifteen days by immigration officers. Doc. 1 ¶ 34; Doc. 10 ¶ 34; Doc. 20-22 at 10 (depo. at 30:6–15, 31:3–13); Doc. 20-23 at 9–10 (depo. at 28:1–14, 29:8–17).

91.     Reveles recalls Khan was "cordial," was "very friendly and cooperative," was "pretty forthcoming," "wasn't rude," "wasn't unfriendly," and "smiled a lot." Doc. 20-22 at 12 (depo. at 39:6–7, 12–13; 40:7–11). Reveles could recall no hostility. Doc. 20-22 at 12 (depo. at 40:9).

92.     Flores prepared a written memorandum documenting the encounter and recording Khan's verbal admissions. Doc. 20-22 at 26–27 (depo. ex. 3); Doc. 20-23 at 9, 25–26 (depo. at 26:13–27:16; depo. ex. 3).

93.     CBP detained Khan's United States passport for about two months and then returned it to him around January 11, 2014. Doc. 20-22 at 10–11, 28–33 (depo. at 32:1–36:10; depo. exs. 4–7).

94.     In his affidavit, Khan states the following about the encounter:

a.    "It was not until [he] was taken aside by immigration authorities at the San Francisco airport … that [he] was told what name was on that passport. The inspector explained that USCIS had found [his] initial immigration entry to the U.S. from 1991. She wrote in her statement that [he] told her all of this. This is not correct. She told [him] and then asked [him] if what she said was true." Doc. 24 ¶ 35.

b.    "It was not until this lawsuit that [he] saw the passport [he] used in December 1991. The immigration officer took the passport from [him] on December 7, 1991." Doc. 24 ¶ 36.

## E.    Interview at Abu Dhabi

95.    On March 2, 2014 (approximately three-and-a-half months after the encounter at San Francisco airport), Khan presented himself for inspection at Abu Dhabi preclearance with a valid United States passport.[19] Doc. 1 ¶ 35; Doc. 10 ¶ 35.

96.    Khan was referred to secondary inspection, where Sarah Wescott, a CBP enforcement officer, inspected him. Doc. 20-24 at 8 (depo. at 23:9–10).

97.    CBP's information revealed Khan's fingerprints were linked to several identities. Doc. 20-24 at 8, 11 (depo. at 23:11–15, 36:12–14).

98.    Khan agreed to provide a statement. Doc. 20-24 at 8 (depo. at 23:16–20).

99.    Wescott typed her questions and Khan's answers as they were asked and answered and recorded what was said as close to verbatim as possible. Doc. 20-24 at 9 (depo. at 27:12–28:5).

100.    Wescott recorded the questions and answers on a Form I-877 (Record of Sworn Statement). Doc. 20-24 at 8 (depo. at 22:5–23:15; depo. ex. 2).

101.    Khan told Wescott when he had first arrived in the United States, he used a passport under Mohammad Akhtar but obtained permanent residency under Parvez Khan and naturalized under Parvez Manzoor Khan. Doc. 20-24 at 8–9 (depo. at 25:11–13, 26:18–27:11).

102.    Khan told Wescott on his initial entry to the United States he had presented a Pakistani passport under Mohammad Akhtar; INS had detained him; he had gone before an immigration judge; and he had requested asylum. Doc. 1 ¶ 36; Doc. 10 ¶ 36; Doc. 20-24 at 31–34 (depo. ex. 2).

---

[19]With some exceptions, preclearance is the same immigration and customs inspection that would be done at a port of entry in the United States, but the inspection occurs abroad before embarkation. Doc. 20-24 at 5 (depo. at 12:19–13:17).

103.    Wescott recalled the encounter with Khan because he was not unpleasant, which is unusual for someone in secondary inspection. Doc. 20-24 at 10 (depo. at 31:3–12). She explained, "[S]ometimes in secondary, people aren't pleasant, so when people are pleasant, it's a standout moment. And he wasn't unpleasant to [her]." Doc. 20-24 at 10 (depo. at 31:10–12).

104.    Wescott later created a Form I-213 (Record of Deportable/Inadmissible Alien). Doc. 20-24 at 10–11, 35–36 (depo. at 33:6–34:8; depo. ex. 3).

105.    Wescott summarized her findings on the I-213 and included Khan's photograph and fingerprints of his right and left index fingers. Doc. 20-24 at 11, 35–36 (depo. at 36:5–37:8; depo. ex. 3).

106.    In his affidavit, Khan states, "By the time [he] was stopped again by U.S. immigration authorities on March 2, 2014 at the Abu Dhabi airport and questioned, the immigration authorities in San Francisco had already told [him] the name on the passport when [he] entered the U.S. on December 7, 1991. That name erroneously appeared on [his] I-589 application." Doc. 24 ¶ 50.

## F.    *Initiation of this Lawsuit*

107.    On September 8, 2016 (approximately two-and-a-half years after the encounter in Abu Dhabi), the DHS OIG issued a report titled, "Potentially Ineligible Individuals Have Been Granted U.S. Citizenship Because of Incomplete Fingerprint Records." Doc. 28 at 3.

108.    The report explains,

USCIS granted U.S. citizenship to at least 858 individuals ordered deported or removed under another identity when, during the naturalization process, their digital fingerprint records were not available. The digital records were not available because although USCIS procedures require checking applicants' fingerprints against both the Department of Homeland Security's and the Federal Bureau of Investigation's (FBI) digital fingerprint repositories, neither contains all

old fingerprint records. Not all old records were included in the DHS repository when it was being developed. Further, U.S. Immigration and Customs Enforcement (ICE) has identified[] about 148,000 older fingerprint records that have not been digitized of aliens with final deportation orders or who are criminals or fugitives. The FBI repository is also missing records because, in the past, not all records taken during immigration encounters were forwarded to the FBI. As long as the older fingerprint records have not been digitized and included in the repositories, USCIS risks making naturalization decisions without complete information and, as a result, naturalizing additional individuals who may be ineligible for citizenship or who may be trying to obtain U.S. citizenship fraudulently.

As naturalized citizens, these individuals retain many of the rights and privileges of U.S. citizenship, including serving in law enforcement, obtaining a security clearance, and sponsoring other aliens' entry into the United States. ICE has investigated few of these naturalized citizens to determine whether they should be denaturalized, but is now taking steps to increase the number of cases to be investigated, particularly those who hold positions of public trust and who have security clearances.

Doc. 28 at 4.

109.    The report recommends "that ICE finish uploading into the digital repository the fingerprints it identified and that DHS resolve these cases of naturalized citizens who may have been ineligible." Doc. 28 at 4.

110.    One year later, on September 19, 2017, the DOJ Office of Public Affairs published a press release about this lawsuit and two others. Doc. 27.

111.    The press release describes the allegations in the lawsuits and provides:

"The Justice Department is committed to preserving the integrity of our nation's immigration system, and in particular, the asylum and naturalization processes," said Acting Assistant Attorney General Chad A. Reader of the Justice Department's Civil Division. "The civil complaints charge that defendants in these cases exploited our immigration system and unlawfully secured the ultimate immigration benefit of naturalization. The filing of these cases sends a clear message to immigration fraudsters—if you break our immigration laws, we will prosecute you and denaturalize you."

The three cases, United States of America v. Parvez Manzoor Khan (M.D. Fla.); United States of America v. Rashid Mahmood (D. Conn.); and United States of America v. Baljinder Singh (D.N.J.) were referred to the Department of Justice by USCIS and identified as part of Operation Janus. A Department of Homeland Security initiative, Operation Janus identified about 315,000 cases where some fingerprint data was missing from the centralized digital fingerprint repository. Among those cases, some may have sought to circumvent criminal record and other background checks in the naturalization process. These cases are the result of an ongoing collaboration between the two departments to investigate and seek denaturalization proceedings against those who obtained citizenship unlawfully.

"Naturalization is one of the most sacred honors bestowed by our nation," said Acting USCIS Director James W. McCament. "USCIS takes great care and responsibility in determining to refer a case for denaturalization proceedings. We do so to send the strong message that individuals who seek to defraud the United States by obtaining naturalization unlawfully will be targeted to have their U.S. citizenship stripped. I am grateful for the USCIS team who devoted countless hours to the painstaking work of uncovering fraud in each of these cases."

Doc. 27 at 3.

## G. Other

112. If Khan were to be fingerprinted again, his fingerprints would match those taken under the names Mohammad Akhtar, Jaweed Khan, and Parvez Manzoor Khan. Docs. 20-28, 20-29.

113. In his affidavit, Khan states the following about this lawsuit and his intentions:

 a. "[He] did not know until this lawsuit that USCIS did not have [his] fingerprints from December 7, 1991 in its data base [sic] when [he] filed [his] I-485 and N-400. [He] knew INS had [his] fingerprints from Dec. 7, 1991." Doc. 24 ¶ 41.

 b. "It is unfair and unjust for the [government] to make [him] a scapegoat because it did not access [his] fingerprints from

December 7, 1991 when [he] applied for [his] I-485 and N-400."
Doc. 24 ¶ 42.

    c.  "[He] always thought [he] was legally in the U.S. [He] would not knowingly lie or give false or misleading statements to the INS since [he] knew INS had [his] information and fingerprints from Dec. 1991 and January, 1992." Doc. 24 ¶ 53.

    d.  "[He has] not engaged in any intentional or knowing, misleading or false statement in support of [his] application to the U.S. for immigration benefits." Doc. 24 ¶ 3.

114.    In his affidavit, Suhail Khan states the following about Khan's intentions:

    a.  Khan "had nothing to hide from the INS, especially since INS had his fingerprints from December 7, 1991 and could have easily compared those to the prints taken from him for his I-485 or N-400 proceedings." Doc. 23 ¶ 18.

    b.  Khan never knew he had been subject to any order of deportation or removal. Doc. 23 ¶ 15.

    c.  Khan "has a good reputation for telling the truth when he is given a chance to explain or if he is asked the right questions." Doc. 23 ¶ 17.

## II.   Standards

A court must grant summary judgment on a claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by citing

depositions, affidavits, stipulations, or other materials or by showing "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

An affidavit "to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). An affidavit may not be conclusory. *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc). But an affidavit that satisfies the requirements of personal knowledge, admissibility, and competency may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated. *Id.* at 854, 858–59.

In deciding a motion for summary judgment, a court must consider the relevant burdens of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The court must draw all inferences and review all evidence in the light most favorable to the nonmovant. *Ft. Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F. 3d 1235, 1239 (11th Cir. 2018). The court may not weigh conflicting evidence or make credibility determinations. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

"When a district court renders summary judgment, the only required finding is that there is no genuine issue as to any material fact. If any fact issues exist a trial judge must not make findings but is required to deny the motion and proceed to trial." *Georgia State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotation marks and quoted authority omitted). "In practice, cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Id.* (internal quotation marks and quoted authority omitted). If the parties proceed on the same legal theory and rely on the same material facts, summary judgment is

appropriate. *Id.* But if the parties respond to each respective summary judgment motion with disputes about "undisputed facts," add "material facts" of their own, and object to the other party's additional facts, the mere filing of cross motions for summary judgment does not warrant summary judgment. *Id.*

If a case is a nonjury case and there is no issue of witness credibility, the court "may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though [the] decision may depend on inferences to be drawn from what has been incontrovertibly proved." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir. 1978). "Hearing and viewing the witnesses subject to cross-examination would not aid the determination if there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony. The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial." *Id.* at 1124.

"A court, in its discretion in shaping the case for trial, may deny summary judgment as to portions of the case that are ripe therefor, for the purpose of achieving a more orderly or expeditious handling of the entire litigation." *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975); *see also* Fed. R. Civ. P. 56, adv. comm. notes (2010 amends.) ("[The court] may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial.").

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[.]" *Celotex*, 477 U.S. at 323. But a court may grant summary judgment on a claim or defense even if not requested insofar as doing so would be compatible with the purpose of Rule 56. *Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 786 (5th Cir. 1997).

If a party moves for final summary judgment, the responding party must raise in its opposition to the motion any defense that would preclude final summary

judgment. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001). "The availability of an affirmative defense is a question of law[.]" *Christiansen v. Wright Med. Tech., Inc.*, 851 F.3d 1203, 1215 (11th Cir. 2017).

"If the court does not grant all the relief requested …, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). The standard for this rule is the same as the standard for summary judgment on the merits. Fed. R. Civ. P. 56, adv. comm. notes (2010 amends.). This rule allows a court to "salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process by narrowing the triable issues." *D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 356 (E.D.N.Y. 2014) (quoted authority omitted). Whether to enter an order treating an undisputed material fact as established is discretionary. *Id.*

## III.    Law & Analysis

### A.    *Discovery Sanction Request*

During discovery, Khan provided initial disclosures under Federal Rule of Civil Procedure 26(a)(1)(A). Doc. 31-1. In them, he identified himself, his brother (Suhail Khan), his wife (Betty Louise Khan), and his son (Usman Khan) as persons likely to have discoverable information to support his defenses, and he specified the subjects of their information in a general manner. Doc. 31-1 at 2–3. He also identified fourteen documents from his A-Files as documents he may use to support his defenses. Doc. 31-1 at 3–4. He and Suhail Khan made their affidavits *after* the discovery period and *after* the government moved for summary judgment as a response to the motion and as support for his own motion for summary judgment. *See* Doc. 16 (order setting March 1, 2018, as the discovery deadline); Doc. 20 (United States' motion for summary judgment filed March 27, 2018); Docs. 23, 24 (affidavits dated April 6, 2018); Doc. 30 (Khan's motion for summary judgment filed April 13, 2018).

Relying on Federal Rules of Civil Procedure 26(a)(1)(A)(ii), 26(e)(1)(A), and 37(c), the government argues the Court should not consider the affidavits, the DHS OIG report, or the DOJ press release because Khan failed to disclose them in his initial disclosures or through supplementation of the disclosures.[20] Doc. 31 at 2–8. The government argues the failure was neither substantially justified nor harmless, contending "[t]here is no reasonable basis on which affidavits … concerning events that happened years and even decades ago could not have been completed, disclosed, and served during discovery." Doc. 31 at 6.

Rule 26(a)(1)(A) governs initial disclosures. A party must, without awaiting a discovery request, provide the other parties (1) "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses" and (2) "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i)–(ii).

Rule 26(e)(1)(A) governs supplementation of discovery. The rule provides that a "party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response … in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the

---

[20]The government also relies on Federal Rule of Civil Procedure 12(f). Doc. 31 at 3. Rule 12(f) provides, "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A pleading is a complaint, an answer to a complaint, an answer to a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer. Fed. R. Civ. P. 7(a). Rule 12(f) is inapplicable because it applies to pleadings, not to motions.

additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Rule 37(c) governs sanctions for failing to disclose or supplement discovery. The rule provides that, if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "In addition to or instead," the court, after providing an opportunity to be heard, may "impose other appropriate sanctions." Fed. R. Civ. P. 37(c)(1)(C).

Regarding Khan's and Suhail Khan's affidavits, neither the rules nor longstanding, customary practice supports the government's position. Khan complied with his initial witness disclosure obligations by disclosing persons—including himself and Suhail Khan—likely to have discoverable information to support his defenses and by generally specifying the subjects of their information. *See* Doc. 31-1 at 2–3. Nothing required him to disclose his and Suhail Khan's yet-to-be-prepared affidavits (or their content) offered under Rule 56(c)(4) to oppose the government's motion for summary judgment or to support his own motion for summary judgment. After he had identified himself and Suhail Khan in his initial disclosures, the government possessed discovery tools (depositions, interrogatories, and requests for production and admission) to identify and probe what they would say about the subjects within their knowledge. The government points to no discovery request it made that Khan should have but did not answer.

The government cites no case that stands for the proposition the government asserts: "[A] self-serving affidavit based on personal knowledge still must be disclosed prior to the close of discovery to be properly considered at summary judgment." Doc. 31 at 6 n.3. Indeed, the unsupported proposition fails to recognize that Rule 56 contemplates such affidavits. *See* Fed. R. Civ. P. 56(c)(4).

The government cites *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), for the Supreme Court's observation that a party is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue. Doc. 31 at 6. That observation is unremarkable and well short of a holding that a party must disclose during discovery yet-to-be-made sworn statements of persons offered to support or oppose summary judgment when those persons have been identified in initial disclosures.

The government cites *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1361-62 (11th Cir. 2008); *Reese v. Herbert*, 527 F.3d 1253, 1264–65 (11th Cir. 2008); and *Longhini v. West 97 Corp.*, No. 15-cv-22874, 2016 WL 3671870, at *3– 4 (S.D. Fla. Jul. 11, 2016) (unpublished), with these respective parentheticals: "disclosure of affidavit after close of discovery violated Rule 26," "affirming exclusion of affidavit submitted after close of discovery," and "explaining 'Rule 26 exists to allow parties to prepare their case adequately and to prevent surprise' and excluding evidence disclosed six days after close of discovery." Doc. 31 at 6–7. Those cases are inapposite. Each applied Rule 26(a)(2), which governs expert witness disclosure obligations and requires disclosure of a complete statement of all opinions a trial expert will express. *See* Fed. R. Civ. P. 26(a)(2). Khan and Suhail Khan are lay witnesses, not experts subject to the obligations for expert witnesses under Rule 26(a)(2).

The government cites *Bank of Am., N.A. v. St. Louis*, No. 8:11-cv-1745-T-27EAS, 2012 WL 12905987, at *4 & *7 (M.D. Fla. Dec. 20, 2012) (unpublished), for its statement, "Defendants may not avoid summary judgment with a conclusory affidavit that asserts new or markedly different [facts] asserted for the first time after discovery has closed." Doc. 31 at 6. That case likewise is inapposite. There, the court held an affidavit could not defeat summary judgment because statements in it were conclusory and contradicted the affiant's deposition testimony, written discovery, and counterclaim. *Bank of Am.*, 2012 WL 12905987 at *3, *7. The government points to

no conclusory statement in the affidavits that contradicts deposition testimony or other statements made in the course of this litigation. *See generally* Doc. 31 at 6.

The government points to its own disclosure of Pellechia's declaration during the discovery period "[b]y way of comparison." Doc. 31 at 4 n.2; *see* Doc. 31-1 at 17. Pellechia executed the declaration on December 12, 2017, and the government disclosed it on February 12, 2018, during the discovery period. Insofar as the government had the declaration in its possession, custody, or control during the discovery period, the comparison is not apt, and, in any event, the government's voluntary disclosures do not set the standard for Rules 26(a)(1)(A) and 26(e)(1)(A).

In short, in deciding the motions for summary judgment, it is appropriate to consider Khan's and Suhail Khan's affidavits.

Regarding the press release and DHS OIG report, assuming without deciding Khan should have disclosed them under Rules 26(a)(1)(A) and 26(e)(1)(A) despite their public availability and government authorship,[21] a Rule 37(c) sanction is unwarranted because failing to disclose them is harmless. The government itself prepared the press release about this very lawsuit, and the press release appears to reference the findings in the DHS OIG report. In a sense, the government itself brought the documents into the lawsuit and thus can express no surprise over their appearance. In any event, the government's primary complaint appears to concern Khan's and Suhail Khan's affidavits, and neither the press release nor the DHS OIG report is material to the outcome of the motions. They are for mere background or context for this lawsuit (at the least) and for support of equitable affirmative defenses (at the most) that, as explained below, are unavailable to Khan as a matter of law.

---

[21]Some courts interpret Rule 26(a)(1) to require disclosure of publicly available documents to avoid trial by surprise. *See, e.g., Shatsky v. Syrian Arab Rep.*, 312 F.R.D. 219, 223 (D.D.C. 2015) (citing cases).

## B.      *Summary Judgment Motions*

### 1.      *8 U.S.C. § 1451(a)*

The law under which the government sues, 8 U.S.C. § 1451(a), provides:

> It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization **on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation**, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively[.]

8 U.S.C. § 1451(a) (emphasis added). Thus, there are two grounds on which United States Attorneys must institute denaturalization proceedings: (1) naturalization was illegally procured; and (2) naturalization was procured by concealment of a material fact or by willful misrepresentation. *Id.* Here, the government proceeds on both grounds and, on the illegal-procurement ground, under two theories.

### 2.      *Burden*

"[T]he right to acquire American citizenship is a precious one." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). "[O]nce citizenship has been acquired, its loss can have severe and unsettling consequences." *Id.* Considering the importance of the right that is at stake, the government has a "heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello v. United States*, 365 U.S. 265, 269 (1961). The evidence must be "clear, unequivocal, and convincing" and "not leave[] the issue in doubt." *Schneiderman v. United States*, 320 U.S. 118, 125 (1943) (citation and internal quotation marks omitted). The Supreme Court has likened the

standard to the beyond-a-reasonable-doubt standard in a criminal case. *See Klapprott v. United States*, 335 U.S. 601, 612 (1949). "Any less exacting standard would be inconsistent with the importance of the right that is at stake[.]" *Fedorenko*, 449 U.S. at 505–06. Indeed, "in reviewing denaturalization cases, [the Supreme Court has] carefully examined the record" itself. *Id.* at 505 (citing *Costello*, 365 U.S. 265, *Chaunt v. United States*, 364 U.S. 350 (1960)*, Nowak v. United States*, 356 U.S. 660 (1958), and *Baumgartner v. United States*, 322 U.S. 665 (1944)).

"At the same time, … there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Id.* at 506. Failure to comply with a prerequisite "renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside" under § 1451(a). *Id.* If the government satisfies its burden, the court "lack[s] equitable discretion to refrain from entering a judgment of denaturalization[.]" *Id.* at 517 (quoting § 1451(a)); *accord United States v. Jean-Baptiste*, 395 F.3d 1190, 1192 (11th Cir. 2005). The Supreme Court has explained,

> An alien who seeks political rights as a member of this nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare.
>
> …
>
> No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it … and demand its cancelation unless issued in accordance with such requirements. If procured when prescribed qualifications have no existence in fact, it is illegally procured; a manifest mistake by the judge cannot supply these nor render their existence nonessential.

*United States v. Ginsberg*, 243 U.S. 472, 474–75 (1917). "[I]nsistence on strict compliance with the [prerequisites] is simply an acknowledgment … that Congress alone has the constitutional authority to prescribe rules for naturalization, and the

courts' task is to assure compliance with the particular prerequisites to the acquisition of United States citizenship by naturalization legislated to safeguard the integrity of this priceless treasure." *Fedorenko*, 449 U.S. at 506–07 (internal quotation marks and quoted authority omitted).

Under those standards, "summary judgment for the government in a denaturalization proceeding is warranted in narrow circumstances: if, viewing the evidence in the light most favorable to the naturalized citizen, there is no genuine issue of material fact as to whether clear, unequivocal, and convincing evidence supports denaturalization." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012); *accord United States v. Hirani*, 824 F.3d 741, 748 (8th Cir. 2016).

### 3. *Asserted Grounds for Denaturalization*

For count I, the government seeks Khan's denaturalization on the ground his naturalization was illegally procured because he was ineligible to naturalize due to his lack of good moral character during the pertinent time period. Doc. 1 ¶¶ 44–53. The government contends he did not have the requisite good moral character during the pertinent time period because he provided false testimony during his N-400 interview with Pellechia.[22] Doc. 1 ¶ 48.

---

[22]For count I, the government points to four representations Khan assertedly made under oath during his N-400 interview with Pellechia. First, the government points to Khan's asserted representation he has never been detained by a law enforcement officer except for an arrest in Miami despite that he was detained upon arrival in the United States for at least fifteen days. Doc. 1 ¶¶ 48, 49. Second, the government points to Khan's asserted representation under oath he has never given false or misleading information to any federal government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal despite that: he used an altered passport to enter the United States; the I-589 and I-485 provide different names, birthdays, and parent names; the I-589 provides only the names Jaweed Khan and Mohammad Akhtar; the I-485 provides no aliases; the I-485 provides he entered in 1990, he entered without inspection, and Miami was his place of last entry into the United States; and the I-485 provides he has not used fraud or a willful misrepresentation of a material fact to procure a visa, other documentation, entry into the United States, or any other immigration benefit. Doc. 1 ¶¶ 48, 49; Doc. 20 at 12–14. Third, the government points to Khan's

No person may be naturalized unless he "has been and still is a person of good moral character" from the five years immediately preceding the date of filing his N-400 (or from the three years immediately preceding the date of filing his N-400 if his spouse is a United States citizen and he has been living in marital union with his spouse during that time period) to his admission to citizenship.[23] 8 U.S.C. §§ 1427(a), 1430(a); 8 C.F.R. §§ 316.2(a)(7), 316.10(a), 319.1(a). An applicant may not be regarded as or found to be a person with good moral character if, during the pertinent time period, he has given "false testimony for the purpose of obtaining" an immigration or naturalization benefit.[24] 8 U.S.C. § 1101(f)(6); 8 C.F.R. § 316.10(b)(2)(vi).

---

asserted representation under oath he has never been ordered to be removed, excluded, or deported from the United States despite that Judge Daniel had ordered him excluded and deported. Doc. 1 ¶¶ 48, 49. Fourth, the government points to Khan's asserted representation he has never applied for relief from removal or deportation despite that he had applied for asylum. Doc. 1 ¶¶ 48, 49.

[23]In the good cause affidavit to support the complaint, the affiant explains, "As an applicant for naturalization under section 319 of the INA, ... Khan was required to establish that he was a person of good moral character during the period beginning three years prior to the filing of his application for naturalization and continuing until the time of admission to citizenship," and "Khan filed his application ... on December 12, 2005; accordingly, he was required to establish that he was a person of good moral character from December 12, 2002, until the time of his admission to citizenship on July 3, 2006." Doc. 1-1 ¶¶ 19, 20; *accord* Doc. 20-17 at 4 and Doc. 25 at 82 (N-400 box in "Part 2. Information About Your Eligibility" indicating Khan sought eligibility based on the three-year period based on marriage). In its motion for summary judgment, the government references only the five-year period, Doc. 20 at 1–2, 11, perhaps because the record contains no facts on whether Mr. and Mrs. Khan were actually living in marital union during the pertinent period. Regardless, whether the period is three or five years is immaterial here because the bases for the government's claim—statements to Pellechia during the March 31, 2006, interview—occurred during the three- and five-year periods alike.

[24]Conduct outside the five year period may be considered under appropriate circumstances: "In determining whether the applicant has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this section, the Attorney General shall not be limited to the applicant's conduct during the five years preceding the filing of the application, but may take into consideration as a basis for such determination the applicant's conduct and acts at any time prior to that period." 8 U.S.C. § 1427(e).

The testimony need not be material, *United States v. Kungys*, 485 U.S. 759, 779 (1988), "in the sense that if given truthfully it would have rendered [the applicant] ineligible for benefits," 8 C.F.R. § 316.10(b)(2)(vi). But the testimony (1) must be oral (neither a written statement nor a concealment qualifies), (2) must be made under oath, and (3) must be made with the subjective intent to obtain an immigration benefit. *Kungys*, 485 U.S. at 779–80; 8 C.F.R. § 316.10(b)(2)(vi).

"It is only dishonesty accompanied by [subjective intent to obtain an immigration benefit] that Congress found morally unacceptable." *Kungys*, 485 U.S. at 780 (quoted authority omitted). "Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, [are not] sufficiently culpable to brand the applicant as someone who lacks good moral character." *Id.* (quoted authority omitted).

Whether someone had possessed the subjective intent to obtain an immigration benefit is a question of fact that must be proven by clear, unequivocal, and convincing evidence that does not leave the issue in doubt. *Id.* at 781. Although the testimony need not be material, "it will be relatively rare that the Government will be able to prove that a misrepresentation that does not have the natural tendency to influence the decision regarding immigration or naturalization benefits was nonetheless made with the subjective intent of obtaining those benefits." *Id.* at 780–81.

For count II, the government seeks Khan's denaturalization on the ground he procured his citizenship illegally because he was ineligible to naturalize. Doc. 1 ¶¶ 54–62. The government contends he was ineligible to naturalize because he had not been lawfully admitted for permanent residence due to his procurement of an immigration benefit (adjustment of status to lawful permanent resident) by misrepresentation of a material fact.[25] Doc. 1 ¶¶ 54–62.

---

[25]For count II, the government points to three representations Khan assertedly made in the I-485. First, the government points to Khan's asserted representations he

No person may be naturalized "unless he has been lawfully admitted to the United States for permanent residence[.]" 8 U.S.C. § 1429; *accord* 8 C.F.R. § 316.2(a)(2). "[L]awfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" 8 U.S.C. § 1101(a)(20). This definition means not just that the person was granted lawful-permanent-resident status but also that the grant of that status was in substantive compliance with the immigration laws. *Savoury v. U.S. Att. Gen.*, 449 F.3d 1307, 1317 (11th Cir. 2006).

"The status of an alien who was inspected and admitted or paroled into the United States … may be adjusted by the Attorney General, in his discretion … to that of an alien lawfully admitted for permanent residence" if "(1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." 8 U.S.C. § 1255(a); *accord* 8 C.F.R. § 245.1(a).

Under 8 U.S.C. § 1182(a)(6)(C)(i), "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i); *accord* 22 C.F.R. § 40.63.[26] Application of § 1182(a)(6)(C)(i) requires (1) fraud or

---

entered the United States without inspection in Miami in December 1990 despite that he actually had entered the United States with inspection in Los Angeles in December 1991. Doc. 1 ¶ 59; Doc. 20 at 15. Second, the government points to Khan's asserted representation he had never been in exclusion proceedings despite that he had. Doc. 20 at 15. Third, the government points to Khan's asserted representation he had never sought entry by fraud or willful misrepresentation despite that he had tried to gain admission to the United States using an altered passport under the name Mohammad Akhtar. Doc. 20 at 15–16.

[26]The Attorney General in his discretion may waive the application of the fraud-or-willful-misrepresentation provision under some circumstances:

willful misrepresentation (2) of a material fact (3) to procure an immigration benefit. 8 U.S.C. § 1182(a)(6)(C)(i).

For count III, the government seeks Khan's denaturalization on the ground he procured his citizenship by concealment of a material fact or by willful misrepresentation. Doc. 1 ¶¶ 63–69. The government contends he concealed and willfully misrepresented facts on the N-400.[27] Doc. 1 ¶¶ 65–66.

For denaturalization under § 1451(a) based on procurement of naturalization by concealment or misrepresentation, the government must establish (1) the

---

[I]n the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien or, in the case of a VAWA self-petitioner, the alien demonstrates extreme hardship to the alien or the alien's United States citizen, lawful permanent resident, or qualified alien parent or child.

8 U.S.C. § 1182(i).

[27]For count III, the government points to four representations Khan assertedly made on the N-400. First, the government points to Khan's asserted representation he had not ever been detained by any law enforcement officer except for an arrest in Miami despite that he was detained upon arrival in the United States for at least fifteen days. Doc. 1 ¶ 66; Doc. 20 at 18–19. Second, the government points to Khan's asserted representation he had not used other names despite that he had used the names Jaweed Khan and Mohammad Akhtar. Doc. 1 ¶ 66; Doc. 20 at 19. Third, the government points to Khan's asserted representation he has never given false or misleading information to any federal government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal despite that: he used an altered passport to enter the United States; the I-485 provides he entered in 1990, he entered without inspection, and Miami was his place of last entry into the United States despite that he arrived in Los Angeles in 1991 and was inspected and paroled; and the I-485 provides he had never been in exclusion proceedings despite that he had. Doc. 1 ¶ 66; Doc. 20 at 19–20. Fourth, the government points to Khan's asserted representation on the N-400 he had never applied for relief from removal or deportation despite that he had applied for asylum. Doc. 1 ¶ 66; Doc. 20 at 20. In the complaint, the government points to additional representations Khan assertedly made on the N-400 and in the interview with Pellechia. Doc. 1 ¶¶ 66, 67. The government does not rely on those in its motion for summary judgment. *See* Doc. 20 at 19–20.

naturalized citizen misrepresented or concealed a fact, (2) the misrepresentation or concealment was willful, (3) the fact was material, and (4) the naturalized citizen procured citizenship because of the misrepresentation.[28] *Kungys*, 485 U.S. at 767.

A misrepresentation is willful if made deliberately and with knowledge of its falsity. *Azim v. U.S. Att. Gen.*, 314 F. App'x 193, 194 (11th Cir. 2008) (addressing willfulness for § 1182(a)(6)(C)(i) and relying on *In re Healy & Goodchild*, 17 I. & N. Dec. 22, 28 (BIA 1979), and *In re S & B-C-*, 9 I. & N. Dec. 436, 445 (BIA 1960, A.G. 1961)). "Willfully" may be distinguished from "accidentally, inadvertently, or in a good faith belief that the factual claims are true." USCIS Policy Manual, Vol. 8, Part J, Ch. 3, § D.1; *accord Emokah v. Mukasey*, 523 F.3d 110, 116 (2d Cir. 2008) (addressing willfulness for § 1182(a)(6)(C)(i)). Willfulness does not require intent to deceive. *Ortiz-Bouchet v. U.S. Att. Gen.*, 714 F.3d 1353, 1356 (11th Cir. 2013) (addressing willfulness for § 1182(a)(6) and relying on *Matter of Kai Hing Hui*, 15 I. & N. Dec. 288, 290 (BIA 1975)); *see also United States v. Ahmed*, 735 F. App'x 863, 868 (6th Cir. 2018) (addressing willfulness for § 1451(a) and citing several appellate cases to support that a misrepresentation is willful if made deliberately and with knowledge of its falsity and willfulness and does not require intent to deceive).

A fact is material if it has a "natural tendency to influence" the immigration decision. *See Kungys*, 485 U.S. at 772 (addressing materiality under § 1451(a)). Materiality of a false statement is "measured in terms of its effect on the applicant's admissibility into this country." *Fedorenko*, 449 U.S. at 509 (addressing materiality

---

[28]The parties do not contend or present any reason why the standards for willfulness and materiality under § 1182(a)(6)(C)(i) and § 1451(a) should be different. *See United States v. Golding*, 162 F. Supp. 3d 1285, 1294 (S.D. Fla. 2016) (accepting the government's position that the standard for materiality under § 1182(a)(6)(C)(i) and § 1451(a) is the same and discerning no reason why they should be different considering both statutes pertain to whether an applicant misrepresented a material fact in an application for an immigration benefit).

under § 1451(a)). At a minimum, a misrepresentation is material "if disclosure of the true facts would have made the applicant ineligible" for the benefit sought. *Id.* at 749.

"[A] person whose lies throw investigators off a trail leading to disqualifying facts gets her citizenship by means of those lies—no less than if she had denied the damning facts at the very end of the trail." *Maslenjak v. United States*, 137 S. Ct. 1918, 1929 (2017) (discussing § 1451(a) in the context of its criminal counterpart, 18 U.S.C. § 1425(a)). In the criminal context, relying on the civil context, the Supreme Court held an "investigation-based theory" requires that (1) "the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, 'seeking only evidence concerning citizenship qualifications,' to undertake further investigation"; and (2) "the investigation 'would predictably have disclosed'" some legal disqualification. *Id.* (quoting *Kungys*, 485 U.S. at 774).

4.    *Analysis*

Cross motions for summary judgment in favor of one side or the other is unwarranted, though many facts—identified below—are material, not genuinely in dispute, and, under Rule 56(g), will be treated as established in the case, with hope of salvaging effort spent on the motions for summary judgment, streamlining the litigation, and narrowing the triable issues. *See D'Iorio*, 68 F. Supp. 3d at 356 (discussing purpose of Rule 56(g)).

The government is not entitled to summary judgment because, at a minimum, Khan has come forward with sufficient evidence to create a genuine issue of material fact on subjective intent for count I and willfulness (as distinguished from accidental, inadvertent, or in-good-faith belief) for counts II and III.

In Khan's affidavit, he states he acted neither intentionally nor knowingly deceptive when he sought immigration benefits, Doc. 24 ¶ 3, and he has always believed he was in the United States legally, Doc. 24 ¶ 53. Alone, those statements

arguably would be little more than a denial in a pleading insufficient to defeat summary judgment and would siren the caution that Rule 56 "would be rendered sterile" if "the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61–62 (2d Cir. 1998) (internal quotation marks and quoted authority omitted).

But Khan presents more. Besides those statements, he presents the following evidence that could pertain to intent or willfulness: evidence of a substantial language barrier, Doc. 23 ¶¶ 7–9; Doc. 24 ¶¶ 4–12, 14, 29, 31, 49; evidence of an uncommunicative and ineffective lawyer, Doc. 23 ¶¶ 4–6, 11–14; Doc. 24 ¶¶ 13, 15–23, 25–27, 37–38, 47–48, 50, 52; Doc. 26 at 3, 5–9, 58–64; evidence of a careless and time-strapped interviewer for the I-485, Doc. 24 ¶¶ 33, 43–45; evidence of a careless interviewer for the N-400, Doc. 24 ¶ 46; and evidence of imprecise questioning, imperfect memory, and misunderstandings, Doc. 23 ¶ 15; Doc. 24 ¶¶ 32–37, 48, 51–52; *cf.* Doc. 30 at 21 (argument that I-485 and N-400 questions are "vague, confusing and equivocal"). Khan also states in his affidavit he would not knowingly lie or give false or misleading statements to officials considering his belief they possessed his fingerprints and information and pointing out they considered the I-485 for more than two years. Doc. 24 ¶¶ 39, 41, 53; *see also* Doc. 23 ¶ 18 (Suhail Khan's statement Khan had nothing to hide considering officials possessed his fingerprints). And Suhail Khan states in his affidavit Khan has a good reputation for telling the truth when given a chance to explain or asked the right questions, Doc. 23 ¶ 17, a statement at least arguably corroborated by Reveles, *see* Doc. 20-22 at 12 (depo. at 39:6–7, 12–13; 40:7–11), and Wescott, *see* Doc. 20-24 at 8–10, 31–34 (depo. at 25:11–13, 26:18–27:11, 31:10–12, ex. 2).

Whether Khan's evidence is weak or unbelievable is not the issue. To decide the government's motion for summary judgment, the Court may not weigh conflicting evidence or assess Khan's credibility. *See Jones*, 683 F.3d at 1292 (explaining that weighing conflicting evidence or making credibility determinations are not matters

for deciding a motion for summary judgment). As the Supreme Court has cautioned, "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473 (1962).

Not insignificant is this triad: (1) the standard under which the Court must review the evidence and make all reasonable inferences in the light most favorable to Khan, (2) together with the general impropriety of deciding matters of willfulness and intent as a matter of law, (3) together with the government's clear-unequivocal-convincing-no-room-for-doubt burden. As the Supreme Court has cautioned, "[W]here the fate of a human being is at stake [in a denaturalization action], we must not leave the presence of his evil purpose to conjecture. Furthermore, we are dealing in cases of this kind with questions of intent. … Intent is a subjective state, illusory and difficult to establish in absence of voluntary confession. What may appear objectively to be false may still fall short of establishing an intentional misrepresentation[.]" *Knauer v. United States*, 328 U.S. 654, 659 (1946) (internal citation omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982) ("[Q]uestions of subjective intent so rarely can be decided by summary judgment."); *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir. 1984) ("[W]here subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable."); *accord* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2730 (2d ed. 1983).

Applying those principles in a denaturalization case, the Supreme Court remanded for a finding on intent rather than deciding intent as a matter of law. *Kungys*, 485 U.S. at 782. The Court observed that "issues of intent are factual matters for the trier of fact" and rejected the government's argument that a "so-called pattern of lies establishes the illegal subjective intent of [the alien's] alleged false testimony as a matter of law." *Id.*; *see also United States v. Tuteur*, 215 F.2d 415, 418 (7th Cir. 1954) (reversing summary judgment based on asserted fraudulent statements

because the defendant denied intent and thereby created a factual issue); *Ampe v. Johnson*, 157 F. Supp. 3d 1, 20 (D.D.C. 2016) ("Because the government has not shown that Petitioner indisputably committed fraud or willful misrepresentation, it is not entitled to summary judgment on the basis that Petitioner was inadmissible under … § 1182(a)(6)(C)(i)."); *United States v. Delroy Golding*, No. 14-cv-80514, 2015 WL 12001283, at *4 (S.D. Fla. July 24, 2015) (unpublished) ("Even assuming Golding provided false testimony, there is a dispute of material fact on the issue of intent."). It would be difficult to reconcile the Supreme Court's decision with a decision that Khan's intent or to a lesser extent willfulness (deliberateness and knowledge) may be determined as a matter of law based on the strength of the government's case.

Worth mentioning (but not a reason to deny summary judgment), a trial on Khan's intent and willfulness—should the trial result in denaturalization—would provide any reviewing court a robust record inclusive of credibility findings for when, as the Supreme Court has done, the reviewing court undertakes its own careful examination of the evidence to ensure satisfaction of the clear-unequivocal-convincing-no-room-for-doubt burden. *See Fedorenko*, 449 U.S. at 505.

The government correctly observes that, despite the government's "heavy burden of proof in a denaturalization case, summary judgment is appropriate when no genuine, triable issues of fact exist." *See* Doc. 20 at 10 (quoted). But this is most often the case when the issue is not subjective intent or willfulness. *See, e.g., United States v. Dor*, 729 F. App'x 793, 798 (11th Cir. 2018) (criminal conviction and related evidence established absence of good moral character during pertinent time period); *United States v. Hsu*, 695 F. App'x 393, 397–98 (10th Cir. 2017) (same); *United States v. Hongyan Li*, 619 F. App'x 298, 303 (5th Cir. 2015) (same); *United States v. Al-Aqaili*, 550 F. App'x 356, 357 (8th Cir. 2014) (same); *but see Hirani*, 824 F.3d at 748 (affirming summary judgment against defendant for willfully misrepresenting his name on N-400 because evidence showed his "habitual use" of another name throughout his life).

Khan is not entitled to summary judgment because he provides no basis for that relief.

Khan argues the government is estopped from pursuing denaturalization because it reasonably delayed bringing this lawsuit, resulting in loss of "substantial exculpatory evidence." Doc. 30 at 15.

That argument fails for at least two reasons. First, equitable doctrines are unavailable to defeat a denaturalization claim. *See Fedorenko*, 449 U.S. at 517; *Jean-Baptiste*, 395 F.3d at 1192. Second, as the government observes, Doc. 31 at 13, the argument fails because Khan points to no particular evidence lost.

Khan argues, "There is no proof that [he] lied. The [government] has not attached any transcript of proceedings showing he lied. This bar to naturalization applies only to oral testimony. Thus, false statements on written applications, be they under oath or not, do not bring the applicant within the purview of this statutory bar." Doc. 30 at 13 (citations omitted).

Khan presumably directs this argument to count I. The argument fails because the government bases the claim not on Khan's written statements on the N-400 but on his oral statements made to Pellechia under oath during the N-400 interview, *see* Doc. 1 ¶¶ 48, 49, and provided evidence of the oral statements through Pellechia's declaration, Doc. 20-20. Khan presents no authority—and the Court could find none— for the proposition that the government can prove oral testimony only through recordings or transcripts. *Cf. United States v. Puerta*, 982 F.2d 1297, 1301 n.2 (9th Cir. 1992) (in criminal action under § 1425(a), finding that examiner's testimony and marks on the N-400 sufficed to prove the defendant had given false oral testimony).

Khan observes, "Notwithstanding a Request to Produce from [Khan], the [government] has not provided any record or transcript of an interrogation or questioning from his December 1991 detention or Defendant's appearance in

[Executive Office for Immigration Review (EIOR)] in December 1991 or January 1992." Doc. 30 at 6.

Given the absence of authority that the government may prove oral testimony through transcripts only, Khan's observation appears to reference nothing more than a discovery matter not brought to the Court's attention during the discovery period and irrelevant now at the summary judgment stage.

Khan asserts, "Neither USCIS or its predecessor, INS, relied solely on his sworn statements. USCIS always does a fingerprint check. [The government's] own failure to do a proper fingerprint check is the real basis for this suit, but this basis is invalid as a matter of law. … The basis of the [government's] case is that it did not check his fingerprints from Dec. 7, 1991 to his prints from the I-485 and N-400 because they were not in the system. This is legally insufficient." Doc. 30 at 14 (internal citations omitted).

Whether the United States Attorney had a statutory obligation to bring this action comes down to whether Khan illegally procured his naturalization or procured it by concealment of a material fact or by willful misrepresentation. *See* 8 U.S.C. § 1451(a). Khan fails to show the relevancy of interagency communication failures or of their aftereffects. To the extent he attempts to invoke equity based on a theory that the government's asserted failures somehow trump his own asserted failures, equity is, as explained, unavailable to him. *See Fedorenko*, 449 U.S. at 517; *Jean-Baptiste*, 395 F.3d at 1192.

Khan appears to argue he could reopen the case before Judge Daniel based on failure to receive notice of the February 18, 1992, hearing or based on exceptional circumstances. *See* Doc. 30 at 6–13. Khan later observes he was paroled into the United States, argues he could apply for adjustment of status to that of a lawful permanent resident, and observes an alien with that status is deemed admitted. *See* Doc. 30 at 15–17. After stating, "This case is controlled by" *Maslenjak* and excerpting

substantial portions of *Maslenjak*, Khan then argues, "As applied to the instant case, the [government] has failed to show that even if its allegations are true, that this would have negatively affected [Khan's] naturalization. The facts … do not show that [Khan] was not entitled to citizenship."[29] Doc. 30 at 17–20. According to Khan, "The

[29]In *Maslenjak*, the Court considered what the government must prove for a conviction under 18 U.S.C. § 1425(a), which makes it a crime to "knowingly procure, contrary to law, the naturalization of any person." *Maslenjak*, 137 S. Ct. at 1923. Citing § 1451(e), the Court observed "when someone is convicted under § 1425(a) of unlawfully procuring her *own* naturalization, her citizenship is automatically revoked." *Id.* (emphasis in original).

The Court first held the government must prove that an illegal act by the defendant played some role in acquisition of citizenship. *Id.* The Court relied on the statutory text of § 1425(a) and the ordinary meaning of "to procure" ("to get possession of"). *Id.* at 1924. The Court explained the "most natural understanding" of § 1425(a) "is that the illegal act must have somehow contributed to the obtaining of citizenship." *Id.* The Court observed the "broader statutory context" reinforced its interpretation because the government's contrary interpretation "would create a profound mismatch between the requirements for naturalization on the one hand and those for denaturalization on the other." *Id.* at 1926. The Court explained, "The immigration statute requires all applicants for citizenship to have 'good moral character,' and largely defines that term through a list of unlawful or unethical behaviors. On the Government's theory, some legal violations that do not justify denying citizenship under that definition would nonetheless justify revoking it later." *Id.* at 1926–27 (internal citations omitted).

The Court held, "When the illegal act is a false statement, that means demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result." *Id.* at 1923. The Court added that the inquiry "turns on objective legal criteria" because the "entire system … is set up to provide little or no room for subjective preferences or personal whims." *Id.* at 1928. The Court specified, "To decide whether a defendant acquired citizenship by means of a lie, a jury must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law." *Id.*

The Court held, "When relying on … an investigation-based theory, the Government must make a two-part showing to meet its burden." *Id.* at 1929 (citing *Kungys*, 485 U.S. at 774–77). The Court specified, "As an initial matter, the Government has to prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials seeking only evidence concerning citizenship qualifications, to undertake further investigation." *Id.* at 1929 (internal quotation marks and quoted authority omitted). The Court continued, "If that much is true, the inquiry turns to the prospect that such an investigation would have borne disqualifying fruit. As to that second link in the causal chain, the Government need not show definitively that its investigation would have unearthed a disqualifying

alleged lies do not disqualify his permanent residency since he gained his residence [through] his bona fide marriage to a U.S. citizen. He was and still is eligible for permanent residence. He is qualified for citizenship since he has [met] the tests for naturalization and there is no showing … [he] intentionally lied or gave misleading testimony." Doc. 30 at 20–21 (citations omitted).

Khan's arguments are unclear. To the extent he argues he is entitled to summary judgment because he qualifies for naturalization, the argument fails. Even if *Maslenjak* could be said to apply here, Khan has not come forward with undisputed material facts establishing that he qualifies for naturalization as a matter of law.

Although summary judgment is inappropriate, the following numbered paragraphs (including their lettered subparagraphs) under section I of this order are deemed material, not genuinely in dispute, and, under Rule 56(g), will be treated as established in the case: 2–7, 12–16, 18–22, 24–27, 29, 31–33, 35–41, 44–52, 54–58, 60–67, 69, 76–78, 81–91, 93, 95–105, 112. The parties should prepare for the April trial accordingly.

---

fact (though, of course, it may). Rather, the Government need only establish that the investigation 'would predictably have disclosed' some legal disqualification." *Id.* (quoting *Kungys*, 108 S. Ct. at 774).

But the Court cautioned, "Even when the Government can make its two-part showing, however, the defendant may be able to overcome it. Section 1425(a) is not a tool for denaturalizing people who, the available evidence indicates, were actually qualified for the citizenship they obtained." *Id.* at 1930. The Court explained that when addressing § 1451(a), the Court provided a defendant an opportunity to rebut the government's case by showing by a preponderance of the evidence "'that the statutory requirement as to which [a lie] had a natural tendency to produce a favorable decision was in fact met'" or, "said otherwise, we gave the defendant a chance to establish that she was qualified for citizenship, and held that she could not be denaturalized if she did so—even though she concealed or misrepresented facts that suggested the opposite." *Id.* at 1930 (quoting and citing *Kungys*, 485 U.S. at 777). The Court emphasized, "We have never read a statute to strip citizenship from someone who met the legal criteria for acquiring it." *Id.* Thus, the Court concluded, "Whatever the Government shows with respect to a thwarted investigation, qualification for citizenship is a complete defense to a prosecution brought under § 1425(a)." *Id.*

## IV.     Conclusion

The Court **denies** the motions for summary judgment, Docs. 20, 30, except to the extent some facts are deemed material and established in the case.

**Ordered** in Jacksonville, Florida, on February 21, 2019.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     Counsel of Record