IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,            Jacksonville, Florida

        Plaintiff,                  Case No. 3:17-cv-965-J-PDB

vs.                                  April 2, 2019

PARVEZ MANZOOR KHAN,                 9:06 a.m.
A/K/A MOHAMMED AKHTAR,
A/K/A JAWEED KHAN,                   Courtroom No. 5B

        Defendant.
_____


                         BENCH TRIAL
           BEFORE THE HONORABLE PATRICIA D. BARKSDALE
                 UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

         Shannon M. Bishop, RDR, CRR, CRC
         221 North Hogan Street, #150
         Jacksonville, Florida  32202
         Telephone:  (904)549-1307
         dsmabishop@yahoo.com


     (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

**AARON R. PETTY, ESQ.**
US Department of Justice, Immigration Litigation
219 South Dearborn Street, 5th Floor
Chicago, IL 60604

**TIMOTHY MICHAEL BELSAN, ESQ.**
US Department of Justice, Immigration Litigation
Ben Franklin Station
PO Box 868
Washington, DC 20044

DEFENSE COUNSEL:

**JAMES R. LAVIGNE, ESQ.**
American Lawyers International, PLLC
7380 West Sand Lake Road, Suite 395
Orlando, FL 32819

**JOSEPH BOTHWELL MCFARLAND, ESQ.**
Joseph B. McFarland, P.A.
7380 West Sand Lake Road, Suite 500
Orlando, FL 32819

# T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE GOVERNMENT:

**PARVEZ MANZOOR KHAN**
Direct Examination................................  15
Cross-Examination................................ 105
Redirect Examination............................. 148
Recross-Examination.............................. 149
**LISA N. PELLECHIA**
Direct Examination............................... 152
Cross-Examination................................ 191
Redirect Examination............................. 233
Recross-Examination.............................. 238


WITNESSES FOR THE DEFENDANT:

**BETTY LOUISE KHAN**
Direct Examination............................... 249
Cross-Examination................................ 257
Redirect Examination............................. 273
**SUHAIL KHAN**
Direct Examination............................... 279
Cross-Examination................................ 290
Redirect Examination............................. 316

# E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

1......................................................  10
2......................................................  10
3......................................................  10
4......................................................  11
5......................................................  11
6......................................................  11
7 (under seal)......................................  12
8 (under seal)......................................  12
9......................................................  13
10.....................................................  14
11.....................................................  14
12.....................................................  14
13.....................................................  20
14.....................................................303

Defendant's Exhibits:

2.....................................................321
3 and 4...............................................323

Joint Exhibits:

1......................................................   9
2 (under seal)......................................   9

P R O C E E D I N G S

April 2, 2019                                          9:06 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Patricia D. Barksdale presiding.

Please be seated.

THE COURT:  Good morning.  We're on the record in *United States versus Khan*, 3:17-cv-965.  I'll ask lead counsel to please stand, introduce himself for the record, and introduce the people at counsel table, starting with the United States, please.

MR. PETTY:  Good morning, Your Honor.  Aaron Petty on behalf of the United States.  And with me is co-counsel Timothy Belsan.  And at counsel table also is our paralegal Daniel Meyer.

THE COURT:  Good morning.

MR. PETTY:  Good morning, Your Honor.

THE COURT:  For the defense.

MR. LAVIGNE:  Good morning, Your Honor.  On behalf of the Defendant, James Lavigne.  And my co-counsel, Joseph McFarland, and the Defendant, is sitting next -- to my left.

THE COURT:  All right.  Good morning.

MR. MCFARLAND:  Good morning.

THE COURT:  The folks in the courtroom are as

1　follows.  We have our courtroom deputy, I think most of you

2　have met, Angela Loeschen.  Our court reporter is Shannon

3　Bishop.  Law clerk, Katherine Roth.  And our court security

4　officer, should you need anything, is Robby Bryan.

5　　　　　Before we get started, are there any preliminary

6　matters we need to go over, Mr. Petty?

7　　　　　MR. PETTY:  Your Honor, I just wanted to confirm that

8　all of the witnesses have exited the courtroom.

9　　　　　THE COURT:  Okay.  And we'll do that in one second.

10　　　　　Anything before we get the trial started?

11　　　　　MR. PETTY:  No, Your Honor.

12　　　　　THE COURT:  All right.  Mr. Lavigne, any preliminary

13　matters?

14　　　　　MR. LAVIGNE:  No, Your Honor.  We were here yesterday

15　afternoon and were able to work a lot.

16　　　　　THE COURT:  Great.  All right.  The rule has been

17　invoked.  Are there any witnesses in the courtroom besides the

18　parties?  No witnesses?

19　　　　　All right.  We'll get started, then.

20　　　　　If there are no objections to the exhibits, I'll go

21　ahead and admit all of the exhibits.

22　　　　　Mr. Petty, any objections to any exhibit?

23　　　　　MR. PETTY:  Your Honor, there has been a renumbering,

24　as you requested at the pretrial conference.

25　　　　　THE COURT:  Okay.

1     MR. PETTY:  We have what's been marked as Joint

2  Exhibits 1 and 2.  I believe 1 is the redacted version and 2 is

3  the unredacted version to go under seal.

4          THE COURT:  Okay.

5          MR. PETTY:  And the parties --

6          THE COURT:  Number 2 is the redacted -- is the sealed

7  version?

8          MR. PETTY:  Number 2 is the sealed version, yes, Your

9  Honor.

10         THE COURT:  Okay.

11         MR. PETTY:  And the parties had a chance to go over

12  both of those.  We both worked on the redactions for the

13  version to go on ECF.  And we think that one is ready to go.

14         THE COURT:  Okay.  And you redact -- the redactions

15  are for just personal identifiers; is that correct?

16         MR. PETTY:  Yes, Your Honor, that's correct.

17         THE COURT:  Okay.

18         MR. PETTY:  And then the -- it may be easier just to

19  go through these one by one, because there's been the

20  renumbering, because almost all of the Government's exhibits

21  are now part of the joint exhibit.

22         THE COURT:  Okay.

23         MR. PETTY:  And I'm not exactly sure what the

24  Defendant is looking to put in and for what purpose.

25         THE COURT:  Okay.  Let me ask Mr. Lavigne.

1     Do you have any objection to any of the Government's

2  exhibits?

3     MR. LAVIGNE:  No, Your Honor.  Those are the ones we

4  mutually put together yesterday.

5     THE COURT:  For the -- okay.  Everything for the

6  Government is in the joint exhibits?

7     MR. PETTY:  No, Your Honor.

8     MR. LAVIGNE:  No, no.

9     THE COURT:  No?

10    MR. LAVIGNE:  You have another document.

11    MR. PETTY:  I have -- well, we have deposition --

12  maybe it would be better --

13    THE COURT:  I tell you what I'm going to do -- I just

14  want it to be more efficient.  I don't want each witness to

15  have to identify an exhibit and then ask the Court, May we, you

16  know, move to admit Exhibit X, Y, or Z.

17    I was trying to shortcut that, so that the lawyers

18  could simply show the witnesses the exhibits that are -- that

19  there's no objection to.

20    So if there's a way to quickly tell me which exhibits

21  there are no objections to -- and at the preliminary

22  conference, there were no objections.

23    There could be some now.  But I'll simply admit those

24  and the lawyers can proceed as if the exhibits are admitted.

25    Are you able to do that, Mr. Petty?  We can start, I

1  suppose, with Joint Exhibit 1 and 2.

2  　　　　MR. PETTY:  I think -- I think I'd prefer to go

3  through them just one by one.  I don't think it will take very

4  long.

5  　　　　MR. BELSAN:  Not with the witnesses.

6  　　　　MR. PETTY:  Not with witnesses, no, Your Honor.

7  These are just -- these are exhibits that are going to be

8  admitted just on their face.  There's depositions and a couple

9  of other documents that are -- that don't need to be

10  authenticated by a witness.

11  　　　　THE COURT:  All right.

12  　　　　MR. LAVIGNE:  We've already --

13  　　　　THE COURT:  We'll proceed in that manner.  If it

14  becomes inefficient we'll revisit this.  But for now the Court

15  will admit Joint Exhibit 1 and 2.

16  　　　　Is there any other joint exhibit?

17  　　　　MR. PETTY:  No, Your Honor.

18  　　　　THE COURT:  All right.  Those two are deemed

19  admitted.

20  　　　　MR. LAVIGNE:  Okay.

21  　　(Joint Exhibit 1 received into evidence.)

22  　　(Joint Exhibit 2 received into evidence under seal.)

23  　　　　THE COURT:  Mr. Petty, if you'll call your first

24  witness, please.

25  　　　　MR. PETTY:  Your Honor, we do have other exhibits

1  that are not in the joint exhibit.  So I -- I'd offer what's

2  been previously marked as Plaintiff's Exhibit 1, which is the

3  deposition of Xiomara Flores.

4        THE COURT:  Okay.  Any objection, Mr. Lavigne?

5        MR. LAVIGNE:  No, Your Honor.  That was part of the

6  deposition, so everything is in there.

7        THE COURT:  All right.  Plaintiff's Exhibit 1 is

8  admitted.

9     (Plaintiff's Exhibit 1 received into evidence.)

10       MR. PETTY:  Your Honor, Plaintiff's Exhibit 2 is the

11 video recording of the deposition of Xiomara Flores.

12       THE COURT:  All right.  Mr. Lavigne, any objection?

13       MR. LAVIGNE:  No, Your Honor.  That was -- not on the

14 video, but it was on the audio.

15       THE COURT:  All right.  Plaintiff's Exhibit 2 is

16 admitted.

17    (Plaintiff's Exhibit 2 received into evidence.)

18       MR. PETTY:  Plaintiff's Exhibit 3 is the transcript

19 of the deposition of Eduardo Reveles.

20       THE COURT:  Any objection?

21       MR. LAVIGNE:  No, Your Honor.

22       THE COURT:  All right.  Plaintiff's Exhibit 3 is

23 admitted.

24    (Plaintiff's Exhibit 3 received into evidence.)

25       MR. PETTY:  Plaintiff's Exhibit 4 is the video

1    recording of the deposition of Eduardo Reveles.

2              THE COURT:  Any objection, Mr. Lavigne?

3              MR. LAVIGNE:  No, Your Honor.

4              THE COURT:  Plaintiff's Exhibit 4 is admitted.

5         (Plaintiff's Exhibit 4 received into evidence.)

6              MR. PETTY:  Plaintiff's Exhibit 5 is the transcript

7    of the deposition of Sarah Wescott.

8              THE COURT:  Mr. Lavigne, any objection?

9              MR. LAVIGNE:  No, Your -- no, Your Honor.  I

10   participated in that one as well.

11             THE COURT:  All right.  Plaintiff's Exhibit 5 is

12   admitted.

13        (Plaintiff's Exhibit 5 received into evidence.)

14             MR. PETTY:  Plaintiff's Exhibit 6 is the video

15   recording of the deposition of Sarah Wescott.

16             THE COURT:  Any objection, Mr. Lavigne?

17             MR. LAVIGNE:  No, Your Honor.

18             THE COURT:  All right.  Plaintiff's Exhibit 6 is

19   admitted.

20        (Plaintiff's Exhibit 6 received into evidence.)

21             MR. PETTY:  Plaintiff's Exhibit 7 is a certified copy

22   of the Defendant's Form N-400.  This is also in redacted form

23   in Joint Exhibit 1.  But it may be easier for the parties to

24   move around just the ten pages, rather than taking it out of

25   the 600.

1    THE COURT:  All right.  Okay.  Mr. Lavigne, any

2  objection?

3    MR. LAVIGNE:  No.  I don't have a problem with that.

4  We can refer to that easier probably.

5    THE COURT:  All right.  Plaintiff's Exhibit 7 is

6  admitted under seal -- that's unredacted?

7    MR. PETTY:  This is unredacted.

8    THE COURT:  Under seal.

9    MR. PETTY:  Because it's certified, we didn't touch

10  it.

11    THE COURT:  Okay.

12      (Plaintiff's Exhibit 7 received into evidence under seal.)

13    MR. PETTY:  And Plaintiff's Exhibit 8 is the

14  certified copy of Defendant's Form I-485.

15    THE COURT:  Any objection, Mr. Lavigne?

16    MR. LAVIGNE:  I think it's the same we've already

17  looked at.  It's a better copy than what I have.  I agree with

18  that one.

19    THE COURT:  All right.  And that's unredacted as

20  well?

21    MR. PETTY:  Yes, Your Honor.  Exhibit 8 should be

22  under seal.

23    THE COURT:  All right.  Plaintiff's Exhibit 8, under

24  seal, is admitted.

25      (Plaintiff's Exhibit 8 received into evidence under seal.)

1      MR. PETTY:  Plaintiff's Exhibit 9 is a stipulation of

2  facts signed by counsel for both parties.

3      THE COURT:  Any objection, Mr. Lavigne?

4      MR. LAVIGNE:  No, Your Honor.  I think that's

5  pertaining to the agreement on the fingerprints all being the

6  same person.

7      Is that it?

8      MR. PETTY:  Uh-huh (affirmative).

9      MR. LAVIGNE:  That's what we signed.

10     THE COURT:  All right.  Plaintiff's Exhibit 9 is

11  admitted.

12     (Plaintiff's Exhibit 9 received into evidence.)

13     MR. PETTY:  Plaintiff's Exhibit 10 is a Form I-877,

14  Record of Sworn Statement in Administrative Proceedings.  It's

15  a four-page document.

16     MR. LAVIGNE:  Let me just look at that real quick.

17     THE COURT:  And that's by one of the agents?

18     MR. PETTY:  Yes, Your Honor.

19     THE COURT:  All right.  Mr. Lavigne?

20     (Counsel confer.)

21     MR. LAVIGNE:  Oh, okay.  Just for the record, I

22  believe it was part of the Wescott deposition.  But if he wants

23  to make it a separate one, that's fine with me.

24     THE COURT:  All right.  Plaintiff's Exhibit 10 is

25  admitted.

1    (Plaintiff's Exhibit 10 received into evidence.)

2        MR. PETTY:  Plaintiff's Exhibit 11 is a warning as to

3    rights and health questionnaire signed by the Defendant.

4        THE COURT:  Mr. Lavigne, any objection?

5        MR. LAVIGNE:  Again, that was one of the exhibits to

6    the depositions.  And it was identified/authenticated.  No

7    objection.

8        THE COURT:  All right.  Plaintiff's Exhibit 11 is

9    admitted.

10    (Plaintiff's Exhibit 11 received into evidence.)

11        MR. PETTY:  And, lastly, Plaintiff's Exhibit 12 is a

12    laboratory report, number 18-00136.  And this is not being

13    offered for the truth of the matter asserted.  It's being

14    offered as context for the stipulation, because it identifies

15    the fingerprint cards that are part of Joint 1.

16        THE COURT:  All right.  Mr. Lavigne, any objection?

17        MR. LAVIGNE:  None.

18        THE COURT:  Plaintiff's Exhibit 12 is admitted.

19    (Plaintiff's Exhibit 12 received into evidence.)

20        MR. PETTY:  I'm providing Plaintiff's Exhibits 1

21    through 12 to the courtroom deputy.

22        May I approach, Your Honor?

23        THE COURT:  Yes.

24        COURTROOM DEPUTY:  Thank you.

25        THE COURT:  All right.  Mr. Petty, if you'll call

1   your first witness, please.

2        MR. PETTY:  Your Honor, at this time the Government

3   calls Parvez Manzoor Khan.

4        THE COURT:  Mr. Khan, if you'll come forward to the

5   witness box right here.  When you enter the witness box, you'll

6   raise your right hand as you remain standing.

7        COURTROOM DEPUTY:  Do you solemnly swear or affirm

8   that the answers you will give during these proceedings will be

9   the truth, the whole truth, and nothing but the truth, so help

10  you God?

11       THE DEFENDANT:  I do.

12       COURTROOM DEPUTY:  Thank you.

13       THE COURT:  All right.  Thank you, sir.  If you'll

14  take a seat and get comfortable, and just move that chair as

15  close to the microphone as possible so everyone can hear you.

16       Thank you.

17       THE DEFENDANT:  You're welcome.

18       **PARVEZ MANZOOR KHAN, GOVERNMENT'S WITNESS, SWORN**

19                      **DIRECT EXAMINATION**

20  BY MR. PETTY:

21  Q.   Good morning, Mr. Khan.  I have some questions to ask you.

22  First just some general background.  Okay?

23       What is your current legal name?

24  A.   My name?

25  Q.   Yes.

1  A.   Parvez Manzoor Khan.

2  Q.   And what is your date of birth?

3  A.   27 July '57.

4  Q.   And where were you born?

5  A.   In Pakistan.

6  Q.   What are your parents' names?

7  A.   Parents' name?  Manzoor Ahmad Khan, my father name.  And

8  Razia Khan.  Razia Manzoor is my mother name.

9  Q.   Do you have any siblings?

10        THE COURT:  I'm sorry.  Before you -- would you mind

11 spelling those names for the record.

12        THE DEFENDANT:  R-a-z-i-a.  R-a-z-i-a, Razia.

13        THE COURT:  Okay.

14        THE DEFENDANT:  My mother name.

15        THE COURT:  And your father's name?

16        THE DEFENDANT:  Manzoor, M-a-n-z-o-o-r.

17        THE COURT:  Thank you.

18        THE DEFENDANT:  You're welcome.

19 BY MR. PETTY:

20 Q.   Do you have any siblings?

21 A.   No.

22 Q.   You have no siblings?  No siblings?

23 A.   I don't understand what you --

24        MR. LAVIGNE:  Objection.

25 BY MR. PETTY:

1  Q.    Do you have any brothers or sisters?

2  A.    I have three more brother.

3  Q.    Three more brothers?

4  A.    Yes.  We have four brother.  No sister.

5  Q.    And what are their names?

6  A.    My other brother is Jaweed Khan.  He's not here.  He's in

7  the Pakistan.  And the third brother is Zubair Kahn.  He's here

8  in the United States.  And the fourth brother, Suhail Khan,

9  he's also here.

10 Q.    Are you currently married?

11 A.    Yes, sir.

12 Q.    Have you ever been treated for drug or alcohol issues?

13 A.    No.  Never.

14 Q.    Have you ever been under medical care for any serious

15 health issues?

16 A.    No.

17 Q.    And where do you live right now?

18 A.    Lake City -- actually Branford, Florida.  B-r --

19 B-r-a-n-f-o-r-d, Branford, Florida.

20 Q.    And how long have you lived in Branford?

21 A.    Seven years.

22 Q.    Where did you live before you lived in Branford?

23 A.    Pennsylvania.  Log Haven, Pennsylvania.

24 Q.    Log Haven?

25 A.    Yes, sir.

1    Q.   Your native language is Urdu?

2    A.   Urdu, yes.

3    Q.   And Urdu is written in Arabic script, right?

4    A.   It's also in Pakistani -- national language from Pakistan.

5    Q.   I'm sorry?  I didn't understand.  Could you repeat that?

6    A.   I don't understand your question, sir.

7    Q.   Is Urdu written in Arabic script, Arabic letters?

8    A.   Yes.

9    Q.   Can you read Urdu?

10   A.   I read Urdu, yes.

11   Q.   Did you learn that in school?

12   A.   In the school.

13   Q.   Okay.  I'd like to ask you about the affidavit that you

14   filed in support of your motion for summary judgment.  Do you

15   remember filing an affidavit?

16   A.   My -- my parents filed a -- one -- okay.  Affidavit what?

17   Q.   The affidavit for this court case.

18   A.   Yes.

19   Q.   Do you remember signing an affidavit for this case?

20   A.   Yes.

21   Q.   Okay.  I'd like to ask you about that affidavit.

22   A.   Okay.

23   Q.   Okay?  Do you recall signing that affidavit?

24   A.   I don't know.  I signed --

25            MR. LAVIGNE:  Your Honor, may I request that the

1  counsel show him the affidavit and show him the signature so he
2  can verify.
3          THE COURT:  Mr. Petty.
4          MR. PETTY:  Okay.
5          MR. LAVIGNE:  That's the proper way, I believe.
6          I have one here in the court file.
7          THE COURT:  I think Mr. Petty found one.
8          MR. PETTY:  I'm showing the affidavit to counsel.
9          MR. LAVIGNE:  Yeah.  There you go.
10         MR. PETTY:  May I approach the witness, Your Honor?
11         THE COURT:  Yes.
12         MR. PETTY:  I'm handing the witness a document
13  entitled Affidavit of Parvez Manzoor Khan.  This is marked
14  document 22 at the top.
15  BY MR. PETTY:
16  Q.   Please take a look at that document.  If you'd turn to the
17  last page, please.
18         Is that your signature?
19  A.   Yes, that's my signature.
20         MR. PETTY:  May I approach, Your Honor?
21         THE COURT:  Yes.
22         MR. PETTY:  Retrieving the document from the witness.
23         Your Honor, I'd like to have this marked as
24  Prosecution Exhibit -- I believe we're up to 13.
25         THE COURT:  Plaintiff's Exhibit 13.

1          Mr. Lavigne, any issue?

2          MR. LAVIGNE:  No.  I think he's identified it.

3     That's the one we filed in court.  I believe it's the one we

4     just looked at.

5          THE COURT:  All right.  Plaintiff's Exhibit 13 is

6     admitted.

7       (Plaintiff's Exhibit 13 received into evidence.)

8     BY MR. PETTY:

9     Q.   Did you assist your attorney in preparing that document?

10    A.   Prepare to the documents?  Yes.  Whatever he asked me,

11    question, you know, I give him the answer, you know.

12    Q.   Okay.  Do you understand that this document was signed

13    under oath?

14    A.   Yes.

15    Q.   Okay.  Do you understand that that means that the penalty

16    of perjury attaches to it?

17    A.   Uh-huh (affirmative).

18    Q.   Just as it attaches --

19          THE COURT:  Sir, you just have to say yes or no so

20    that the court reporter can transcribe, instead of the --

21          THE DEFENDANT:  Okay.  Yes.

22          THE COURT:  Okay.  Thank you.

23    BY MR. PETTY:

24    Q.   The same as your testimony right here does right now?

25    A.   Yes.

1   Q.   When was the last time that you reviewed that document?

2   A.   Last time?

3             MR. LAVIGNE:  This morning.

4             THE DEFENDANT:  Like a couple of month -- two month

5   ago, yes, in his office.

6   BY MR. PETTY:

7   Q.   Okay.  Is there anything in that document that is

8   incorrect?

9   A.   No.

10  Q.   So there's nothing in it that you need to change?

11  A.   No.

12  Q.   And there's nothing in that document that is not entirely

13  and completely truthful?

14  A.   It's all true.

15  Q.   Okay.  Okay.  Let's look at the affidavit for a moment.

16  I'm going to ask you some questions about the affidavit.

17  A.   Uh-huh (affirmative).

18  Q.   You say in paragraph 4 in the affidavit, quote, When I

19  arrived in the U.S. on December 7th, 1991, at the Los Angeles,

20  California airport, I could not read or speak or write English,

21  end quote.

22  A.   Yes.

23  Q.   There's a number -- there's no question yet.

24            There's a number of different parts to that

25  statement, so I'm going to break it down piece by piece.

1        Okay.  First, it is your testimony that you arrived

2    in the United States on December 7th, 1991; is that right?

3    A.    Yes.

4    Q.    Okay.  And that was your first arrival to the United

5    States in your entire life, right?

6    A.    Yes.

7    Q.    Okay.  How long did you plan to stay in the United States?

8    A.    I don't know that time, how long I'm going to stay.  I

9    just come here in this country.

10   Q.    Had you ever been to any other countries other than

11   Pakistan --

12   A.    No.

13   Q.    -- before you arrived here?

14   A.    No.

15   Q.    Okay.  So that was your first time --

16   A.    First time.

17   Q.    -- out of your native country?

18   A.    Yes.

19   Q.    In your whole life?

20   A.    In whole life.

21   Q.    So would it be fair to say that that was a significant

22   date for you?

23   A.    Yes.

24   Q.    And you don't recall arriving at any other time, right?

25   A.    Yes.

1   Q.   Okay.  You know it was December 7th, 1991?

2   A.   Yes.

3   Q.   Okay.  And you arrived at the airport in Los Angeles; is

4   that right?

5   A.   Yes.

6   Q.   Okay.  And were there signs there that said welcome to

7   California or welcome to Los Angeles?

8   A.   It's 25 years ago.  So many things -- detail I don't

9   remember, sir.

10  Q.   Okay.  You don't --

11  A.   Honestly, I don't remember.

12  Q.   That's fine.  If you don't remember, that's fine.

13  A.   Yes.

14  Q.   And the -- the -- you took a flight, correct?

15  A.   Took a flight, yes.

16  Q.   Okay.  Was it a direct flight?

17  A.   Yes, it was direct flight.

18  Q.   Okay.  And it landed in Los Angeles, right?

19  A.   Yes.

20  Q.   And it took off from Islamabad?

21  A.   No.  Kerachi.

22  Q.   Kerachi.  Okay.  So you boarded a plane in Kerachi and it

23  was a direct flight to Los Angeles?

24  A.   Right.

25  Q.   Okay.  And you knew when you got on the plane in Kerachi

1   that it was going to Los Angeles?

2   A.   Right.

3   Q.   Okay.  And when you boarded that plane, you boarded it

4   with a passport, right?

5   A.   Yes.

6   Q.   Okay.  But it wasn't your passport?

7   A.   No.

8   Q.   Okay.  It was Mohammad Akhtar's passport?

9   A.   Yes.

10  Q.   And that passport had a visa in it, right?

11  A.   Yes.

12           MR. PETTY:  And, actually, if I may have a moment,

13  Your Honor?

14           THE COURT:  Yes.

15           MR. PETTY:  Retrieving a document.

16           Your Honor, may I approach the witness?

17           THE COURT:  Yes.

18           MR. PETTY:  I'm handing the witness what's been

19  previously marked as pages 585 and 586 of Joint Exhibit 1.

20  BY MR. PETTY:

21  Q.   Take a look at those two pages, please.

22           Are those photocopies --

23  A.   Yes.

24  Q.   -- of pages from the passport that you had --

25  A.   Yes.

1  Q.   -- with you?

2  A.   Yeah.  Same passport I had.

3         MR. PETTY:  Okay.  Retrieving the documents.

4         And returning 585 and 586 to the joint exhibit.

5  BY MR. PETTY:

6  Q.   And you understood that you needed a passport to travel to

7  the United States, right?

8  A.   Yes.

9  Q.   And you understood that you also needed a visa to travel

10 to the United States?

11 A.   Yes.

12 Q.   Okay.  And you knew that both of those had been issued to

13 Mohammad Akhtar?

14 A.   Yes.

15 Q.   Okay.  And not to you?

16 A.   No.

17        THE COURT:  I think there was a double negative in

18 there.

19        MR. PETTY:  Let me ask that again.

20 BY MR. PETTY:

21 Q.   You understood that both the visa and the passport had

22 been issued to someone other than --

23 A.   Someone else.

24 Q.   -- yourself?

25 A.   Yes, sir.

1  Q.   Okay.

2  A.   I understand.

3  Q.   Okay.  So let me -- let me back you up to when you arrived

4  to Los Angeles.  Okay?  How did you feel when you arrived?

5  A.   I feel happy.

6  Q.   Were you excited?

7  A.   Yes, very excited.

8  Q.   Were you nervous?

9  A.   No.

10 Q.   Not nervous?  Were you scared at all?

11 A.   Yeah, I'm scared, because I have a -- somebody else

12 passport.  So I'm worried.  I'm scared.

13 Q.   Okay.  And then sometime later you went to live with your

14 brother in Miami, right?

15 A.   Yes.

16 Q.   Okay.  And I know there's time in between.  We'll come

17 back to that in a minute.

18 A.   Okay.

19 Q.   Okay.  And you said in your affidavit that you traveled

20 from Los Angeles to Miami by Greyhound bus.

21 A.   Greyhound bus.

22 Q.   Okay.  How long did that take you?

23 A.   It take four to five days.

24 Q.   Four or five days?

25 A.   Four days.

1   Q.   Was it -- was it a pleasant journey?

2   A.   Not really.

3   Q.   Why not?

4   A.   Because no shower and not too many good rest.

5   Q.   Was the bus crowded?

6   A.   No.  Sometimes, but sometimes empty.

7   Q.   Did it smell okay?

8   A.   Yes.

9   Q.   Did it make stops along the way?

10  A.   Say again.

11  Q.   Did the bus make stops along the way?

12  A.   Yeah.  I change the bus -- three or four buses I change

13  it.  It stop -- so many stop.

14  Q.   You had to change buses three or four times?

15  A.   Yes.

16  Q.   Where did you sleep?

17  A.   In the -- on the seat in the bus.

18  Q.   You didn't stop for the night anywhere?

19  A.   No.

20  Q.   Where did you eat?

21  A.   In the bus stop restaurant there.

22  Q.   Okay.  You mentioned in paragraph 4 in your affidavit that

23  you could not read or speak or write English.

24  A.   Yes.

25  Q.   Okay.  And you say in paragraph 23 that you did not read

1  the form which -- referring to the asylum form -- because --

2  I'm sorry, before you signed it, because you could not

3  understand English at that time; is that right?

4  A.   Yes.

5  Q.   You could not understand English --

6  A.   No.

7  Q.   -- in 1991?

8  A.   No.  Very -- some -- few words --

9  Q.   Few words?

10  A.   -- only, yes.

11  Q.   Okay.  And so how many words could you -- how much English

12  did you know at that time?

13  A.   Like hello, hi, like that.  I know the French fries.  I

14  look -- I need this one, potato, like this, and some food

15  words.

16  Q.   So just --

17  A.   Some --

18  Q.   -- basic greetings?

19  A.   Like basic -- some -- very few words I understand.

20  Q.   Okay.

21       MR. PETTY:  One moment, Your Honor, please.

22       (Counsel confer.)

23       MR. PETTY:  May I approach the witness, Your Honor?

24       THE COURT:  Yes.

25  BY MR. PETTY:

 1 | Q.   Mr. Khan, I'm handing you a page that's marked in the
 2 | upper left 00166.  Please take a look at that.
 3 |          Can you tell us what that document is?
 4 | A.   Yes.
 5 | Q.   What is it?
 6 |          MR. LAVIGNE:  I'm sorry.  Can I ask counsel to
 7 | identify the Bates page it's taken from.
 8 |          MR. PETTY:  166.
 9 |          MR. LAVIGNE:  166?
10 |          THE DEFENDANT:  Yeah.  That's my school.
11 |          MR. PETTY:  Retrieving the document from the witness.
12 |          THE DEFENDANT:  Yes.
13 | BY MR. PETTY:
14 | Q.   And this document reflects that you studied English at
15 | school, right?
16 | A.   Yes, sir.  But look at the numbers -- how many numbers I
17 | got.  It's not even -- about 40 percent.
18 | Q.   Your attorney can ask you about that later.
19 | A.   Okay.
20 | Q.   Okay.  So when you got to Los Angeles, you got off the
21 | plane, right?
22 | A.   Right.
23 | Q.   And then you got in line for immigration inspection,
24 | right?
25 | A.   Yes.

1  Q.   Okay.  And then you -- the passport that we looked at

2  earlier, you presented that to an immigration officer?

3  A.   Yes.

4  Q.   Okay.  And there were other people around you, right?

5  A.   Yes.

6  Q.   There was a big line?

7  A.   Yes, it was line.

8  Q.   And everybody was standing in line waiting their turn to

9  present their passport?

10 A.   Right.

11 Q.   Okay.  And the immigration officers who were looking at

12 the passports, you understood that they were deciding whether

13 the people would be admitted to the United States or not,

14 right?

15 A.   Yes.

16 Q.   You understood that function?

17 A.   Yes.

18 Q.   Okay.  And you saw them questioning passengers in front of

19 you, right?

20 A.   No, because they don't -- the line was little bit far.

21 They just call each person in the -- on the booth.

22 Q.   Okay.

23 A.   Yes.

24 Q.   Did you see them examining any other passengers'

25 passports?

1  A.   They're questioning.  I don't know what they're talking,

2  you know.

3  Q.   Okay.  Did you see any immigration officers stamping

4  passports?

5  A.   No.  I don't remember if they stamp or not.  But I know

6  they're talking to the people.  It's like a booth.

7  Q.   In the booth?

8  A.   Yes.

9  Q.   Okay.  So you saw them talking to people in the booth?

10 A.   Right.

11 Q.   Okay.  And eventually you got to the front of the line,

12 right?

13 A.   Uh-huh (affirmative).

14 Q.   And it was your turn to see the immigration officer?

15 A.   Yes.

16 Q.   And you presented the passport --

17 A.   Passport, yes.

18 Q.   -- that we already talked about --

19 A.   Yes.

20 Q.   -- to the immigration officer?

21      And you understood what was happening, right?

22 A.   Yes.

23 Q.   You understood that you were making a formal request to

24 enter the United States, right?

25 A.   No.  I don't say anything.  He just checked my passport

1  and he asked me, Where you get from this passport?  I said,

2  This is my passport.  He say, No.

3  Q.    No.  I mean before that.

4  A.    Yes.

5  Q.    I mean, you walked up, right?

6  A.    Right.

7  Q.    And you handed the passport --

8  A.    Passport, yes.

9  Q.    -- to the officer?

10         Okay.  And you understand that by doing that --

11  A.    Right.

12  Q.    -- you were asking for permission to come into the United

13  States?

14  A.    Yes.

15  Q.    Okay.  And, again, that passport was Mohammad Akhtar's

16  passport?

17  A.    Yes.

18  Q.    And it had a photo of yourself in that passport?

19  A.    Yes.

20  Q.    Okay.  Do you know Mr. Akhtar personally?

21  A.    No.

22  Q.    How did you obtain the passport?

23  A.    He's some agent there.  I paid them the money.  They give

24  me the passport.  They arrange everything.

25  Q.    So you paid money to an agent and an agent provided the

1  passport to you?

2  A.   Yes.  Right.

3  Q.   How much money did you pay the agent?

4  A.   I don't remember right now.

5  Q.   Was it a lot of money?

6  A.   Not really at that time.

7  Q.   Okay.

8  A.   But I don't remember.  Maybe a couple of thousand.

9  Q.   A couple of thousand dollars?

10 A.   Thousand dollars, yes, U.S. dollar.  Or -- honestly, I

11 don't remember.

12 Q.   Okay.  But you think it might be a couple of thousand

13 U.S. dollars?

14 A.   Right.  Yes.  This much money, yes.

15 Q.   Okay.  And so when you presented that passport, you were

16 not allowed into the United States right away, right?

17 A.   No.  They -- he called somebody else to hand over me and

18 my passport, my documents.  And they took me -- he took me

19 inside.

20 Q.   They referred you for some additional screening?

21 A.   Yes.

22 Q.   Okay.  And ultimately there was a decision made by someone

23 that you were to be detained, right?

24 A.   Yes.

25 Q.   Okay.  And you were taken basically to a jail, right?

1  A.   Right.

2  Q.   Okay.  And you were not allowed to leave?

3  A.   No.

4  Q.   You were locked in?

5  A.   Locked in, yes.

6  Q.   There were guards there?

7  A.   Yes, guards there.  And so many peoples there.

8  Q.   So many -- and were the guards armed?  Do you remember?

9  A.   I think.

10 Q.   You think the guards were armed?

11 A.   No.  It's not armed inside, no.

12 Q.   Not inside?

13 A.   No.

14 Q.   Okay.  And there was no one there who spoke your language,

15 right?

16 A.   No.

17 Q.   Nobody?

18 A.   Nobody.

19 Q.   There were some people who perhaps spoke Punjabi or Hindi,

20 but nobody --

21 A.   India -- that was from India, yes, was there.  Some

22 people.

23 Q.   I'm sorry.  We were talking over.  Can you repeat that

24 again?

25 A.   Yeah.  Those from India -- Indian people, some there.

```
1   Q.   Okay.  So there were Indian people --

2   A.   People, they speak Punjabi and --

3   Q.   -- who spoke other languages?

4   A.   Yes.  Hindi and -- but few words are similar --

5   Q.   Okay.

6   A.   -- my language.

7   Q.   And you were there for about a month; is that right?

8   A.   Yes.

9   Q.   Okay.  With nobody who spoke your language?

10  A.   No.

11  Q.   Okay.  What did you do all day?

12           THE COURT:  I think there's another double -- there's

13  lots of double negatives here.

14           MR. PETTY:  I'll try and clean it up, Your Honor.

15           THE COURT:  Okay.  I think you said with nobody who

16  can speak your language and he said no.

17  BY MR. PETTY:

18  Q.   Was there anyone there who spoke your language?

19  A.   No anybody there spoke my language.

20  Q.   What did you do all day?

21  A.   What did I do there?

22  Q.   Yes.

23  A.   Just stay there.

24  Q.   You just did nothing all day?

25  A.   Nothing.
```

1    Q.   Were you able to speak to anyone?

2    A.   No.  I speak some -- few words their language.

3    Q.   But not -- you couldn't carry on a conversation with

4    anyone?

5    A.   No, not too much.

6    Q.   Okay.  Now, you wrote in some of your documents that you

7    were arrested in 1995 for soliciting a prostitute; is that

8    right?

9    A.   Yes.

10   Q.   Okay.  Did you spend any time in jail related to that?

11   A.   A few hours.

12   Q.   Just a few hours?

13   A.   Yes.

14   Q.   Okay.  Did you ever go to court for that?

15   A.   Yes.

16   Q.   How many times?

17   A.   One time.

18   Q.   One time?

19        Okay.  So other than that one arrest in 1995 and the

20   immigration detention in 1991 in Los Angeles --

21   A.   Yes.

22   Q.   -- have you ever been detained or jailed or incarcerated

23   at any other time?

24   A.   Never.

25   Q.   Okay.  Just the two times?

1   A.    Just the two times.

2   Q.    And the one in Los Angeles was about a month; is that

3   right?

4   A.    Yes.

5   Q.    And the one in Florida was just a couple of hours?

6   A.    Yes, few hours.

7   Q.    Okay.  And when you were arrested in Florida in '95, did

8   you speak English at that time?

9   A.    Very little.  Not too much.

10  Q.    Okay.  Were you able to communicate with the other people

11  in jail in Florida?

12  A.    No, because I just talked to my -- my brother.  And he

13  came and he just bailed me out.

14  Q.    Okay.  So you weren't there long enough --

15  A.    No.

16  Q.    -- to talk to anyone?

17        Okay.  And while you were detained for that month in

18  Los Angeles, you got a lawyer, right?

19  A.    Yeah.  The lawyer came.  Yes.

20  Q.    That was Mr. Johnson?

21  A.    He came for the different people, not for me.

22  Q.    Okay.

23  A.    And while there, the guy -- he mentioned that he's a

24  lawyer, you need to talk to him.

25  Q.    Okay.  So he --

1  A.   So I talked to him there, yes.

2  Q.   So he -- he had already been hired by someone else?

3  A.   Someone else, yes.

4  Q.   Okay.  And then you met him --

5  A.   Yes.

6  Q.   -- while he came --

7  A.   Right.

8  Q.   -- to that client?

9  A.   Right.

10 Q.   Okay.  And you said that Mr. Johnson told you to sign your

11 name as Mohammad Akhtar on some immigration papers.

12 A.   Yes.

13 Q.   And you did that, right?

14 A.   Yes.

15 Q.   Okay.  And as we've discussed previously, you knew at that

16 time that your name was not Mohammad Akhtar.

17 A.   Yes.

18 Q.   Okay.  And now you've had an opportunity to review that

19 asylum application, right?

20 A.   Yes.

21 Q.   Okay.  And you said in your affidavit that you gave

22 Mr. Johnson what you say is your true name, Parvez Manzoor

23 Khan?

24 A.   Yes.

25 Q.   Okay.  And Mr. Johnson got your brother's address

```
 1    correct --
 2    A.   Yes.
 3    Q.   -- on the document, right?
 4              He lived at 4275 Northwest 18th Street?
 5    A.   Miami.
 6    Q.   Miami?
 7    A.   Yes.
 8    Q.   So he got the address correct?
 9    A.   Yes.
10    Q.   But he got your name wrong and wrote down Jaweed, instead
11    of Parvez Manzoor?
12    A.   Yes.
13    Q.   Okay.  Now, at some point before you were released from
14    detention, you appeared in immigration court, right?
15    A.   No.
16    Q.   You never appeared in immigration court?
17    A.   No.
18    Q.   Okay.
19              MR. PETTY:  May I approach the witness, Your Honor?
20              THE COURT:  Yes.  And, Mr. Petty, Mr. Lavigne, feel
21    free to move about the courtroom without permission.
22              MR. PETTY:  Thank you, Your Honor.
23              MR. LAVIGNE:  I have no objection to that.  Anytime.
24    I don't have a problem.
25    BY MR. PETTY:
```

1    Q.   Mr. Khan, could you please read the first sentence of

2    paragraph 11 of your affidavit.

3              THE COURT:  And you're showing him Plaintiff's

4    Exhibit 13?

5              MR. PETTY:  Yes, Your Honor.

6              MR. LAVIGNE:  Exhibit 13.

7              THE DEFENDANT:  Yeah.  I appear in the court when I

8    was in the detention center.  And the court is right there.

9              MR. LAVIGNE:  The court is in the jail.

10   BY MR. PETTY:

11   Q.   Okay.

12   A.   Yes.  I don't go off to that -- in separate court, yes.

13   Q.   Okay.  So -- so if I understand you correctly, you did

14   appear before an immigration judge?

15   A.   Yeah, but --

16   Q.   It was just in the detention center?

17   A.   In the detention, yes.

18   Q.   Okay.  Understood.  Thank you.

19              Okay.  And when you appeared before the immigration

20   judge, was it in a room like this room, but smaller?

21   A.   No, it was very big, lot of people there.

22   Q.   Lot of people?  Was there a bench at the front, like there

23   is in this room, for the judge?

24   A.   Yes, like this.  And like a hundred people with me sitting

25   there, more than hundred.  I don't remember.  But it was big

1   room.

2   Q.    Okay.  And were there -- were there tables for the

3   attorneys?

4   A.    Yes.

5   Q.    And then there was a gallery for people to sit?

6   A.    Yes.

7   Q.    And was the judge wearing a robe?

8   A.    Yeah.  But you're asking me like 25 years ago some

9   question.  Honestly, I don't remember a lot of things that --

10  Q.    Okay.  If you don't remember, that's fine.

11  A.    It was court.  Yeah.  It was court.

12  Q.    You understood it was court?

13  A.    Yeah.  I don't know -- I don't remember what he wear, the

14  judge.  But he was man.

15  Q.    Okay.  And, again, apart from the one incident in Florida,

16  and that incident, there's no other times you've been to court?

17  A.    No.

18  Q.    Okay.  Just those two times?

19  A.    Yes.

20  Q.    Okay.  In paragraph 29 of the affidavit, you say, quote, I

21  was released from the jail cell on January 7th, 1992, along

22  with a number of other people, in the middle of the night and

23  put into a van with the others released.  I was only given a

24  white card when I was let out of the immigration van.

25             I had to follow some of the others who had been

1  released to a nearby hotel, where someone who spoke Urdu helped

2  me to get a cab.  I stayed overnight in a motel.

3         The next day one of the released persons helped me

4  get a cab to the Greyhound bus station.  He also helped me buy

5  a ticket to Miami for the next day.

6  A.   Yes.

7  Q.   Is that all accurate?

8  A.   Yes.

9  Q.   Okay.  Is that all from your memory of the incident?

10  A.   Yeah.  That's true.  The best I remember, the middle of

11  the night they just drop us -- like, six, seven people, in the

12  dark, and they left.

13  Q.   Okay.  So you remember exactly what happened and where you

14  slept and how you got from point to point in those first hours

15  after you were released from detention --

16  A.   Yes.

17  Q.   -- in 1991?

18  A.   Yes.

19  Q.   Okay.  In paragraph 51 of your affidavit you say, quote, I

20  thought I was granted asylum since I was released from custody

21  on January 7th, 1992, after my brother posted a $2500 bond, end

22  quote.

23         So just to be clear, you believed when you were

24  released from custody in January 1992 that you had been granted

25  asylum in the United States?

1  A.   Yes.

2  Q.   Okay.  Okay.  Let's take a look at your asylum

3  application.

4           MR. PETTY:  If I could have a moment, Your Honor?

5           THE COURT:  Sure.

6           MR. LAVIGNE:  What page?  May I have the Bates page

7  number?

8           MR. PETTY:  553.

9           MR. LAVIGNE:  553.

10          MR. PETTY:  I'm sorry, 533.

11          I'm handing to the witness pages 533 and 540 of the

12  joint exhibit.

13 BY MR. PETTY:

14 Q.   Mr. Khan, if you'd take a look at the top left of that

15 document, do you see where it says last hearing 12/12/91?

16 A.   Yes.

17 Q.   Was that the date that you appeared in immigration court,

18 or before the immigration judge in the detention center?

19 A.   Uh-huh (affirmative).

20 Q.   Is that a yes?

21 A.   Just 12/18/91, the date.

22 Q.   No, on the left side.  Last hearing --

23 A.   12/12 -- 12/12/91.

24 Q.   Yes.

25 A.   Yes.

1  Q.    Is that the day that you appeared --

2  A.    Yes.

3  Q.    -- before the immigration judge?

4        That's a yes?

5  A.    Yes.

6  Q.    Okay.  Thank you.

7        If you look at block 3 on the upper right, do you see

8  where it says sex?  On the right side.

9  A.    Right-hand side.  Yes.

10 Q.    Block 3.  And the box for male is checked?

11 A.    I don't know who did this one.

12 Q.    Okay.  But I'm not asking you who did it.  I'm asking you

13 do you see it.

14 A.    Yes.

15 Q.    Okay.  Is it correct?  Are you male?

16 A.    It's correct, yes.

17 Q.    Okay.  And if you move one over, marital status, the box

18 for single is checked.  Do you see that?

19 A.    Yes.

20 Q.    Were you single at that time?

21 A.    Yes.

22 Q.    Okay.  If you move down a line, do you see it says, I was

23 born, and then it has month/day/year?

24 A.    Yes.

25 Q.    Okay.  And it's your testimony that that is not your

1  birthday?

2  A.   No, that's not my birthday.

3  Q.   Okay.  If you move down to box 6 --

4  A.   Yes.

5  Q.   -- do you see Asian?

6  A.   Yes.

7  Q.   Is that accurate?

8  A.   Yes.

9  Q.   And then next to that religion, Islamic?

10 A.   Yes.

11 Q.   Is that correct?

12 A.   Yes.

13 Q.   Okay.  Box 9, is that your brother's correct address in

14 Miami?

15 A.   Yes.

16 Q.   And if you go down to block 12, did you, in fact, arrive

17 on December 7th, 1991, at Los Angeles International Airport on

18 Korean Airlines 002?

19 A.   Yes.

20 Q.   If you go down to block 22, which is on the next page, did

21 you have any children at that time?

22 A.   No.

23 Q.   So where it says I have zero sons or daughters is correct?

24 A.   Yes.

25 Q.   And if you go down to block 23, do you see where it says

1    relatives in the U.S. other than immediate family, and there's

2    a handwritten note for Suhail A. Khan?

3    A.    Yes.

4    Q.    Is that the name of your brother?

5    A.    Yes.

6    Q.    So it had all of that information correct, but your name

7    and your birthday wrong?

8    A.    Yes.

9    Q.    Okay.  And then block 45, which is on page 4, is that

10   where you signed it as Mohammad Akhtar?

11   A.    Yes.

12   Q.    And you signed it because your attorney advised you to

13   sign it?

14   A.    Right.

15   Q.    Okay.  And you intended to sign it, right?

16   A.    Yes.

17   Q.    It wasn't an accident that you signed it?

18   A.    No.

19   Q.    No one forced you to sign it?

20   A.    No.  My attorney told me to sign.

21   Q.    But nobody threatened you?

22   A.    No.

23            THE COURT:  You have like three double negatives in

24   there, just so you know.

25   BY MR. PETTY:

 1  Q.   Did anyone threaten you?

 2  A.   No.

 3  Q.   Did anyone force you to sign it?

 4  A.   No.

 5  Q.   Okay.

 6           MR. PETTY:   Retrieving the...

 7       (Counsel confer.)

 8           MR. PETTY:   Retrieving the document from the witness.

 9       (Counsel confer.)

10           MR. PETTY:   I'm handing the witness pages 146 through

11  -48 of the joint exhibit.

12  BY MR. PETTY:

13  Q.   Now, it appears that this document was signed by your

14  wife; is that correct?

15  A.   Yes.

16  Q.   When did you meet your wife?

17  A.   Her sister daughter wedding.  Her sister work with me.  We

18  worked together.  Her daughter wedding she came from Miami.  I

19  was at that time in Orlando.

20           And we met Brooksville, Florida.  I met her there.

21  Q.   Okay.  And when did that happen?

22  A.   I don't remember the date exactly.

23  Q.   Do you remember what year you met your wife?

24  A.   I don't remember really.

25  Q.   Do you normally speak English with your wife?

1   A.   Very little.

2   Q.   Does she speak Urdu?

3   A.   No.

4   Q.   What language do you speak with your wife?

5   A.   English.

6   Q.   Do you have any other languages in common other than

7   English?

8   A.   No.

9   Q.   Did you provide the information about yourself to her to

10  include on this document?

11  A.   No.

12  Q.   How did she get the information about you that's on this

13  document?

14  A.   This document?

15  Q.   Yes.

16  A.   Because she was with me.  We filed together.

17  Q.   Okay.  But did you fill out this application yourself?

18  A.   No.

19  Q.   Did your wife fill it out?

20  A.   No.

21  Q.   Who filled it out?

22  A.   I paid some lady.  She -- in Miami.  She filled out all

23  the paperwork.

24  Q.   So you didn't provide any information to your wife that's

25  on that document?

 1  A.    No.

 2  Q.    You provided it to some third person?

 3  A.    Right.

 4  Q.    Okay.

 5        MR. PETTY:   Okay.   Retrieving the document from the

 6  witness.

 7      (Counsel confer.)

 8        MR. PETTY:   Okay.   I'm handing the witness a Form

 9  G-325A dated January 10th, 1998.

10  BY MR. PETTY:

11  Q.    Now, Mr. Khan, this document you did sign, right?

12  A.    Yes.

13  Q.    Okay.   Did you provide the information that it contains?

14  Was this prepared by the same person that prepared the last

15  document?

16  A.    Yes.   Yes.

17  Q.    Did you provide the information that this document

18  contains --

19  A.    Yes.

20  Q.    -- to the preparer?

21  A.    Yes.   My date of birth, my school certificate, and my

22  passport, real passport.

23  Q.    And you submitted this document in connection with your

24  application for --

25  A.    Yes.

1   Q.   -- a green card, right?

2   A.   Yes.

3   Q.   Okay.  And starting at the top, this document has your

4   correct name, right?

5   A.   Yes.

6   Q.   Correct sex?

7   A.   Yes.  Correct name, yes.

8   Q.   Correct birth date?

9   A.   Yes.

10  Q.   Correct nationality?

11  A.   Yes.

12  Q.   Correct country of birth?

13  A.   Yes.

14  Q.   Correct Social Security number?

15  A.   Yes.

16  Q.   Correct names of your parents?

17  A.   Yes.

18  Q.   Correct residence for your parents?

19  A.   Yes.

20  Q.   Okay.

21       MR. PETTY:  Retrieving that document from the

22  witness.

23       MR. LAVIGNE:  Can we -- can we stipulate for the

24  record that this is the same document as appears at pages 495,

25  496, 497, and 498?

1          MR. PETTY:  Including the last document that was

2    shown the witness, yes.

3          MR. LAVIGNE:  What page would that be, 498?

4          MR. PETTY:  This is a different document.  The last

5    witness.

6          MR. LAVIGNE:  Oh, let me see that.  Oh, the last one

7    was the --

8          MR. PETTY:  Yeah.

9          MR. LAVIGNE:  Okay.  Got you.

10          MR. PETTY:  So the last document that was shown the

11    witness was 498.

12          MR. LAVIGNE:  498.  Okay.  Now that's a different

13    one.  Okay.

14          MR. PETTY:  I'm now showing the witness 541, which is

15    a different document.

16    BY MR. PETTY:

17    Q.   This is also a similar biographic information form,

18    correct?

19          THE COURT:  Mr. Petty, just if you can try to speak

20    behind the microphone.

21          MR. PETTY:  Yes.

22          THE COURT:  It's really hard -- although the court

23    reporter is transcribing and she can hear you, when she goes to

24    relisten to it on the recording, anytime you're away from the

25    microphone it's not picked up or it might be very weak.  So to

1    the extent you can, talk behind the microphone.

2              MR. PETTY:  Understood, Your Honor.

3              THE COURT:  Thank you.

4    BY MR. PETTY:

5    Q.    Mr. Khan, did you sign this document?

6    A.    Yes.

7    Q.    Did you provide the information that this document

8    contains?

9    A.    Yeah.  Address I provide.

10   Q.    Does this have the correct sex?

11   A.    No.  The name is not correct.

12   Q.    What is the name on this document?

13   A.    Mohammad Akhtar.

14   Q.    Okay.  Is that the name that you used when you entered the

15   United States?

16   A.    Yes.

17   Q.    Is that the name that your attorney told you to sign your

18   name as?

19   A.    Yes.

20   Q.    Okay.

21             MR. PETTY:  Just a moment, please.

22   BY MR. PETTY:

23   Q.    Okay.  Do you see in the top center where there's a box

24   for male and female?

25   A.    Uh-huh (affirmative).  Yes.

1   Q.   And the box male is checked?  Do you see that?  In the top

2   center.

3   A.   Top center?

4   Q.   Was that correct?  You are a male?

5   A.   Yes.

6   Q.   Okay.  And your nationality is Pakistan --

7   A.   Yes.

8   Q.   -- or was at that time?

9   A.   Yes.

10  Q.   Okay.  If you go down to the center of the page, is that

11  your correct residence in Pakistan?

12  A.   Yes.

13  Q.   And then you mentioned that you signed this in the bottom

14  right, correct?

15  A.   Yes.

16  Q.   Okay.

17       MR. PETTY:  Okay.  Retrieving that document from the

18  witness.

19  BY MR. PETTY:

20  Q.   Let's turn to the I-485.

21       (Counsel confers with courtroom deputy.)

22       THE COURT:  Number 7?

23       MR. PETTY:  The certified I-485.

24       I'm handing to the witness Plaintiff's Exhibit 7.

25  BY MR. PETTY:

1  Q.   If you'd turn to page 4, is that your signature in the

2  upper left?

3  A.   Yes.

4  Q.   And you signed this document on January 10th, 1998; is

5  that right?

6  A.   Page 4 I don't see any -- my signature here.

7  Q.   The last page before the...

8        I'm not including the cover page.  So it might be 5.

9        THE COURT:  Mr. Petty, why don't you go over and show

10  the witness what you're referring to.

11        THE DEFENDANT:  I don't see any -- my signature here.

12     (Counsel confer.)

13        MR. PETTY:  This is -- this is not the -- this is the

14  wrong exhibit.  Just a moment.  I need 8.  The other certified

15  document.

16        I'm handing the witness Government's Exhibit 8.

17  BY MR. PETTY:

18  Q.   Mr. Khan, is that your signature on Government's Exhibit

19  8?

20  A.   Yes.

21  Q.   And this was submitted together with the I-130 that we

22  looked at previously, right?

23  A.   Yes.

24  Q.   And you signed this on January 10th, 1998; is that

25  correct?

1    A.    Yes.

2    Q.    And that was three days after you got married?

3    A.    Yes.

4    Q.    And you understood that by signing this form you were

5    certifying under penalty of perjury that this application was

6    true and correct, right?

7    A.    Yes.

8    Q.    Okay.  And by 1998 you had sufficient capacity in the

9    English language to communicate with your wife, right?

10   A.    Yes.

11   Q.    And this document has your correct name at the top?  If

12   you'd flip back to the first page.

13              THE COURT:  He's not including the cover page.

14              MR. PETTY:  Not the cover page.  The first page of

15   the application.

16   BY MR. PETTY:

17   Q.    Do you see your name at the top of that page?

18   A.    Yes.

19   Q.    And that's your correct name?

20   A.    That's my correct name.

21   Q.    And the addresses that are written here, were those your

22   correct addresses?

23   A.    Yes.

24   Q.    And the typed address, 11810 Southwest 176th Street, was

25   that correct as of the time that you originally filled out this

1    application?

2    A.    Honestly, I don't remember this address, where I am that

3    time.

4    Q.    Are any of the addresses on this document your correct

5    address?

6    A.    Holmes Street, yes, Apartment 12.  Yeah, I remember this

7    address.

8    Q.    Okay.  And it has your correct birth date on it; is that

9    right?

10   A.    Yes.  Correct.

11   Q.    And your correct country of birth?

12   A.    Yes.

13   Q.    And your correct Social Security number?

14   A.    Yes.

15   Q.    For date of last arrival it says 12/1990.  Is that when

16   you arrived at Los Angeles?

17   A.    Yes.

18   Q.    That was in 1991, not 199- --

19   A.    '91.

20   Q.    But it was December?

21   A.    No.  That's wrong.

22   Q.    Okay.  Now, if you move down to part 2 -- well, let me ask

23   you this.  Did you speak with a lawyer about filling out this

24   application?

25   A.    Not really.  Not very good English that time.

1  Q.   Did you speak with a lawyer at all about this application?

2  A.   No.

3  Q.   Well, who filled out this application?

4  A.   Somebody is there, you know, some lady.

5  Q.   Some lady filled it out?

6  A.   In the office, sir.  She immigration, file applications in

7  Miami.

8  Q.   Did you provide information for her?

9  A.   Yes.

10 Q.   Did you tell her that you thought you'd been granted

11 asylum?

12 A.   Yes.

13 Q.   Did you read this application before you signed it?

14 A.   No.

15 Q.   Did you go over this application with an immigration

16 officer?

17 A.   Yes.

18 Q.   Did the immigration officer ask you questions about it?

19 A.   I don't remember.  All the questions you're asking me,

20 honestly, I don't remember, not even one.

21 Q.   So you don't remember --

22 A.   Yes.

23 Q.   -- having lived at 1127 Northeast --

24 A.   I just know -- I remember my signature, where I -- I

25 remember my signature.  But beside that, what I said -- I

1    remember my address -- home address.  But beside that, I don't

2    remember.

3    Q.    Do you remember going to a government office to go over

4    those documents?

5    A.    Yes, I remember.

6    Q.    If you go to page 2 -- and I'm looking at the page numbers

7    in the bottom right, the handwritten numbers on the bottom

8    right.

9              Okay.  Page 2, at the top of page 2 -- do you see

10   where at the top right it says current occupation taxi driver?

11   A.    Yes.

12   Q.    Was that correct?

13   A.    Yes, correct.

14   Q.    Okay.  And where it says place of last entry into the U.S.

15   and it says, Miami, Florida --

16   A.    Yes.

17   Q.    -- that's not correct, is it?

18   A.    Not correct.

19   Q.    And you didn't forget that you entered in Los Angeles,

20   right?

21   A.    No.

22   Q.    You remember leaving from Kerachi and flying to

23   Los Angeles?

24   A.    Yes.

25   Q.    And then the bus trip --

1    A.    Yes.

2    Q.    -- from Los Angeles to Miami?

3    A.    Yes.

4    Q.    Okay.  If you go down to part (b) on this page, do you see

5    all the -- the information here relating to your children?

6    A.    Uh-huh (affirmative).  Yes.

7    Q.    And all of that information is correct, isn't it?

8    A.    It's correct.

9    Q.    Okay.  And then if you turn to the next page, do you see

10   question 1 at the top, where there's written in red ink claims

11   one arrest?

12          Do you see where that's written?

13          Do you see where it's written in red ink claims one

14   arrest?

15   A.    Uh-huh (affirmative).  Yes.

16   Q.    Is that the one arrest that we discussed previously?

17   A.    Yes.

18   Q.    So that's accurate?

19   A.    Yes.

20   Q.    Okay.  Okay.  And then if you turn to the next page, do

21   you see there's a cell phone number written in red ink?

22   A.    Yes.

23   Q.    Was that your cell phone number?

24   A.    Yes.

25   Q.    Okay.  Now, if you'd turn back to page 2, do you see in

1  the upper right where it has a typed word for visitor and then

2  it's crossed out and then a handwritten notation EWI, which is

3  then crossed out, and then EWI written in red ink?

4  A.   That's the page you're talking about?

5  Q.   No.

6         MR. LAVIGNE:  The one after that, I think.

7         THE DEFENDANT:  Oh, this one?

8  BY MR. PETTY:

9  Q.   Right here.

10  A.   Okay.

11         THE COURT:  Mr. Petty, are there page numbers at the

12  bottom?

13         MR. PETTY:  There --

14         THE COURT:  Or at the top?

15         MR. PETTY:  There are not.

16         THE COURT:  Okay.  Then we're looking at page 2, not

17  including the cover page?

18         MR. PETTY:  We are -- yes.  There's a handwritten

19  note in the lower right corner for page 2.  We're looking at

20  the box in the upper right that says, as part of the form, In

21  what status did you last enter?  Visitor, student exchange,

22  alien crewman, and temporary worker without inspection,

23  et cetera.

24  BY MR. PETTY:

25  Q.   Mr. Khan, do you see where we're looking at right now?

1  A.    Yes.

2  Q.    Okay.  Now, you wrote in your affidavit in paragraph 45

3  that you did not write down that you were EWI, meaning entry

4  without inspection.

5          Is that still your testimony?

6  A.    What is that, EWI?

7  Q.    Did you tell the person who interviewed you about this

8  application that you entered the United States without

9  inspection?

10  A.    I don't remember.

11  Q.    Did you tell the person interviewing you about this

12  application that you entered on a visa?

13  A.    No.  I don't say it like that, that I had a visa.

14  Q.    I'm sorry?  I didn't understand.

15  A.    I don't said like that, that I had a visa.

16  Q.    You did not say that you had a visa?

17  A.    No.

18          THE COURT:  Another double negative.

19  BY MR. PETTY:

20  Q.    So just to be clear, is it your testimony that you did not

21  tell the officer interviewing you about this application that

22  you entered as a visitor?

23          Is that correct?

24  A.    Yes, correct.

25  Q.    Okay.  Okay.  So I'd like you to take a moment and look at

1  the red marks on this application.  And I believe we've gone

2  over most of them.  And tell me if there are any red marks that

3  are wrong.

4         THE COURT:  Mr. Petty, I think he's ready, if you'll

5  ask the question again.

6  BY MR. PETTY:

7  Q.    Is there anything written in red ink that is incorrect?

8  A.    It's correct, all of it.

9  Q.    All of it is correct?

10 A.    Yes.

11 Q.    Okay.

12 A.    One thing is not correct with this here, is the arrest

13 only one time.  But I arrest twice.

14 Q.    So you -- in the twice, you're including the one in

15 Florida?

16 A.    Yeah, question number 1.

17 Q.    Could you repeat that?  Could you repeat the last thing

18 you said?  I didn't understand.

19 A.    No, this is not correct, the first number 1.

20 Q.    The first number 1?

21 A.    Yes.

22        MR. LAVIGNE:  On part 3?  Is that what you're looking

23 at?

24        THE DEFENDANT:  Yes.  Claim one arrest, part 3.

25        THE COURT:  Mr. Petty, why don't you go over and see

1  what he's pointing at, and then you can ask him a question,

2  please.

3           THE DEFENDANT:  Claim one arrest.

4  BY MR. PETTY:

5  Q.   Okay.

6  A.   But I was twice.

7  Q.   So what you're saying is that where it says claims one

8  arrest, that's wrong, because you'd claimed two arrests?

9  A.   Two arrests.  I was arrested first in LA, and the second

10  in Miami.

11  Q.   Okay.  Did you tell the officer that was interviewing you

12  about this application that you'd been arrested twice?

13  A.   No.  No.  He not ask me.

14  Q.   Okay.  So apart from that, everything else that's written

15  in red is correct?

16  A.   Yes, it's correct.

17  Q.   Okay.  Let's look at question 9 on page 3.

18           Question 9 asks if you are now in exclusion or

19  deportation proceedings.  And, now, as I understand your

20  testimony today, you thought you had been granted asylum.

21           Is that right?

22  A.   Yes.

23  Q.   Okay.  And that's what you said today and that's what you

24  said in your affidavit?

25  A.   I never received any paperwork that I'm deported.  Never.

1  Q.    Okay.  So you thought that you were answering this

2  question honestly?

3  A.    Yes.

4  Q.    Okay.  Now, let's go to the next question.

5  A.    Uh-huh (affirmative).

6  Q.    In pertinent part it reads, Have you by fraud or willful

7  misrepresentation of a material fact ever sought to procure, or

8  procured, a visa, other documentation, entry into the U.S., or

9  any other immigration benefit?

10        And you answered this question no; is that right?

11  A.    Yes.

12  Q.    But you knew when you answered this question that when you

13  arrived in the United States you had presented a passport under

14  the name Mohammad Akhtar?

15  A.    Yes.

16  Q.    And you knew that you are not Mohammad Akhtar?

17  A.    Yes.

18  Q.    And your testimony earlier today was that it was your

19  intent by using that passport to gain entry to the United

20  States?

21  A.    Yes.

22  Q.    And you knew all of that at the time that you signed this

23  document?

24  A.    I knew, but I don't mention anybody that -- I don't

25  mention here that I was arrested in California.

1  Q.   Okay.  I'm not asking about the arrest.

2  A.   Yes.

3  Q.   I'm saying, at the time that you signed this document, you

4  knew you'd used the Mohammad Akhtar passport?

5  A.   Yes.

6  Q.   Okay.  And that your intent in using that passport was to

7  get into the United States?

8  A.   Yes.

9  Q.   Okay.  You didn't forget you'd used someone else's

10  passport?

11  A.   Yes.  I don't forgot, yes.

12  Q.   And, now, you said in your affidavit that you didn't

13  remember the name.  But you knew that it was somebody else's

14  name?

15  A.   Yes.

16  Q.   And not your own name?

17  A.   Yes.

18  Q.   And you remember boarding the plane in Pakistan?

19  A.   Yes.

20  Q.   And arriving in Los Angeles?

21  A.   Yes.

22  Q.   And not in Miami?

23  A.   Yes.

24  Q.   And you remember presenting your passport to the

25  immigration officer?

1    A.    Yes.

2    Q.    Meaning the Mohammad Akhtar passport.

3    A.    Yes.

4    Q.    You remember being detained --

5    A.    Yes.

6    Q.    -- for a month --

7    A.    Yes.

8    Q.    -- with nobody who spoke your language?

9    A.    Yes.

10   Q.    And you remember being released in the middle of the

11   night?

12   A.    Yes.

13   Q.    And you remember making a cross-country journey by bus to

14   join your brother in Miami?

15   A.    Yes.

16   Q.    Okay.

17            MR. PETTY:  If I could have --

18            THE COURT:  Are you moving to a different document,

19   Mr. Petty?

20            MR. PETTY:  Yes, Your Honor.

21            THE COURT:  Would now be a good time to take a short

22   break?

23            MR. PETTY:  I don't -- well, let me see how much

24   longer I have.  We can take a short break, Your Honor.

25            THE COURT:  All right.  Let's take a five-minute

1    break -- a seven-minute break.  We'll be back on the record at
2    10:35.
3                    Mr. Khan, feel free to take a break.  You'll remain
4    under oath.  All right.
5                    MR. PETTY:  And, Your Honor, could you remind
6    Mr. Khan that he's not to discuss his testimony with the other
7    witnesses.
8                    THE COURT:  Yes.  Mr. Khan, there are other witnesses
9    in the case.  You're not to discuss your case or your testimony
10   with the other witnesses.
11                   Do you understand?
12                   THE DEFENDANT:  Okay.  Okay.
13                   THE COURT:  All right.  Thank you.
14                   THE DEFENDANT:  Only my wife is there with me.
15                   THE COURT:  Right.
16                   MR. LAVIGNE:  I'll make sure he doesn't.
17                   You can't talk to anybody else except your lawyers.
18                   THE DEFENDANT:  Okay.  Okay.
19                   MR. LAVIGNE:  You understand that?
20                   THE DEFENDANT:  Yes.
21                   THE COURT:  Take a break, stand up, have a drink of
22   water, what have you, talk to your lawyer, but nothing else.
23                   Thank you.
24                   COURT SECURITY OFFICER:  All rise.
25                (Recess from 10:28 a.m. to 10:36 a.m.; all parties

1   present.)

2           COURT SECURITY OFFICER:  All rise.  This Honorable

3   Court is now in session.  Please be seated.

4           THE COURT:  We're back on the record in 3:17-cv-965.

5           Mr. Khan, you remain under oath.

6           Mr. Petty.

7           MR. PETTY:  I'm handing the witness what's been

8   previously admitted as Plaintiff's Exhibit 7 and retrieving

9   Exhibit 8.

10          MR. LAVIGNE:  I'm sorry.  Could you just quickly

11  identify what number 7 was.

12          MR. PETTY:  That's the N-400.

13          MR. LAVIGNE:  Okay.

14  BY MR. PETTY:

15  Q.   Mr. Khan, this is the document that you submitted to apply

16  for U.S. citizenship, correct?

17  A.   Correct.

18  Q.   And if you turn all the way to the end, around page 10 and

19  part 11 -- and I'll help you out.

20          If you look at part 11, you signed this document

21  there; is that correct?

22  A.   Yes.

23  Q.   Okay.  And it's dated December 1st, 2005; is that right?

24  A.   Yes.

25  Q.   So that's about eight years after you got married to your

 1 | wife?

 2 | A.   Yes.

 3 | Q.   And in -- at that time in December of 2005, you understood

 4 | English reasonably well?

 5 | A.   Not very much, but --

 6 | Q.   Enough?

 7 | A.   Yes.

 8 | Q.   And you'd been in the United States for about 13 years at

 9 | that point; is that right?

10 | A.   Yes.

11 | Q.   So you were able to read where it says, above your

12 | signature line, I certify under penalty of perjury under the

13 | laws of the United States of America that this application and

14 | the evidence submitted with it are all true and correct?

15 | A.   Yes.

16 | Q.   And you understood what that meant?

17 | A.   Yes.

18 | Q.   And as we discussed with some of the earlier documents,

19 | you intended to sign this document, right?

20 | A.   Yes.

21 | Q.   It wasn't an accident that you signed it?

22 | A.   No.

23 | Q.   It wasn't a slip of the pen?

24 | A.   No.

25 |          THE COURT:  Lots of double negatives there.

1  BY MR. PETTY:

2  Q.    Did you intend to sign this?

3  A.    Yes.

4  Q.    Was it an accident that you signed it?

5  A.    No.  No accident.  I signed myself.

6  Q.    No one threatened -- did anyone threaten you?

7  A.    No.

8  Q.    Okay.  And after you signed this, you submitted this to a

9  government agency so that you could become a citizen, right?

10  A.    Yes.

11  Q.    And you understood that your responses on this document

12  would be used to make that decision?

13  A.    Yes.

14  Q.    Okay.  So let's turn back to page 1, which is the page

15  with the stamp on it, not the -- yes, that page.  Thank you.

16        Okay.  So for these next few questions, I'm only

17  talking about what's written in black on the form, not the red.

18  Okay?

19  A.    (Nods head affirmatively.)

20  Q.    Okay.  So if you look in part 1(a) at the top, where it

21  says family name Kahn, given name Parvez, and then for middle

22  name you put M., that's your correct name, right?

23  A.    Right.

24  Q.    Okay.  And then that -- and then in part (b) you've

25  written the same thing, and that was your name exactly as it

1   appeared on your permanent resident card, right?

2   A.    Yes.

3   Q.    Okay.  And then in part (c) it says, If you've ever used

4   other names, provide them below.  And then there are three

5   horizontal slashes there.  Do you see that?

6   A.    Yes.

7   Q.    Okay.  Now, in your affidavit you wrote, quote, I did not

8   knowingly fail to disclose any aliases on my I-485 or N-400

9   since I did not remember the name on the passport.

10          Is that still your testimony?

11  A.    Yes.

12  Q.    Okay.  But you didn't write, I forgot the name on the

13  passport, in part 1(c), did you?

14  A.    The (c)?

15          THE COURT:  Why don't you ask the question again.

16  BY MR. PETTY:

17  Q.    You didn't write, I forgot the name on the passport, did

18  you?

19  A.    I don't write anywhere that I forgot the passport.

20  Q.    Right.  You drew three lines through the box where you

21  were asked --

22  A.    I don't drew.  This is not -- I don't fill out this

23  application.  Not myself.

24  Q.    Okay.  But you signed this application, right?

25  A.    They told me to sign here.  I just sign.

1   Q.   Okay.  Let's go to page 8.  Do you see in part 10(d),

2   question 15, which is the first question on this page, where it

3   says, Have you ever committed a crime or offense for which you

4   were not arrested?

5          Do you see that?

6   A.   Yes, in 15.

7   Q.   Yeah.  And you're aware that lying under oath is a crime,

8   correct?

9   A.   Yes.  It says no, but that's wrong.

10  Q.   What's wrong?

11  A.   Ever committed crime.  I arrested.

12  Q.   Are you saying that you have committed a crime or offense

13  for --

14  A.   Yes.

15  Q.   -- which you were not arrested?

16  A.   Yes.  I arrest one time.

17  Q.   But you were arrested for that?

18  A.   Yes.

19  Q.   Okay.

20          MR. LAVIGNE:  Objection, Your Honor.  I think the

21  question is vague.  It says for which you have not been

22  arrested.  What he said was -- was for what he was arrested

23  for.

24          THE COURT:  Why don't you -- there's a little bit of

25  confusion there.

1    Why don't -- Mr. Petty, why don't you ask that

2    question again.

3         THE DEFENDANT:  Not arrested.

4    BY MR. PETTY:

5    Q.   Okay.  Question 10(d) asks, Have you ever committed a

6    crime or offense for which you were not arrested?  Do you see

7    that?

8    A.   Yes.  I say no.  That's the right answer.

9    Q.   Okay.  And at the time that you signed this document, you

10   were aware that lying under oath is a crime; is that right?

11   A.   Yes.

12   Q.   And at the time you signed this document, had you ever

13   lied under oath?

14   A.   No.

15   Q.   Okay.  Question 16 asks, Have you ever been arrested,

16   cited, or detained by any law enforcement officers, including

17   INS and military officers, for any reason?  And you checked the

18   box marked no; is that right?

19   A.   Yes.

20   Q.   And then at the interview, when you were interviewed on

21   your application, you indicated verbally that you had been, in

22   fact, arrested once, that time in April of '95 in Miami-Dade,

23   right?

24   A.   Yes.

25   Q.   Okay.  And you told the officer conducting the interview

1   that there were no other times that you had been arrested,

2   cited, or detained by any law enforcement officer, including

3   INS and military officers, for any reason, right?

4   A.   Yes.

5   Q.   You were asked that question verbally?

6   A.   Yes.

7   Q.   And you responded no, just the one time in Miami-Dade?

8   A.   Yes.

9   Q.   Okay.  But that wasn't accurate, was it?

10  A.   You're asking about question number 17?

11  Q.   No.  I'm asking about question 16.

12  A.   16?  Yeah, that's wrong.

13  Q.   Right.  Because you previously testified that you were

14  detained by INS officers when you arrived here in 1991, right?

15  A.   Yes.

16  Q.   And, actually, you used that -- that same language in your

17  affidavit when you said, I was detained for a month in a cell

18  with people from India, right?

19  A.   Uh-huh (affirmative).  Yes.

20  Q.   And we already talked about the fact that you recall that

21  it was a month long, right?

22  A.   Yes.

23  Q.   And that nobody spoke your language?

24  A.   Yes.

25  Q.   And that you didn't have anything to do all day?

1  A.   Yes.

2  Q.   And you went before an immigration judge?

3  A.   Yes.

4  Q.   And you were released in the middle of the night?

5  A.   Yes.

6  Q.   And you got a cab to a motel?

7  A.   Yes.

8  Q.   And you got a bus ticket --

9  A.   Right.

10 Q.   -- to go across the country?

11 A.   Yes.

12 Q.   Okay.  Further down that same page, question 23 asks, Have

13 you ever given false or misleading information to any U.S.

14 government official while applying for any immigration benefit

15 or to prevent deportation, exclusion, or removal?

16      And the box marked no is checked, right?

17 A.   Yes.

18 Q.   And that's inaccurate, also, right?

19 A.   Yes.

20 Q.   Because you did give misleading information to the

21 immigration officer that inspected you when you first got to

22 the United States?

23 A.   Yes.

24 Q.   You gave the immigration officer a passport --

25 A.   Yes.

1   Q.   -- in the name of Mohammad Akhtar?

2   A.   Yes.

3   Q.   And that was misleading?

4   A.   Yes.

5   Q.   Okay.  And that was for the purpose of being allowed into

6   the United States?

7   A.   Yes.

8   Q.   Okay.  And then question 24 is similar.  It asks, Have you

9   ever lied to any U.S. government official to gain entry or

10  admission into the United States?

11       And you checked the box marked no, right?

12  A.   Yes.

13  Q.   Okay.  And that was inaccurate for the same reason?

14  A.   Yes.

15  Q.   Okay.  Let's turn to the next page, part 10(e).  Question

16  28 -- do you see question 28?

17  A.   Uh-huh (affirmative).

18  Q.   It says, Have you ever applied for any kind of relief from

19  removal, exclusion, or deportation?  And you checked the box

20  marked no, right?

21  A.   Yes.

22  Q.   And that's also inaccurate, isn't it?

23  A.   Have you ever applied for any kind of relief?  I don't

24  apply any relief from government, no.

25  Q.   Do you recall when I asked you a little while ago about

1  paragraph 51 of your affidavit, where you said, quote, I

2  thought I was granted asylum since I was released from custody

3  on January 7th, 1992?

4          Do you recall me asking you that?

5  A.   What's your question?

6  Q.   Do you recall me asking you, in reference to paragraph 51

7  of your affidavit, where you said, quote, I thought I was

8  granted asylum -- do you remember me asking you that a moment

9  ago, a little while ago?

10 A.   I don't apply any asylum.

11 Q.   No, that's not what I'm asking you.  I'm asking you:  Do

12 you remember me asking you a question about your affidavit

13 where you said, I thought I was granted asylum?

14 A.   Yes, I remember.

15 Q.   Okay.  And I asked you did you believe that you were

16 granted asylum in the United States.  And you said yes.

17         Do you remember that?

18 A.   I don't remember.  I don't apply any asylum.

19 Q.   So your testimony is that you never applied for asylum?

20 A.   No.  I don't sign -- I don't ask anybody to asylum.

21 Q.   Okay.  Do you remember signing in your affidavit --

22 signing your affidavit where you said that you thought you had

23 been granted asylum?

24 A.   In the LA, in the jail immigration --

25 Q.   Yes.

1  A.    -- attorney --

2  Q.    Yes.

3  A.    He came.  I signed some paper.  But I don't know what I'm

4  signing.

5  Q.    Okay.  But then you wrote --

6  A.    I don't -- yes.  And they release -- release me at night

7  in the middle of the night.  They say, Go, you're free to go.

8  I thought, I'm free.

9  Q.    Do you remember signing in the affidavit that you made

10 with your attorney --

11 A.    Yes.

12 Q.    -- that you said, I thought I had been granted asylum?

13 A.    I thought that I'm free.  They told me, Go, leave, free to

14 go.

15 Q.    Okay.  So is it your testimony that you thought you had

16 been granted asylum, or that you hadn't?

17 A.    I don't know.  Honestly, I don't remember.  But I remember

18 that -- that the jail people, they told me to leave, You're

19 free to go.

20        And they gave me one card.  And I lost that card,

21 too.  I don't remember why they released me, why they tell me

22 to go, leave.  I don't remember.

23 Q.    Okay.  But I'm asking you not about what happened in 1991.

24 I'm asking you about your affidavit that you did for this case.

25 A.    Uh-huh (affirmative).

1  Q.   Okay?  Your affidavit says, I thought I was granted

2  asylum, right?

3  A.   Right.

4  Q.   Okay.  So you thought you had been granted asylum, right?

5  A.   Yeah, I thought, but I'm not sure what is that.

6  Q.   And then you checked the box for no when you were asked,

7  Have you ever applied for any kind of relief from removal,

8  exclusion, or deportation; is that right?

9  A.   Right.

10  Q.   Okay.  But you knew that you had filed an asylum

11  application, because you said in your affidavit, I thought I

12  was granted asylum?

13        MR. LAVIGNE:  Your Honor, I think the line of

14  questions is simply argumentative at this time.

15        THE COURT:  All right.  Overruled.

16        THE DEFENDANT:  I'm really confused now what you

17  asking me.  I don't understand.

18        MR. PETTY:  May I have a moment, Your Honor?

19        THE COURT:  Yes.

20  BY MR. PETTY:

21  Q.   Mr. Khan, is it your belief right now that you were

22  granted asylum?

23  A.   Asylum for what?  I don't understand.  I no apply for the

24  asylum.  No, no way.

25  Q.   So your understanding is that you had not applied for

1    asylum?

2    A.    No, I don't sign -- nobody tell me that -- they told me

3    you're just free to go, leave.  I don't know why they -- what

4    condition they released me from the jail.  What is the name of

5    that release?  You know, I don't know.

6          (Counsel confer.)

7    BY MR. PETTY:

8    Q.    Okay.  Let's move on.  After you filed this application,

9    you went to an interview, right?

10   A.    Yes.

11   Q.    Okay.  And that was in May of 2006?

12   A.    Yes.

13   Q.    Okay.  And that took place in a government building,

14   right?

15   A.    Yes.

16   Q.    With U.S. Citizenship and Immigration Services?

17   A.    Yes.

18   Q.    And you knew that was a government agency, right?

19   A.    Yes.

20   Q.    And you went to a government office to do that?

21   A.    Yes.

22   Q.    And you knew your interview was with a government

23   official?

24   A.    Yes.

25   Q.    And you understood that this was a formal procedure?

1  A.    Oh, I remember that interview maybe few minutes, maybe
2  five minutes, because the lady --
3  Q.    I'm not asking you --
4  A.    Yeah.
5  Q.    Your attorney can ask that.
6  A.    Yeah.
7  Q.    Just yes or no.  You understood --
8  A.    Yes.
9  Q.    -- that this was a formal procedure --
10 A.    Yes.  Yes.  Yes.
11 Q.    -- right?
12       You knew this was in relation to your application for
13 naturalization?
14 A.    Yes.
15 Q.    Okay.  And you knew that the statements that you made
16 during that interview would be used to make a decision on
17 whether your application would be approved or not, right?
18 A.    Yes.
19 Q.    And you understood that the government official was going
20 to ask you some questions?
21 A.    Yes.
22 Q.    And when it was your turn you were called back to the
23 office, right?
24 A.    Yes.
25 Q.    And the officer spoke to you?

1   A.   No.

2   Q.   She never spoke to you?

3   A.   No.

4   Q.   At all?

5   A.   At all.

6   Q.   Okay.  And so she never asked you any questions?

7   A.   I don't remember.  She asked me maybe two, three minutes,

8   asking me that -- I remember -- oh, you can understand English,

9   something like that, you know, and write -- oh, I have a black

10  dog.  I remember she told me to write it.  That's two questions

11  I remember.

12  Q.   So you took the English proficiency exam?

13  A.   Right.

14  Q.   Okay.

15  A.   Very simple question, yes.

16  Q.   After that, did anyone speak to you about what you

17  actually wrote down on your application?

18  A.   No.

19  Q.   Never?  At all?

20  A.   At all.  Nobody asked me.

21  Q.   Nobody went through this application with you and asked

22  you the questions that are written there?

23  A.   Said it was an interview -- yes, she asked me a couple of

24  questions, but I don't remember.

25  Q.   You don't remember it happening, or you don't remember the

1  questions?

2  A.    I remember some -- a few questions she asked me.  And it

3  felt like a five-minute --

4  Q.    So somebody did talk to you about what was written there?

5  A.    Yes.  Right.

6  Q.    Okay.  So that's different from what you said a moment

7  ago.  Okay.  So you mentioned taking an English exam, right?

8  A.    English exam?

9  Q.    You wrote out the sentence to show that you could write in

10 English?

11 A.    Yeah, I was worried like -- like I have a dog, like this,

12 you know.

13 Q.    Okay.  And you passed that, right?

14 A.    Yeah, I passed.

15 Q.    Okay.  You didn't ask for a waiver of the English language

16 requirement?

17 A.    No.

18 Q.    And when that interview started, the officer asked you to

19 take an oath, right?

20 A.    Yes.

21 Q.    Okay.  And you raised your hand and took an oath?

22 A.    Yes.

23 Q.    Okay.  And you understood that that was the same as you

24 did today?

25 A.    Yes.

1    Q.    And you swore that you would tell the truth?

2    A.    Yes.

3    Q.    And you knew that during your interview you were required

4    to tell the truth to comply with that oath?

5    A.    Yes.

6    Q.    And you sat down and the officer asked you some questions,

7    right?

8    A.    Yes.

9    Q.    And she did that out loud, just as I'm doing to you right

10   now, right?

11   A.    Okay.

12   Q.    Is that a yes?

13   A.    Yes.

14   Q.    Okay.  And you gave your answers out loud, same as you're

15   doing right now, right?

16   A.    Yes.

17   Q.    Okay.  And the officer had that same form on the desk,

18   right?

19   A.    Officer no ask me so many questions like this, no.

20   Q.    No, I'm not asking if she asked you every single one.  I'm

21   saying that document was present during the interview, right?

22   A.    I don't know.

23   Q.    You don't remember?

24   A.    I don't remember -- there's so many documents there --

25   which documents was there.

1  Q.    Okay.  So in paragraph 46 of your affidavit, you say the

2  N-400 form has written changes and any changes in red were done

3  by the immigration officer.

4           Is that still your testimony?

5  A.    Paragraph 46, you said?

6           THE COURT:  Not in that.  He was talking about

7  paragraph 46 of your affidavit.

8           THE DEFENDANT:  Oh, okay.

9           MR. LAVIGNE:  May I request that he be given the

10  affidavit to look at that paragraph 46.

11           THE COURT:  Mr. Petty, why don't you -- ask your

12  question a little more clear.  And, yes, you can -- if you'll

13  hand him the affidavit, please.

14  BY MR. PETTY:

15  Q.    Paragraph 46 says that any red marks on the N-400 were

16  made by the immigration officer.  Is that still your testimony?

17  A.    Yes.

18  Q.    Okay.  So you do remember that the red marks were made by

19  the immigration officer?

20  A.    Red marks?

21  Q.    The red marks on the form.

22  A.    This form?

23  Q.    Yes.

24  A.    And here I said that I remember, right?  Written change

25  not by me.  That's true.  I don't change anything.

1  Q.   And then the next sentence?

2  A.   That's true.

3  Q.   Okay.  So you remember the immigration officer making

4  notations in red ink on the N-400?

5  A.   Yes.

6  Q.   Okay.  So, for example, if you turn back to the first page

7  of the form -- and I'll retrieve the affidavit.

8        So, for example, the immigration officer wrote in the

9  remainder of your middle name, Manzoor, right?

10 A.   Yes.

11 Q.   Okay.  And then it appears that -- that she wrote a 1 and

12 circled it to number the change.

13 A.   Yes.

14 Q.   And then she went along and asked you other questions on

15 this document, right?

16 A.   Yes.

17 Q.   So, for example, in part 1(d) she asked you did you want

18 to legally change your name?  And you said no, right?

19        Is that correct?

20 A.   Yes.

21 Q.   Okay.  And then she asked you in part 2(b) the basis for

22 your application.  And you said you'd been a lawful permanent

23 resident for three years and married to and living with the

24 same U.S. citizen for three years, and that the spouse -- your

25 spouse had been a citizen for three years.

1    You told her that was the provision of law you were

2   applying under?

3   A.   Yes.

4   Q.   Okay.  And then if you turn to the next page, in part

5   3(b), the officer asked you your date of birth, and you told

6   her your date of birth, right?  At the top center.

7   A.   Yes.

8   Q.   Okay.  And she asked you the date you became a permanent

9   resident.  And you told her that, right?

10   A.   Yes.

11   Q.   And she asked you where you were born.  And you told her

12   Pakistan.

13   A.   Yes.

14   Q.   And she asked you where you were currently a citizen of.

15   And you told her Pakistan, right?

16   A.   Yes.

17   Q.   And she asked you, Are either of your parents U.S.

18   citizens, and you said no?

19   A.   Yes.

20   Q.   And she asked you if you were married, and you said yes,

21   right?

22   A.   Yes.

23   Q.   And she asked you where you were living, and you gave her

24   that address that's marked in part 4(a), right?

25   A.   Yes.

1  Q.   Okay.  And she asked you for a -- your phone number.  And

2  you said the -- that phone number beginning with 407 was no

3  longer a good number, and then you gave her two other ones,

4  right?

5  A.   Right.

6  Q.   Okay.  And then on the next page, part 5 -- okay.  She

7  asked you if you were male or female, and you said male, right?

8  A.   Yes.

9  Q.   And she asked you your height, and you told her you were

10 five-foot-eleven.

11 A.   Yes.

12 Q.   And she asked you if you were Hispanic or Latino, and you

13 said no.

14 A.   Yes.

15 Q.   And she asked you what race do you consider yourself, and

16 you said Asian.

17 A.   Yes.

18 Q.   Okay.  And we can skip down.  She asked you what your

19 current employment was, and you said you're self-employed as a

20 taxi driver, right?

21 A.   Yes.

22 Q.   And that you were doing that up through the present time,

23 right?

24 A.   Yes.

25 Q.   Okay.  And then on the next page she asked you if there

1  were any trips outside the United States that you'd taken since

2  you filed this, and you told her that you'd been to Pakistan

3  and you'd taken four or five day trips to Canada, right?

4  A.    Yes.

5  Q.    Okay.  And then in part 8(b) she asked you your wife's

6  name.  And she added the name Betty, right?

7  A.    Yes.

8  Q.    Because Louise is actually her middle name, right?

9  A.    Yes.

10  Q.    Okay.  And she corrected your wife's date of birth, right,

11  because the year was off?

12  A.    Yeah.  My son date of birth -- no, wife -- my wife.  Yes.

13  Q.    Okay.  And she corrected -- or I guess added a day for

14  the -- for the date of marriage -- it looks like maybe it was

15  just a month and a year before.

16  A.    Yes.

17  Q.    But, in any event, she wrote in the correct month, day,

18  and year for your marriage, right?

19  A.    Right.

20  Q.    Okay.  And then on the next page, part 8, the officer

21  asked you if your spouse was a U.S. citizen, right?

22  A.    Yes.

23  Q.    And you said yes, she was.

24  A.    Yes.

25  Q.    And she asked you how your spouse became a citizen, and

1  you told her she became a citizen at birth, right?

2  A.   Yes.

3  Q.   Okay.  And the officer asked you how many times your

4  current spouse has been married, and you told her once.

5  A.   Yes.

6  Q.   And then on the next page, the officer asked you about

7  your children, and you told her that Usman was a child of your

8  current marriage.

9  A.   Yes.

10  Q.   And Stephanie was a child from a different relationship.

11  A.   Yes.

12  Q.   Okay.  And you told her that you're current on child

13  support.

14  A.   Yes.

15  Q.   And you told her that you had no other children.

16  A.   Yes.

17  Q.   Okay.  Okay.  And if we skip to page 8, Officer -- the

18  officer asked you, Have you ever been arrested, cited, or

19  detained by any law enforcement officer, including INS and

20  military officers, for any reason?

21       I'm looking at question 16.  Right?

22       And you told her yes, you had been.  And then you

23  told her about that arrest in Miami-Dade County, right?  And

24  you told her there were no other times?

25  A.   Yes.

1    Q.    And you also told her that you had been charged with

2    committing a crime or offense, and that was the same thing,

3    right, the arrest in Miami?

4    A.    Yes.

5    Q.    And then she changed your response to question 22(b) for

6    the same reason, right, because you had procured someone for

7    prostitution?

8              MR. LAVIGNE:  Objection, Your Honor.  That's not

9    established by the record.  It says nol-prossed.  That means

10   the case was dismissed.

11             THE COURT:  Ask the question again, please,

12   Mr. Petty.  What is your question?

13             MR. PETTY:  I'll withdraw the question.

14             THE COURT:  Okay.

15   BY MR. PETTY:

16   Q.    And the officer asked you if you had ever been a habitual

17   drunkard, and you said no.

18   A.    Yes.

19   Q.    Is that correct?

20   A.    Yes.

21   Q.    And she asked you if you've ever sold or smuggled

22   controlled substances, illegal drugs, or narcotics, and you

23   said no.

24   A.    Yes.

25   Q.    And she asked you have you ever been married to more than

1    one person at the same time, and you said no.

2    A.    Yes.

3    Q.    And she asked you have you ever helped anyone to enter or

4    try to enter the United States illegally, and you said no.

5    A.    Yes.

6    Q.    And she asked you have you ever gambled illegally or

7    received income from illegal gambling, and you said no.

8    A.    Yes.

9    Q.    And she asked you have you ever given false or misleading

10   information to any U.S. government official while applying for

11   any immigration benefit or to prevent deportation, exclusion,

12   or removal, and you said no.

13   A.    Yes.

14   Q.    And that was inaccurate for the reasons we've already

15   discussed, correct?

16   A.    What's your question?

17   Q.    That response was inaccurate, correct?

18   A.    Yes.

19   Q.    And then question 24:  Have you ever lied to any U.S.

20   government official to gain entry or admission into the United

21   States?

22          She asked you that and you responded no, right?

23   A.    Yes.

24   Q.    And that was also inaccurate, right?

25   A.    Yes.

1  Q.    And at the end of the interview the officer went over all

2  the changes that she made in red ink to this application with

3  you, didn't she?

4  A.    Yes.

5  Q.    And you reviewed all of them?

6  A.    Yes.

7  Q.    And she asked you if you had any other changes to make to

8  this application, right, and you told her that you did not have

9  any other changes to make?

10  A.    I don't remember really this question, you know --

11  Q.    Okay.  And then --

12  A.    -- that she asked me.

13  Q.    And then you signed the application again in part 13,

14  right?

15  A.    Yes.

16  Q.    And then she signed the application, as well?

17  A.    Yes.

18  Q.    And just like in part 11, when you signed it here, you

19  intended to sign it, right?

20  A.    Yes.

21  Q.    Because you knew you needed to sign it to move forward

22  with your application?

23  A.    Yes.

24  Q.    And it was not an accident that you signed it?

25  A.    Yes.

 1  Q.   I'll rephrase.  You --

 2        MR. LAVIGNE:  We stipulate he intended to sign it

 3  without --

 4        MR. PETTY:  Okay.

 5        MR. LAVIGNE:  -- being an accident under duress,

 6  coercion, or anything like that.

 7        THE COURT:  All right.  Thank you.

 8        MR. PETTY:  Okay.

 9     (Counsel confer.)

10        MR. PETTY:  I'm handing Plaintiff -- I'm handing

11  Plaintiff's Exhibit 13 back to the witness.

12        THE COURT:  Plaintiff's Exhibit 13.

13        MR. PETTY:  Yes, Your Honor, 13.

14        THE COURT:  Which document is that?

15        MR. PETTY:  That's the affidavit.

16        THE COURT:  Okay.

17  BY MR. PETTY:

18  Q.   Mr. Khan, drawing your attention to paragraph 46 of the

19  affidavit, you said, Any changes in red were done by an

20  immigration officer, not by me.  Some changes are not accurate.

21  I was misquoted.

22  A.   Yes.

23  Q.   I haven't noted anything in red today that we've covered

24  that you said was inaccurate.  Is there anything that is in a

25  red mark that is inaccurate?

1   A.   I can talk to my attorney.  He knows.

2   Q.   But your attorney wasn't present with you during the

3   interview, right?

4   A.   No.

5   Q.   Okay.  So he doesn't know what you could have been

6   misquoted about, right?

7   A.   I don't know.  I'm real confused what -- what is your

8   question?

9   Q.   So you said in your affidavit --

10  A.   Yes.

11  Q.   -- that you were misquoted.

12  A.   Yes.

13  Q.   I'm asking what were you misquoted about.  What's wrong?

14  A.   My mother name was wrong.  That's right here, you know.

15  Date of birth was wrong.

16  Q.   On what form are you looking?

17  A.   Number 47, 48.

18  Q.   No, no, no.  I'm referring to your N-400 and your I-485.

19           MR. PETTY:  Can I retrieve 7 and 8?

20           COURTROOM DEPUTY:  7 and 8?  I think you have 7.

21           MR. PETTY:  Oh, he has 7.  Just 8.

22  BY MR. PETTY:

23  Q.   So my question is -- paragraph 46 says the N-400 and the

24  I-485 forms, which are the two exhibits you have up there, That

25  written change is not made by me.  Any changes in red were done

1    by the immigration officer.  Not me.  Some changes are

2    inaccurate.  I was misquoted.

3    A.    Yes.

4    Q.    So my question is:  On those two forms, what marks in red

5    are wrong?

6    A.    This one?

7    Q.    Which one?

8    A.    You asking me this question, that what was wrong?

9    Q.    All right.  Yes.  Which notations in red ink are

10   incorrect?

11   A.    Is it claim one arrest?

12            THE COURT:  Mr. Khan, are you reviewing the document

13   or waiting for a question right now?

14            THE DEFENDANT:  Yes.

15            THE COURT:  You're reviewing it right now?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Okay.  Take your time.

18            THE DEFENDANT:  Yes.  Those questions are right.

19   BY MR. PETTY:

20   Q.    Which questions?

21   A.    Is all right, except one only question, you know.

22            MR. LAVIGNE:  What form are you looking at -- are we

23   looking at?  Is that the N-400?  Oh, it's the 485.

24       (Counsel confer.)

25            THE COURT:  All right.  Just, Mr. Petty, if you'll

1  clarify what he's looking at.  Mr. Khan was looking at the

2  I-485, which is Government's Exhibit 8.

3  BY MR. PETTY:

4  Q.    Okay.  So -- so just to clarify, you're saying that the

5  only incorrect red mark on Exhibit 8 --

6  A.    Yes.

7  Q.    -- is where it says claims one arrest on question 1 --

8  A.    Yes.

9  Q.    -- of part 3?

10 A.    Yes.

11 Q.    Is there anything wrong with 7 --

12 A.    No.

13 Q.    -- with Government Exhibit 7?  Any incorrect red marks on

14 that document?

15         THE COURT:  Why don't you, Mr. Khan, just take a few

16 minutes to review that.  What he's asking you, if any of those

17 red marks are incorrect.

18 BY MR. PETTY:

19 Q.    All of the red marks on the N-400 are correct?

20 A.    Yes.  That's correct.

21 Q.    Okay.

22         MR. LAVIGNE:  Your Honor, I can point out two --

23 well, I'll do it in my cross-examination.

24         THE COURT:  Please.

25         MR. LAVIGNE:  We're not going to stipulate that

1   there's no incorrect red marks.

2           THE COURT:  No, sir.  We're just asking him questions

3   right now.

4           MR. LAVIGNE:  Okay.

5           THE COURT:  You can clarify anything you'd like on

6   cross-examination --

7           MR. LAVIGNE:  We will.

8           THE COURT:  -- but not ask the questions right now or

9   testify.

10          MR. PETTY:  Okay.  I have retrieved Plaintiff's

11  Exhibit 7, Plaintiff's Exhibit --

12          THE COURT:  Mr. Khan, would you mind moving that

13  microphone back to your -- as closest to your mouth as

14  possible.

15          I'm sorry, Mr. Petty.

16          MR. PETTY:  So I've retrieved Plaintiff's Exhibits 7,

17  8, and 13 from the witness.

18  BY MR. PETTY:

19  Q.   Mr. Khan, do you remember applying for something called

20  advance parole in 2000 and 2001 to allow you to return back to

21  Pakistan?

22  A.   No, I don't remember.  I don't apply anything.

23  Q.   Did you go back to Pakistan in 2000 and 2001?

24  A.   Yes.  I --

25  Q.   You did?

1  A.    Yeah, I did.

2  Q.    Okay.

3          MR. PETTY:  I'm handing to the witness page number

4  472 of the joint exhibit.

5  BY MR. PETTY:

6  Q.    Mr. Khan, is that your signature on this document?

7  A.    Yes.

8  Q.    Okay.  Did you annotate this EWI?

9  A.    I don't know -- what is that EWI?

10 Q.    I'm not asking if you know what it is.  I'm asking did you

11 write it there, or did someone else write it there?

12 A.    No.

13          THE COURT:  Ask that question again.

14          THE DEFENDANT:  That's not my handwriting.

15 BY MR. PETTY:

16 Q.    Okay.  So someone else wrote it?

17 A.    Someone else.

18 Q.    Okay.

19 A.    But this is my signature.

20 Q.    Okay.

21          MR. PETTY:  Retrieving that document.

22          I'm handing the witness page numbers 473 and 474.

23 BY MR. PETTY:

24 Q.    Mr. Khan, is that your signature that appears on page 2?

25 A.    Yes.

 1  Q.   At the time that you signed this, did you believe that you

 2  had asylum status in the United States?

 3  A.   No, I don't believe.

 4          MR. PETTY:  Okay.  Retrieving that document.

 5          Handing the witness page number 435 of the joint

 6  exhibit.

 7  BY MR. PETTY:

 8  Q.   Mr. Khan, is that your signature on this document?

 9  A.   Yeah, that's my signature.  Yes.

10  Q.   Okay.  And did you write EWI on this document?

11  A.   No.

12  Q.   Okay.

13          THE COURT:  Mr. Petty, can I see which document that

14  is?

15          Thank you.

16          MR. PETTY:  Handing the witness pages 437 and 438 of

17  the joint exhibit.

18  BY MR. PETTY:

19  Q.   Mr. Khan, is that your signature on page 2 of this

20  document?

21  A.   Yes.

22  Q.   Okay.  And at the time that you signed this document, did

23  you believe that you had asylum status in the United States?

24  A.   I don't believe, because they told me to sign and I sign,

25  you know.  But I don't read the -- the --

1   Q.   I'm not asking you about the document.  I'm saying at the

2   time that you signed this, did you believe you had asylum

3   status in the United States?

4   A.   No.

5            MR. PETTY:  Retrieving that document.

6            THE COURT:  Mr. Petty, can I look at that also?

7            Thank you.

8   BY MR. PETTY:

9   Q.   Mr. Khan, you're aware that a visa is required to travel

10  from Pakistan to the United States, right?

11  A.   Yes.

12  Q.   And because you entered as Mohammad Akhtar, you were aware

13  that there was no visa issued to Parvez Manzoor Khan?

14  A.   Yes.

15  Q.   You've testified several times this morning that you just

16  signed a document because you were told to; is that right?

17  A.   Yes.

18  Q.   But not including your N-400, because you testified you

19  went through that line by line with the officer?

20  A.   Yes.

21  Q.   With regard to your application for adjustment of status,

22  the four-page I-485 document, you can -- do you know what I'm

23  referring to, the green card application?

24  A.   Yes.

25  Q.   Okay.  Is it your testimony that you didn't read that

1  document at all before you signed it?

2  A.   No.

3  Q.   Is it -- are you saying you didn't read it or you --

4  A.   No, I did not.

5  Q.   You did not read it?

6  A.   No.

7  Q.   At all?

8  A.   At all.

9  Q.   Okay.  So you knew that the information on the form would

10 be used to decide whether to give you the green card or not,

11 and you didn't read the application?

12 A.   I don't read application.

13 Q.   You didn't make sure it was accurate?

14 A.   No.

15 Q.   But you signed it?

16 A.   But I signed, yes.

17 Q.   Under penalty of perjury?

18 A.   Yes, I signed.

19 Q.   And you could read English in 1998, right?

20 A.   Not really very good.

21 Q.   Could you read it enough to understand that what you were

22 signing was under penalty of perjury?

23 A.   I'm still -- today, I don't read too -- very good English,

24 because I don't go to any school in the last 25 years.  I just

25 learn to drive taxi and here and there.

1    　　　　Mostly with my wife I learn English, but I don't go

2    any school.  Until today I cannot read very good English.

3    Q.   Okay.  Did you -- were you able to understand that the

4    document you were signing, the I-485 --

5    A.   No.

6    Q.   -- was under penalty of perjury?

7    A.   No.

8    Q.   You had no idea that was under penalty of perjury?

9    A.   No idea.  No.

10   Q.   Your attorney that represented you when you were detained

11   in California, Mr. Johnson --

12   A.   Yes.

13   Q.   -- he didn't represent you for any other application --

14   A.   No.

15   Q.   -- right?  He didn't represent you when you wanted advance

16   parole to go back to Pakistan?

17   A.   No.

18   Q.   He didn't represent -- on either occasion?

19   A.   No.

20   　　　　THE COURT:  Those were all double negatives.

21   　　　　THE DEFENDANT:  One paper I just sign.

22   BY MR. PETTY:

23   Q.   Okay.

24   A.   Just one paper.

25   Q.   Let me back up.  Okay?  Mr. Johnson only represented you

1   that one time?

2   A.   One time.

3   Q.   Okay.  When you filed your first request to go back to

4   Pakistan, the request for advance parole, there was a different

5   attorney that represented you?

6   A.   Different, yes.

7   Q.   And the second time there was yet a different attorney

8   that represented you?

9   A.   Yes.

10  Q.   And when you filed your -- your I-130 and your I-485 to

11  get your green card, that attorney was not Mr. Johnson?

12  A.   No.

13  Q.   I'm -- that attorney was someone other than Mr. Johnson?

14  A.   Yes.

15  Q.   And when you filed your N-400 to become a citizen, did you

16  have an attorney working with you then?

17  A.   No.

18  Q.   Okay.

19          MR. PETTY:  I have no further questions, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Mr. Lavigne.

22          MR. LAVIGNE:  Okay.  If I could just have all these

23  exhibits.

24          THE COURT:  Sir, how long do you anticipate having

25  with Mr. Khan, your best guess?

1          MR. LAVIGNE:  I could be 45 minutes to an hour.

2          THE COURT:  Okay.

3          MR. LAVIGNE:  I could either reserve and just put him

4    on my direct for the same questions, so the Government can

5    finish their case in chief, and put my witnesses on.  That

6    might be more efficient.

7          THE COURT:  Go ahead and do your cross-examination.

8    I was asking just to try to figure out lunchtime, but we'll --

9    why don't you go ahead and proceed --

10          MR. LAVIGNE:  Let's go as far as we can.

11          THE COURT:  -- and we'll play it by ear.

12          MR. LAVIGNE:  Sure.  Thank you, Your Honor.

13                        **CROSS-EXAMINATION**

14   BY MR. LAVIGNE:

15   Q.   Mr. Khan, let me show you what's been marked as

16   Plaintiff's Exhibit No. 10.  Can you look at that.  It appears

17   to be something of a transcript of what was said by you and

18   some officer in Abu Dhabi.

19   A.   Yes.

20   Q.   At the time you were pulled aside in Abu Dhabi --

21   A.   Yes.

22   Q.   -- had you already been interrogated by immigration at

23   San Francisco about three-and-a-half months before?

24   A.   First time they asked me question in Abu Dhabi.

25   Q.   Okay.

1  A.   The first time.  And they sent my paperwork, my passport,

2  to the --

3  Q.   To Jacksonville?

4  A.   Jacksonville, yes.

5  Q.   Okay.

6  A.   And before that San Francisco -- the first time -- no.

7  I'm wrong.  I'm sorry.  First time San Francisco.

8  Q.   And was that in November?

9  A.   Yes.

10  Q.   Of the previous year?

11  A.   Yes.

12  Q.   And would you tell the Court what happened then.

13  A.   Yes.  I -- yeah.  I told them, yes.

14  Q.   When you came in at that time, were you questioned by the

15  two officers, I think it was?  One was Flores?

16  A.   Yes.

17  Q.   A woman?

18  A.   Yes.

19  Q.   Another officer was Reveles?

20  A.   Yes.  I remember -- I don't remember the name, but I

21  remember one woman and one man.

22  Q.   Okay.  And did they tell you what they found in your

23  record?

24  A.   They don't ask me.  They just keep my passport and --

25  Q.   They kept your passport, too?

1  A.   Yes.  And they said that we're going to work it out and
2  we'll let you know.
3  Q.   Let you know?
4  A.   Yes.
5  Q.   Okay.
6            THE COURT:  Mr. Lavigne, to clear your lectern there,
7  would you like the courtroom deputy to take those away?
8            MR. LAVIGNE:  Yes.  Let me have her have these.  And
9  that may be -- thank you.
10            Let me go back to the...
11            All right.  I'm just going to, for the record, show
12  the witness from page 3 of the N-400 --
13            THE COURT:  And I'll just remind you also,
14  Mr. Lavigne, when you speak away from the microphone, we don't
15  have it on recording.  I think -- it's fine.  Just keep that in
16  mind.
17            MR. LAVIGNE:  Let me just do it from here.
18            THE COURT:  Thank you.
19  BY MR. LAVIGNE:
20  Q.   Okay.  Mr. Khan, I'm looking at the third page of the
21  N-400.  And I'm looking under hair color.  What was your hair
22  color when you applied for your citizenship?
23            You don't have that form in front of you?
24            THE COURT:  Mr. Khan, what is the exhibit that you're
25  looking at?  What is the exhibit number right now?

1          THE DEFENDANT:  18 -- 1-877.

2          MR. LAVIGNE:  The record is -- this is Plaintiff's

3    Exhibit 10, which I'm withdrawing.

4          THE COURT:  Thank you.

5          MR. LAVIGNE:  I'm not asking any questions on this.

6    That's the confusion.

7    BY MR. LAVIGNE:

8    Q.   Okay.  For the record, Mr. Khan, I'm looking at the N-400

9    with the red marks on it.

10   A.   Okay.

11         THE COURT:  Would you mind giving him the N-400?

12         MR. LAVIGNE:  Yeah.

13         THE COURT:  Do you need a copy of that, sir?

14         MR. LAVIGNE:  I thought we had another copy that was

15   put in the record?  Is that the one you were using?

16         MR. PETTY:  It's 7.

17         MR. LAVIGNE:  Is that up here?

18         THE COURT:  Why don't we put Exhibit 7, which is the

19   N-400, and Exhibit 8, which is the -- what is that, the I-485,

20   in front of Mr. Khan.  And if you'll just reference them.

21         MR. LAVIGNE:  Okay.  I was trying to find the exact

22   same number.

23         THE COURT:  We'll find -- why don't you give him the

24   whole -- let's just put the whole N-400 and the whole I-485 in

25   front of Mr. Khan.

 1            We can -- I'm sorry.  Not your notebook.  Let's

 2    actually find the original exhibits.

 3            Ms. Loeschen, do you have those?

 4            COURTROOM DEPUTY:  No, Your Honor, I do not.

 5            THE COURT:  All right.  Can someone find Exhibit 7

 6    and 8, please.

 7            All right.  There we go.

 8            All right.  If you'll just give them to Mr. Khan, and

 9    you can ask him questions about them.  If you'll just identify

10    which one you're talking about and then ask the question.

11            MR. LAVIGNE:  For the record, I'm going to give

12    Mr. Khan Plaintiff's Exhibit No. 7, which is the N-400

13    application --

14            THE COURT:  Okay.

15            MR. LAVIGNE:  -- and I'm going to give him

16    Plaintiff's Exhibit No. 8, which is the I-485 application.

17            THE COURT:  Thank you, sir.

18    BY MR. LAVIGNE:

19    Q.   Okay.  Mr. Khan, would you please look at page 3 --

20            MR. LAVIGNE:  I'm sorry.

21    BY MR. LAVIGNE:

22    Q.   Mr. Khan, would you please look at page 3 --

23    A.   Yes.

24    Q.   -- of the N-400 application.

25    A.   Yes.

1  Q.   Would you look under part 5, look under (f).  What hair

2  color did you mark off as your hair color?

3  A.   Black.

4  Q.   Is there a red mark?

5  A.   Yes.

6  Q.   Is that red mark -- for what color?

7  A.   Brown.

8  Q.   Was your hair ever brown?

9  A.   No.

10 Q.   Look underneath that sub part (g), eye color.  What did

11 you mark off as your eye color?

12 A.   Brown.

13 Q.   What did she mark off as red?

14 A.   Blue.

15 Q.   Were you eyes ever blue?

16 A.   No.

17 Q.   So there are two instances on this page of this incorrect

18 red markings?

19 A.   Yes.

20 Q.   Looking -- please look at all of the red marks.  On all

21 those pages, did you initial any of those red marks?

22 A.   No.

23          MR. LAVIGNE:  I'm withdrawing from the witness

24 Plaintiff's Exhibit No. 7 and Plaintiff's Exhibit No. 8 and

25 returning them to the clerk.

1          Does she have all the Plaintiff's exhibits here?

2          THE COURT:  Which one -- which form would you like?

3          MR. LAVIGNE:  The I-131.  I think it was 10.

4          THE COURT:  That's -- that's in the joint exhibit.

5          Mr. Petty, help him out with that.  What page number?

6          MR. LAVIGNE:  No.  I'm looking -- I'm back to the

7    I-485.  Okay.  Let me have that.  I think it's 7 or 8.

8    BY MR. LAVIGNE:

9    Q.   Mr. Khan, I'm -- for the record, Mr. Khan, I've just given

10   you Plaintiff's Exhibit No. 8.  Do you have that in front of

11   you?  Could you go to the second page, under part 3.

12   A.   Yes.

13   Q.   Where it says place of last entry into the U.S., you put

14   Miami, Florida?

15   A.   Yes.

16   Q.   Was that the place you went to to first live in the U.S.?

17   A.   Yes.

18   Q.   Underneath of -- next to that, where it says, In what

19   status did you last enter, what did you put in?  Let me

20   rephrase the question.

21          Did you put in the letters EWI in black?

22   A.   No.

23   Q.   Did you put in the letters EWI in red?

24   A.   No.

25   Q.   Do you recall whether that examiner asked you at that time

1  that if you entered the United States in Miami, Florida, were

2  you inspected in Miami, Florida only?

3  A.    No.

4  Q.    She did not ask you that question?

5  A.    No.

6  Q.    Please go to page -- let's go to part 3.  I think it's

7  another page or two later.

8  A.    What page?

9  Q.    Part 3.  It's page 143 in the Bates numbers.

10 A.    Yes.

11 Q.    Go down to number 9.  The question is, Have you ever been

12 deported from the U.S. or removed from the U.S. at government

13 expense, excluded within the last year, or are you now in

14 exclusion or deportation proceedings?  At that time you

15 answered that no.

16 A.    Yes.

17 Q.    At that time did you have any order of deportation or

18 removal that was ever given to you by any government agency,

19 immigration court, or lawyer, or anyone?

20 A.    No.

21 Q.    Number 10, the question is, Are you under a final order of

22 civil penalty for violating Section 274(c) of the Immigration

23 Act for use of fraudulent documents?  Were you under any civil

24 penalty or final penalty for filing fraudulent documents?

25 A.    No.

1  Q.   Okay.

2       MR. LAVIGNE:  Okay.  Do we have the petition for

3  alien relative?  That was number -- the I-130?  Or was that

4  different -- was that part of --

5       MR. PETTY:  It's part of the joint.

6       MR. LAVIGNE:  The joint?  Okay.

7  BY MR. LAVIGNE:

8  Q.   I am looking at the petition for alien relative, which is

9  an I-130.  And the Bates number I have is pages 146 and 147.

10      Okay.  I think it's the only one I have.  Look at

11 number -- let me approach the -- look at -- look at number 14.

12      What was the answer given as to what the status was

13 or what you thought you had arrived in?

14 A.   That's 14(a) or 14(b)?  There's two 14 here.

15 Q.   Look...

16 A.   13.

17 Q.   Look at 14.  Does the word visitor appear in answer to

18 number 14?

19 A.   Yes.

20 Q.   Look at the line below.  Do the words lost I-94 appear on

21 that application?

22 A.   Yes.

23 Q.   At the time you filled in -- or your wife filled in this

24 application, did you remember the name Mohammad Akhtar?

25 A.   No.

1   Q.   At the time you made your application for the 485, did you

2   have any recollection of a name Mohammad Akhtar?

3   A.   No.

4   Q.   At the time you made the application for N-400, did you

5   have any recollection of the name Mohammad Akhtar?

6   A.   No.

7   Q.   Okay.

8            MR. LAVIGNE:  Let me retrieve these documents from

9   the witness.

10           THE COURT:  And, Mr. Lavigne, if it would make it

11   easier, so you don't have to go back and forth, you can keep

12   those documents with you to reference.

13           And, Mr. McFarland, if you could pull -- if the

14   witness needs to look at a document, perhaps you can assist by

15   getting it from the actual joint exhibit --

16           MR. MCFARLAND:  Okay.

17           THE COURT:  -- and handing it to the witness.

18           MR. LAVIGNE:  Okay.

19           THE COURT:  And, Mr. McFarland, they're over here by

20   the courtroom deputy.  We have Exhibits 7 and 8 there.  But

21   then the joint exhibit I think is right in front of her.

22           What numbers would you like?

23           MR. LAVIGNE:  Well, the -- from the joint exhibit?

24           THE COURT:  Yeah.  What Bates numbers?

25           MR. LAVIGNE:  Bates numbers 231 -- 231.  That's in

1    the -- I believe the redacted.  I want to be careful.

2    BY MR. LAVIGNE:

3    Q.    I will have my associate counsel, Mr. McFarland, show you

4    page 231.  It appears to be something from the United States

5    Department of Justice Immigration and Naturalization Service,

6    dated March 25, 1993, to Howard George Johnson.  It looked to

7    be an order for you to surrender yourself for deportation.

8          Do you ever remember seeing this before this lawsuit,

9    this page?

10   A.    No.

11   Q.    Did Mr. Johnson ever mail that to you or your brother?

12   A.    No.

13         MR. LAVIGNE:  Okay.  Mr. McFarland, I'd like to show

14   him the next page, which is 232.

15   BY MR. LAVIGNE:

16   Q.    The top of the document reads, Receipt of immigration

17   officer, United States bonds or notes or cash accepted as

18   security on immigration bond.  The name of the obligator there

19   is Howard George Johnson.

20         Were you ever supplied a copy of this bond?

21   A.    No.

22         MR. LAVIGNE:  Okay.  Go ahead and stay up here,

23   because it would be quicker.  234.

24   BY MR. LAVIGNE:

25   Q.    The next document I'm going to show you is page 234 from

1   the joint exhibit.  It's entitled at the top deferred

2   inspection unit, obligor's bond information sheet.

3           Would you please look at that.  Please go to the

4   right side of that form, where it says alien's address where

5   he/she will reside in the U.S.

6           Do you see that address?

7   A.   Yes.

8   Q.   What is that address?

9   A.   4275 Northwest 18th Street, number 108, Miami, Florida.

10  Q.   Is there a ZIP code to that?

11  A.   33126.

12  Q.   Is that the address you went to to live with your brother

13  when you left Los Angeles?

14  A.   Yes.

15  Q.   Is there a phone number under that for a home telephone

16  number?

17  A.   I don't remember this number -- phone number.

18  Q.   Okay.  And on that second-to-the-last part there is a date

19  and place alien last entered the U.S.  And is there a date

20  there?  It's kind of hard to read.  I see that.

21  A.   Home address, street, left side?

22  Q.   Yes.  Something that says 12/7/91 LAX, do you see that,

23  bottom right corner?

24  A.   Yes.

25  Q.   Okay.  Going to the top, where it says alien's name, has

1  your name always been Khan?

2  A.   No.

3  Q.   No.  My question is:  Has your last name always been Khan?

4  A.   Khan.  Last name is Khan.  But that's not my name.

5  Q.   Where did the name Jaweed come from?

6  A.   I don't know.

7  Q.   Do you have a twin brother named Jaweed?

8  A.   Yes, my brother, but he's not here.

9  Q.   Okay.

10 A.   His name is Jaweed, but the spelling is wrong.

11 Q.   The spelling is wrong?

12 A.   Yes.

13 Q.   Are you sure that you gave to Mr. Johnson your complete

14 name of Mohammad --

15 A.   Yes.

16 Q.   Your complete name?

17 A.   Yes.

18 Q.   Okay.  And what is your complete name?

19 A.   Parvez Manzoor Khan.

20 Q.   And has that always been your name that you've used

21 throughout your life?

22 A.   Yes.

23 Q.   Other than using that passport one time with the name

24 Mohammad Akhtar --

25 A.   No.

1   Q.   -- have you ever used that name Mohammad Akhtar in your

2   life?

3   A.   No.

4   Q.   Did you ever use the name Mohammad Akhtar for anything in

5   the United States --

6   A.   No.

7   Q.   -- after you were let out by INS?

8   A.   No.

9           THE COURT:  And, Mr. Khan, if you'll just let him

10  complete the sentence before answering.  Thank you.

11      (Counsel confer.)

12  BY MR. LAVIGNE:

13  Q.   Okay.  We're going to show you what's been marked as

14  number -- page 234 of the joint exhibit.  It says memorandum,

15  subject, change of custody condition and address of record.

16          Can you look at that?

17  A.   Yes.

18  Q.   What names are on that document?

19  A.   Akhtar Mohammad Khan Jaweed, at the bottom.

20  Q.   And there's a new address of record.  Look at that C/O

21  Howard George Johnson, 1406 South Union Avenue, LA, cap, CA

22  90015.

23  A.   Yes.

24  Q.   Did you ever live at that address?

25  A.   No.

1  Q.   Was that an address you gave to Immigration as to where

2  you were going to live?

3  A.   No.

4  Q.   Was the correct address the address in Miami?

5  A.   Yes.

6  Q.   Were you released to Howard George Johnson?

7  A.   No.

8        MR. LAVIGNE:  We want to next show him -- if you can

9  retain that back from him.  I want to put that back.

10       THE COURT:  No, you can leave them there.  I think

11 there's a lot of documents there.  My courtroom deputy will

12 collect them.

13       MR. LAVIGNE:  Get them back?  Okay.

14       THE COURT:  Thank you.

15 BY MR. LAVIGNE:

16 Q.   Okay.  We're going to go to page 236.  At the top of that

17 document, it says notice to alien ordered excluded by

18 immigration judge.

19       Prior to this lawsuit, had you ever seen that notice?

20 A.   No.

21 Q.   Does that notice have your complete name on it?

22 A.   That's not my name.

23 Q.   What name is on there?

24 A.   Khan Jaweed.

25 Q.   Okay.  And the date of this notice is February 8, 1993?

1   A.   Yes.

2   Q.   The next page will be page 237 of the joint exhibit.  I'm

3   showing you what is called notice to deliver alien, appears to

4   be dated 02/09/93, to Howard George Johnson for a Khan Jaweed.

5            Did you ever receive that paper?

6   A.   No.

7   Q.   Okay.  238.  My co-counsel has given to you a page 238.

8   It appears to be some sort of attachment to Howard G. Johnson,

9   Esquire, date 2/26/92, in the matter of Khan, comma, Jaweed.

10            Did you ever get a copy of that notice or the

11   attachment of order?

12   A.   No.

13            MR. LAVIGNE:  Let's give him page 242.

14   BY MR. LAVIGNE:

15   Q.   Let me show you what's been part of Plaintiff's -- I'm

16   sorry, the Joint Exhibit No. 1, page 242, memo to file.

17            Look at the paragraph that reads, No statement was

18   taken from subject due to the subject's inability to speak and

19   understand sufficient English, and the lack of a translator.

20            Do you see that?

21   A.   Yes.

22   Q.   This appears to be from the Immigration memo file.

23   A.   Yes.

24   Q.   Do I understand correctly you have never been given a

25   translator or interpreter the whole time you were in

1  Los Angeles?

2  A.   No.

3  Q.   Were you offered an interpreter or translator?

4  A.   No.

5  Q.   At the time you were --

6           THE COURT:   That -- you asked do you -- do I -- ask

7  that --

8           MR. LAVIGNE:   I can rephrase it.

9           THE COURT:   The one before that was a negative --

10  double negative.  If you can --

11           MR. LAVIGNE:   I'm trying to avoid those double

12  negatives.

13           THE COURT:   -- ask it again.

14  BY MR. LAVIGNE:

15  Q.   Have you been given -- let me rephrase that question.

16           When you were in Los Angeles and you were in a cell

17  before you were allowed back in the U.S., were you ever offered

18  a translator or an interpreter from Immigration?

19  A.   No.

20  Q.   Were you offered a translator or an interpreter from

21  anyone else, included -- including Howard Johnson?

22  A.   No.

23  Q.   How did you try to communicate with Mr. Johnson?

24  A.   With the -- with the Indian guy with me there.

25  Q.   So somebody else in the cell could speak some other

1  language?

2  A.    Other language, yes.

3  Q.    Was that the Punjabi?

4  A.    Yes.

5  Q.    But is Punjabi your language?

6  A.    No.

7  Q.    So at the top of the form it says you speak Punjabi.

8  That's not correct?

9  A.    No.

10 Q.    What is the language you speak?

11 A.    Urdu.

12        THE COURT:  It is 12:05.  We've been here for about

13 three hours.  We can take a break for lunch, unless,

14 Mr. Lavigne, your questions are few.  Otherwise, we could take

15 a break, you can organize yourself, and we can come back.

16        What's your preference?

17        MR. LAVIGNE:  We can organize myself.  Why don't we

18 come back.

19        THE COURT:  All right.  Then we'll take a one-hour

20 break until 1:05.

21        And during that break, Mr. Petty, if you can work

22 perhaps with your paralegal to do the same type of collection

23 of documents and handing them to the witness, just to try to

24 speed things up.  If he can assist you in handing the witness

25 documents, that might help a little bit, take away some of the

1    lag time.

2         Mr. Khan, you're again instructed not to talk to any

3    witnesses during the lunch break about your testimony or about

4    this trial.  You can talk about where to go to lunch.  But

5    that's about it.

6         Anything, Mr. Lavigne, before we break?

7         MR. LAVIGNE:  No.  I'm just going to go off the

8    record and see where we can go eat fast.

9         THE COURT:  All right.  Mr. Petty, anything before

10   the break?

11        MR. PETTY:  No, Your Honor.

12        THE COURT:  We'll see everyone back in the court at

13   1:05.  Thank you.

14        COURT SECURITY OFFICER:  All rise.

15        THE COURT:  And, by the way, the courtroom deputy

16   will collect the documents that are on the witness stand right

17   now and put them back in order.

18        Thank you.

19      (Recess from 12:06 p.m. to 1:07 p.m.; all parties

20   present.)

21        COURT SECURITY OFFICER:  All rise.  This Honorable

22   Court is now in session.  Honorable Patricia D. Barksdale

23   presiding.

24        Please be seated.

25        THE COURT:  We're back on the record in *United States*

```
 1   versus Khan, 3:17-cv-965.  It looks like everyone is back in
 2   the courtroom.
 3            Mr. Lavigne, you may proceed.
 4            Mr. Khan, if you'll please return to the witness box.
 5   And you remain under oath, sir.
 6            MR. LAVIGNE:  She's going to --
 7            COURTROOM DEPUTY:  I got it.
 8            MR. LAVIGNE:  Right.  Okay.
 9   BY MR. LAVIGNE:
10   Q.   Mr. Khan, I'm going to show you what's been marked in
11   Joint Exhibit No. 1, page 251, and then page --
12            MR. LAVIGNE:  Can we get them all at one time to be
13   quicker?
14            COURTROOM DEPUTY:  Sure.
15            MR. LAVIGNE:  Yeah.  252, then page 331, page 473,
16   page 509, page 513, and 517 is the quickest way.
17   BY MR. LAVIGNE:
18   Q.   Sir, look at page 251.  Do you have that in front of you?
19   A.   Yes.
20   Q.   Is there a name of Akhtar, comma, Mohammad on that?
21   A.   Yes.
22   Q.   And is the date on that 7 December 1991?
23   A.   Yes.
24   Q.   Do you recall ever getting a copy of that page?
25   A.   No.
```

1  Q.   Do you remember getting a copy of the next page, which is

2  252, that is with it?

3  A.   Yes, I have it.

4  Q.   Okay.  Did you get that page?

5  A.   No.

6  Q.   Okay.  Go to page 331.  Do you have that page in front of

7  you?

8  A.   Yes.

9  Q.   That appears to be a -- it's page 331, naturalization

10  document request?

11  A.   Yes.

12  Q.   Was that addressed to you at the right address, 7707 High

13  Pine Road, Orlando, Florida 32819?

14  A.   Yes.

15  Q.   Do you see the date on that as 03/21/2006?

16  A.   Yes.

17  Q.   And did it ask you to bring in your arrest records for the

18  FBI background check?

19  A.   Yes.

20  Q.   And did you do that?

21  A.   Yes.

22  Q.   And did you supply the arrest records from Miami before

23  your interview for your N-400?

24  A.   Yes.

25  Q.   Okay.  I'm going to look at the next page, sir.  It's 473.

1  Do you have that in front of you, page 473?

2  A.  Yes.

3  Q.  It says an application for travel document.  Do you see

4  that in front of you?

5  A.  Yes.

6  Q.  And it's checked off, I am applying for an advance parole

7  to allow me to return to the U.S. after temporary foreign

8  travel.

9  A.  Yes.

10  Q.  You were asking for a travel permit.  Why were you asking

11  for a travel permit?

12  A.  I wanted to go back to the Pakistan to see my mother.  She

13  was sick.

14  Q.  She was sick?

15  A.  Yes.

16  Q.  And did you get a travel permit to go back?

17  A.  Yes.

18  Q.  Down at the bottom of that page, can you read what's

19  written in red, I-485 changed to denied 4/19/00?

20        Do you see that down there?

21  A.  Yes.

22  Q.  Did you write that in red on your application?

23  A.  No.

24  Q.  I want to now go to page 509.  Do you have that in front

25  of you?  It looks like a memorandum dated 01/08/92.

1    A.    Yes.

2    Q.    And does that document say, on 01/08/92, the memorandum to

3    the Executive Office for Immigration Review was forwarded,

4    requesting that they schedule this case for a hearing before an

5    immigration judge?

6    A.    Yes.

7    Q.    Before you were released on January the 7th, 1992, did

8    you -- were you given any papers from anybody to appear again

9    in front of the immigration judge in February 1992?

10   A.    No.

11   Q.    After the date of January the 8th, 1992, did you receive

12   anything from anyone saying you had to go back to the

13   immigration judge?

14   A.    No.

15   Q.    Go to page 513.  That document, at the top, states notice

16   to applicant for admission detained for a hearing before

17   immigration judge, right?

18   A.    (Nods head affirmatively.)

19   Q.    Did you ever get a copy of that back on December the 7th,

20   1991?

21   A.    No.

22   Q.    And is there a hearing date listed on that page when you

23   were to go to court?

24   A.    No.

25   Q.    Okay.  I now want to go to page 570.  Do you see page 570?

1   A.   Yes.

2   Q.   That looks like a Customs declaration, dated 7 -- oops.  I

3   can't tell what the date is.  But it has the name Mohammad

4   Akhtar.

5           MR. LAVIGNE:  And, I'm sorry, page 571 should have

6   gone with it, but I may not have pulled that out.

7   BY MR. LAVIGNE:

8   Q.   Second page says December 7th, 1991.  Were you allowed to

9   keep a copy of this page -- these two pages?

10  A.   No.

11  Q.   On that page -- can you read number 7?  How long did you

12  expect to stay in the U.S.?

13          Did you give an answer at that time?

14  A.   No.

15  Q.   Okay.  What is the purpose of your trip at that time you

16  came in, on December 7th, 1991?  Did you mark off pleasure?

17  A.   Yes.

18  Q.   Okay.  Do you remember coming in on Korean Airlines,

19  Flight No. 002?

20  A.   Yes.

21  Q.   Okay.  Do you -- okay.

22          MR. LAVIGNE:  We're almost there.

23  BY MR. LAVIGNE:

24  Q.   Just a few -- just a few general questions, sir.  You

25  earlier testified you studied some English in Pakistan in

1   school.

2   A.   Yes.

3   Q.   How were your grades?  Did you have good grades?

4   A.   No.

5   Q.   And how many years was it before you came to the U.S. that

6   you studied any English in school?

7   A.   I was 14.

8   Q.   And how old were you when you came in in 1991?

9   A.   I don't remember.  I could count.

10  Q.   What year were you born?

11  A.   '57.

12  Q.   So in '57.  I guess that would be about 34 years?

13  A.   34 years.

14  Q.   Would it be fair to say you did not study English for 17

15  years after you were in school?

16  A.   No.

17  Q.   Did you study any more English after school?

18  A.   No.

19  Q.   Okay.  And do I understand it correctly that anything

20  that's been written in red on any of these forms is not your

21  handwriting?

22  A.   No.

23  Q.   And did you know what the --

24           THE COURT:  Do you want to ask that again?

25           MR. LAVIGNE:  Say again.

1      THE COURT:  Do you want to ask that question again?

2      MR. LAVIGNE:  Yes.

3  BY MR. LAVIGNE:

4  Q.   On these forms, the I-485, and there's an N-400, there's

5  some things written in red.  Did you ever write anything in red

6  ink on any of these applications?

7  A.   No.

8  Q.   Okay.  I think that's a better way of asking it.

9      Let's go back.  Did you give fingerprints when you

10  first came to the United States in December 1991?

11  A.   Yes.

12  Q.   Did you give fingerprints again at the time you made the

13  application for the 485 and the I-130, which is your green

14  card?

15  A.   Yes.

16  Q.   Did you give fingerprints again when you did the N-400

17  application for citizenship?

18  A.   Yes.

19  Q.   Okay.  Did you ever refuse to give fingerprints?

20  A.   No.

21  Q.   At the time you filed the I-130, I-485, did you know at

22  that time you had given fingerprints in Los Angeles?

23  A.   Yes.

24  Q.   Did you have any reason to try to cover up what happened

25  in Los Angeles with Immigration?

1  A.   No.

2  Q.   Were you knowingly or intentionally trying to mislead

3  Immigration when you made your application for a green card?

4  A.   No.

5  Q.   Did you knowingly or intentionally try to mislead

6  Immigration at the time you were applying for citizenship as to

7  your background?

8  A.   No.

9  Q.   Were you arrested in Los Angeles for any criminal acts?

10 A.   No.

11 Q.   So the only time you've been arrested, actually, is in

12 Miami?

13 A.   Yes.

14 Q.   But you were detained in Los Angeles?

15 A.   Yes.

16 Q.   But, so far as you know, you were not detained because you

17 were arrested for any criminality?

18 A.   No.

19      THE COURT:  Want to ask that question again?  That

20 was --

21      MR. LAVIGNE:  Maybe.

22      THE COURT:  Might have also been a double negative.

23      MR. LAVIGNE:  If you'd read it back.

24      THE COURT:  The question -- Ms. Bishop, if you'll

25 read that back.

1    (Last question read back by court reporter.)

2  BY MR. LAVIGNE:

3  Q.   Were you ever detained for being charged with any crimes

4  in Los Angeles the whole time you were there?

5  A.   No.

6  Q.   Were any criminal charges ever brought against you in

7  Los Angeles?

8  A.   No.

9  Q.   Okay.

10          MR. LAVIGNE:  I don't have any further questions,

11  Your Honor.

12          THE COURT:  All right.  Thank you.

13          Mr. Petty?

14          MR. PETTY:  No redirect, Your Honor.

15          THE COURT:  All right.  Mr. Khan, I have a few

16  questions.  If you'll sit tight for one second, I have to fix

17  something on my bench here.

18      (Judge confers with courtroom deputy.)

19          THE COURT:  Mr. Khan, has your signature changed over

20  time?

21          THE DEFENDANT:  No.

22          THE COURT:  And how many times have you been

23  arrested?

24          THE DEFENDANT:  One in Miami and one when I came.

25          THE COURT:  Okay.  When you came to the United States

1    for the first time in 1991 using someone else's passport, why

2    didn't you use your own passport or try to obtain the passport

3    for yourself?

4            THE DEFENDANT:  Because I was thinking that the

5    United States Government basically not going to give me the

6    visa.

7            THE COURT:  And why is that?

8            THE DEFENDANT:  Because they asking so many

9    questions, and bank statement.  But I don't have that kind of

10   money, no business, so I can show that I have money.

11           THE COURT:  All right.  Any other reason?

12           THE DEFENDANT:  No.

13           THE COURT:  And when you came here in 1991, what were

14   you coming for?  Why were you coming?

15           THE DEFENDANT:  Just coming here to see my brother.

16           THE COURT:  And had you planned to stay at that time?

17           THE DEFENDANT:  Not really.  No.

18           THE COURT:  So you planned to visit and go back?

19           THE DEFENDANT:  Yeah.  Visit, yes.

20           THE COURT:  And then what changed?

21           THE DEFENDANT:  Change -- I see the country.  I like

22   a lot better than my country.  Better life.  So I just changed

23   my mind to stay.

24           THE COURT:  Okay.  And I know you met your wife at a

25   wedding, you said, right?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And you couldn't recall exactly when that

3     was.  Do you know the -- about the time frame when that was,

4     around-about estimate?

5          THE DEFENDANT:  About the marriage?

6          THE COURT:  When -- no, when you first met your wife.

7     You met her at a wedding.  When was that?

8          THE DEFENDANT:  Yes, was a wedding.  Her niece

9     wedding.

10          THE COURT:  When was the niece's wedding, just

11     approximately?  I know you don't know an exact date.

12          THE DEFENDANT:  I don't remember exact date.

13          THE COURT:  How about within a couple of years?  Do

14     you know about what year it was?

15          THE DEFENDANT:  It was a year ago when we married.

16          THE COURT:  A year before your marriage?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Okay.  So you knew each other one year

19     before you got married?

20          THE DEFENDANT:  Yes.

21          THE COURT:  And how did you communicate at the time?

22          THE DEFENDANT:  At that time, you know, I slowly

23     speak English, little bit, little bit, you know.

24          THE COURT:  Okay.

25          THE DEFENDANT:  Learning, yes.

1          THE COURT:  What does the word asylum mean to you?

2          What does the word asylum mean to you?

3          THE DEFENDANT:  Asylum?  I don't know, really, about

4    asylum, what is that.

5          THE COURT:  You do not know what it means?

6          THE DEFENDANT:  No.

7          THE COURT:  Okay.  Ms. Loeschen, if you wouldn't mind

8    giving Mr. Khan Exhibits 8 and 7.

9          Mr. Khan, we're going to start with Exhibit 8.  Is

10   that in front of you, sir?  It will say Exhibit 8 on the front.

11   And we're talking right now about the green card, the

12   application to register for permanent residency.

13         THE DEFENDANT:  Yes.

14         THE COURT:  All right.  You have that in front of

15   you?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Okay.  That first page of the

18   application -- so skipping the cover page -- there's

19   typewritten letters there, starting in part 1, Khan, Parvez M.

20         Who typed that?

21         THE DEFENDANT:  Who typed that?

22         THE COURT:  Yes.

23         THE DEFENDANT:  Not me.

24         THE COURT:  All right.  Skip the cover page and go to

25   the first page of the application.  Yes, you're there.  Who

1    typed that?

2              THE DEFENDANT:  Not me.  Somebody else.

3              THE COURT:  Who typed that?

4              THE DEFENDANT:  It was the lady.  She prepared the

5    paperwork and everything, you know.

6              THE COURT:  Who is this lady?

7              THE DEFENDANT:  I don't know.  I don't remember.

8              THE COURT:  She was not a lawyer?

9              THE DEFENDANT:  No.

10             THE COURT:  Okay.  And so she -- she -- was she a

11   lawyer?

12             THE DEFENDANT:  My -- first my question -- I need to

13   know where -- is from the California or Miami, this paper?

14             THE COURT:  This is your green card application.

15             THE DEFENDANT:  Oh, green card application?

16             THE COURT:  Yes.

17             THE DEFENDANT:  I remember now.  It was in Miami, one

18   lady.  But she is not liar, no.

19             THE COURT:  Okay.

20             THE DEFENDANT:  She just file the application.

21             THE COURT:  Where did you find her?  Just tell me

22   about her a little bit, what you remember about her.

23             THE DEFENDANT:  Yes.  A friend told me that she can

24   file your application.

25             THE COURT:  And did she have a business to do this?

1           THE DEFENDANT:  Yeah.  She have one office.  And I

2    think my wife -- she know her, too.

3           THE COURT:  And you don't recall her name?

4           THE DEFENDANT:  I don't remember her name.

5           THE COURT:  Was it in a -- like, a strip mall or

6    something like that?

7           THE DEFENDANT:  It's like kind of mall, yes.

8           THE COURT:  Do you pay her to do this?

9           THE DEFENDANT:  Yes, I pay her.

10          THE COURT:  Okay.  And how did it operate?  You went

11   to her office?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And just talk to me about it without --

14          THE DEFENDANT:  Yeah.  I went to the office and

15   talked to her about the -- apply for the green card.  And so

16   many -- bunch of papers.  She say, Okay.  Come tomorrow.  And

17   she prepared all the paperwork.

18          THE COURT:  And she asked you questions and you

19   answered?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Okay.  And on page 1 -- I think you're on

22   page 1 right now.  And in part 1 it says date of last arrival

23   12-1990.

24          Why does it say that date?

25          THE DEFENDANT:  That's wrong date.  I came '91.

1              THE COURT:  Why does it say 1990?

2              THE DEFENDANT:  I don't know why she write 1990.

3              THE COURT:  On -- if you flip the page to page 2 of

4    the application, the question says, in part 3, place of last

5    entry into the U.S., city, state.

6              Underneath that is typed Miami, Florida.

7              Why does it say that?

8              THE DEFENDANT:  Because I -- when I leave from

9    California, my first stop is Miami, Florida.  I lived there.

10             THE COURT:  And did place of entry to you mean --

11   what did that mean to you?

12             THE DEFENDANT:  My place of entry is the Los Angeles,

13   California, not Miami.

14             THE COURT:  So why does this say Miami?

15             THE DEFENDANT:  I don't know.

16             THE COURT:  Okay.  On page 3 -- so if you'll flip

17   that page.  There's a handwritten note that says claims one

18   arrest.

19             Do you know who wrote that?

20             THE DEFENDANT:  Yeah.  I arrest in Miami 1995.

21             THE COURT:  The handwritten note that says claims one

22   arrest -- look down at the paper there, please.  There's

23   language that says, in handwriting, claims one arrest.

24             THE DEFENDANT:  One arrest, yes.

25             THE COURT:  Who wrote that?

1          THE DEFENDANT:  Not me.  That's not my handwriting.

2          THE COURT:  Do you know who wrote it?

3          THE DEFENDANT:  I don't know.  Honestly, no, I don't

4    know who write it.

5          THE COURT:  Were you interviewed for this form?

6          THE DEFENDANT:  Yes.

7          THE COURT:  And how many arrests did you claim at

8    that time?

9          THE DEFENDANT:  Two.

10         THE COURT:  And which ones did you claim?

11         THE DEFENDANT:  One Miami, one LA.

12         THE COURT:  Okay.  On that same page, question 9,

13   toward the bottom, says, Have you ever been deported from the

14   U.S. or removed from the U.S. at government expense, excluded

15   within the past year, or are you now in exclusion or

16   deportation proceedings?

17         And the no box is checked.  Why is the no box

18   checked?

19         THE DEFENDANT:  No, because nobody -- I don't receive

20   any deportation letter, or nobody tell me, nobody called me,

21   that you're deported.  No.

22         THE COURT:  Okay.  And then for the I-130, Mr. Petty,

23   what number is that, in the joint exhibit?

24         MR. PETTY:  Your Honor, that's 146 to -48.

25         THE COURT:  And the courtroom deputy is going to show

1   you just a few pages from the I-130.  This would have been part

2   of the green card application.  It would have been the part

3   that your wife completes, petition for alien relative.  Okay?

4   Are you following me?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Okay.

7              COURTROOM DEPUTY:  146?

8              MR. PETTY:  146 to -48.

9              THE COURT:  All right.  If you'll just glance at that

10  for a second, I had just a couple of questions on this one.

11             On the second page of that document -- do you see at

12  the top it says biographic information?  Tell me which document

13  you're reading right now.  Is there one that says biographic

14  information at the top?

15             MR. PETTY:  Your Honor, I think that's the G-325.

16             MR. LAVIGNE:  325A.

17             MR. PETTY:  That would be a different form.

18             THE COURT:  Okay.  Which -- what number is that?

19             MR. PETTY:  There are two of them.  The one that

20  applies --

21             THE COURT:  And this is the second one?

22             MR. PETTY:  541.  541.

23             THE COURT:  541?  Okay.  Thank you.

24             MR. PETTY:  No.  That's another...

25        (Counsel confer.)

1                    MR. PETTY:  497.

2                    COURTROOM DEPUTY:  497?

3                    THE COURT:  And, Mr. Khan, we're going to still first

4    stick with the petition for alien relative at the top.  That's

5    the I-130.

6                    Do you see the document that says, in the top

7    right-hand corner, petition for alien relative?

8                    THE DEFENDANT:  Yes, I find it.

9                    THE COURT:  Okay.  So while you have that, on -- if

10   you go to the -- section C, it says information about your

11   alien relative.  Do you see that?

12                   It's on the right-hand side.  Just look at that one

13   page.  Don't look at two pages right now.  If you'll just look

14   at the one that says petition for alien relative in the top

15   right.

16                   THE DEFENDANT:  Yes.

17                   THE COURT:  Okay.  Now stick on the right-hand side.

18   If you follow down there's a section C, information about your

19   alien relative.

20                   Do you see that?  It's -- do you see a stamp on

21   there?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  Okay.  Right underneath the stamp is

24   section C in bold, information about your alien relative.

25                   THE DEFENDANT:  Yes.

1    THE COURT:  Okay.  Follow me down.  There's -- 1 is
2    name.  2 is address.
3             THE DEFENDANT:  Yes.
4             THE COURT:  3 is place of birth.
5             THE DEFENDANT:  Yes.
6             THE COURT:  4 is date of birth.
7             THE DEFENDANT:  Yes.
8             THE COURT:  And 5 and 6 are sex and marital status.
9    And then underneath that is 7, other names used.  And under
10   that is none.
11            Do you know why none is put there?
12            THE DEFENDANT:  Yeah.  When I came I used a different
13   name, a different passport.  It's wrong here as none.
14            THE COURT:  And do you know why none was put there?
15            THE DEFENDANT:  I don't know why.  No.
16            THE COURT:  Okay.  And then the second page that was
17   given to you that says biographic information --
18            THE DEFENDANT:  Yes.
19            THE COURT:  I think that was handed to you last.
20            That one also, at the top left, under Khan, Parvez
21   Manzoor -- right underneath that box is a box that says all
22   other names used.  And under that is none.
23            Do you know why that says none?
24            THE DEFENDANT:  Yes.
25            THE COURT:  And why does that say none?

1          THE DEFENDANT:  I don't know.

2          THE COURT:  Okay.  All right.  Well, let's go to -- I

3    just have a few more questions.  If you'll go to Exhibit 7,

4    which is the application for naturalization -- and just let me

5    know when you have that in front of you.

6          Ms. Loeschen will help you here.

7          THE DEFENDANT:  I don't know which one is --

8          THE COURT:  She's going to point out Exhibit 7 and

9    take away those other exhibits.

10          COURTROOM DEPUTY:  Exhibit 7 is right here.  And this

11    is the one that she asked for.

12          THE DEFENDANT:  Okay.

13          THE COURT:  Okay.  Just skip that cover page and go

14    to the first page of the application, please.  There's

15    handwritten -- handwriting in each of the boxes.  The first

16    handwritten thing says Khan.

17          Is that your handwriting?

18          THE DEFENDANT:  No, ma'am.

19          THE COURT:  And whose is that?

20          THE DEFENDANT:  I don't know.

21          THE COURT:  Who completed the form?

22          THE DEFENDANT:  Yeah.  I think the lady -- she fill

23    out the form, her handwriting.  It's not my writing.

24          THE COURT:  Okay.  And when you say "the lady who

25    filled out the form," who is that?

```
 1              THE DEFENDANT:  It just application -- file
 2   application, that's all.
 3              THE COURT:  Who filed it for you?  Did you get help
 4   in filing this?
 5              THE DEFENDANT:  No.  She's the one just file for me,
 6   and I just sign.
 7              THE COURT:  So you did get -- someone filed it for
 8   you?
 9              THE DEFENDANT:  She filed, I think.
10              THE COURT:  But who applied for naturalization for
11   you?
12              THE DEFENDANT:  In Miami somebody, you know, in
13   the -- some office.  She fill out application for me.
14              THE COURT:  And it was a lady?
15              THE DEFENDANT:  A lady, yes.
16              THE COURT:  The same lady who completed the --
17              THE DEFENDANT:  No, ma'am.  That was different.
18              THE COURT:  A different woman?
19              THE DEFENDANT:  Yes.
20              THE COURT:  Okay.  And for this woman, do you
21   remember her name?
22              THE DEFENDANT:  No.
23              THE COURT:  Did you pay someone to help you with
24   this?
25              THE DEFENDANT:  Yes, I pay her.
```

1          THE COURT:  Same thing?  You went to an office?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And what happened in the office?  What

4    did you do?  You explained you wanted to become a --

5          THE DEFENDANT:  Yes, explained.

6          THE COURT:  And then what did she do?

7          THE DEFENDANT:  I explain her and she asked me my

8    driver's license and everything.  And my wife was with me, and

9    her documents and date of birth and everything.  And she keep

10   writing, and just sign here, and I sign the paper and that's

11   all.

12         THE COURT:  Okay.  In that same page it says Khan --

13   if you follow down Khan, and then Parvez.  Under that Khan,

14   Parvez, in block C, it has some name -- little lines crossed

15   through.

16         THE DEFENDANT:  Yes.

17         THE COURT:  If you have ever been -- if you have ever

18   used other names, provide those below.  What are those lines?

19   What does that mean to you?

20         THE DEFENDANT:  I don't know.  This means -- look

21   like there's no -- another name.

22         THE COURT:  And you were interviewed for

23   naturalization?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Some of your testimony -- you talked

1   about the interview being just five minutes.  Were you talking

2   about this interview or the previous interview for your -- your

3   permanent residency?

4            THE DEFENDANT:  No.  I'm talking about the

5   citizenship interview.

6            THE COURT:  The citizenship --

7            THE DEFENDANT:  Not green card interview.

8            THE COURT:  Okay.  How long was the green card

9   interview?

10           THE DEFENDANT:  That's also like 15, 20 minute.

11           THE COURT:  How long was the naturalization

12  interview?

13           THE DEFENDANT:  Five minute, less than five minutes.

14           THE COURT:  So the naturalization interview was less

15  than the green card interview?

16           THE DEFENDANT:  Yes.

17           THE COURT:  When you talked to the interviewer for

18  naturalization, did you tell her that you were detained when

19  you first arrived in the United States?

20           THE DEFENDANT:  No.

21           THE COURT:  Why not?

22           THE DEFENDANT:  She don't ask me.

23           THE COURT:  Okay.  On that same application, if you

24  flip over -- and please find part 10, additional questions.

25  It's on page 7.

1         Are you there?

2         THE DEFENDANT:  Yes, ma'am.

3         THE COURT:  Okay.  On the following page, number --

4    question number 23, if you'll look on there.

5         THE DEFENDANT:  I'm on the page 7.

6         THE COURT:  Okay.  Now page 8.  Sorry.  I directed

7    you to the wrong page.  Page 8, at the bottom, is question 23.

8         THE DEFENDANT:  Yes.

9         THE COURT:  It says, Have you ever given false or

10   misleading information to any U.S. government official while

11   applying for any immigration benefit or to prevent deportation,

12   exclusion, or removal?  And no is checked there.

13        Why is no checked?

14        THE DEFENDANT:  Because I don't fill -- I don't take

15   mark -- say no or yes.  I did not.  Somebody else -- that lady

16   did.  Not me.

17        THE COURT:  Okay.  And for question 24, have you ever

18   lied to any U.S. government official to gain entry or admission

19   into the United States, no is checked there.

20        Why is no checked there?

21        THE DEFENDANT:  Yes.  I don't know.  I did not do

22   these things.  No.

23        THE COURT:  Okay.  And page 9, number 25, removal,

24   exclusion, or rescission, or deportation proceedings pending

25   against you, there's a no checked there.

1          Do you know why that's checked no?

2          THE DEFENDANT:  Yes, because I never received any

3    paper from the court.

4          THE COURT:  Okay.  On 26, have you ever been removed,

5    excluded, or deported from the United States, do you know why

6    that's no?

7          THE DEFENDANT:  Also, I never -- I don't know that

8    I'm deported.  I no receive no paper.

9          THE COURT:  Okay.  At any time when you were filling

10   out paperwork for either your green card or for permanent --

11   or, excuse me, for citizenship, or when you were taking the

12   oath -- during any of these, were you ever worried at all about

13   having come to the United States using an altered passport?

14         THE DEFENDANT:  No.

15         THE COURT:  Why not?

16         THE DEFENDANT:  Because nobody sent me any paper.

17   And they told me, You're good to go.  I thought I'm okay.

18         THE COURT:  Were you ever worried when you were

19   signing any of these documents?

20         THE DEFENDANT:  No, ma'am.

21         THE COURT:  Okay.  All right.  Any follow-up,

22   Mr. Petty?

23                    **REDIRECT EXAMINATION**

24   BY MR. PETTY:

25   Q.   Mr. Khan, you testified previously about the time that you

1  were stopped at Abu Dhabi.

2  A.    Yes.

3  Q.    And you testified previously that you obtained the

4  Mohammad Akhtar passport because you paid for it; is that

5  right?

6  A.    Yes.

7  Q.    Okay.  When you were in Abu Dhabi, do you recall telling

8  the officer stationed there that you got Mohammad Akhtar's

9  passport because he was a friend of yours?

10  A.    Yes, some friend of -- through the friend, yes.

11  Q.    Do you recall telling the officer that you did not buy it

12  and, in fact, he gave it to you?

13  A.    No, I buy it.  I pay.

14  Q.    Do you recall the officer asking you, Is there anything

15  that you would like to add to your sworn statement, and you

16  responding, Make this go away?

17  A.    Yes.

18          MR. PETTY:  No further questions.

19          THE COURT:  All right.  Mr. Lavigne, any follow-up?

20          MR. LAVIGNE:  Just a short one.

21          THE COURT:  All right.

22                    **RECROSS-EXAMINATION**

23  BY MR. LAVIGNE:

24  Q.    The ladies who were helping you do the forms, do you

25  recall if they were paralegals?

1   A.   I don't know who she -- she have one office and she fill

2   out application.  So many other people do.  Friend of mine,

3   they refer me to go there.  She know about immigration and she

4   will file your application.

5   Q.   Okay.

6   A.   I don't know who is she.

7   Q.   Okay.  In your N-400 interview, did you answer all the

8   questions that were asked of you?  Did you answer all the

9   questions --

10  A.   Yes.

11  Q.   -- that the examiner asked you to answer?

12  A.   Yes.

13  Q.   In your 485 examination, did the lady ask you any

14  questions about your EWI, entry without inspection?

15  A.   No.  I don't know what EWI -- nobody asked me any question

16  about that.

17  Q.   There was no follow-up at all on the EWI?

18  A.   No.

19       MR. LAVIGNE:  Okay.  I don't have any further

20  questions.

21       THE COURT:  All right.  Thank you.

22       Sir, you can return to counsel table.

23   (Witness excused.)

24       THE COURT:  Mr. Petty, please call your next witness.

25       MR. BELSAN:  Your Honor, the Government calls Lisa

 1   Pellechia.

 2          THE COURT:  All right.  If you'll get her, please.

 3          You're going to be using Government Exhibit 7 for

 4   this witness?

 5          MR. BELSAN:  7A.

 6          THE COURT:  Okay.  If you'd like to go ahead and

 7   place them on counsel table, that's fine.

 8      (Ms. Pellechia enters the courtroom.)

 9          MR. BELSAN:  Your Honor, may I leave them at the --

10          THE COURT:  Sure.  Both of them are already there?

11          MR. BELSAN:  Yes.

12          THE COURT:  Okay.  Great.  Thank you.

13          Good afternoon, ma'am.  You're going to come forward

14   into the witness box right here.  When you arrive there, if

15   you'll please remain standing and raise your right hand.

16          COURTROOM DEPUTY:  Do you solemnly swear or affirm

17   that the answers you will give during these proceedings will be

18   the truth, the whole truth, and nothing but the truth, so help

19   you God?

20          THE WITNESS:  I do.

21          COURTROOM DEPUTY:  Thank you.

22          THE COURT:  All right.  Thank you, ma'am.  If you'll

23   take a seat.  Pull forward as close to the microphone as

24   possible.  Thank you.

25          If you need a glass of water or anything, just let us

1    know.

2              THE WITNESS:  Will do.

3         **LISA N. PELLECHIA, GOVERNMENT'S WITNESS, SWORN**

4                      **DIRECT EXAMINATION**

5    BY MR. BELSAN:

6    Q.    Good afternoon.

7    A.    Hi.

8    Q.    Could you please state your name for the full record.

9    A.    Lisa N. Pellechia.

10   Q.    And what is your current occupation?

11   A.    Immigration services officer with Citizenship and

12   Immigration Services.

13   Q.    Is that what is called USCIS sometimes?

14   A.    Yes.

15   Q.    And how long have you worked for USCIS?

16   A.    I started with INS -- legacy INS in 1985.  They became

17   USCIS in 2003, when they became part of the Department of

18   Homeland Security.  So about 34 years with the service in

19   total.

20   Q.    And since joining INS and then what became USCIS, what

21   positions have you held?

22   A.    Immigration inspector and immigration examiner, district

23   adjudications officer, immigration services officer.  The IE,

24   DAO, and ISO are the same positions, just different titles.

25   Q.    And so how long have you been an immigration examiner or

1   adjudications officer?

2   A.   Since about 1991.

3   Q.   Okay.  Now, turning to the time frame at issue in this

4   case, what was your duty position in May 2006?

5   A.   I was an officer with exams.  In 2006 we were still

6   district adjudication officers.  They hadn't changed the title

7   yet to ISOs.

8   Q.   Okay.  And is that essentially the same position you hold

9   today?

10  A.   Yes.

11  Q.   And how would you describe the general responsibility

12  of -- or responsibilities of that position?

13  A.   We adjudicate applications and petitions for various

14  benefits, citizenship, adjustment of status, and other

15  applications that go along with them.

16  Q.   And what does it mean to adjudicate?

17  A.   To make a decision based on law that a person is eligible

18  to receive a benefit.

19  Q.   So are you ultimately the person who makes a yes or no

20  determination?

21  A.   Yes, approving, denying.

22  Q.   And when did you first began adjudicating Form N-400

23  naturalization applications?

24  A.   Sort of touched on them in 1998.  Our office at the time,

25  our supervisor decided to split us into units.  So she

1  primarily put me into adjustment of status cases.  And in about

2  2005 I requested to be able to go over and do some

3  naturalization.  So I went to the NATS unit.

4  Q.    And did you do kind of exclusively naturalization-related

5  applications for a while?

6  A.    At that time, yes.

7  Q.    How long did you do that?

8  A.    About three or four years, until about 2008, when we moved

9  to the new building.

10 Q.    And starting in 2008, what did you begin doing?

11 A.    We all did all the applications.  They initially had us in

12 units doing adjustments or NATS, but then they decided everyone

13 in the office should do all applications.

14 Q.    And so since then have you still been adjudicating

15 naturalization applications?

16 A.    Yes.

17 Q.    But back in 2005, were you adjudicating multiple types --

18 I'm sorry.

19         2006, were you adjudicating multiple types of

20 benefits?

21 A.    Primarily naturalization and 400s and 600s.

22 Q.    And what is an N-600?

23 A.    An application for citizenship -- derivative citizenship

24 through parents.

25 Q.    And how much of your time at that point in 2006 were you

1   spending adjudicating N-400 applications?

2   A.   Most of the time we're in the 400s, at least 80 to 90

3   percent.

4   Q.   And how many interviews would you do in a given week, do

5   you think?

6   A.   Roughly three to four days a week, ten interviews a day.

7   So roughly 30, 40 interviews a week.

8   Q.   And you said you did that for multiple years?

9   A.   Yes.

10  Q.   Are you still adjudicating naturalization applications

11  today, you said?

12  A.   Yes.

13  Q.   Okay.  So how many naturalization interviews would you

14  estimate that you've conducted over the course of your career?

15  A.   Thousands.

16  Q.   And to be clear, that's just naturalization interviews.

17  That doesn't count other benefits that you would have done?

18  A.   That's correct, yeah.

19  Q.   Let's talk about the process for becoming a United States

20  citizen.

21  A.   Uh-huh (affirmative).

22  Q.   Given that you've adjudicated several thousand

23  applications, is it fair to say you're familiar with the

24  process for becoming a naturalized citizen of the United

25  States?

1  A.   Yes.

2  Q.   Are you familiar with how that process -- as it existed in

3  2006?

4  A.   Yes.

5  Q.   What is the process for applying for a naturalized

6  citizenship in the United States?

7  A.   Well, anyone who is a lawful permanent resident files an

8  application.  It's submitted to the -- at that time, and still

9  today, to a service center.

10        They review the application.  They obtain the A

11 files.  They do all of the clerical and prep work.  And then

12 they ship the file to the local office for an interview, where

13 we then make an interview and a decision to either approve,

14 deny, or continue.

15 Q.   And specifically what was your part in the naturalization

16 process?

17 A.   Conducting the interviews.

18 Q.   And were you the person who also made adjudication

19 decisions?

20 A.   Yes.  Uh-huh (affirmative).

21 Q.   Okay.  Does USCIS conduct an interview in every

22 naturalization application?

23 A.   All except those that meet the requirements of an oath

24 waiver.

25 Q.   And when would an oath waiver be used?

1   A.   If someone is not mentally competent to understand the

2   meaning of the oath, what it means to become a citizen.

3   Q.   Were interviews required in 2006?

4   A.   Yes.

5   Q.   And what is the purpose of a naturalization interview?

6   A.   To determine that the applicant is eligible under law

7   to -- meets all the requirements to become a citizen.

8   Q.   Have you received training in the legal requirements for

9   becoming a citizen?

10  A.   Over the years, yes.

11  Q.   And what are the legal requirements for naturalization?

12  A.   Basically, they have to be lawfully admitted as a

13  resident.  They have to meet the educational requirements under

14  312, physical presence, continuity of residence, good moral

15  character, attachment to the Constitution.

16  Q.   Do they have --

17  A.   Basic ones.

18  Q.   Do they have to pass any test to become a United States

19  citizen?

20  A.   Under the knowledge ones, yes.  They have to take a

21  reading and writing, English.  Civics, that's oral.  And then

22  an oral English, which is going over the application with them.

23  Q.   Is the naturalization interview a formal or an informal

24  process?

25  A.   It's formal.

1   Q.    Why do you consider it formal?

2   A.    They're placed under oath that they will respond

3   truthfully to all the questions asked under penalty of perjury.

4   Q.    And have you followed the same procedure for every

5   naturalization interview during the course of your career?

6   A.    I have, yeah.

7   Q.    Why?

8   A.    It's my way of keeping myself on track with each

9   interview.  It's a habit now.

10  Q.    Where are naturalization interviews conducted?

11  A.    In each individual office for an officer.

12  Q.    So where did you conduct your naturalization interviews?

13  A.    At that time in 2006, in my office at Trade Port.

14  Q.    So walk me through the naturalization interview process.

15  How does a case get from landing on your desk until the point

16  in which you make a decision?

17  A.    We're given the bundle of interviews for the day,

18  sometimes ahead of time, sometimes the day of.  I can't recall

19  in 2006 if it was ahead of time or not.

20        But we would pull the file, make a review, kind of go

21  through the -- the form itself, and the paperwork in the file

22  itself, go out to the waiting room, call the applicant into the

23  office.

24        I'd introduce myself.  I'd ask them to have a seat,

25  to present their passport, their resident card, their driver's

1   license.

2            I would place them under oath.  My personal way is to

3   do the interview after the N-400 form, after administering the

4   tests on the civics and the reading and writing.

5            Once that was concluded, I'd go through the

6   application itself.  And assuming they were able to get through

7   it all, sign it, finish it up, and possibly make a decision

8   that day as approved or denied or continued.

9   Q.   And you -- did you say you -- you introduce yourself to

10  the applicant when you go to the waiting room?

11  A.   Yeah.  I'll usually state, I'm Officer Pellechia.  I'll be

12  doing your interview today.

13  Q.   And so breaking this -- your statement about all these

14  steps down, kind of step by step, after introducing yourself,

15  what would you do?

16  A.   I would ask them for their passport, their resident card,

17  driver's license.  I want to make sure I've got the right

18  person.  On occasion it has happened.  You call the name and

19  somebody else comes in.  And after I confirm that, I'd ask them

20  to raise their right hand and place them under oath.

21  Q.   And did you always put -- do you always put the applicant

22  under oath at the beginning of the interview?

23  A.   Yes.

24  Q.   Always?

25  A.   Yes.

1    Q.    Why?

2    A.    Because it's their testimony.  It's made under penalty of

3    perjury.  It's how we hold them accountable.

4    Q.    And how is an applicant sworn in?

5    A.    Literally, Raise your right hand.  Do you solemnly swear

6    that the questions or statements you make will be the truth,

7    the whole truth, and nothing but the truth, and they respond.

8    Q.    Similar to the -- similar to the oath you took this

9    morning?

10   A.    Yes.  Uh-huh (affirmative).

11   Q.    Why -- what would you do if an applicant refused to take

12   the oath?

13   A.    I've never had anyone outright refuse.  If they're not

14   going to swear or affirm that the answers they give will be

15   truthful, we, I assume, would not conduct an interview, things

16   would stop there.

17          I'd have to confer with the supervisor how we want to

18   handle it.  But in all the years I've done interviews, the most

19   people have ever done was they said they will affirm, they

20   won't swear to an oath.

21   Q.    And are naturalization interviews conducted orally?

22   A.    Yes, unless there's some sort of a -- a disability that

23   requires an accommodation.  Someone might be deaf or blind.  We

24   might have to work around how to administer everything to them,

25   if they can't verbally respond.

1          But as long as they can indicate they are

2    understanding and can give a meaningful response, we'll

3    accommodate.

4    Q.   So after administering the oath, what do you do next?

5    A.   My style would -- I'd give them the civics exam, go

6    through all ten questions, if -- well, six if they pass.  We

7    stop at six.  And they're required to write one sentence out of

8    three correctly.

9          So we would administer the writing and the reading.

10   One read out of three sentences correct is passing.  And once

11   that's done, I move on to the N-400 itself.

12   Q.   Is that commonly called the English examination?

13   A.   Yes.

14   Q.   Is the English --

15   A.   Part of.

16   Q.   Pardon me?

17   A.   Part of.

18   Q.   Part of?  What do you mean by that?

19   A.   The reading and writing is mainly testing their ability to

20   read and write.  The comprehension, understanding, is done when

21   you're going over the application itself.

22   Q.   Why do you do the English examination at the beginning of

23   the interview?

24   A.   Personally I like to get it out of the way.  A lot of

25   applicants get hung up on passing.  So for them it's easier to

1   have it done and they can relax and we can get into the

2   interview easier.

3   Q.    And would a failure on the English examination be

4   indicative of an applicant's ability to understand English?

5   A.    It could.  It depends on their English abilities.  It's

6   not always indicative.

7   Q.    What if -- what would you do if you identified someone who

8   cannot understand you in English?

9   A.    We would stop the interview.  We couldn't move forward.

10  Q.    And have you done that in your -- during your career?

11  A.    Yes.

12  Q.    And what would happen if you stopped the interview at that

13  stage?

14  A.    They'd be explained that because of their lack of English

15  we're not going to do the interview -- the complete interview

16  today, we'll rescheduled them in 60 to 90 days, to come back to

17  either finish the interview, or whatever portion they could not

18  complete, and hopefully pass at that time.

19  Q.    So after you completed the civics and the reading and

20  writing tests, what was your -- what is your next step?

21  A.    I'd go over the application from start to finish.

22  Q.    Do you literally start on page 1?

23  A.    Yeah.

24  Q.    Part 1 at the top?

25  A.    Uh-huh (affirmative).

1   Q.   Would it be fair to say you follow it kind of like a

2   script?

3   A.   Yes.

4   Q.   So do you have the N-400 application in front of you at

5   that time?

6   A.   Yes.

7   Q.   And you go over that application with the applicant?

8   A.   Yeah.

9   Q.   Do you review every question on the N-400 with the

10  applicant?

11  A.   Yes.  We try to.

12  Q.   Do you ask any follow-up questions based on the

13  applicant's answers?

14  A.   If it requires clarification, yes.

15  Q.   And do you ever take notes during the interview?

16  A.   Yeah.  If it's their response it's on the N-400 itself.

17  Q.   And how do you make such notations?

18  A.   We're required to write everything in red ink to

19  differentiate it from what the applicants have written.

20  Q.   And why do you always use a red pen?

21  A.   To make that distinction between what they might have

22  filled out the form with, to show that it was the officer who

23  made those notations.

24  Q.   Have you ever, during the course of your career, made a

25  marking on an N-400 application other than in a red pen?

1   A.   Not at that time, no.  They have changed it as of

2   recently, this last year, when an interview was stopped because

3   of English, somewhere in the form.

4          We no longer write that in red.  We write it in blue

5   or black, because it's not really a change to their testimony.

6   But everything that they tell us we write in red.

7   Q.   Prior to two or three years ago, had you ever made a mark

8   on the N-400 other than in red?

9   A.   No.  Huh-uh (negative).

10  Q.   If the applicant doesn't seem to understand a particular

11  question, what would you do?

12  A.   Try and rephrase it so they can understand it.

13  Q.   And how would you determine whether an applicant

14  understands the question?

15  A.   Their body language, how they kind of look at you

16  quizzical.  Or sometimes outright they'll say, you know, I

17  don't understand.  Can you repeat it?

18  Q.   Is it your practice to allow an applicant time to explain

19  an answer?

20  A.   Yeah.  If they -- if they want.  We don't stop them from

21  talking.

22  Q.   So if you asked a question that was yes or no, would they

23  be able to answer other than just yes or no?

24  A.   Yeah.  Yes.

25  Q.   Have you ever had applicants who indicated that they

1  weren't sure whether a particular piece of information

2  responded to a question; for example, whether something

3  constituted an arrest or a citation?

4  A.   For example, if you ask, Have you ever been arrested,

5  cited, or detained for anything, and they'll go, Well, I've had

6  traffic tickets.  Do you mean that?

7        And we'll clarify, you know, all traffic offenses are

8  traffic citations, but other types of arrests, as well, you

9  know, petit thefts or DUIs, et cetera.

10 Q.   And if they had not originally marked that on the N-400,

11 what would you do?

12 A.   That they hadn't -- what do you call it?  That they didn't

13 indicate the traffic offenses you mean?

14 Q.   Right.  If they informed you of something during the

15 interview that they had not previously been sure whether to

16 disclose --

17 A.   We'd make the notation on the form.

18 Q.   During your naturalization interviews, is it your practice

19 to begin by asking the question verbatim, so as written on the

20 Form N-400, or by rewording it?

21 A.   Initially as -- as it's written, reworded as needed.

22 Q.   Is it your practice to mark the naturalization in any way

23 to verify what questions you've covered during the

24 naturalization interview?

25 A.   We place red check marks over their responses.

1  Q.   What exactly does the red check mark or tick mark mean?

2  A.   It shows that we've asked that question and they've

3  answered it.

4  Q.   So if they did not answer a question, would you put a red

5  check mark?

6  A.   No.

7  Q.   So does it always indicate that they responded to the

8  question?

9  A.   Yes.

10 Q.   Does an applicant's response have to be oral?  Or can they

11 make it by gesture or head nod or some other physical sign?

12 A.   It's oral.  I'll remind them sometimes.  They kind of get

13 in the habit of just nodding along.  So I have to remind them,

14 Please answer verbally, orally.

15 Q.   And if an applicant had an attorney present, is the

16 attorney allowed to answer the question?

17 A.   They're not supposed to answer on their behalf.  They can

18 advise their client, but they can't answer for them.

19 Q.   So who answers the questions during the application -- or

20 during the naturalization interview?

21 A.   The applicant themselves.

22 Q.   And have you ever made a red mark on a naturalization

23 application before you've gone into the interview?

24 A.   No.

25 Q.   Why not?

1  A.   Because I haven't interviewed them yet.  It's not their

2  response.  The red marks or notations, et cetera, are their

3  testimony, their changes or additions.

4  Q.   Was the use of red marks and notations you've described

5  standard practice in your office in 2006?

6  A.   Yes.  For the nation, actually.

7  Q.   And was it consistent with your training?

8  A.   Yes.

9  Q.   And you mentioned earlier that you've also adjudicated

10  I-485 applications to adjust status?

11  A.   Yes.

12  Q.   Is that consistent with the practice used for I-485s,

13  as -- yes, I-485s, as well?

14  A.   Making the notations in red is not required.  Because on

15  the adjustment of status applications, at that time they did

16  not have an attestation for changes made.

17        So just out of habit, though, if you've got a red pen

18  in your hand, you know, because that's what we use for most

19  everything else, we'll do it with them as well.

20  Q.   And so if there are red marks on an application to adjust

21  status, it would be from the interviewer?

22  A.   Possibly.  You know, for myself, I always use red pen.

23        THE COURT:  Mr. Belsan, I have a question about

24  the -- is the red pen rule -- is that in a regulation, in a

25  ruling, in an agency memorandum?  How -- where is that found?

1        THE WITNESS:  It's part of the naturalization quality

2   of procedures that they instituted in 1987 roughly.

3        THE COURT:  So sort of an internal procedures

4   handbook?

5        THE WITNESS:  Yeah.  Consistency to have consistent

6   processing of the applications.

7        THE COURT:  Okay.  Thank you.

8        Sorry to interrupt.

9        MR. BELSAN:  No problem.

10  BY MR. BELSAN:

11  Q.   At the end of the interview, does the applicant have to

12  sign anything?

13  A.   Assuming they get through all of the questions on the

14  form, we have them sign the attestation.  And any changes that

15  have been made, or additions or notations, made on the form are

16  numbered.  If there are any supplemental pages, those are

17  numbered, as well.

18       And on the attestation, it's placed on there as

19  changes 1 through whatever, and additional pages 1 through

20  whatever.  And the applicant signs that everything is true and

21  correct.

22  Q.   And you referred to this as the attestation?

23  A.   Uh-huh (affirmative).

24  Q.   What does the attestation mean?

25  A.   They're signing under penalty of perjury that all the

1   responses they provided are the truth, and they're aware of

2   those changes and the pages that are attached therein.

3   Q.    And is that made under penalty of perjury?

4   A.    Yes.

5   Q.    Do you sign the naturalization application, as well?

6   A.    We only sign that if the applicant completes the interview

7   and they signed, yes.

8   Q.    And earlier you said you've conducted thousands of

9   naturalization interviews.

10  A.    Uh-huh (affirmative).

11  Q.    And, again --

12        THE COURT:  Is that a yes?  Yes or no?

13        THE WITNESS:  Yes.  Sorry.

14        THE COURT:  Thank you.  That's okay.

15        THE WITNESS:  I fell into the trap.

16        THE COURT:  You should know after all.

17        THE WITNESS:  I know.  I fell in the trap.

18  BY MR. BELSAN:

19  Q.    Did you conduct each and every one of those application

20  interviews for naturalization consistent with the procedures

21  you've just described?

22  A.    Yes.

23  Q.    What options does an adjudicator have at the end of an

24  interview?

25  A.    You can either approve it on the spot, if you -- if

1    everything meets and it's all there.  It could be continued for

2    various reasons, documents are needed, review of file is

3    needed, or it could be denied.

4            Usually, though, a denial is not done on the spot.

5    It's usually done at a later time, just because you don't have

6    time to write up a denial during a day of interviews.

7    Q.   Now turning to the date of May 31st, 2006, did you

8    interview Mr. Khan regarding his eligibility for

9    naturalization?

10   A.   Yes.

11   Q.   And how do you know you interviewed Mr. Khan?

12   A.   Because my signature was on the form.

13   Q.   Now, if you'd pick up Exhibit 7 in front of you,

14   Plaintiff's Exhibit 7.

15   A.   Uh-huh (affirmative).  Okay.

16   Q.   And is this an application for naturalization?

17   A.   Yes, it is.

18   Q.   Is this the exhibit that you -- or the document that you

19   looked at in reviewing whether or not you had interviewed

20   Mr. Khan?

21   A.   Yes, it is.

22   Q.   Can you please indicate which pages of this exhibit your

23   signature and stamp appear.

24   A.   On the first page in the action block, where the approval

25   stamp is, that's my signature.  And on page 10, part 13, the

1   attestation, as we call it, that's my signature, name, stamp,

2   and date.

3   Q.   And on what date did you conduct Mr. Khan's naturalization

4   interview?

5   A.   May 31st, 2006.

6   Q.   And where was that interview conducted?

7   A.   In Orlando, Florida.

8   Q.   Do you have an independent memory of the interview of

9   Mr. Khan?

10  A.   Not specifically of him, no.

11  Q.   Is that common with regard to specific interviews?

12  A.   Yeah.  When you've done so many a day for so many weeks,

13  not all of them are going to stick in your mind, at least not

14  mine.

15  Q.   Reviewing Exhibit 7, can you tell whether Mr. -- you went

16  over Mr. Khan's N-400 with him?

17  A.   Yes, because of all the changes -- the marks that I've

18  made on it, my signature at the end, and his signature.

19  Q.   And do these appear to be your red marks on the -- on

20  Exhibit 7?

21  A.   Yes, they do.

22  Q.   How can you tell?

23  A.   It's my handwriting where the forms are -- where the

24  notations are made.  And that is the way I check, my style.

25  Q.   And, in general, which questions did you go over with

1   Mr. Khan?

2   A.   All the ones that have red check marks.

3   Q.   So is it correct to conclude that any question or field

4   with a red check mark next to it is information you

5   specifically asked Mr. Khan during his naturalization

6   interview?

7   A.   Yes.

8   Q.   Did Mr. Khan personally confirm his answers to each of

9   these questions that have been marked with a red check mark?

10  A.   I assume by signing the attestation he's attested that

11  everything he answered was the truth.

12  Q.   And would he have had to give a response before you put a

13  red check mark down?

14  A.   Yes.

15  Q.   Now directing your attention to page 2 of Exhibit 7, part

16  4(c), do you see the red notations in that section?

17  A.   Yes.

18  Q.   Are those your notations?

19  A.   Yes, that's my handwriting.

20  Q.   And what do they indicate?

21  A.   That I updated his address, the cell phone number, and the

22  house phone number.

23  Q.   And what does the circled number indicate?

24  A.   That would have been the third notation made on the form,

25  or change or addition.

1   Q.    And was that consistent with your common practice for

2   corrections, alterations, or notations?

3   A.    Yes.

4   Q.    And was that consistent with your training?

5   A.    Yes.

6   Q.    And where would that information have come from?

7   A.    The information that I corrected here?

8   Q.    Yes.

9   A.    Was from him, his testimony.

10  Q.    So would you have made a similar red notation anytime the

11  oral answer to a question differed from what was written down?

12  A.    Yes.

13  Q.    Now, directing your attention to page 1, back to page 1 --

14  A.    Yes.

15  Q.    -- part 1 captions, Your name.

16  A.    Yes.

17  Q.    Did you ask Mr. Khan for his full legal name?

18  A.    Yes, I did.  And I completed the middle name of Manzoor.

19  Q.    So what did he say his name was?

20  A.    Parvez Manzoor Khan.

21  Q.    Did you ask Mr. Khan whether he had ever used any other

22  names?

23  A.    Based on the application that I see, he did not fill

24  anything in.  He crossed it through.  So I didn't follow up on

25  that.

1  Q.   Would it be your common practice to ask an applicant about

2  other names they've used if they write something into those

3  boxes?

4  A.   Yes.  I would have clarified it.

5  Q.   If Mr. Khan had told you previously that he used the name

6  Jaweed Khan, what would you have done?

7  A.   Well, the interview would have been completed.  Assuming

8  we can get through it all, the case probably would have been

9  continued.

10          We have to run some system checks to see if that name

11  appears in any of our systems, if there are other files under

12  that name, or any security issues, clearances and stuff.

13  Q.   And if you determine that there were other files based on

14  that name, what would you do?

15  A.   We would have to obtain the file and review it, confirm

16  that's the same identity, and see what effect, if any, it might

17  have on the naturalization and/or the underlying adjustment of

18  status.

19  Q.   And how might it affect the application for

20  naturalization?

21  A.   If there was some reason in the original -- in the other

22  file that relates to them that might have precluded them from

23  being lawfully admitted, then at time of citizenship they're

24  not a lawful resident, so we would not be able to approve the

25  application.

1   Q.   And if Mr. Khan had told you during the interview that he

2   previously used the name Mohammad Akhtar, what would you have

3   done?

4   A.   Made the notation on the form, and same outcome, continued

5   it to review.

6   Q.   And if you learned for the first time at the interview

7   that Mr. Khan had previously used another name, would you have

8   granted his application that day?

9   A.   More likely no, because we don't always have time to run

10  all the systems at time of interview.  We have back-to-back

11  interviews.  It's easier to continue it and do it on a day

12  where we're given time to follow up.

13  Q.   What would you have done if Mr. Khan told you he had used

14  another name but could not remember what that name was?

15  A.   I'd make the notation.  It would seem a little out of

16  sorts.  I've never had somebody admit to using other names but

17  they can't recall it.

18  Q.   What would that notation look like?

19  A.   Claim -- something along the lines of, Claims other names

20  used, can't recall.

21  Q.   And would you have any follow-up questions?

22  A.   Possibly I'd ask them when did they use this, for what

23  purpose, et cetera.

24  Q.   And then what impact would that have had on your

25  adjudication of the application?

1   A.   We'd have to continue it, possibly call him back for a

2   further statement regarding it.  We'd run our systems to see if

3   we can find anything else that might relate to him.

4   Q.   Now, directing your attention to the same page of this

5   exhibit, but part 2, toward the bottom, captioned information

6   about your eligibility --

7   A.   Uh-huh (affirmative), yes.

8   Q.   -- what is this section?

9   A.   It's their eligibility, what they -- what section of law

10  they're applying under, resident of five years, resident of

11  three years, married to U.S. citizen, or other category, such

12  as military, et cetera.

13  Q.   And what basis did Mr. Khan claim here?

14  A.   He filed his three year, Section 319, married to a U.S.

15  citizen for three years, resident for three years.

16  Q.   And if you had any questions regarding an individual's LPR

17  status, or lawful permanent resident status, is there a

18  document you would look at?

19  A.   We'd flip through the file.  There should be an

20  underlying -- either adjustment of status, I-485, or a grant by

21  an immigration judge for resident.

22  Q.   Will you please turn to Exhibit 8, Plaintiff's Exhibit 8,

23  in front of you, which is the adjustment of status application.

24  A.   Yes.

25  Q.   Looking at Exhibit 8, can you determine the basis upon

1   which Mr. Khan obtained his LPR status?

2   A.   Based on part 2, he indicated he was applying for

3   adjustment of status based on his spouse, or a parent, was

4   granted lawful permanent residence.

5   Q.   And can you tell what date Mr. Khan signed his

6   application?

7           THE COURT:  Which application are you talking about?

8           MR. BELSAN:  I'm sorry.  The application for

9   adjustment of status, Exhibit 8.

10          THE WITNESS:  It would have been the last page.  I

11  guess it's page 4.  Because when they submit, they sign under

12  penalty of perjury that all the information they've included on

13  their submission is true and accurate.  And that's dated

14  January 10th, 1998.

15  BY MR. BELSAN:

16  Q.   And so just to be clear, that's page 4 of Exhibit 8 that

17  you're looking at?

18  A.   Yes.

19  Q.   Are there other provisions of law, other than married to a

20  United States citizen, that allow one to adjust and become a

21  lawful permanent residence?

22  A.   Yes.  There's employment based.  Asylees can file for

23  adjustment.  Military.

24  Q.   And specific to individuals who have asylum, how long

25  would someone who has asylum have to wait before they could

1   file a lawful permanent resident application?

2   A.   They have to be an asylee for one year exact, and then

3   they can file for a residence.

4   Q.   So if Mr. Khan believes he had been granted asylum in

5   1992, what would be the earliest he could have applied for

6   lawful permanent residence status?

7   A.   One year and one day in 1993.

8   Q.   Now, putting aside Exhibit 8 and returning to

9   Exhibit 7 --

10  A.   Uh-huh (affirmative).

11  Q.   -- directing your attention to page 2, specifically part

12  3, captioned information about you, do you see that?

13  A.   Yes.

14  Q.   Did you ask Mr. Khan for his date of birth?

15  A.   Yes, I did, because I placed a red check.

16  Q.   And what did he say?

17  A.   July 27th, 1957.

18  Q.   And how do you know that's what he said?

19  A.   Because I just confirmed it with the red mark.

20  Q.   And if Mr. Khan had told you he previously used a

21  different date of birth, what would you have done?

22  A.   I would have corrected it and put it in, or added it.

23  Q.   And if Mr. Khan disclosed a different date of birth during

24  the interview, how would that have impacted your adjudication

25  of this application?

1  A.    We would have had to continue it to run all of those names

2  and date-of-birth combinations again through the systems.

3  Q.    And what would you be running that through the system for?

4  A.    To see if there are any other matches in our records for

5  any other names and dates-of-birth combination, as well as all

6  the security and background clearances we have to run on

7  applicants for naturalization.

8  Q.    And if you found that there were matches, what would you

9  do?

10  A.    We'd have to get the file request and, again, review it,

11  determine if it relates to them or not, and see how it may

12  affect their citizenship.

13  Q.    If Mr. Khan had disclosed that he used a different name --

14  date of birth previously, would you have granted his

15  application on the day of the interview?

16  A.    Not likely.

17  Q.    Now, directing your attention elsewhere on that same

18  page -- excuse me, to the -- the next page, page 3 --

19  A.    Uh-huh (affirmative).  Yes.

20  Q.    -- information for criminal record search -- do you see

21  that part 5 there?

22  A.    Yes.

23  Q.    And field (f) says hair color.

24  A.    Yes.

25  Q.    And what did the applicant mark prior to the interview?

1  A.    Black.

2  Q.    And eye color, what did the applicant mark?

3  A.    Brown.

4  Q.    And it appears that there are red check marks.  Do you see

5  those?

6  A.    Yes.

7  Q.    And what do those indicate?

8  A.    That I confirmed it, basically visually, having them

9  sitting in front of me.

10  Q.    So do these red check marks indicate that he testified the

11  same, or you -- you confirmed the same hair and eye color?

12  A.    Information.  Yeah.

13  Q.    Were they a change in his response?

14  A.    No.

15  Q.    Now, directing your attention to page 8 --

16  A.    Page 8.

17  Q.    -- part 10(d), captioned good moral character.

18  A.    Yes.

19  Q.    Question 16 asked the applicant, Have you ever been

20  arrested, cited, or detained by any law enforcement officer,

21  including INS and military officers, for any reason?

22         Did you ask Mr. Khan question 16 during the

23  interview?

24  A.    Yes, I did.

25  Q.    And, again, how can you be sure you asked this question?

1   A.    I changed his response from no to yes, placing an X mark

2   in the yes box.

3   Q.    And did you ask Mr. Khan question 16 as written?  Or did

4   you rephrase it?

5   A.    I usually ask as written.  And if needed, I'll rephrase

6   it.

7   Q.    And how do you know you would have done that?

8   A.    It's my habit, my process.

9   Q.    And what was Mr. Khan's oral answer when you asked

10  question 16?

11  A.    He responded yes.

12  Q.    Did you ask Mr. Khan to elaborate on why his answer was

13  yes?

14  A.    Yes.  Because in the box below question 21, I indicated

15  there was an arrest for prostitution on April 20th, 1995, in

16  Miami-Dade, and it was nol-prossed.

17  Q.    And how do you know that's what he said to you?

18  A.    Because that's what I wrote as his testimony.

19  Q.    Did you ask Mr. Khan whether he'd ever been arrested,

20  cited, or detained or any other occasions?

21  A.    I usually ask -- my habit is to ask them, Other than this

22  incident, are there any other arrests, citations, DUIs?  And if

23  they respond no, then I'll usually write, Claims no others, or,

24  No others.

25  Q.    And can you tell whether you asked that follow-up question

1   based on this application?

2   A.    I did, because I indicated no others.

3   Q.    What would you have done if Mr. Khan had indicated that

4   there were additional times on which he had been arrested,

5   cited, or detained?

6   A.    I would have added it to the fields.

7   Q.    Would it have surprised you if Mr. Khan had indicated that

8   he had been stopped by INS in 1991 when trying to enter the

9   United States?

10  A.    Probably, because I don't believe in the file that there

11  was any indication of issues.

12  Q.    Would it have surprised you if Mr. Khan indicated that he

13  had been detained by INS for approximately a month in

14  connection with that incident?

15  A.    If there was nothing in the file that indicated it, yeah,

16  I'd be caught off.

17  Q.    And if Mr. Khan had indicated that he had been detained by

18  INS in 1991, would that have had any impact on your

19  adjudication of this application?

20  A.    Yes.  Because if it's not in the file in front of me, then

21  there's got to be a file somewhere else, and we need to get

22  that file and review it.

23  Q.    And how would you have identified where that file was?

24  A.    We run in our systems -- in the case where we don't have

25  an actual A number, we run them by name and date of birth,

1   either as an exact name search, or a sounds-like name search.

2   And it will usually hit in some manner with an A number.  And

3   we can locate what's the file control office for that file.

4   Q.   And if you determined that there were additional files,

5   what would you have done?

6   A.   Completed the interview, if we could, and the case would

7   have been continued to obtain that file.

8   Q.   And, again, why are you -- what would you do with the file

9   once it comes to your office?

10  A.   We'd want to see if it has any impact on the citizenship

11  and underlying application for the residence.

12  Q.   Now, directing your attention to the bottom of page 8,

13  part 10(d), question 23 --

14  A.   Yes.

15  Q.   -- which asks, Have you ever given false or misleading

16  information to any U.S. government official while applying for

17  any immigration benefit, or to prevent deportation, exclusion,

18  or removal -- did you ask Mr. Khan question 23 during the

19  interview?

20  A.   Yes, I did.

21  Q.   And, again, how can you be sure?

22  A.   I placed a red mark over the response no.

23  Q.   And what was Mr. Khan's oral response to your question?

24  A.   It was no.  I confirmed it at the time.

25  Q.   And what would you have done if Mr. Khan had indicated

1  that he had previously given false or misleading information to

2  a U.S. government official while applying for a benefit

3  application?

4  A.    I would have asked him to clarify it.  And any information

5  that he provided I would have indicated it on the application.

6  Q.    And is that the same if he had indicated he had given

7  false or misleading information to prevent deportation,

8  exclusion, or removal?

9  A.    Yes.

10 Q.    And if Mr. Khan had indicated to you that he had

11 previously given false or misleading information to INS, would

12 that have any impact on your adjudication of the application?

13 A.    Yes, because we'd want to find out what exactly it was,

14 the specifics as to what he -- what he said, what was

15 committed.

16 Q.    And, again, how would you determine what it was and what

17 impact it might have?

18 A.    Based on his testimony, we'd more than likely take a

19 separate sworn statement, getting all the specifics.

20 Q.    And then what would you do after the interview?

21 A.    Continue it, to determine what impact it might have.

22 Q.    And in that same section of the N-400, Exhibit 7, please

23 look at question 24, which asks the applicant, Have you ever

24 lied to any U.S. Government official to gain entry or admission

25 into the United States?

1     Did you ask Mr. Khan question 24 during the

2  interview?

3  A.   Yes, I did.

4  Q.   And, again, how can you be sure?

5  A.   I placed a red -- my red check over the response no.

6  Q.   And did you ask Mr. Khan question 24 as written?  Or did

7  you rephrase it?

8  A.   As written, possibly rephrased, if not -- if he didn't

9  understand it.

10 Q.   And how do you know you did that?

11 A.   I placed the red mark over his response no.

12 Q.   And how do you know you asked it as written and possibly

13 rephrased?

14 A.   It's my -- my policy, my procedure.

15 Q.   And what was Mr. Khan's oral answer when you asked him

16 question 24?

17 A.   He stated no.

18 Q.   And what would you have done if Mr. Khan had indicated

19 that he had previously lied to a government official to gain

20 entry into the United States?

21 A.   Continue the case -- well, initially obtain whatever

22 information he could provide, as to what, where, when, see if

23 there was another file created from that incident, and then

24 continue it to get that file.

25 Q.   And so if Mr. Khan had indicated that he had previously

1  lied to a government official to gain entry or admission into

2  the United States, would that have an impact on your

3  adjudication of the application?

4  A.   Yes.  It probably wouldn't have been approved that day,

5  then.

6  Q.   And, ultimately, how would you have determined whether to

7  approve it?  You said it wouldn't have been approved that day.

8  A.   It would have been continued.  And we'd address the

9  issues.

10  Q.   And would that be the same process you've discussed

11  previously about obtaining files?

12  A.   Obtaining any files that may relate, et cetera, yes.

13  Q.   And on the next page of the exhibit, page 9, please look

14  at question 27.  Question 27 asks the applicant, Have you ever

15  been ordered to be removed, excluded, or deported from the

16  United States?

17         Did you ask Mr. Khan question 27 during the

18  interview?

19  A.   Yes, I did.

20  Q.   And, again, how can you be sure?

21  A.   I placed the red check again over the response no.

22  Q.   Did you ask Mr. Khan question 27 as written?  Or did you

23  rephrase it?

24  A.   As written.  And then rephrased if it was needed.

25  Q.   And what was Mr. Khan's oral answer when you asked

1  question 27?

2  A.    He stated no.

3  Q.    And if Mr. Khan had indicated that he had previously been

4  ordered to be removed, deported, or excluded from the United

5  States, what would you have done?

6  A.    Asked for the specifics as to where this occurred, if he

7  had any information as to another file, and, again, continued

8  it to follow up on that.

9  Q.    And question 28 on that same page, which asks, Have you

10 ever applied for any kind of relief from removal, exclusion, or

11 deportation -- did you ask Mr. Khan question 28 during the

12 interview?

13 A.    Yes, I did.

14 Q.    And, again, how can you be sure?

15 A.    I placed the red check over the response.

16 Q.    Did you ask Mr. Khan question 28 as written, or did you

17 rephrase it?

18 A.    As written, unless needed to be rephrased.

19 Q.    And what was Mr. Khan's oral answer when you asked

20 question 28?

21 A.    He responded no.

22 Q.    What would you have done if Mr. Khan indicated he had

23 previously applied for any kind of relief from removal,

24 exclusion, or deportation?

25 A.    Same as before, obtain as much information from him

1    regarding that, continue the case, get any relating A files.

2    Q.    Based on your review of Mr. Khan's Form N-400 and your

3    annotations on it, do you have any reason to believe that

4    Mr. Khan did not have a sufficient understanding of or ability

5    to communicate in English?

6    A.    No, because we completed the interview, I went through all

7    of the application, indicated all the changes that were made on

8    the form.  There were no supplemental pages attached.  He

9    signed.  I signed.

10   Q.    Would you have completed the interview if you had any

11   question about his ability to understand English?

12   A.    Yes.  It would have been stopped and continued for a

13   possible re-exam if we couldn't get through it.

14   Q.    So would you have completed the interview if you had

15   questions about his ability to understand?

16   A.    No.

17   Q.    After you covered all the relevant questions on the N-400,

18   what did you do, here?

19   A.    My process -- I go through and I number as they're in

20   front of me, all the number -- all the changes or corrections

21   I've made -- excuse me, I've made.

22          I'll indicate that I've made these changes on the

23   attestation.  I would turn the page around for them and tell

24   them, Please read and then sign.

25   Q.    And based on your review of the N-400, Exhibit 7, did you

 1 | follow that process here?

 2 | A.    Yes.

 3 | Q.    And was that consistent with your standard practice?

 4 | A.    Yes.

 5 | Q.    How long would an applicant have to review the N-400

 6 | before signing?

 7 | A.    I've never had anyone ask to actually look at the form

 8 | again.  But if they wanted to, they're allowed.  I mean, it's

 9 | their application.  There's no time set, so to speak.

10 | Q.    And at the end of the interview, did Mr. Khan sign his

11 | N-400 affirming the truthfulness of his written answers on the

12 | naturalization application?

13 | A.    Yes, he did.

14 | Q.    Now, directing your attention to page 10, part 13,

15 | captioned signature at interview, is that Mr. Khan's signature

16 | just below completed signature of applicant?

17 | A.    Yes.

18 | Q.    And is that your signature next to his?

19 | A.    Yes, it is.

20 | Q.    Mr. Khan's application to naturalize was approved on

21 | May 31st, 2006?

22 | A.    Yes.

23 | Q.    Is that the same day as your interview of him?

24 | A.    Yes, it was.

25 | Q.    Were you the one who approved Mr. Khan's application?

1   A.   Yes, I did.

2   Q.   Is it fair to say you approved his application based on

3   the information he provided in it and his testimony during the

4   interview?

5   A.   Yes.

6   Q.   Officer Pellechia, if you'd turn back to Exhibit 8

7   briefly.

8   A.   Yes.

9   Q.   This is the 485 adjustment application.

10  A.   Yes.

11  Q.   You mentioned earlier that at some point in time there

12  were interviews that were not -- or the attestation was not

13  under penalty of perjury for Forms 485, is that correct, at

14  some point in the history?

15  A.   They didn't have attestations at time of interview.

16  Q.   Okay.

17  A.   Correct.

18  Q.   Turning to page 4, there is a signature line, correct, on

19  the 485?

20  A.   Yes, there is.

21  Q.   And is that an attestation that this interview makes at

22  some point -- or this applicant makes on this form at some

23  point?

24  A.   This is what they sign at submission, the application.

25  Q.   And is their signature submitted under penalty of perjury?

1    A.   It so states, yes.

2         MR. BELSAN:  No further questions at this time, Your

3    Honor.

4         THE COURT:  All right.  Excellent timing, Mr. Belsan.

5    We've been here for an hour-and-a-half.  We'll take a

6    ten-minute break.  We'll be back on the record at 2:40.

7         Officer Pellechia, you'll remain under oath.  Please

8    refrain from talking to any witnesses about your testimony or

9    the trial itself.

10        Thank you.

11        THE WITNESS:  Okay.

12        COURT SECURITY OFFICER:  All rise.

13     (Recess from 2:27 p.m. to 2:40 p.m.; all parties present.)

14        COURT SECURITY OFFICER:  All rise.  This Honorable

15   Court is now in session.  Please be seated.

16        THE COURT:  All right.  We're back on the record in

17   *United States versus Khan*, 3:17-cv-965.  It looks like everyone

18   is back in the courtroom.  We have Officer Pellechia back on

19   the stand.  You remain under oath.

20        Mr. Lavigne.

21        MR. LAVIGNE:  Thank you, Your Honor.

22                        **CROSS-EXAMINATION**

23   BY MR. LAVIGNE:

24   Q.   I can't say it.  Officer Pellechia?

25   A.   Pellechia.

1   Q.   Do you recall me saying your name?

2   A.   Yeah, a few times.

3   Q.   Okay.

4   A.   It's been a while.

5   Q.   It has.  Okay.  And how long have you been in the Orlando

6   office?

7   A.   Since '91.

8   Q.   '91.  So were you at the Orlando office when it was the

9   little trailer on the end of the runway?

10  A.   Yes, on Bear Road.

11  Q.   Okay.  And you were there when it was on Trade Port Drive,

12  next to the west runway?

13  A.   West side, yes.  It moved in 1998, I think.

14  Q.   And then in 2008 you got a new building?

15  A.   Yes.

16  Q.   Okay.  Do I understand correctly you have also adjudicated

17  I-130 applications and I-485 applications?  Correct?

18  A.   Yes.

19  Q.   Okay.  Let me --

20         MR. LAVIGNE:  Which ones are the two joint exhibits?

21         COURTROOM DEPUTY:  They're both.  One is redacted and

22  one is unredacted.  That's the redacted and that's the

23  unredacted.

24  BY MR. LAVIGNE:

25  Q.   I want to put in front of you -- we have two joint

1   exhibits.  One is the unredacted version and the other is the

2   redacted version.

3   A.    Okay.

4   Q.    Okay.

5         MR. LAVIGNE:  And, Mr. McFarland, if you can help me.

6   BY MR. LAVIGNE:

7   Q.    Prior to today's trial, have you been given an opportunity

8   by the Plaintiff to review either one of these exhibits, which

9   consists of -- and I will tell you -- what I can tell you is in

10  there is the A file for a Jaweed Khan, and I think an A file

11  for the Mohammad Akhtar.

12  A.    No, I have not.

13  Q.    The reason I ask you the questions -- do I understand

14  correctly that it had been an issue or a question of

15  eligibility for citizenship because of some of the statements

16  made between question 22, 23, 24?  You would have said, wait,

17  wait, we can't finish, let me get the A files?

18  A.    Correct.

19  Q.    So you would have cross-referenced A files.  So -- and

20  this is what's been produced to me, the A files, under two

21  other names.  That's Jaweed -- I don't know how to say it,

22  Jaweed Khan, J-a-w-e-e-d, Khan.  And the other is Mohammad

23  Akhtar.

24  A.    Uh-huh (affirmative).

25  Q.    So you're telling me today you've not had a chance to look

1   at either one of those A files?

2   A.   No, I have not.

3   Q.   Because my understanding from you is that you would not

4   necessarily make a determination that he's not qualified for a

5   citizenship until you've had a chance to look at all the --

6   what's in the papers, records, and data in those two files?

7   A.   At the time of interview, yes, we want to see the other

8   files.

9   Q.   That's what I'm saying.  So -- but you haven't had a

10  chance to look at these either unredacted or redacted files?

11  A.   No.

12  Q.   You cannot tell me today, can you, that you would

13  definitely reject him for citizenship without looking at all

14  these files, would you?

15  A.   He wouldn't have been denied outright.  The case would

16  have been continued until the files had been obtained.

17  Q.   Right.  Okay.  So let's go back to a few of the forms

18  here.

19  A.   Okay.

20  Q.   I get a little confused myself there's so much going on

21  here.  I'm looking at the I-485.

22          MR. LAVIGNE:  And, Mr. McFarland, would you show her

23  this.

24          THE WITNESS:  Okay.

25          MR. BELSAN:  Your Honor, I'm not sure if that's the

1    admitted exhibit or if that's his notes.

2              MR. LAVIGNE:  No.  That's one of the pages from

3    the -- you can -- I can show it to you.

4              MR. BELSAN:  Right.  But there's an admitted exhibit

5    that is covering the I-485.

6              THE COURT:  I-485 is which exhibit?

7              MR. BELSAN:  I believe it's Exhibit 8.

8              THE COURT:  8.

9              MR. LAVIGNE:  Okay.

10             THE COURT:  We'll show her Exhibit 8, rather than one

11   that's marked.

12             MR. LAVIGNE:  Let's do that.

13   BY MR. LAVIGNE:

14   Q.    Do you have Exhibit 8 in front of you?

15   A.    Yes, I do.

16   Q.    Okay.  Exhibit 8 in front of you, if you go to that second

17   page -- toward one, two, three, four lines -- or five lines

18   down, it says, Place of last entry into the U.S., Miami,

19   Florida.

20   A.    Yes.

21   Q.    And then the actual original answer was, what, visitor?

22   A.    Yes.

23   Q.    And then after that is -- written in black, it looks

24   like -- EWI, marked out with a red mark.

25   A.    Yes.

1  Q.   And then written EWI in red again.

2  A.   Yes.

3  Q.   Would that indicate to you that was written by the

4  examiner at that time?

5  A.   It -- yes, it would be, if they follow the same --

6  Q.   And the 485 was approved, right?

7  A.   Yes, it was.

8  Q.   Correct me if I'm wrong.  Isn't it IRS -- or Immigration

9  law and policy that if you come into the United States with an

10  EWI, entry without inspection, you're not entitled to an

11  adjudication of a 485?

12            MR. BELSAN:  Objection.  Lack of foundation.

13            MR. LAVIGNE:  There's no lack of foundation.

14            THE COURT:  Are you able to answer that question?

15            THE WITNESS:  Yes.

16            THE COURT:  All right.  Overruled.

17            THE WITNESS:  He might have qualified for 245-I,

18  which would have allowed him to adjust status.

19  BY MR. LAVIGNE:

20  Q.   And what's 245-I?

21  A.   It allows persons who entered the states illegally to

22  still adjust status here, rather than depart the country and

23  remain three to five years outside the U.S.

24  Q.   Is that under the new form 601A or the original form 601?

25  A.   Back in 2006, it was -- I believe the 601.

1  Q.    The 601.  In fact, the 601A, which allows you to do it in

2  the U.S. and adjust, was not adopted until 2012; is that

3  correct?

4  A.    Probably.  I'd have to check to make sure the date, I

5  don't know the year.

6  Q.    It was 2012/2013.

7  A.    Uh-huh (affirmative).

8  Q.    But that would be in the public records of the USCIS

9  somewhere --

10  A.    Yes.

11  Q.    -- so they could adjust, if what, an extreme, unusual,

12  hardship would result to a U.S.A. citizen's spouse?  Is that

13  correct?

14  A.    Uh-huh (affirmative).  Yes.

15  Q.    So I still don't understand.  Back at the time this one

16  was adjudicated, which was in -- he filed in January of 1998,

17  correct?

18  A.    Well, looking at the receipt stamp from the Miami district

19  office, it was January 14th of 1998.

20  Q.    And what was the actual approval date?

21  A.    November 7, 2001.

22  Q.    So Immigration had this file for almost four years?

23  A.    Yes.

24  Q.    Does that seem like a little long time to you?

25  A.    No.  There was quite a bit of a backlog in the late

 1   '90s --

 2   Q.   Okay.

 3   A.   -- early 2000s.

 4   Q.   Was that due to the 1996 IIRIRA Relief Act that we used to

 5   call it?

 6   A.   That and many things, that amongst others.

 7   Q.   Okay.  Doing this process the 485, the applicants are

 8   required to submit for fingerprints; are they not?

 9   A.   Yes, they are.

10   Q.   And during the process for the N-400 are the applicants

11   also required to submit to a process of fingerprints again?

12   A.   Yes.

13   Q.   And if fingerprints have been taken by Immigration or

14   Customs and Border Control, should they be in your database?

15   A.   Yes.

16            MR. BELSAN:  Objection.  Lack of foundation.  He

17   hasn't explained whether the witness would know where the

18   fingerprints were kept at that time.

19            THE COURT:  Sustained.

20            Mr. Lavigne, why don't you ask some background

21   questions first.

22            MR. LAVIGNE:  Yes.

23   BY MR. LAVIGNE:

24   Q.   Are you familiar with the requirements for fingerprints?

25   A.   Yes.

1   Q.   And even before you get a file, either for a 485, I-130,

2   the fingerprint would be -- backgrounds would be checked,

3   correct?

4   A.   Yes.  They're all prepped by the service centers.

5   Q.   Before they get to you?

6   A.   Yes.

7   Q.   All right.

8   A.   For naturalization, yes.

9   Q.   Well, you said for naturalization.  What about the 485?

10  You said you also did those a lot.

11  A.   Well -- in 1998?

12  Q.   Yeah.

13  A.   I'd have to look back and see.  I believe at that time the

14  responses were received in the files.

15  Q.   In the file?

16  A.   Yes.  They were placed there prior to adjudicators doing

17  the interviews.

18  Q.   All right.  Let's go back to the 601 procedure.  That's an

19  application for a waiver of inadmissibility for a number of

20  different grounds, correct?

21  A.   Correct.

22  Q.   And those grounds can be found in the Form 601 and the

23  instructions?

24  A.   Yes.

25  Q.   And then later on it was changed so that you didn't have

1  to go outside the U.S. to get your immigrant visa, but you

2  could do it in the U.S.?

3  A.    Correct.

4  Q.    Okay.  But that's 601A.  And I don't see a 601A in this

5  file.  Because this was adjusted in 2001, not 2012, correct?

6  A.    Correct.

7  Q.    All right.  I'm going to show you what is from page 331.

8  I don't know if you can get that in front of you -- either one

9  of those two files.

10          It says -- a notice to Mr. Parvez Khan, dated

11  3/21/2006, to bring to your interview...

12          THE COURT:  You're looking at Exhibit 1 or 2, Officer

13  Pellechia?

14          MR. LAVIGNE:  I think it should be the same.

15          THE COURT:  One is redacted.  One is not.  I'm just

16  trying to clarify.

17          THE WITNESS:  It's hard to tell.  I don't know if

18  there are page numbers on here.

19          THE COURT:  Ms. Loeschen is going to help you out

20  there.

21          THE WITNESS:  Page 331.  Okay.

22          THE COURT:  Ms. Loeschen, which exhibit is that, 1 or

23  2?

24          COURTROOM DEPUTY:  It is 1, the redacted.

25          THE COURT:  Thank you.

 1            MR. LAVIGNE:  Yeah.  We'll just keep it -- it's

 2    redacted, then.

 3            COURTROOM DEPUTY:  331?

 4            THE COURT:  331, sir?

 5            MR. LAVIGNE:  331 is correct.

 6    BY MR. LAVIGNE:

 7    Q.   Are you familiar with that type of request or notice?

 8    A.   I've seen it before, yes.

 9    Q.   And this was addressed to Mr. Parvez Khan in Orlando,

10    Florida?

11    A.   Yes.

12    Q.   And it states, On an FBI background check using your

13    fingerprints, it revealed that you have an arrest record.

14    A.   Yes.

15    Q.   For these arrests and any other incidents in which you may

16    have been involved, bring originals or certified copies of the

17    arrest records.

18    A.   Correct.  Yes.

19    Q.   So at the N-400 would you also look to see if he had an

20    arrest record in the A file?

21    A.   Yes.  We would have looked on the right side for the rap

22    sheet.

23    Q.   When you do the N-400, does the N-400 have the complete A

24    file for you for this applicant?

25    A.   Yes, the majority of the time.

1  Q.   And that -- that would include the I-130 and the I-485?

2  A.   Yes.

3  Q.   I-131 application for travel permit, correct?

4  A.   If they had filed such, yes.

5  Q.   I-765, application for employment authorization?

6  A.   In that time frame, probably, yes.

7  Q.   And at that time G-325A?

8  A.   Yes, because we still use them for adjustment of status.

9  Q.   Now we use an I-138, don't we, instead of a G-325A?

10  A.   Yeah.  They just combined them down.

11  Q.   Yeah.  Okay.  So this would have given him an opportunity

12  to bring in whatever arrest records that were in there.  Okay?

13       Now, I'm trying to figure out what it is in his

14  A files -- whether it's Mohammad Akhtar or there's another name

15  for Mr. Khan that you're looking for.  Okay?

16       In fact, let me show you something else.

17  (Counsel confer.)

18  BY MR. LAVIGNE:

19  Q.   Okay.  I only have one copy right now.  These were not put

20  in as a joint exhibit.  And I'd like to show you a document

21  that appears to be Bates No. 740, Plaintiff's production of

22  documents to Defendant.  Okay?

23       THE COURT:  Are they labeled as an exhibit yet?  Are

24  they labeled as an exhibit?

25       MR. LAVIGNE:  I'd like to label it Defendant's

1  Exhibit No. 1.  I'm sorry.

2       THE COURT:  Do you have another Defendant's Exhibit 1

3  already labeled?  Or is this your -- no, you don't have any

4  exhibits labeled?

5       MR. LAVIGNE:  They're two of the same thing, but

6  they're on different pages.

7       THE COURT:  I understand.  But did you prepare other

8  documents as defense exhibits?

9       MR. LAVIGNE:  Yes, yes, the whole file.

10       THE COURT:  Do you already have a Defense Exhibit 1?

11  Is that what you want to label this?

12       MR. LAVIGNE:  I want this to be labeled 1.  What we

13  had labeled we didn't put in.

14       Did we?  Did we put in Defendant's --

15       THE COURT:  We haven't put in any exhibits yet.

16       MR. LAVIGNE:  I don't think so.

17       THE COURT:  Okay.  You pre-labeled exhibits

18  yesterday, right?

19       MR. LAVIGNE:  We pre-labeled some of them.

20       THE COURT:  Okay.  Do you already have one that's

21  pre-labeled Defense Exhibit 1?

22       MR. LAVIGNE:  Right.  It had about 200 pages, but we

23  don't need 200 pages.

24       THE COURT:  Okay.  And this is part of Defense

25  Exhibit 1?

1    MR. LAVIGNE:  True.

2    THE COURT:  Okay.  Thank you.

3    So you're going to show the witness what's been

4  marked as Defense Exhibit 1?

5    MR. LAVIGNE:  Correct.

6    THE COURT:  Okay.  If you'll give that to the

7  witness, sir.  Thank you.

8  BY MR. LAVIGNE:

9  Q.   I'm looking at the top of it.  Does it say, Encounter EOIR

10 search?

11 A.   Yes, it does.

12 Q.   Is there a Bates number on it?

13 A.   Excuse me?  A what?

14 Q.   A Bates number, 0007- --

15 A.   -40.

16 Q.   Okay.  Yeah.  We call that a Bates number.  Sorry.

17 A.   Okay.

18 Q.   Okay.  I have something in here, down where it says case

19 charge -- are you familiar with this type of report prepared by

20 USCIS?

21 A.   Not in this format.  I'm not sure where this was taken out

22 of, what system, or...

23 Q.   I don't know.  It was given to me by the Plaintiff in this

24 action.  That's why I'm asking questions.

25 A.   If it's the more recent one, PCQS.

1  Q.  Well, this is date -- run 1/3/2018, at the bottom.

2  A.  That would be probably PCQS.

3  Q.  Okay.  I think that is part of what it is, yes.

4  A.  Okay.

5  Q.  Look at where it says case charge.

6  A.  Yes.

7  Q.  Charge 212a07Ai -- I think it's number -- I -- capital I,

8  dash, no valid immigrant visa?

9  A.  Yes.

10 Q.  Says criminal charge no.

11 A.  Yes.

12 Q.  What was the disposition of that?

13 A.  Sustained.

14 Q.  Next charge, 212a06Ci, dash, fraud --

15        COURT REPORTER:  Can you slow down on that?

16        MR. LAVIGNE:  Oh.  Slow down?

17 BY MR. LAVIGNE:

18 Q.  212a06Ci, dash, fraud or willful misrepresentation to

19 procure a visa, comma, documentation or admission into the U.S.

20 A.  Yes.

21 Q.  Was there a criminal charge brought on that?

22 A.  No.

23 Q.  And what was the disposition?

24        MR. BELSAN:  Objection, Your Honor.  We don't know

25 what this document is.  He hasn't laid any foundation for

 1  whether the witness has seen it or is familiar with it, or

 2  could testify as to whether it's admissible.

 3          THE COURT:  Yeah.  Mr. Lavigne, what is the point

 4  here?  You're having her read things off of a piece of paper.

 5          MR. LAVIGNE:  This is the record submitted by the

 6  Plaintiff.  This is the only witness they've produced.  They

 7  didn't say she couldn't testify to the whole A file and what

 8  was in there, and the record.

 9          THE COURT:  I think she -- all right.  I'm not sure

10  why you're doing this.

11          MR. LAVIGNE:  I'll tell you in just a moment.

12          THE COURT:  She has -- she hasn't explained that she

13  even knows what this document is.

14          MR. LAVIGNE:  Right.

15          THE COURT:  So all you're doing right now is having

16  her read things off the document.

17          MR. LAVIGNE:  That's right.  Well, I'll explain it in

18  just a moment.  I will establish a predicate.

19          THE COURT:  Do you want to introduce the document?

20          MR. LAVIGNE:  I would like to introduce it.  It was

21  produced by Plaintiff.  I just want to read what was the

22  disposition of the next one we just read, not sustained.

23          THE COURT:  Officer Pellechia --

24          MR. LAVIGNE:  Sorry.

25          THE COURT:  -- he's asking you about the disposition.

1          THE WITNESS:  It stated not sustained.

2          THE COURT:  Do you know what this document is?

3          THE WITNESS:  The charge you mean or this actual --

4          THE COURT:  The actual paper.  What is that?

5          THE WITNESS:  It appears to be a printout from the

6     systems regarding cases that are filed with the immigration

7     court.

8          THE COURT:  And what does that mean?  What is that?

9          THE WITNESS:  What charges were brought against a

10    person when they were placed into proceedings.

11         THE COURT:  Okay.

12    BY MR. LAVIGNE:

13    Q.   And does it show the dispositions?

14    A.   Yes.

15    Q.   And is this one of the records or documents you would look

16    at in reviewing whether to continue the citizenship and for the

17    other evidence you wanted to look at?

18    A.   It would be one of the systems we could check into to see

19    if we knew the other file existed.

20    Q.   Okay.

21         MR. LAVIGNE:  I'd like to submit this into evidence.

22         THE COURT:  All right.  Any objection?

23         MR. BELSAN:  Yes, Your Honor.  He hasn't even

24    identified what file this document -- or who it relates to.

25    The witness hasn't testified that she's ever seen it before.

1          Just because she's seen generally types of documents

2    doesn't mean that it's admissible in this case.  And the mere

3    fact that the Government produced it in discovery -- the scope

4    of discovery is much more broad than the admissibility of

5    evidence, which we don't believe the Defendant has met here.

6          THE COURT:  Do you know what it is exactly?

7          MR. BELSAN:  We believe it post-dates the -- I think

8    the filing, even, of this case.  It's a record since the -- I

9    believe the documents were corrected --

10       (Counsel confer.)

11         MR. BELSAN:  Right.  It was -- according to my

12   co-counsel, it was collected for the discovery in this case.

13         THE COURT:  And it's a public record?

14         MR. BELSAN:  It's an internal, I believe --

15         MR. LAVIGNE:  Internal.

16         MR. BELSAN:  -- government record.  So we don't

17   question the authenticity.  But the foundation of what it is

18   and how it relates in this case and the timing of the

19   document's creation, this witness hasn't been --

20         THE COURT:  Sort of a relevancy issue that you have?

21         MR. BELSAN:  Well, we don't believe the Defendant has

22   laid foundation for this witness to testify as to it or whether

23   this document is relevant or admissible at this time.

24         THE COURT:  Okay.  I'll reserve ruling on your

25   objection.

1          So go ahead and ask your questions.

2          MR. LAVIGNE:  Certainly.

3          THE COURT:  And I'll make a ruling on its

4    admissibility later.

5          MR. LAVIGNE:  All right.

6    BY MR. LAVIGNE:

7    Q.   Officer Pellechia, is there an application received date

8    on this page, at the very top?

9    A.   Yes, there is.

10   Q.   And what's the application received date?

11   A.   December 23rd, 1991.  I'm not sure which application it's

12   referencing, though.

13   Q.   Well, let's go down to the next box, where it says case.

14   Look at where it says subject alien lead number.  Is there an

15   A number there?

16   A.   Yes.

17   Q.   And what is the A number?

18   A.   70106989.

19   Q.   Okay.  Let me show you -- if you could look at -- I think

20   it's page 242 of Joint Exhibit 1.

21   A.   She's got it.

22   Q.   Oh, she's got it?

23          MR. LAVIGNE:  The redacted version.

24   BY MR. LAVIGNE:

25   Q.   There's a memo to the file.  Do you see that?

1    A.    Yes.

2    Q.    And does -- at the top, where it says applicant speaks,

3    what language does it say?

4    A.    Punjabi.

5    Q.    And is there a reference number or an A number on this?

6    A.    Yes, there is.

7    Q.    And what's the A number on that?

8    A.    70106989.

9    Q.    Now, is that the same number you just read off to me from

10   this Defendant's 1 subject alien lead number?

11   A.    Yes.

12   Q.    Looking at this document, does it appear to be a memo to

13   the file from the U.S. Immigration and Naturalization Service

14   in Los Angeles?

15   A.    Yes.

16   Q.    By the name of Akhtar, Mohammad?

17   A.    Yes.

18   Q.    And is there an arrival date there?  Let's see.

19   A.    Date of birth?

20   Q.    No.  See that -- towards the bottom -- I think it's toward

21   the bottom of the paragraph.

22   A.    Well, they served the I-122 on him on December 7th, 1991.

23   Q.    Okay.  I agree.  Would you read that paragraph right

24   before it, where it says no statement was taken.

25   A.    From -- no statement was taken from subject due to

 1    subject's inability to speak and understand sufficient English,

 2    and the lack of translator.  Subject is being transported in

 3    custody for exclusion proceedings in Los Angeles' district

 4    office.

 5    Q.    Would this impact your judgment or ability to render a

 6    decision on this N-400 if you had to continue it to get the

 7    rest of the evidence?

 8    A.    I'm not sure I understand.

 9    Q.    Well, he's being charged with lying under oath, that he

10    lied to the government to get a benefit, right?

11    A.    Yes.

12    Q.    Does this document say he didn't say anything because he

13    couldn't speak the language and he was not interviewed?

14    A.    This document indicates at that time they did not take a

15    statement.

16    Q.    Okay.  Now, let me show you what's been marked as -- and I

17    know this is in.  Page 252.

18    A.    Okay.

19    Q.    Oh, I'm sorry.  If you go to --

20    A.    She's got them.

21          MR. LAVIGNE:  Oh, you have them.  Might be just as

22    quick if I just give her this.  You have it?  There we go.

23          It should be 251 and 252.  I'm sorry.

24          Okay.  Give her the other page.  Oh, she's going to

25    give it to her.

1   BY MR. LAVIGNE:

2   Q.   So, Officer, looking at pages 251 and 252, does this type

3   of a form appear familiar to you?

4   A.   Yes, it does.

5   Q.   Yes, it does?  And is this a charging form for a notice to

6   applicant for admission detained for a hearing before an

7   immigration judge?

8   A.   Yes.  It's an I-122.

9   Q.   And on the next page, there are three different charges

10  for A number 70106989?

11  A.   Yes.

12  Q.   Would you look and compare those three charges to what's

13  on this case charge sheet, Defendant's No. 1.

14  A.   Yes.

15  Q.   And do those statutory citations match up with what's on

16  the case charge compared to the notice to appear charge?

17  A.   Yes.  Yes, they do.

18  Q.   Okay.  Let me ask you to look at pages 343, 344, 345, 346,

19  and -47, -48, and -49.

20            THE COURT:   In Joint Exhibit 1?  Okay.

21            COURTROOM DEPUTY:   Do you need some water?

22            THE WITNESS:   No.  I'm good.  Thanks.

23  BY MR. LAVIGNE:

24  Q.   Okay.  The pages start with Exhibits A, B, C, D, with some

25  descriptions for Parvez Khan.  Would these be the typical

1   documents you would be looking for on criminal arrest matters

2   in an A file?

3   A.   Yes, the arrest reports, the dispositions.

4   Q.   Okay.  So this would be in his A file?

5   A.   Yes, for anything that he submitted or had been previously

6   submitted.

7   Q.   Correct.  I'd like to bring your attention to page -- I

8   think it's 473 and 474, which is the Form I-131.

9   A.   Thanks.

10           MR. LAVIGNE:  May I approach the witness, Your Honor?

11           THE COURT:  Yeah.  Sure.

12  BY MR. LAVIGNE:

13  Q.   Officer Pellechia, I'm looking at page 473 on Form I-131.

14  That appears to be an application for travel document.

15  A.   Yes.

16  Q.   Can you look at the bottom of the page and tell me what

17  that says and read, I-485?

18  A.   Charged to denial on April 19th, 2000.

19  Q.   So does that tell me the 485 was denied to begin with?

20  A.   I would read it as the file was charged to the denial

21  section.

22  Q.   Right.

23  A.   I can't confirm whether there was a denial on the

24  application or not.

25  Q.   It just goes to a section for denial?

1   A.   In our office it might have, yes.

2   Q.   Yeah.  So why would you do that?  Why would that be done?

3   A.   The case was continued for possible write-up of a denial.

4   Q.   Okay.  Would that be because of a fingerprint match,

5   possibly, to something else that you -- that was not previously

6   disposed?

7   A.   There are various reasons to deny an adjustment of status.

8   Q.   Say again.

9   A.   There are many reasons for denial of adjustment of status.

10  Q.   Right.

11  A.   Arrests.

12  Q.   Okay.  In this case, based, I think, for the green card,

13  he was married to a U.S. citizen for at least -- he was married

14  to a U.S. citizen, right?

15  A.   Yes.

16  Q.   And if you look on it, what was the date of the marriage?

17  It was about a year before, wasn't it, the 485?

18  A.   Based on the 485 -- actually, it would be on the I-130.

19  Q.   Yes, that's correct.

20  A.   And I don't have the I-130.

21       MR. LAVIGNE:  Who has it?  One moment.  It was right

22  here.

23  BY MR. LAVIGNE:

24  Q.   The I -130 I have is at page -- I don't know.  It's a

25  little different page, 000044.  Married in Miami is what it

1   shows to me.  Okay?

2          All right.  So the green card is based on his

3   marriage to a U.S. citizen --

4   A.    Correct.

5   Q.    -- right?

6          And let me ask you another question, because I -- it

7   just confuses me.  If he says he came to Miami as a visitor --

8   okay?

9   A.    Uh-huh (affirmative).

10  Q.    -- but then has put EWI, do you know of any EWIs to Miami

11  unless there are Cubans or Haitians coming over in a boat?

12  A.    Well, that would be a question in my mind.  The same thing

13  would happen in New York.

14  Q.    See, that's what I'm asking.

15  A.    If they claim entry through a major airport, how did you

16  get an EWI?

17  Q.    Right.

18  A.    I mean, you didn't swim in, so...

19  Q.    So in Miami --

20  A.    So you follow up questions.

21  Q.    Correct.  You would -- in Miami you could either fly in

22  the airport or one of the ports --

23  A.    Uh-huh (affirmative).  Correct.

24  Q.    -- and be inspected, correct?

25  A.    Right.

1  Q.    Are there any other inspection points in Miami?

2  A.    Several.  Water entry at water ports entry and such.

3  Q.    Right.  Maybe some other smaller airports, correct?

4  A.    Uh-huh (affirmative).  Yes.

5  Q.    So wouldn't that bring to your mind that there has to be

6  some sort of a question that he says he was -- came in as a

7  visitor?

8  A.    Then he should have evidence of such admission in his

9  passport.

10 Q.    Okay.

11 A.    An admission stamp or an I-94.

12 Q.    Let me show you -- I can't tell what page it is, but it

13 looks like it's page 000061, an I-94 card, dated January 7th,

14 1992.

15         MR. LAVIGNE:  It should have been in...

16     (Counsel confer.)

17         THE COURT:  This is still part of Joint Exhibit 1,

18 Mr. Lavigne?  Still part of Joint Exhibit 1?

19         MR. LAVIGNE:  Yes.  It would be part of my 1.

20         THE COURT:  Okay.  And -- hold on one second.

21 Ms. Loeschen is saying it's not part of Joint Exhibit 1.

22     (Judge confers with courtroom deputy.)

23         THE COURT:  She says Joint Exhibit 1 starts at 9-0.

24         MR. LAVIGNE:  9-0?  Oh, that's right.

25         MR. BELSAN:  Your Honor, I think it starts with 89,

1   actually.

2           MR. LAVIGNE:  89.  He had given me 1 through 88 on a

3   separate disk.  I understand the confusion now.

4           THE COURT:  Okay.  And so what number is this?

5           MR. LAVIGNE:  This is -- I'm going to have to make it

6   Defendant's 2, I believe.

7           MR. PETTY:  Your Honor, we'll -- this is a duplicate

8   of a document that is in Joint Exhibit 1.  We'll stipulate that

9   it's in --

10          THE COURT:  All right.  Defense Exhibit 2?  Is that

11  what you're making -- what exhibit --

12          MR. LAVIGNE:  Let's make it 2 because it would be

13  easier.  But I think it is --

14          THE COURT:  It's fine.  If this is -- this is in --

15  this is in the joint exhibit?

16          MR. PETTY:  Yes.

17          MR. LAVIGNE:  This is in the joint exhibit.

18          THE COURT:  Okay.  Why don't you show it to counsel,

19  make sure it's the right document, and you can show it to the

20  witness.

21          Just identify it, Mr. Lavigne.

22          MR. PETTY:  Yes.  That's --

23          MR. LAVIGNE:  That would be part of --

24          THE COURT:  That's fine.  You can show it to the

25  witness and ask your questions.

1              MR. LAVIGNE:  Okay.

2              THE COURT:  Will you please identify it just one more

3   time, Mr. Lavigne.

4              MR. LAVIGNE:  Oh, let me --

5   BY MR. LAVIGNE:

6   Q.    The Bates number on that?

7   A.    000061.

8              THE COURT:  Thank you.

9   BY MR. LAVIGNE:

10  Q.    Are you familiar with that type of a document form?

11  A.    Yes.  It's the arrival record for an I-94 admission card

12  for inspections.

13  Q.    Okay.  And there's a date on that arrival.

14  A.    January 7th, 1992.

15  Q.    Is there a name on that arrival record?

16  A.    The name indicated is Mohammad Akhtar.

17  Q.    If Mr. Khan had put the original name Mohammad Akhtar on

18  the 485, the I-130, and the N-400, this 94 -- I-94 card would

19  show up, correct?

20  A.    Well, a record of the file for this name would.

21  Q.    Right.  And it actually would show he was inspected and

22  admitted into the U.S., not an entry without inspection?

23  A.    He was paroled.  He was paroled and pending exclusion

24  hearings, yes.

25  Q.    Okay.  So he was inspected?

1   A.    Well, Mohammad Akhtar was.

2   Q.    Right.  So this would prove it's not an EWI, entry without

3   inspection?

4   A.    It would show that this person was paroled in, yes.

5   Q.    Correct.  People who are paroled in under the 485

6   instructions from Immigration are allowed to adjust status,

7   correct?

8   A.    Yes.

9   Q.    Okay.  Now, I'm looking at some fingerprint records for

10  Los Angeles for December the 7th, 1991, for Akhtar, Mohammad.

11       (Counsel confer.)

12           THE COURT:  Mr. Lavigne, are you taking these from

13  the exhibit or from your own copies?

14           MR. LAVIGNE:  These are from the copies of what we

15  have produced here at trial.

16           THE COURT:  All right.

17           MR. LAVIGNE:  It's just quicker for me to go through

18  that than to go through every page.

19           THE COURT:  All right.  Is the --

20           MR. LAVIGNE:  And we've already stipulated these

21  fingerprints into evidence.

22           THE COURT:  Mr. Belsan, any issue with that?  Or

23  would you like the original ones used?

24           MR. BELSAN:  Your Honor, it's certainly our

25  preference to use the originals.  But, you know, we recognize

1    he's having trouble getting to these quickly.

2             THE COURT:  These are fine.

3             MR. BELSAN:  So that -- we question the relevance of

4    this, where he's stipulated these are his fingerprints.

5             THE COURT:  All right.  I mean, to the extent there's

6    a relevancy objection, it's overruled.  It's fine.  I don't

7    like switching back and forth.  You're either using the

8    courtroom deputy to gather them or using yours.  It's a little

9    bit confusing right now.

10             MR. LAVIGNE:  Okay.

11             THE COURT:  I don't want some of your copies to end

12    up with the witness and the originals to end up here.

13             MR. LAVIGNE:  Right.

14             THE COURT:  So let's just stick with the originals.

15    Which number are they?

16             MR. LAVIGNE:  Well, the problem is --

17             MR. MCFARLAND:  OO -- it's 57.

18             THE COURT:  Number 57, which we do not have; is that

19    correct?

20             MR. LAVIGNE:  That's what I'm saying.

21             THE COURT:  Okay.

22             MR. LAVIGNE:  They weren't put in there for some

23    reason.

24             THE COURT:  All right.  That's fine.  Use that copy.

25    It's Government's Exhibit 1, Bates 57.  It's a fingerprint

1   card.

2          MR. PETTY:  Your Honor -- Your Honor, the Bates

3   numbers for the -- for the joint exhibits don't start until 89.

4   So the Bates number -- this document has Bates that's not part

5   of the joint exhibit.  It's somewhere else in there, but I

6   don't have the Bates number off the top of my head.

7          THE COURT:  It's somewhere else in the joint exhibit?

8          MR. PETTY:  Yes, Your Honor.

9          THE COURT:  But it doesn't have a Bates number?

10          MR. PETTY:  It does have a Bates number.  It's --

11   below 89 were not part of the joint exhibit.  Many of them are

12   duplicated in the joint exhibit.  And this is duplicated

13   somewhere in that stack.

14          MR. LAVIGNE:  Numbers 1 through 89 are in the joint

15   exhibit, but not as those numbers.

16          THE COURT:  That's fine.  Mr. Lavigne -- Mr. Lavigne,

17   take the exhibit, describe it fully, and then hand it to the

18   witness and ask your questions.

19   BY MR. LAVIGNE:

20   Q.   The exhibit I'm showing you is 57.  It looks like a

21   fingerprint card for a Mohammad Akhtar, dated 12/7/91, and

22   U.S. INS Los Angeles.

23          THE COURT:  Thank you.  If you'll give it to

24   the -- exhibit to the witness, Mr. Lavigne, and ask your

25   questions.

1      MR. LAVIGNE:  Okay.

2  BY MR. LAVIGNE:

3  Q.   Would this type of fingerprint be ordinarily in the

4  A file?

5  A.   A copy might have been placed in the file, yes.

6  Q.   When the fingerprints are taken by Immigration, what does

7  Immigration do with the fingerprints?

8  A.   They're submitted to FBI.

9  Q.   Okay.

10  A.   And if there's a second set, they'll put it in the file,

11  as well.

12  Q.   So even if somebody does not put down, let's say, that

13  name Mohammad Akhtar, if those fingerprints are in the

14  database, you can do a check anyhow of the fingerprints and

15  say, Look, we got something else, there's another name that's

16  come up?

17  A.   Assuming it's entered in the database, yes, it would show

18  up.

19  Q.   Right.  That's right.  And then would you then give that

20  applicant an opportunity to come back in under additional

21  questioning?

22  A.   If it was discovered after the interview, we might have

23  them come back in.  You're talking about for the N-400 portion

24  or...

25  Q.   I'm still talking about -- if the name had been put on all

1  of his paperwork, Mohammad Akhtar, the fingerprints may not

2  have shown up in this case, correct?

3         Are you familiar with the memo from the Inspector

4  General's office that they couldn't find a lot of these

5  fingerprints from back then?

6         MR. BELSAN:  Your Honor, objection.  Relevance.

7  You've already ruled on the equitable defenses Defendant

8  purported based on this report.  It's unclear why he's

9  referencing it at this point.

10         MR. LAVIGNE:  It's not to the equitable defense.  I'm

11  trying to find out exactly the final step of the analysis to

12  revoke somebody's citizenship, is that you've got to determine

13  that he would not otherwise be eligible either for the green

14  card or for citizenship.

15         And I don't know from the Government's case what it

16  is in the A file that disqualifies my client from having either

17  a green card or citizenship.

18         THE COURT:  Mr. Lavigne, are you talking to the

19  witness or to the Court right now?

20         MR. LAVIGNE:  To the Court probably.  So let me

21  rephrase the question.

22         THE COURT:  That's okay.

23         MR. LAVIGNE:  I'll withdraw it.

24         THE COURT:  That's okay.  I just didn't -- I didn't

25  want the witness to think you were about to ask a question.

1   All right.

2            MR. LAVIGNE:  My understanding is --

3            THE COURT:  Let me -- let me rule on the objection

4   first before you proceed.  Okay?

5            The objection is overruled.  Ask her a specific

6   question that she needs to answer.

7            MR. LAVIGNE:  Okay.

8   BY MR. LAVIGNE:

9   Q.   Do I understand you're not saying today you would not

10  grant him his N-400?

11  A.   Can you clarify that?

12  Q.   Right.  You have not had a chance to look at the complete

13  A file for either Jaweed Khan or Mohammad Akhtar, have you?

14  A.   It wasn't present at the time I did his interview, no.

15  Q.   What about today before trial?  Did you look at either one

16  of them?

17  A.   No, I did not.

18  Q.   So you cannot say today that for sure all of this new

19  evidence would still say he's not eligible for either a

20  permanent residence or for an N-400?  That's what I'm asking.

21  A.   Based on his testimony he never admitted to using a

22  fraudulent name or fraudulent document at entry.

23  Q.   Right.  Correct.  And this -- the charge was not sustained

24  that he did give false testimony from the record I just showed

25  you.  Is that -- that's what we're looking at.

1  A.   From that proceeding.  At the time of interview for

2  naturalization, he's now committed false testimony by failing

3  to admit that he was in proceedings, detained, used other

4  names, et cetera.

5  Q.   Well, let's -- let's talk about that.  The new forms

6  I-485, N-400 have a lot more, like, attestation language, don't

7  they, than the old forms?

8  A.   Yes.

9  Q.   In the new Form I-485, do they not ask you, What port did

10 you come through, what was your airline number or ship number?

11        MR. BELSAN:  Objection, Your Honor.  Relevance of the

12 new forms.  It seems that he's trying to get around Rule 407 to

13 suggest that the change in forms somehow suggests there was

14 something wrong with the prior form.

15        MR. LAVIGNE:  I -- no.  I'm just asking -- the old

16 forms are so vague and confusing with words of vagueness that

17 you can't say somebody's intentionally lying.  The forms can't

18 be -- can't be answered either way.  They're --

19        MR. BELSAN:  Your Honor, that's exactly what 407

20 tries to preclude, is the government making improvements and

21 somehow suggested that there was something wrong.

22        THE COURT:  All right.  I'll reserve ruling on this

23 objection, as well.

24        Mr. Lavigne, ask your questions.

25        If you'll please answer to the best of your ability.

1        MR. LAVIGNE:  Right.

2        THE WITNESS:  Okay.

3   BY MR. LAVIGNE:

4   Q.    Some of the questions, for someone who's not really good

5   with English -- all right?  Assuming he's not good with

6   English, or has some limited English, it can be a little

7   confusing, correct?

8        THE COURT:  Are you -- hold on.  Are you asking about

9   the questions on the --

10        MR. LAVIGNE:  On the form.

11        THE COURT:  -- N-400 that Mr. Khan completed or

12   the --

13        MR. LAVIGNE:  That's right.

14        THE COURT:  -- new ones?  Which are you asking about?

15        MR. LAVIGNE:  The N-400 and the I-485.

16        THE COURT:  The old ones?

17        MR. LAVIGNE:  The old ones.

18        THE COURT:  Okay.

19        THE WITNESS:  Okay.  And your question again?  I'm

20   sorry?

21   BY MR. LAVIGNE:

22   Q.    Have you not had times when people just simply couldn't

23   understand the questions, quite often?

24   A.    I'm sorry.  I'm confused.

25   Q.    I'll rephrase it.  Okay?

 1          MR. LAVIGNE:  And, by the way, Your Honor, I did list

 2   all these forms as defendant's exhibits in the pretrial.

 3          THE COURT:  Okay.

 4          MR. LAVIGNE:  This is not a surprise.  I listed them.

 5          THE COURT:  Okay.  I think --

 6          MR. LAVIGNE:  I'd ask Your Honor to take judicial

 7   notice.

 8          THE COURT:  I think his question was with the forms

 9   that were in existence when Mr. Khan completed his N-400 that

10   you worked on --

11          THE WITNESS:  Uh-huh (affirmative).

12          THE COURT:  -- were there times when people were

13   confused by the questions?  I think that was his question.

14          THE WITNESS:  They can be.  Some of them get into a

15   little bit of a legal phrase terminology.

16   BY MR. LAVIGNE:

17   Q.   Right.  For example, there's a difference between --

18   exclusion, removal, and deportation have different meanings,

19   don't they?

20   A.   Yes.

21   Q.   Doesn't the word pending admission have a different

22   meaning than deportation and removal?

23   A.   Yes.

24   Q.   So when you asked him the question, Have you been ordered

25   deported, you -- that's a formal proceeding where -- in front

1  of an immigration judge, you're ordered deported, right?

2  A.   Yes.

3  Q.   All right.  When somebody presents a passport that's --

4  maybe it's not their passport, but has not been asked any

5  questions -- I'm trying to figure out what the testimony is.

6  What's the lie?  Just the passport?

7  A.   In regards to the N-400?

8  Q.   To the N-400.  The only question is, Have you ever lied to

9  receive an immigration benefit?

10  A.   Have you ever lied, given false information, or

11  misrepresented.  Presenting a photo-sub passport is --

12  Q.   Right.  Well, wouldn't you want to know whether he -- in

13  this particular case, if he knew what the name -- or if he knew

14  the name at the time -- Mohammad Akhtar at the time he filed

15  these forms?  Wouldn't it make a difference to you?

16  A.   I'm confused by the --

17  Q.   I'll rephrase the question.  Would it make a difference to

18  you whether or not he had that passport in his possession at

19  the time he filed the I-130 or I-485, or if it was taken away

20  from him?

21  A.   I can't say what the officer did at that adjustment

22  interview, so I don't know how she --

23  Q.   Okay.  Let's look at the form.

24       Go to your -- the I-485 form.  Do you have that in

25  front of you still?

1   A.   Yes.

2   Q.   Go to page 3.

3   A.   Okay.

4   Q.   Does number 9 ask anything -- are you in asylum or have

5   you ever applied for an asylum benefit?

6   A.   Specifically question 9?

7   Q.   Yes.

8   A.   It states, Have you ever been deported or removed at

9   government expense, excluded within the past year, or are you

10  now in exclusion or deportation proceedings?

11  Q.   Right.  Number 10, does it ask, Have you ever filed an

12  asylum application?

13  A.   No, it does not.

14  Q.   Is there anywhere on the Form I-485 where it asks the

15  question, Have you ever filed for asylum?  You can look at it.

16  A.   The only place it might indicate it would be the first

17  page, as to how they're filing for residence based on --

18  Q.   Correct.

19  A.   -- spouse, employment asylum.

20  Q.   And that means they knew they were granted asylum,

21  correct?

22  A.   Yes, if they had checked it off.  But then --

23  Q.   Actually, isn't the correct box on this -- is 1(a), an

24  immigrant petition giving me an immediately available immigrant

25  visa number has been approved?

1    A.    Should have been.

2    Q.    Yeah.  Let's go to the...

3            MR. LAVIGNE:  I'm trying to get that N-400 in front

4    of me again.

5            THE COURT:  That's Exhibit 7, ma'am.

6            THE WITNESS:  Yeah.

7            MR. LAVIGNE:  Go to that one.

8    BY MR. LAVIGNE:

9    Q.    Look at questions -- was it 22, 23, 24?

10   A.    Page 8, yes.

11   Q.    So I'm looking at these questions and I am wondering -- go

12   to page -- I'm sorry.  Page 9, removal, exclusion, and

13   deportation proceedings.

14           Go to number 28.

15   A.    Yes.

16   Q.    The question, read it for me.

17   A.    Have you ever applied for any kind of relief from removal,

18   exclusion, or deportation?

19   Q.    Well, why doesn't it ask have you ever applied for asylum?

20   A.    I couldn't answer that.  I did not design the form.

21   Q.    Isn't that a -- seem to be a fair question, have you

22   applied for asylum?

23   A.    I can't say why it's not included, or why it should be.

24   Q.    All right.  Go to 23.

25   A.    Okay.

1    Q.    It asks, Have you ever filed -- ever given false or

2    misleading information to any U.S. government official to

3    prevent deportation, exclusion, or removal?

4    A.    Correct.

5    Q.    Right.  I'm looking for any proof of written or oral

6    statements given by Mr. Khan when he was in Los Angeles in the

7    admissions detention, detention from the --

8    A.    There was nothing indicated to me from him.

9    Q.    Okay.  And then that question number 24, Have you ever

10   lied to a U.S. government official to gain entry or admission

11   into the United States --

12   A.    Correct.

13   Q.    -- doesn't that require an oral statement, said

14   something -- something said by the applicant or defendant or

15   respondent?

16   A.    Well, an oral testimony.

17   Q.    Correct.  It could be oral, right?

18   A.    Yeah.

19   Q.    Okay.  Okay.  Just one moment, Officer.

20   A.    Uh-huh (affirmative).

21   Q.    I think we're almost there.  I had a few others I wrote

22   last night.  Hold on.

23         So removal and deportation are not the same thing as

24   admission, correct?

25   A.    Correct.

1   Q.   And you can be held in detention for admission, but not

2   have been under a formal arrest for a criminal charge, correct?

3   A.   Correct.

4             MR. LAVIGNE:  I don't have any further questions,

5   Your Honor, because the rest of it is just comments we'll

6   make --

7             THE COURT:  All right.  Thank you, sir.

8             MR. LAVIGNE:  -- at some point on the records.

9             THE COURT:  Mr. Belsan?

10            MR. BELSAN:  Yes, Your Honor.  Just a minute while we

11  gather our thoughts here.

12            THE COURT:  Sure.

13       (Counsel confer.)

14            THE COURT:  And, Mr. Lavigne, I think the witness

15  still has the fingerprint card, and possibly some other

16  documents.

17            But, ma'am, if you'll keep the marked exhibits -- let

18  me get with the courtroom deputy and make sure that you give

19  back the right ones here.

20            THE WITNESS:  And this is the other one.  Well, this

21  one is marked, as well.  So just those.

22       (Counsel confer.)

23            THE COURT:  And Mr. Belsan might want to ask about

24  those.  So if you'll just keep those -- Mr. Lavigne's copies on

25  that side.  All right.

1    THE WITNESS:  I didn't separate his out.  Sorry.  I

2  just put them in number order.

3    MR. BELSAN:  Thank you, Your Honor.

4                  **REDIRECT EXAMINATION**

5  BY MR. BELSAN:

6  Q.  Officer Pellechia, are you aware that sometimes A files

7  are consolidated?

8  A.  Yes.

9  Q.  When does that happen?

10  A.  Usually once they've been discovered that there are two

11  separate files for a person.  They're reviewed, verified that

12  they are, in fact, the same person.  They're physically

13  consolidated.

14      It's noted on the inside of the jacket what was

15  consolidated, which is the survivor, which was the one that was

16  consolidated, the date, and by whom.  And then it's

17  consolidated in our file-tracking system, as well, as well as

18  CIS 9101.

19  Q.  And did Mr. Khan have a consolidated A file at the time

20  you adjudicated his naturalization application?

21  A.  I don't believe so.  I only recall the adjustment and

22  NATS.

23  Q.  Opposing counsel noted that there was a note on possible

24  denial.  Is one of the reasons for a possible denial of a 485

25  and I-130 where there is suspected marriage fraud?

 1   A.    That's one reason, yes.

 2   Q.    Would it be possible that there would have been suspected

 3   marriage fraud where someone applied for immigration benefits

 4   three days after they married and they could not speak the same

 5   language?

 6   A.    Yes.

 7   Q.    Is it possible that it would be referred to the denial

 8   unit for possible denial, and then eventually referred back out

 9   of the denial unit for a grant at some point?

10   A.    Yes, it's possible.

11   Q.    You're familiar with the letters EWI?

12   A.    Yes.

13   Q.    What does that indicate?

14   A.    Entry without inspection.

15   Q.    Would indicating that you had entered without inspection

16   be a way to avoid questions about whether you had ever been

17   issued a visa?

18   A.    It could, yes.

19   Q.    Opposing counsel asked you about waivers that could be

20   obtained in the admission process when trying to adjust status.

21   A.    Yes.

22   Q.    Where someone is trying to obtain a waiver based on fraud,

23   is it a requirement that they acknowledge that they have

24   committed fraud in order to seek that waiver?

25   A.    Yes.

1  Q.   And turning now to Exhibit 8, the 485 -- and if you would

2  turn to page 3, question 10.

3  A.   Yes.

4  Q.   It asks, Are you under a final order of civil penalty for

5  violating Section 274(c) of the Immigration Act for use of

6  fraudulent documents, or have you, by fraud or willful

7  misrepresentation of a material fact, ever sought to procure,

8  or procured, a visa, other documentation, entry into the United

9  States, or any other immigration benefit?

10        Is that correct?

11  A.   Yes.

12  Q.   And what box was marked for section 10 there, question 10?

13  A.   They indicated no.

14  Q.   And so an individual who's indicating that they have not

15  committed fraud also presumably would not be seeking a waiver

16  of such an admissibility?

17  A.   Yeah.   That's correct.

18  Q.   With regard to the fingerprint checks, do you know what

19  records those are checked against when someone submits a

20  fingerprint, back in 2006 what records they would have been

21  checked against?

22  A.   Against the FBI database.

23  Q.   Do you know what other records they were or were not

24  checked against?

25  A.   Not the fingerprints themselves, no.   We only received

1  responses.

2  Q.    Okay.  And responses from whom?

3  A.    FBI.

4  Q.    And did you send those fingerprints anywhere else at that

5  time?

6  A.    Not that I know of.  We weren't responsible for processing

7  fingerprints.

8  Q.    Opposing counsel introduced what was labeled Defense

9  Exhibit 1.  Prior to today -- do you have that in front of you?

10  A.    The printout?

11  Q.    Yes.  It should be only one page.

12  A.    Yes.

13  Q.    Prior to today, have you ever seen that exhibit?

14  A.    Not this exhibit, no.

15  Q.    Do you know where it came from?

16  A.    Not really.  I can't determine that based on just the

17  page.

18  Q.    Do you know when it was created?

19  A.    The printout was done on January 3rd, 2018.

20  Q.    And do you know why it was created?

21  A.    You mean the record itself or just the document?

22  Q.    Yes.  Do you have any understanding of why that document

23  was created?

24  A.    Not really.

25  Q.    Do you know who created it?

 1   A.    No.

 2   Q.    And the Defendant testified earlier that he entered the

 3   United States at LAX using a photo-sub passport.  Are you

 4   familiar with that type of entry?

 5   A.    Yes.

 6   Q.    You were -- previously worked at many airports, yes?

 7   A.    Correct.

 8   Q.    So had you seen photo-sub passports before?

 9   A.    Oh, yeah.

10   Q.    And the Defendant also indicated that he was detained for

11   one month in a detention facility, and released when his

12   brother posted bond.  The Defendant also said he didn't tell

13   Immigration that on his 485.

14         MR. LAVIGNE:  Your Honor, this is improper

15   cross-examination.  I object.

16   BY MR. BELSAN:

17   Q.    If --

18         THE COURT:  It's not really cross-exam.  He's about

19   to ask a question --

20         MR. LAVIGNE:  It's redirect on my cross asked.

21         THE COURT:  All right.  Overruled.

22         Ask your question.

23   BY MR. BELSAN:

24   Q.    If you knew such facts at the time you had his

25   application, would you have granted his naturalization

1  application?

2  A.   Can you repeat that again?

3  Q.   Yes.  If you knew that he had entered the United States on

4  a photo-sub passport and he had been detained for a month and

5  only released upon posting a bond, and that he did not disclose

6  that during his 485 process --

7  A.   If it wasn't in the A file at the time of naturalization,

8  the case would have been continued.

9  Q.   Right.  And if he did not disclose that prior to adjusting

10 status, what would that have indicated to you?

11 A.   He was not lawfully admitted as a resident.

12 Q.   And if you determined he was not lawfully admitted as a

13 resident at the time you were interviewing him for

14 naturalization?

15 A.   It ultimately gets denied as inadmissible at adjustment.

16       MR. BELSAN:  No further questions, Your Honor.

17       THE COURT:  Okay.  You'd like to ask something,

18 Mr. Lavigne?

19       MR. LAVIGNE:  Oh, my gosh.  No, because I think we'd

20 go over the same territory.

21                  **RECROSS-EXAMINATION**

22 BY MR. LAVIGNE:

23 Q.   I just wanted to be sure that -- were you aware of any

24 601A applications for waiver of inadmissibility being filed

25 when you were looking at his N-400 --

1          MR. LAVIGNE:  Let me go back up here.  Sorry.

2          THE WITNESS:  I can't recall --

3    BY MR. LAVIGNE:

4    Q.   Are you aware of any 601A applications for waiver of

5    inadmissibility being filed that was in his N-400 file?

6    A.   I can't recall back to --

7    Q.   Okay.

8    A.   -- 2006 what I saw then.  I haven't reviewed the file

9    since then.

10   Q.   Do you have any independent recollection of seeing

11   Mr. Khan?

12   A.   I can match up to what's in the file and the person in

13   front of me.

14   Q.   Not visual, though?

15   A.   Based on the photo in the file I would.

16   Q.   Okay.  Oh, photos in the file can match him.

17   A.   Yes.

18   Q.   Okay.  Fine.

19          There was one other question.  This issue of marriage

20   fraud, at the N-400, he was still married to the same woman;

21   was he not?

22   A.   He indicated so, yes.

23   Q.   And he had -- he had a child with that woman?

24   A.   I believe it was indicated on there, yes.

25   Q.   And would it still be relevant to you if he's still

1    married to the same woman?

2    A.    Well, yes, because he's filing under the section of law

3    that you are required to be married to that U.S. citizen at

4    time of filing --

5    Q.    Okay.

6    A.    -- and at the time of --

7    Q.    So if he's still married to an American citizen, and we

8    can show that he was admitted into the U.S. with a I-94 card,

9    right -- regardless what name is on it -- he can adjust status

10   in the U.S., correct?

11   A.    He could have applied for a waiver and possibly been

12   granted residence.

13   Q.    Okay.  So you're not saying that he could not still be

14   entitled to a permanent residence or a citizenship?  Are you

15   saying he -- under no circumstances is he entitled to an I-485

16   favorable adjudication?

17   A.    He could be possibly approved, yes.

18   Q.    And the same with the N-400?  He could still be approved

19   for the N-400, based on your --

20   A.    At the time of adjustment, they had addressed that.

21   Q.    -- review of all the A files?

22         Based on your review of all the A files, correct?

23   A.    Well, I've never reviewed the other files from the

24   exclusion.

25   Q.    That's why I'm asking.

1          MR. LAVIGNE:  No further questions, Your Honor.

2          THE COURT:  All right.  Thank you.

3          I have a few questions.  What are your work hours?

4          THE WITNESS:  6:30 to 3:00.

5          THE COURT:  Any overtime?

6          THE WITNESS:  When they authorize it, yes.

7          THE COURT:  Typically 6:30 to 3:00?

8          THE WITNESS:  Typically hours are, yes.

9          THE COURT:  And have you had those hours since 2006?

10         THE WITNESS:  Probably back then it was more like

11    7:00 -- a 7 o'clock start.

12         THE COURT:  7:00 to 4:00 type hours?

13         THE WITNESS:  Roughly, yeah.

14         THE COURT:  Okay.

15         THE WITNESS:  It's an eight hour, yeah.

16         THE COURT:  Eight-hour day?  And then you talked

17    about doing interviews each day.  Do you know the typical

18    average time for an interview, if nothing exceptional occurs?

19         So your typical interview lasts how long?

20         THE WITNESS:  Well, you're referencing back in 2006?

21         THE COURT:  Yes, for the N-400.

22         THE WITNESS:  Probably anywhere from 45 minutes to an

23    hour, depending on the person.

24         THE COURT:  Would any of them have taken a shorter

25    amount of time, like five minutes?

1        THE WITNESS:  Not that short.  It might have been a

2  little faster because they're a native English speaker, so

3  you're not having to explain everything or stop to explain

4  things to them.

5        THE COURT:  What's the shortest amount of time an

6  interview has taken?  And, again, I'm -- approximately.  And

7  this is in the 2006 time frame.

8        THE WITNESS:  It wouldn't be the norm, but maybe 30

9  minutes.  If you've got someone who's a young adult, there

10 appears no history -- no derogatory history in their past, they

11 may be 18 years of age at this point, so there's not a whole

12 lot of issues to address.  So you -- if they're English

13 speaking, maybe 30 minutes to get through it.

14       THE COURT:  Okay.

15       THE WITNESS:  But that's not always the norm.

16       THE COURT:  Can you recall any that are shorter than

17 30 minutes?

18       THE WITNESS:  Not -- not usually, no.  I can't.

19       THE COURT:  All right.  Would it surprise you if one

20 was less than 30 minutes?

21       THE WITNESS:  Yeah, because that means an officer is

22 not asking questions or not addressing the form.

23       THE COURT:  Okay.  Exhibit 7, do you have it in front

24 of you?

25       THE WITNESS:  Yes.

1      THE COURT:  For the -- page 1.

2      THE WITNESS:  Uh-huh (affirmative).  Yes.

3      THE COURT:  Let me make sure I've got the right one.

4      There's a little -- in box (b) there's a -- like a

5  red slash over Khan.

6      THE WITNESS:  Yes.

7      THE COURT:  And that was your mark?

8      THE WITNESS:  Yes.

9      THE COURT:  And what did you say that indicated?

10      THE WITNESS:  That's the name as it appears on his

11  resident card.

12      THE COURT:  Okay.  And then in box (c) there's no red

13  slash.  What does that mean to you?

14      THE WITNESS:  I didn't write anything and I didn't

15  confirm any other names.  He didn't put any in there.

16      THE COURT:  Okay.  And would you have asked anything

17  about that question?

18      THE WITNESS:  If he had indicated any names, I would

19  have followed up.

20      THE COURT:  No.  Under these circumstances, with the

21  little lines through the boxes, and you haven't made a red

22  mark, what does that indicate?  What did you do with that

23  question, skip over it, or just -- or ask anything about it?

24      THE WITNESS:  Okay.  Repeat that again.

25      THE COURT:  Look at box (c).

1          THE WITNESS:  Yes.

2          THE COURT:  Based on the -- what's marked there with

3     the little three slashes and the absence of a red mark, what

4     does that mean to you?  What happened during the interview for

5     that particular question?

6          THE WITNESS:  I can't recall exactly.  I might have

7     forgotten to ask him.  I might have asked and didn't make a

8     notation.

9          THE COURT:  Okay.  And if you had asked him anything

10    about that, would you typically have had a red slash on it?

11         THE WITNESS:  Typically I write claims no other

12    names.

13         THE COURT:  Okay.  And because that's not on there,

14    does that indicate to you that you might have skipped over

15    that?  Or you just don't know?

16         THE WITNESS:  I might have.  I can't recall exactly.

17         THE COURT:  Okay.  All right.  Thank you.

18         THE WITNESS:  Okay.

19         THE COURT.  Any follow-up from those questions,

20    Mr. Belsan?

21         MR. BELSAN:  No.  No, Your Honor.

22         THE COURT:  All right.

23         MR. BELSAN:  Thank you.

24         THE COURT:  Mr. Lavigne?

25         MR. LAVIGNE:  None.

1     THE COURT:  All right.  Does counsel for either side

2 need this witness to stay for any reason?  Otherwise I'm going

3 to release her, let her go on her way, travel back to Orlando

4 before traffic.

5     THE WITNESS:  Oh.

6     THE COURT:  It's too bad?

7     THE WITNESS:  It will be overnight for sure.

8     THE COURT:  Okay.  Mr. Belsan?

9     MR. BELSAN:  We don't have any more questions for

10 this witness, Your Honor.

11     THE COURT:  All right.  Mr. Lavigne?

12     MR. LAVIGNE:  We have no further questions, and agree

13 to allow the witness to be excused.

14     THE COURT:  All right.  Thank you, sir.

15     Ma'am, thank you.  You don't have to stick around.

16     THE WITNESS:  Okay.

17   (Witness excused.)

18     THE COURT:  Call your next witness, Mr. Petty,

19 please.

20     MR. PETTY:  Your Honor, the Government rests.

21     THE COURT:  All right.  And you've admitted

22 everything you want to admit?

23     MR. PETTY:  Yes, Your Honor.

24     THE COURT:  Okay.  Mr. Lavigne, do you have a case to

25 present?

1        MR. LAVIGNE:  I'd like to make our obligatory motion

2   to dismiss.  I can dispense with complete legal argument.  I

3   think the Court knows why.

4        But basically -- essentially the Government hasn't

5   proven the last requirement, that any of these omissions would

6   have altered or changed that he would never have been given an

7   N-400 or an I-485 approval.

8        You've still got to go and look in the record and

9   tell me from the record why he's disqualified, and why he

10  couldn't otherwise get a waiver of inadmissibility.  So we

11  don't have -- the Government hasn't completed it and put on the

12  proper witnesses.

13        THE COURT:  All right.

14        MR. LAVIGNE:  And she said herself she couldn't tell.

15  She'd have to have the record in front of her to see what else

16  would need to be done and examine it.

17        It well be she might agree with everything that's

18  happened and can understand what happened and why he wasn't

19  able to give those names.

20        THE COURT:  All right.  Mr. Petty, your response,

21  sir?

22        MR. PETTY:  Your Honor, first of all, the motion to

23  dismiss is really a jury trial issue.  It doesn't really apply

24  for a bench trial.

25        The issue that counsel raised with respect to a fraud

1   waiver is possibly something that might interest an immigration

2   judge, but it has nothing to do with whether he was lawfully

3   granted citizenship.

4          With respect to the illegal procurement charges, the

5   question is not whether he would be granted citizenship now if

6   he applied again, but whether he was admissible at the time

7   that he originally applied for it, whether he had committed

8   false testimony, which he essentially, under oath, said that he

9   had.

10          And with respect to the charge that he was not

11  lawfully admitted, the same thing applies.  His testimony

12  establishes that he was never lawfully admitted because he made

13  material misrepresentations, including, but not limited to,

14  presenting a passport with a photo-substituted picture, and not

15  acknowledging that at the time that he was adjusting status or

16  at the time that he was naturalizing.

17          With respect to whether he obtained his

18  naturalization by material misrepresentation, I guess charge 3,

19  again, the question is not whether he can show that he might be

20  eligible for naturalization.

21          Again, we do not have to show that he definitively

22  would not be granted naturalization again.  The question under

23  *Kungys* is was there a fair inference that he was ineligible at

24  the time he obtained it.

25          And the evidence that's been presented thus far

1  establishes that there is such a fair inference, based on the

2  Defendant's own testimony, all the documentary evidence, and

3  the exhibits that we haven't talked about today, but include

4  the depositions of three other government officers that

5  Mr. Khan provided statements to.

6          THE COURT:  All right.  Thank you.  I'll take the

7  motion under advisement and defer ruling on that.

8          Mr. Lavigne, if you'll present your first witness.

9          MR. LAVIGNE:  Yes.  I would like to call Betty Khan.

10         THE COURT:  All right.  If you'll please go get her,

11 Mr. McFarland.

12         Feel free to stand and stretch if you'd like while

13 we're waiting for Ms. Khan.

14    (Ms. Khan enters the courtroom.)

15         THE COURT:  All right.  Ms. Khan, you'll come forward

16 and stand in this box over here.  This is the witness box.

17 When you're there, if you'll please stay standing and raise

18 your right hand.

19         COURTROOM DEPUTY:  Do you solemnly swear or affirm

20 that the answers you will give in these proceedings will be the

21 truth, the whole truth, and nothing but the truth, so help you

22 God?

23         THE WITNESS:  Yes.

24         COURTROOM DEPUTY:  Thank you.

25         THE COURT:  All right.  Thank you, ma'am.  Take a

1  seat and get comfortable, and just move that chair as close to

2  the microphone as possible.

3          Do you need a glass of water or anything?

4          THE WITNESS:  Water would be fine.

5          THE COURT:  All right.  We'll get you -- Mr. Lavigne,

6  if you'll get that.

7          Better yet, Mr. McFarland, if you'll do that, and

8  Mr. Lavigne can start his questions.  Thank you.

9          Mr. Lavigne.

10          Thank you, Mr. McFarland.

11          **BETTY LOUISE KHAN, DEFENDANT'S WITNESS, SWORN**

12                    **DIRECT EXAMINATION**

13  BY MR. LAVIGNE:

14  Q.   Would you please tell the Court your full name.

15  A.   Betty Louise Khan.

16  Q.   And what was your maiden name?

17  A.   Pope.

18  Q.   Pope.  And are you married to Mr. Parvez Manzoor Khan?

19  A.   Yes.

20  Q.   And how long have you been married to him?

21  A.   20 years.

22  Q.   And how did you meet Mr. Khan?

23  A.   Through my niece's wedding.

24  Q.   And do you remember about how long that was before you two

25  got married?

1  A.    It was about a year.

2  Q.    So you knew each other for about a year before you got

3  married?

4  A.    Correct.

5  Q.    And where were you living at the time?

6  A.    I was living in Miami, Florida.

7  Q.    And were you working at the time?

8  A.    Yes, I was.

9  Q.    And where were you working?

10  A.    At Domino's Pizza.

11  Q.    And where was he working?  Or do you know what work he was

12  doing?

13  A.    He was driving taxis.

14  Q.    Driving taxis?  When you first met him, how was his

15  English?

16  A.    Not good.

17  Q.    How did you communicate with him?

18  A.    It was kind of difficult.

19  Q.    Did you try to teach him some English words?

20  A.    Yes, I did.  I tried to teach him.

21  Q.    Was he hard to teach?

22  A.    Yes, he is.  I'm still teaching him.

23  Q.    All right.  Okay.  Do you have any children with Mr. Khan?

24  A.    Yes, I do.

25  Q.    And who do you have?

1   A.   Usman Khan.

2   Q.   And do you have any children that Mr. Khan has helped to

3   support over the years?

4   A.   Yes.

5   Q.   And who is that?

6   A.   Stephanie.

7   Q.   And are you -- and where do you and Mr. Khan live?

8   A.   In Branford, Florida.

9   Q.   And how long have you lived there?

10  A.   Since 2010.

11  Q.   And do you have any grandchildren?

12  A.   Yes, I do.

13  Q.   And how many?

14  A.   Three.

15  Q.   And do you work?

16  A.   No, I don't.

17  Q.   And why do you not work?

18  A.   Because I take care of my grandchildren.

19  Q.   Is Mr. Khan your source of support financially?

20  A.   Yes.

21  Q.   And has he been, I guess -- I don't know how to ask the

22  question -- a good husband?

23  A.   He's a very good husband.

24  Q.   Okay.  Have you ever had any problems with his honesty or

25  credibility?

1   A.   No.

2   Q.   Has he ever lied to you?

3   A.   No.

4   Q.   Misrepresented anything to you?

5   A.   No.

6   Q.   Have you known him by any other name than Parvez Manzoor

7   Khan?

8   A.   No.

9   Q.   Do you know any of his family?

10  A.   Yes.

11  Q.   Do you know his brother?

12  A.   Yes.

13  Q.   And which one is that?

14  A.   I know Shawn.  And I also know his other brother, Zubair.

15  Q.   Okay.  What's Shawn's first name?

16  A.   Suhail.  Suhail.

17  Q.   Suhail?

18  A.   Yes.

19  Q.   S-u-h-a-i-l?

20  A.   Correct.

21  Q.   And was your husband living with his brother in Miami at

22  the time you met?

23  A.   Yes.

24  Q.   And did you meet his mother and father from Pakistan at

25  any time?

1   A.   Yes.

2   Q.   Did they come to the U.S. to visit?

3   A.   Yes.

4            MR. BELSAN:  Objection.  Leading, Your Honor.

5            THE COURT:  Sustained.

6            Mr. Lavigne, all of your questions have been leading.

7            MR. LAVIGNE:  Well, usually -- I understand the word

8   leading means I'm suggesting either an answer yes or no.  But

9   if can be answered yes or no, it's not leading.  I just want to

10  make that notation.

11           THE COURT:  Thank you.  If you'll ask your questions

12  in a non-leading way, please.

13           MR. LAVIGNE:  Okay.

14  BY MR. LAVIGNE:

15  Q.   Let me show you -- let me see.  Let's go to -- I have an

16  application you filed for your husband.  Do you remember

17  sponsoring your husband for a green card?

18  A.   Yes.

19  Q.   And do you -- let me show you -- that was --

20           THE COURT:  We'll use the original for the I-130 and

21  I-485.  I-485 should be Exhibit 8.

22           MR. LAVIGNE:  I think it's I-130, is what I'm looking

23  for.  That's 7.

24           MR. BELSAN:  The I-130, I believe, is pages 146

25  through 148 of Joint Exhibit 1.

1            THE COURT:  Okay.

2            MR. LAVIGNE:  Okay.

3            COURTROOM DEPUTY:  I believe it's up there.

4            MR. LAVIGNE:  Is it up there?

5            THE COURT:  Ms. Loeschen, will you go see if the -- I

6    think Exhibit 7, Exhibit 8 should be up there, and then the

7    pages for the I-130.

8            MR. LAVIGNE:  There's some papers up here.

9        (Counsel confers with courtroom deputy.)

10            THE COURT:  Ms. Loeschen, those papers on the corner,

11   those belong to Mr. Lavigne; is that correct?

12            COURTROOM DEPUTY:  Yes, Your Honor.

13            THE COURT:  All right.  Would you mind handing them

14   to Mr. McFarland.  Thank you.

15            Mr. Lavigne, go ahead, please.

16   BY MR. LAVIGNE:

17   Q.   Okay.  Would you look at that thing in front of you.  At

18   the top it says petition for alien relative, at the top right

19   hand.  It should be yellow.

20   A.   Okay.

21   Q.   Is your signature on the second page?  Look at the second

22   page.

23   A.   Yes.

24   Q.   Okay.  Going back to the first page, there's information

25   about you.  Where were you born?

1   A.   Miami, Florida.

2   Q.   Is that date of birth correct?

3   A.   Yes.  Well, I don't see the date, but...

4   Q.   On number 4.  Look at number 4.

5   A.   Yes, I see number 4.

6   Q.   It says 12/13?

7   A.   Well, here it has blank, but it's 12/13/1969.

8        MR. LAVIGNE:  Oh, that's the redacted version.  I'm

9   sorry.

10       THE COURT:  All right.  Thank you.

11  BY MR. LAVIGNE:

12  Q.   Okay.  How many times have you been married?

13  A.   One.

14  Q.   On the right-hand column there are some numbers there.

15  Okay?  Number 11, Did you ever know of any prior names or other

16  names of your husband other than Parvez Manzoor Khan?

17  A.   No.

18       THE COURT:  I think that was the question -- it says

19  names of prior husbands or wives.  Did you mean to direct her

20  to number 7, Mr. Lavigne?

21       MR. LAVIGNE:  I'm sorry.  The Court is right.  I'm

22  looking at --

23  BY MR. LAVIGNE:

24  Q.   Number 7 says other names used.  Did he ever use any other

25  name, that you know of?

1  A.  No.

2  Q.  Okay.  Did he work for Yellow Cab company in number 15?

3  A.  Yes.

4  Q.  At number 14 -- do you know where that information came

5  from that he puts down as visitor?

6  A.  No.

7  Q.  Okay.  Were you at the interview for the 485 and the

8  I-130?

9  A.  Yes.

10 Q.  And do you have any recollection as to how long that

11 interview lasted?  Was it a long one or a short one?

12 A.  I don't remember.

13 Q.  Okay.  And do you recall whether the person who conducted

14 the interview had asked any questions that were not answered?

15 A.  No.

16 Q.  Do you recall any of the questions that were asked?

17 A.  No.

18 Q.  Do you know if the interviewer asked you questions?

19 A.  Yes.

20 Q.  And -- okay.  And you answered those questions?

21 A.  Yes.

22 Q.  Okay.  Has your husband been arrested for anything since

23 you've been married to him?

24 A.  No.

25 Q.  Have you both always paid your income taxes?

1   A.   Yes.

2   Q.   What kind of work does your husband do?

3   A.   He's a truck driver.

4   Q.   Okay.  Would your husband's loss of citizenship have any

5   adverse effect on your family or life?

6   A.   Yes.

7            MR. BELSAN:  Objection, Your Honor.  Relevance.

8            THE COURT:  Sustained.

9   BY MR. LAVIGNE:

10  Q.   Have you ever been to Pakistan?

11  A.   No.

12  Q.   Do you speak Urdu?

13  A.   No.

14  Q.   Okay.

15           MR. LAVIGNE:  I don't have any further questions,

16  Your Honor.

17           THE COURT:  All right.  Thank you, sir.

18           Mr. Petty or Mr. Belsan?

19                       **CROSS-EXAMINATION**

20  BY MR. BELSAN:

21  Q.   Good afternoon.

22  A.   Good afternoon.

23  Q.   Ms. Khan, you're a U.S. citizen by birth?

24  A.   Yes.

25  Q.   And where were you raised?

 1   A.   Miami, Florida.

 2   Q.   You're married to Mr. Khan?

 3   A.   Yes.

 4   Q.   And you first met in 1997?

 5   A.   Correct.

 6   Q.   And you married in 1998?

 7   A.   Correct.

 8   Q.   But you don't speak Urdu?

 9   A.   No.

10   Q.   And you don't speak -- do you speak any languages other

11   than English?

12   A.   No.

13   Q.   But you're a native English speaker?

14   A.   Correct.

15   Q.   Now, you sponsored Mr. Khan for his green card, correct?

16   A.   Correct.

17   Q.   And his eligibility for that green card was based on being

18   married to you?

19   A.   Yes.

20   Q.   To sponsor him, you had to submit a form.

21   A.   Yes.

22   Q.   Did you fill out that form yourself?

23   A.   I don't remember.

24   Q.   Do you remember if you typed the form up, the petition

25   that you had to submit so he could get his green card?

1   A.   No.

2   Q.   Do you remember if you met with a woman who filled out the

3   form for you?

4   A.   I remember meeting a woman.

5   Q.   What do you remember about meeting that woman?

6   A.   Honestly, I really don't remember.  It's been so long.

7   Q.   Okay.  So you just remember that there was a woman?

8   A.   Correct.

9   Q.   Did you -- is that a woman that you knew previously?

10  A.   No.

11  Q.   Is it a woman you've had any ongoing contact with since

12  then?

13  A.   No.

14  Q.   So you didn't know her as a friend?

15  A.   No.

16  Q.   She didn't know anything about you?

17  A.   No.

18  Q.   And -- but you met with her?

19  A.   Correct.

20  Q.   And did you go in person?  I mean, you met in person, not

21  over the phone?

22  A.   Correct.

23  Q.   Was your husband with you?

24  A.   Yes.

25  Q.   He was sitting next to you?

1  A.   Yes.

2  Q.   And she asked you questions that filled out the form?

3  A.   Yes.

4  Q.   And she filled out the form based on what you told her?

5  A.   I -- it's -- like I said, it's been so long ago, I don't

6  remember.

7  Q.   But she didn't -- you didn't have any prior history with

8  this woman?

9  A.   No.

10 Q.   So she wouldn't have known your birth date before --

11 unless you told her, correct?

12 A.   Correct.

13 Q.   And she wouldn't know what names you had used -- you

14 personally had used unless you told her?  She wouldn't know

15 your maiden name?

16 A.   No.

17 Q.   Right.  She wouldn't know where you lived?

18 A.   No.

19 Q.   She wouldn't --

20      THE COURT:  These are all double negatives, but...

21      MR. BELSAN:  I'll clean up.

22      THE COURT:  Okay.

23 BY MR. BELSAN:

24 Q.   Would the woman have known where you lived?

25 A.   No.

1  Q.   You told her that?

2  A.   Correct.

3  Q.   And you told her your address?

4  A.   Yes.

5  Q.   You told her your date of birth?

6  A.   Yes.

7  Q.   Now, if you would -- do we still have Exhibit 1,

8  pages -- 146 up there?

9         COURTROOM DEPUTY:  Yes.

10  BY MR. BELSAN:

11  Q.   Ma'am, do you have the form that's yellow like this, with

12  a stamp -- red stamp at the top?

13  A.   Yes.

14  Q.   Okay.  And just --

15         THE COURT:  And you're about to reference the I-130?

16         MR. BELSAN:  Yes, Your Honor.

17         THE COURT:  Okay.  Thank you.

18  BY MR. BELSAN:

19  Q.   Now, you filled out this form and it was filed shortly

20  after your wedding; is that correct?

21  A.   Yes.

22  Q.   And you were married on January 7th, 1998?

23  A.   Yes.

24  Q.   And you signed this form.  If you turn to page 2, down at

25  the bottom, is that your signature?

 1  A.    Yes.

 2  Q.    And what date did you sign this form on?

 3  A.    1/10/98.

 4  Q.    So was this three days after you got married?

 5  A.    Correct.

 6  Q.    What day of the week did you get married on?

 7  A.    I don't remember.

 8  Q.    Do you remember if it was a weekend or a weekday?

 9  A.    I don't remember.

10  Q.    But you filled out this form three days after you were

11  married?

12  A.    Correct.

13  Q.    It was important to you that Mr. Khan get a green card?

14  A.    Correct.

15  Q.    And it was important to Mr. Khan that he get a green card,

16  correct?

17  A.    Correct.

18  Q.    That's why you acted so promptly to file this immigration

19  paperwork?

20  A.    I don't really understand the question.

21  Q.    You filed this paperwork so quickly after you got married

22  because of its importance to you and Mr. Khan?

23  A.    Yes.

24  Q.    And you took the filing of this form very seriously?

25  A.    Yes.

1  Q.   And do you see there where your signature is, in part (d)?

2  And right above your signature it says your certification, I

3  certify under penalty of perjury under the laws of the United

4  State of America that the foregoing is true and correct.

5            And then you signed below that, correct?

6  A.   Correct.

7  Q.   And you understand what it means to sign something under

8  penalty of perjury?

9  A.   Yes.

10 Q.   You understand it could be a crime if you knowingly

11 committed -- you know, you included false information?

12 A.   Yes, I understand that.

13 Q.   And just like your testimony today?

14 A.   Yes.

15 Q.   Did you review the information on this document before you

16 signed it?

17 A.   Yes.

18 Q.   And so when it says the foregoing is true and correct, you

19 made sure that everything in this document was true to your

20 knowledge?

21 A.   Right.

22 Q.   But you didn't actually have -- personally you didn't have

23 first-hand knowledge of all the information in the form, did

24 you?

25 A.   No.

1  Q.   Right.  So, for example, the form asks the date and place

2  of the marriage.  And you know that because you were there,

3  right?  You were at the wedding?

4  A.   Yes.

5  Q.   So you know the date of the wedding, and you know the

6  place of the wedding, correct?

7  A.   Yes..

8  Q.   And to give another example, you weren't present when your

9  husband was born, were you?

10 A.   No.

11 Q.   So you don't personally know his date of birth, other than

12 what he's told you?

13 A.   Correct.

14 Q.   And so you have to rely on people sometimes, correct?

15 A.   Yes.

16 Q.   You have to trust them when they tell you something?

17 A.   Not all the time.

18 Q.   But if they provide -- sometimes if they provide incorrect

19 information, it's hard to verify?

20 A.   I don't understand.

21 Q.   You wouldn't always know if someone was lying to you,

22 would you?

23 A.   No.

24 Q.   Because you trust them to do the right thing?

25 A.   Yes.

1    Q.   Now, do you see the information back on the first page,

2    part (b), where it says it relates to you, kind of on the left

3    side?

4             Do you see that?

5    A.   Yes.

6    Q.   And then on the right side of the form it says, part (c),

7    information about your alien relative.

8             Do you see that?

9    A.   Yes.

10   Q.   Okay.  Directing your attention to that part (c) there,

11   the question number 7, about midway down, says other names

12   used.

13            Do you see that field?

14   A.   Yes.

15   Q.   And the word none is typed into that box, correct?

16   A.   Correct.

17   Q.   But you don't know whether Mr. Khan used any other names

18   prior to when you met him in 1997, correct?

19   A.   No.

20   Q.   Now, directing your attention to the bottom of part (c)

21   there, question 14, which asks for an arrival/departure record,

22   I-94 number, and the date arrived -- do you see that?

23   A.   Yes.

24   Q.   And it says lost, instead of including a record number,

25   and provides 12/1990 for the date arrived, correct?

1   A.   Yes.

2   Q.   But you weren't with Mr. Khan when he arrived in the

3   United States, were you?

4   A.   No.

5   Q.   You didn't meet him at the plane?

6   A.   No.

7   Q.   You weren't in Los Angeles?

8        THE COURT:  There's more double negatives, but...

9   BY MR. BELSAN:

10  Q.   Were you with Mr. Khan when he arrived in the United

11  States?

12  A.   No.

13  Q.   Did you meet him at the airport?

14  A.   No.

15  Q.   Were you in Los Angeles?

16  A.   No.

17  Q.   As you said earlier, you met him in 1997.

18  A.   Correct.

19  Q.   And that was in Miami?

20  A.   Correct.

21  Q.   So you relied on Mr. Khan for this information about his

22  entry?

23  A.   Yes.

24  Q.   And he's the one who indicated that his I-94 departure

25  record number was lost?

1  A.   Yes.

2  Q.   And he's the one who told the individual 12/1990?

3  A.   Yes.

4  Q.   Because the individual was relying on what you and

5  Mr. Khan told her to fill out this form?

6  A.   Like I say, it's been so long ago, I don't remember.

7  Q.   Now, directing your attention to the same box there --

8  well, box 16, just below that, which asks has your relative

9  ever been under immigration proceedings -- do you see that?

10 A.   Yes.

11 Q.   And there's a box checked for no, and then the letters N/A

12 typed in response to the parts asking where and when.  And that

13 answer was filled in based on what your husband said; isn't

14 that correct?

15 A.   Yes.

16 Q.   And then you later signed this form?

17 A.   Yes.

18 Q.   And you signed it under penalty of perjury?

19      MR. LAVIGNE:  Objection.  It's already been asked and

20 answered.  It's repetitive.

21      THE COURT:  Overruled.

22      MR. LAVIGNE:  It's harassment of the witness.

23 BY MR. BELSAN:

24 Q.   You signed this form under penalty of perjury?

25 A.   No.

1   Q.   When you signed this form, you signed it under penalty of

2   perjury, correct, under penalty of perjury meaning that you

3   knew if you were intentionally lying it could be a crime?

4   A.   Yeah, I understand that.  But I didn't lie.

5   Q.   Right.  Because if you had known something was false, you

6   would never have signed this form, correct?

7   A.   Correct.

8   Q.   Now, Mr. Khan has said in his affidavit, and earlier in

9   this trial, that he was actually -- went to immigration court,

10  and he admitted that he saw the immigration judge once.

11            MR. LAVIGNE:  Objection.  The testimony was the

12  immigration court was in the jail cell, with all the other

13  prisoners.  They didn't go to a separate court.  That's a

14  mischaracterization of the testimony.

15            THE COURT:  All right.  Sustained.

16            Change your question up.

17            MR. BELSAN:  Yes, Your Honor.

18  BY MR. BELSAN:

19  Q.   Mr. Khan has testified that he went to see an immigration

20  judge while he was detained in Los Angeles.  Were you aware of

21  that at the time you signed this document?

22  A.   No.

23  Q.   Did you know at the time you signed this document that

24  Mr. Khan had actually arrived in December of 1991, not December

25  of 1990?

1  A.    I don't remember.

2  Q.    Well, you said earlier if you knew that something was

3  incorrect you would not have signed this form, right?

4  A.    Correct.

5  Q.    Because you took it very seriously?

6  A.    Correct.

7  Q.    So it says he arrived in December of 1990, if you look at

8  page 1, box 14.

9  A.    Yes.

10 Q.    And you didn't know that that was incorrect when you

11 signed this form, did you?

12 A.    No.

13 Q.    But if Mr. Khan arrived in 1991, that's incorrect?  It

14 says 1990, not 1991.

15 A.    Yes.

16 Q.    And did you know --

17        THE COURT:  Mr. Lavigne [sic], you just asked if

18 Mr. Khan arrived in 1991, that's incorrect?  Did you mean to

19 ask that?

20        MR. BELSAN:  Yes, Your Honor.  So --

21        THE COURT:  Okay.

22 BY MR. BELSAN:

23 Q.    So the form -- if you look at box 14 here, ma'am, it says

24 date arrived 12/1990, correct?

25 A.    Yes.

1   Q.   But if Mr. Khan arrived in the United States in 1991, then

2   1990 is not the correct date.  He arrived later than that.

3   A.   Yes.

4   Q.   Did you know at the time that you signed this document

5   that Mr. Khan had actually been held in Immigration for

6   immigration detention for a month?

7   A.   No, I did not know that.

8   Q.   Did you know in his affidavit Mr. Khan indicated that he

9   believed he was always lawfully present in the United States

10  because he had been granted asylum?

11  A.   No.

12  Q.   Did you know that today Mr. Khan testifies he doesn't know

13  what asylum is?

14        MR. LAVIGNE:  Your Honor, this is improper

15  cross-examination.  I didn't get into any of this.  And it's

16  irrelevant to what she knows before 19- -- since 1997.

17        MR. BELSAN:  Your Honor, cross-examination is not

18  limited by the direct examination.  That's redirect.  I think

19  that counsel is mistaken by that.

20        MR. LAVIGNE:  No.  This is cross, actually.  It's got

21  to be within the parameters of my direct.

22        MR. BELSAN:  Your Honor --

23        THE COURT:  Just one second.

24        MR. BELSAN:  Sorry.

25        THE COURT:  I'm going to re-read the question.

1          The objection is overruled.

2          The question is, Did you know that today Mr. Khan

3   testified he doesn't know what asylum is?  That was the

4   question.

5          THE WITNESS:  I don't understand the question.

6   BY MR. BELSAN:

7   Q.   Today Mr. Khan testified that he doesn't know what asylum

8   is.  Were you aware of that?

9   A.   No.

10         THE COURT:  Was she aware of him saying that?

11         MR. BELSAN:  Yes, yes.

12         THE COURT:  Or that he's unaware of asylum?

13         MR. BELSAN:  Was she aware that he testified to that

14  today.

15         MR. LAVIGNE:  Well, the Court instructed --

16         MR. BELSAN:  I will follow up, Your Honor.  I

17  apologize.

18         THE COURT:  All right.  Thank you.

19         MR. LAVIGNE:  I'm a little concerned, because the

20  Court gave an instruction for none of these witnesses to talk

21  to each other.

22         THE COURT:  All right.  Thank you, Mr. Lavigne.

23         MR. LAVIGNE:  So if he's talking about the testimony

24  in the courtroom today, I think that's improper.

25         THE COURT:  The objection is overruled.

1       Ask the question -- what are you trying to get at?

2  BY MR. BELSAN:

3  Q.  Ms. Khan, have you ever heard Mr. Khan use the word

4  asylum?

5  A.  No.

6  Q.  Did you know that when he submitted a declaration in this

7  case he indicated that he believed he had asylum?

8  A.  I don't understand.

9  Q.  Would it surprise you to learn that Mr. Khan believed he

10  had asylum back in 1992?

11  A.  I still don't understand.

12  Q.  Do you know what asylum is?

13  A.  No, I don't.

14  Q.  Okay.  Has that word ever been used in your house?

15  A.  No.

16  Q.  Now, we've identified several things that are wrong on

17  this form, as you've testified to today.  And you testified you

18  would not have signed this form if you understood that those

19  were incorrect.

20       Is that right?

21  A.  Correct.

22  Q.  But you didn't know those things at the time you signed

23  the form, right?

24  A.  Correct.

25  Q.  And you didn't know those because Mr. Khan didn't tell you

1  those things, did he?

2  A.   No.

3  Q.   He withheld that information from you?

4  A.   Correct.

5  Q.   In fact, he told you certain things, like that he'd never

6  been in removal proceedings, that were actually incorrect,

7  didn't he?

8  A.   Correct.

9          MR. BELSAN:  No further questions, Your Honor.

10         THE COURT:  Mr. Lavigne?

11         MR. LAVIGNE:  A couple.

12         THE COURT:  Sure.

13                    **REDIRECT EXAMINATION**

14  BY MR. LAVIGNE:

15  Q.   If you knew each other -- did you know -- you got married

16  and a few days later you signed papers to sponsor your husband?

17  A.   Correct.

18  Q.   But had you planned for this before you even got married,

19  that you would sponsor him for his green card?

20  A.   Yes.

21  Q.   Was this something that just came up immediately right

22  after you got married?

23  A.   Yes.

24  Q.   This date arrived, 12-1990, could that just be a bad

25  memory or failure to remember a correct date?

1    A.    Yes.

2            MR. BELSAN:  Your Honor, it calls for speculation.

3    She's indicated she did not provide that information during the

4    interview.

5            THE COURT:  Okay.  Overruled.

6            Ask your next question.

7    BY MR. LAVIGNE:

8    Q.    Have you ever caught your husband forgetting something?

9    A.    Yes.

10   Q.    Okay.  Did you get from him his birth certificates from

11   Pakistan and his passport from Pakistan to give to Immigration

12   when you were going for the green card for him?

13   A.    No.

14   Q.    Okay.  Do you know whether he was able to get various

15   documents from Pakistan to show his date of birth?

16   A.    Yes.

17   Q.    What date do you celebrate his birthday each year?

18   A.    January -- or July 27th.

19   Q.    Okay.

20           MR. LAVIGNE:  One moment, Your Honor.  We're almost

21   there.

22           No further questions.

23           THE COURT:  All right.  If you'll hold on for one

24   second.

25       (Judge confers with law clerk.)

 1          THE COURT:  I just have a few questions.  When you

 2   first met Mr. Khan, it was your niece's wedding; is that

 3   correct?

 4          THE WITNESS:  Correct.

 5          THE COURT:  Okay.  And he spoke Urdu, you spoke

 6   English.  And you said there were some language barriers; is

 7   that correct?

 8          THE WITNESS:  Correct.

 9          THE COURT:  What was your understanding as to why he

10   was in the United States when you were dating him, how he was

11   in the United States?

12          THE WITNESS:  How he was in the United States?

13          THE COURT:  Yes.

14          THE WITNESS:  He was here visiting with his brother.

15          THE COURT:  And did you -- what was your thought on

16   how he was -- how he was given permission to be in the United

17   States?

18          THE WITNESS:  I don't remember.

19          THE COURT:  Okay.  And you talked about the --

20   getting the green card before you got married; is that correct?

21          THE WITNESS:  Correct.

22          THE COURT:  And do you remember those discussions,

23   why he needed a green card?

24          THE WITNESS:  I don't remember.

25          THE COURT:  And no idea?

1          THE WITNESS:  No.

2          THE COURT:  All right.  The woman who helped with the

3   green card -- you had mentioned there was a woman; is that

4   correct?

5          THE WITNESS:  Correct.

6          THE COURT:  And she was someone you paid to assist

7   you with the documentation?

8          THE WITNESS:  Correct.

9          THE COURT:  Okay.  Did someone also help you with the

10  later N-400 application, when he was applying for citizenship?

11         THE WITNESS:  I don't remember.

12         THE COURT:  You don't remember if anyone helped with

13  that?

14         THE WITNESS:  No.

15         THE COURT:  All right.  Any follow-up?

16         Mr. Lavigne?

17         MR. LAVIGNE:  No.

18         THE COURT:  Okay.  Mr. Belsan, any follow-up?

19         MR. BELSAN:  No, Your Honor.

20         THE COURT:  All right.  Does anyone mind if Ms. Khan

21  stays in the courtroom for the remainder of the trial?  Or

22  would you like her to stay outside the courtroom?

23         Mr. Belsan?

24         MR. BELSAN:  No objection to her remaining in the

25  courtroom.

 1          THE COURT:  All right.  Mr. Lavigne, any issues with
 2   her remaining?
 3          MR. LAVIGNE:  I have no problems with that, Your
 4   Honor.
 5          THE COURT:  All right.  Ms. Khan, feel free to stay
 6   in the courtroom if you'd like, leave the courtroom, whatever
 7   you'd like to do.
 8          Thank you.
 9          THE WITNESS:  Thank you.
10      (Witness excused.)
11          THE COURT:  Mr. Lavigne -- actually, it's 4:10.  Tell
12   me your plan, Mr. Lavigne.
13          MR. LAVIGNE:  I have one last witness.  And that's
14   the brother.
15          THE COURT:  All right.  And how long do you
16   anticipate, similar to Ms. Khan?
17          MR. LAVIGNE:  20, 30 minutes, at most.
18          THE COURT:  All right.  Let's -- let's go ahead and
19   take a quick five-minute -- a seven-minute break,
20   seven-minute-ish, to give everybody a chance to stretch, have a
21   glass of water.
22          I think we can get it done today --
23          MR. LAVIGNE:  Yeah.
24          THE COURT:  -- even if we have to stay past 5
25   o'clock.

1          Any issues with that by either side?

2          MR. BELSAN:  No, Your Honor.

3          THE COURT:  All right.  Mr. Lavigne?

4          MR. LAVIGNE:  No, Your Honor.

5          THE COURT:  All right.  One second.

6      (Judge confers with courtroom deputy.)

7          THE COURT:  My courtroom deputy reminded me they're

8   testing the fire alarms at 5:30.  So that's some --

9          MR. LAVIGNE:  I think we can be out of here by then.

10          THE COURT:  -- some incentive to get through quickly.

11          See you in about seven minutes.  Thank you.

12          COURT SECURITY OFFICER:  All rise.

13      (Recess from 4:13 p.m. to 4:23 p.m.; all parties present.)

14          COURT SECURITY OFFICER:  All rise.  This Honorable

15   Court is back in session.

16          Please be seated.

17          THE COURT:  We're back on the record in *United States*

18   *versus Khan*.  We have everyone back in the courtroom.

19          Mr. Lavigne, if you'll call your next witness,

20   please.

21          MR. LAVIGNE:  Defense calls Mr. Suhail, S-u-h-a-i-l,

22   Khan.

23          THE COURT:  There are several exhibits on the witness

24   table right now.  Are those exhibits that he'll need?

25          MR. LAVIGNE:  Some of them.

1       (Mr. S. Khan enters the courtroom.)

2              THE COURT:  And, Mr. Khan, you're going to step

3    forward and come over to this witness box.  If you'll stay

4    standing and raise your right hand when you get there, please.

5              MR. S. KHAN:  Sure.

6              THE COURT:  Mr. Lavigne is getting some paperwork

7    ready for you there.  All right.

8              MR. LAVIGNE:  None of this he needs.

9              COURTROOM DEPUTY:  Thank you.

10             Please raise your right hand.  Do you solemnly swear

11   or affirm that the answers you will give during these

12   proceedings will be the truth, the whole truth, and nothing but

13   the truth, so help you God?

14             THE WITNESS:  Yes.

15             THE COURT:  All right.  Thank you, sir.  If you'll

16   take a seat, push your chair forward, and just speak directly

17   into the microphone.

18             THE WITNESS:  Okay.

19             THE COURT:  Thank you.  If you need water, just let

20   us know.

21             THE WITNESS:  Okay.  Sure, I will.  Thank you.

22            **SUHAIL KHAN, DEFENDANT'S WITNESS, SWORN**

23                      **DIRECT EXAMINATION**

24   BY MR. LAVIGNE:

25   Q.   Yes, sir.  Would you please tell the Court your full name.

1   A.   Suhail Khan.

2   Q.   And, Mr. Khan, where do you reside?

3   A.   In Orlando.

4   Q.   And how long have you lived in Orlando?

5   A.   Since 2- -- 1996 -- '97, '96, yeah.

6   Q.   And before '96, '97 where did you live?

7   A.   I was in Miami.

8   Q.   And do you remember the address there in Miami?

9   A.   4275 Northwest 18th Street.

10  Q.   And how long did you live at that address?

11  A.   About five or six years, maybe.

12  Q.   Do you have any brothers?

13  A.   Yes.

14  Q.   And what are their names?

15  A.   Parvez Manzoor Khan and Zubair Khan.

16  Q.   Zubair Khan?

17  A.   Yeah.

18  Q.   Do you have any other brothers, Javed?

19  A.   Yes.  I have one brother in Pakistan.  His name is Javed

20  Khan.

21  Q.   How do you spell that?

22  A.   J-a-v-e-d.

23  Q.   Khan?

24  A.   Middle is Manzoor.  The last name is Khan.

25  Q.   Okay.  Do you have any twin brothers?

1  A.   Yes.

2  Q.   Who are the twins?

3  A.   Javed and Parvez.

4  Q.   So Parvez and Javed are twins?

5  A.   Yes.

6  Q.   Okay.  Do you remember when your brother came to live with

7  you in Miami?

8  A.   Yeah.  That was in 1992.

9  Q.   About what month was that?

10  A.   In the beginning at the January.

11  Q.   Do you remember a lawyer by the name of Mr. Howard

12  Johnson?

13  A.   Yes.  Howard Johnson was the lawyer who represent Parvez

14  in Los Angeles.

15  Q.   And were you requested to give a bond for your brother?

16  A.   Yes.

17  Q.   How much was that bond?

18  A.   $2,500.

19  Q.   Okay.  I want to show you what's been marked as

20  exhibits -- pages 529, 530, 531, and 532.

21       THE COURT:  Of Joint Exhibit 1?

22       MR. LAVIGNE:  Yes.  That's out of Joint Exhibit 1.

23  BY MR. LAVIGNE:

24  Q.   Okay.  Have you looked at that front page?

25  A.   Yes.  Uh-huh (affirmative).

1   Q.   And what's the date of that?

2   A.   December 22, 1991.

3   Q.   Go to the next page.

4   A.   Yes.

5   Q.   On page 530 at the top, what does it read?

6   A.   Are you talking about on the top -- on the top left box?

7   Q.   Yeah, in the very top.

8   A.   Yeah.  It -- Jaweed Khan a/k/a Mohammed Akhtar, applicant.

9   Q.   Okay.  Is your name in the next block, underneath of that?

10  A.   Yes.  I see this, Suhail A. Khan.  And my address, 4275

11  Northwest 18th Street, Miami, Florida 331- -- 33126.

12  Q.   Is that the correct address?

13  A.   Yes.

14  Q.   Is that -- is that the address your brother Parvez Manzoor

15  Khan came to live with you at?

16  A.   Right.  Uh-huh (affirmative).

17  Q.   And how long did your brother live with you at that

18  address?

19  A.   I think that was until 1995.

20  Q.   Okay.  Go to page 532.

21  A.   531.  Yeah, 532.

22  Q.   Is your name listed on there as obligor?

23  A.   Yes.

24  Q.   In the next line it says ID, waiting to take oath,

25  2/21/92.  What does that mean?

1  A.   Okay.  This is -- they go -- yeah.  It's -- I think

2  it's -- he was supposed to take oath on that day.

3  Q.   You were supposed to take an oath on 2/21/92?  Were you

4  waiting for citizenship at that time?

5  A.   Yes.  I think so.

6  Q.   Okay.  Is the home address still correct on there, 4275 --

7  A.   4275 Northwest 18th Street, Miami, Florida 321 -- 33126,

8  yeah.

9  Q.   Is that address -- I'm sorry, the home telephone number

10 correct?

11 A.   I don't remember my telephone number.  But the address,

12 yes, 4275 Northwest 18th Street.

13 Q.   Go to the next side, where it says date of birth for

14 Jaweed Khan.  Is his birth date correct?

15 A.   No.

16 Q.   Is that an incorrect birth date?

17 A.   Yeah.  This birthday is not correct.

18 Q.   What is his correct birthday?

19 A.   27th of July, 1957.

20 Q.   Is the address for him correct there in the next line?

21 A.   Yes.

22 Q.   Okay.  After your brother arrived -- oh, do you know how

23 your brother got to Miami?

24 A.   By Greyhound.

25 Q.   Okay.  Did you go pick him up at the Greyhound station?

1    A.    Yes.

2    Q.    And at the time your brother first came to America, would

3    you describe his English proficiency?

4    A.    No.  He didn't know any English at that time.

5    Q.    Have you ever worked as an English and Urdu interpreter or

6    translator?

7    A.    Me?

8    Q.    Yes.

9    A.    Yes.

10   Q.    And who have you worked for?

11   A.    Department of Defense, DOD.

12   Q.    And what language did you translate and interpret into?

13   A.    Urdu.

14   Q.    What language is the official language of Pakistan?

15   A.    Urdu.

16   Q.    After your brother came to live with you in January of

17   1992, did you ever receive any letters, memos, notices, or

18   anything from Immigration for your brother to go to immigration

19   court?

20   A.    No.

21   Q.    Did you ever receive any notices or letters for your

22   brother to deport the United States?

23   A.    No.

24   Q.    Did you ever receive any other letters or notices or memos

25   or anything from Howard Johnson --

1  A.    No.

2  Q.    -- after your brother came to live with you?

3  A.    No.

4  Q.    Did you help your brother to speak and learn some English?

5  A.    Yes.  Uh-huh (affirmative).

6  Q.    How good was he at that?

7  A.    He was kind of like -- he did not know anything, but I

8  taught him a little bit.

9  Q.    Okay.  Did you know of any asylum, revocation, or

10 deportation orders entered against your brother?

11 A.    No.

12 Q.    Did he know of any orders of removal?

13         MR. PETTY:  Objection.  Foundation.

14         THE WITNESS:  To my knowledge, no.

15         THE COURT:  I'm sorry.  What was the objection?

16         MR. PETTY:  Foundation.  The question was asking

17 about whether he knew what his brother knew.

18         THE COURT:  Mr. Lavigne?

19         MR. LAVIGNE:  Yeah.  Let me ask -- I'll rephrase the

20 question.

21         THE COURT:  All right.

22 BY MR. LAVIGNE:

23 Q.    Did you ever discuss anything with your brother after you

24 went to Miami about what the proceedings were in Los Angeles?

25 A.    About like what happened in Los Angeles?

1   Q.   Yes.

2   A.   Yes.

3   Q.   What do you understand what happened in Los Angeles?

4   A.   I thought he -- he got caught over there when he

5   arrived -- I mean, and they put him in the detention center.

6   And from there -- I think they kept him, like, one month, maybe

7   something like that.

8              And Mr. Howard Johnson, who was the lawyer over

9   there, he bail him out with the -- I sent the money, $2,500.

10  And after that, what -- he told me that they took him out with

11  other guys, they put him in the van in the nighttime, and they

12  told him when -- the other people, they told him that you're

13  free to go.

14  Q.   Okay.  Did you have a chance to talk to your brother when

15  he was in detention in Los Angeles on the phone or any way?

16  A.   No.  We don't -- I don't remember.  I don't think so.

17  Q.   Were your communications then related to Mr. Howard

18  Johnson?

19  A.   Yes.  Howard Johnson talked to me.  And he told me about

20  the money.  And he said your brother's here.  We can -- if you

21  send the money so we can bail him out, and he's good.

22  Q.   Do you know your sister-in-law Betty Khan?

23  A.   Yes.

24  Q.   And did you know her before she got married to your

25  brother?

1  A.   Yes.

2  Q.   Did you go to the wedding of your brother and Betty?

3  A.   Unfortunately no.

4  Q.   Okay.  And have they been continuously married since they

5  were first married?

6  A.   Yes.

7  Q.   Does your brother work for you?

8  A.   Yes.

9  Q.   What kind of work does he do for you?

10  A.   He drives truck.

11  Q.   Do you know your brother's reputation for telling the

12  truth when --

13  A.   Yes.

14  Q.   Is he literal sometimes in how to answer questions?

15  A.   No.  He's -- I'm like 100 percent satisfied with his

16  corrector and -- I mean, he never lie.

17  Q.   So far as you know, he would never intentionally lie?  Is

18  that what you're saying?

19        MR. PETTY:  Objection.  Leading.

20        MR. LAVIGNE:  I'll rephrase it.

21  BY MR. LAVIGNE:

22  Q.   Okay.  Do you have any -- okay.  The -- something in the

23  record says that he says he thought he came here in December

24  1990.  Would that be the wrong date --

25  A.   Yes.

1   Q.    -- that he remembered?

2   A.    Yes.

3   Q.    Is he sometimes forgetful as to exactly when things

4   happened?

5   A.    No.  Not really.  I mean, in my judgment, not

6   intentionally.

7   Q.    Not intentionally?

8   A.    Yeah.  Like a lot of people -- like, you know, I have

9   drivers, sometime they -- you know, they're tired or they're --

10  they're -- they want to say something and they say something

11  else.  It's just like -- like normal, I think.

12  Q.    Okay.  Do you know of any reason why he would want to hide

13  anything from Immigration when he was going for the green card

14  or citizenship?

15  A.    No.

16  Q.    Would you have done anything to aid or abet the illegal

17  entry of an alien to the U.S.?

18  A.    No.

19  Q.    When your brother came in in December 1991, do you know

20  why he was coming to the U.S.?

21  A.    If you ask me to -- I don't -- I don't have any idea,

22  like, what was his intention, but he came.

23  Q.    Did you know he was coming to visit with you?

24  A.    Yes.

25  Q.    And did you know if he had a ticket for return to Pakistan

1    when he came?

2    A.   No.  He did not have the ticket to go to Pakistan.

3    Q.   Okay.

4    A.   Are you talking about the return ticket to go back to

5    Pakistan?

6    Q.   Yes, to go back.

7    A.   No, he did not have ticket.

8    Q.   Is it a normal flight schedule to go from Pakistan to

9    Los Angeles?

10   A.   Yeah.  There's different ways to come to the United States

11   from Pakistan.

12   Q.   Are there any direct routes from Pakistan to Miami?

13            MR. PETTY:  Objection.  Foundation.

14            THE WITNESS:  No.

15            THE COURT:  Overruled.

16            THE WITNESS:  There is no flight direct from Pakistan

17   to Miami.

18   BY MR. LAVIGNE:

19   Q.   Okay.  Was Miami the last city he came to in the U.S. when

20   he came in 1992?

21   A.   Yes.

22            MR. LAVIGNE:  I don't have any further questions.

23            THE COURT:  All right.  Thank you.

24            Mr. Petty?

25            MR. PETTY:  Yes, Your Honor.

1                 **CROSS-EXAMINATION**

2 BY MR. PETTY:

3 Q.   Good afternoon, Mr. Khan.  Could you give us your full

4 name again for the record, please.

5 A.   Suhail Ahmad Khan.

6 Q.   And have you ever --

7         THE COURT:  What was that -- what was your middle

8 name?

9         THE WITNESS:  Ahmad.

10         THE COURT:  Ahmad, A-m-i-d?

11         THE WITNESS:  No, A-h-m-a-d.

12         THE COURT:  Oh, thank you.

13 BY MR. PETTY:

14 Q.   And have you ever been known by any other names?

15 A.   Shawn.

16 Q.   Shawn?  Is that a nickname?

17 A.   Yes.  It's my nickname.

18 Q.   And how old are you?

19 A.   I'm 27 -- I'm 57.

20 Q.   And what's your current address?

21 A.   In Orlando?  7707 High Pine Road, Orlando, Florida 32819.

22 Q.   And did you say you run a trucking company?

23 A.   Yes.

24 Q.   Okay.  Do you own that company?

25 A.   Yes.

1  Q.   And you mentioned that you know Parvez Khan's wife; is

2  that right?

3  A.   Yeah.

4  Q.   And what's her name?

5  A.   Louise.

6  Q.   Do you know if that's a middle name or a first name?

7  A.   I know her by Louise.  Louise.

8  Q.   So she goes by Louise?

9  A.   Yeah.

10  Q.   And what are your parents' names?

11  A.   My father's name is Manzoor Ahmad Khan.  If you want I can

12  spell it.

13  Q.   No, that's fine.  And your mother's name?

14  A.   Razia Beguni.

15          THE COURT:  Maybe spell that one.

16          THE WITNESS:  R-a-z-i-a, B-e-g-u-n [sic].

17          THE COURT:  Thank you.

18  BY MR. PETTY:

19  Q.   And where were you born?

20  A.   I born in Pakistan.

21  Q.   When did you arrive in the United States?

22  A.   In 1986.

23  Q.   And how old were you then?

24  A.   25.

25  Q.   Are you currently married?

1   A.   Yes.

2   Q.   What is your wife's name?

3   A.   Huma Khan.

4   Q.   Have you ever been married to anyone else?

5   A.   Yes.

6   Q.   Who else?

7   A.   My first wife, her name was Elizabeth.

8   Q.   I'm sorry?

9   A.   Elizabeth.

10  Q.   Elizabeth?

11  A.   Yes.

12  Q.   And Elizabeth -- her maiden name is Pope, correct?

13  A.   Elizabeth Bernice Byrd.

14  Q.   Byrd?

15  A.   Yeah.

16  Q.   Do you know if she had been married previously?

17  A.   Yes.

18  Q.   Okay.  Was she married to a man whose last name was Byrd?

19  A.   Maybe.

20  Q.   Is she related to Betty Khan?

21  A.   Yes.

22  Q.   How are they related?

23  A.   Betty is -- Louise is her younger sister.

24  Q.   Younger sister?  So they're sisters?

25  A.   Yeah.

1  Q.   So you and your brother Parvez were married to two

2  sisters?

3  A.   Yes.

4  Q.   Okay.  And you married Elizabeth in 1987; is that right?

5  A.   Yes.

6  Q.   And you got your green card through your marriage to

7  Elizabeth?

8  A.   Yes.

9  Q.   Did she petition for you?

10  A.   Yes.

11  Q.   Okay.  And you filed your application to petition for

12  naturalization in September of 1991; is that right?

13       MR. LAVIGNE:  I'm going to object to this whole line

14  of questioning.  Improper cross-examination.  We're not here on

15  his immigration history.  It's what he knows about his brother.

16       THE COURT:  Mr. Petty?

17       MR. LAVIGNE:  It goes way too far afield.

18       THE COURT:  Mr. Petty?

19       Thank you.

20       Mr. Petty?

21       MR. PETTY:  If I'm allowed a little leeway, this all

22  goes to credibility.

23       THE COURT:  All right.  Overruled.

24  BY MR. BELSAN:

25  Q.   You filed your application to petition for naturalization

 1    in September of 1991; is that right?

 2    A.    I don't remember the date.

 3    Q.    Okay.  Would it help if you saw your application to

 4    petition for naturalization?

 5    A.    I'm sorry?  Say again.

 6    Q.    If you saw your petition for naturalization, would that

 7    help you remember the date that you filed it on?

 8    A.    Yes.  If I see any paper -- any date on the paper, I mean,

 9    I can -- I can -- I mean, I have to believe that.

10              MR. LAVIGNE:  Your Honor, I'm going to have to

11    register a strong objection to this whole line of questioning,

12    going on his paperwork.  It's never been disclosed on anything

13    that -- going after him for anything -- his immigration record.

14    I think it's totally intimidating to try to scare the witness

15    from saying anything.  I think it should not be allowed.

16              THE COURT:  All right.  Thank you, sir.

17              I'll reserve ruling on that objection.  And you can

18    ask your questions.

19              MR. PETTY:  Your Honor, would you prefer this marked

20    before I show it to the witness?

21              THE COURT:  Yes.  Does Mr. Lavigne have a copy of

22    this?

23              MR. LAVIGNE:  I don't have any of this.  I've never

24    been supplied anything, listed or anything, a total surprise.

25              MR. PETTY:  Yeah.  Your Honor, I'm not moving this

1   into evidence.  I'm just using it to refresh recollection.

2              THE COURT:  All right.  That's fine.

3              MR. PETTY:  Thank you.

4              THE COURT:  If you'll show it to Mr. Lavigne first.

5              MR. LAVIGNE:  Just give me time.  I have never looked

6   at this before.

7   BY MR. PETTY:

8   Q.   Mr. Khan, does November 1991 sound correct for when you

9   married Elizabeth -- I'm sorry, for when you filed your

10  application to petition for naturalization?

11  A.   That was the time, but I don't remember exact date.

12  Q.   Okay.

13  A.   Yeah.  But if you have any paper -- if the paper is

14  showing the date, of course, that's the date, you know.  But I

15  don't remember.

16  Q.   Do you remember the month?  Could you say it without

17  looking at anything that it was November of 1991?

18  A.   I don't remember the month either.

19  Q.   Okay.

20             MR. LAVIGNE:  I still renew my objection.  Totally

21  improper cross-examination.

22             THE COURT:  Okay.  Thank you.  You've made your

23  objection.  I've reserved ruling on it.

24             Mr. Khan, if you'll just take a look at that

25  document.  And then Mr. Petty may have a question for you about

 1 | that.
 2 |          THE WITNESS:  Sure.
 3 |          THE COURT:  And take whatever time you need.
 4 |          THE WITNESS:  Okay.  What was your question, sir?
 5 | BY MR. PETTY:
 6 | Q.   I'll get the document first.
 7 | A.   Okay.
 8 | Q.   The question was -- you filed your application to petition
 9 | for naturalization in September of 1991.
10 | A.   Uh-huh (affirmative).
11 | Q.   Is that right?
12 | A.   Yeah.
13 | Q.   That's a yes?
14 | A.   Yes.
15 | Q.   Okay.  Thank you.
16 |          And you then divorced your wife two months later, in
17 | November of 1991; is that right?
18 | A.   Yes, I mean, if the paper says that date.  Because I don't
19 | remember all these dates.
20 | Q.   Well, do you recall divorcing Elizabeth shortly after
21 | you -- sort of in that time frame?
22 | A.   Right after my citizen?
23 | Q.   No, after you filed the paperwork.
24 | A.   No.  I don't think so.  Because our divorce was -- it was
25 | after my citizen.

1  Q.   Okay.  And then you married -- you married Huma a few

2  months later, right?

3  A.   Huma Khan, uh-huh (affirmative).

4  Q.   Yes.

5       THE COURT:  A few months later from what?

6  BY MR. PETTY:

7  Q.   You married Huma in about February of 1992?

8  A.   Yes.

9  Q.   And then you're still married to Huma, right?

10 A.   Yes.

11 Q.   Okay.  And at that time in early 1992, when your brother

12 arrived and you married Huma, you were working as a cab driver;

13 is that right?

14 A.   Yes.

15 Q.   Okay.  And do you recall in early 1992 -- was your

16 financial situation basically the same as it had been a couple

17 of years preceding that, in 1990, 1989?

18 A.   I was driving a cab.  Before driving a cab, I was working

19 in restaurant.  But I don't exactly -- when I quit my

20 restaurant job and went to the driving cab.  But that time,

21 1992, then I was driving a cab.

22 Q.   Okay.  Did that substantially change your income?

23 A.   Working at restaurant and driving cab?

24 Q.   Yes.

25 A.   Yeah.

1  Q.    In what way?

2  A.    I was making little bit more money driving a cab.

3  Q.    Okay.  And when you say a little bit more, do you have any

4  idea how much more?

5          MR. LAVIGNE:  I'm going to have to renew my

6  objection.  It's totally irrelevant and immaterial, any of

7  this -- or at least at that time.  Never any question here.

8  It's not in the pleadings, in the complaint, the answer, or

9  affirmative defenses.

10          THE COURT:  All right.  Overruled.

11          Ask your question.

12          MR. PETTY:  Could I get that back?

13     (Last question read back by court reporter.)

14          THE WITNESS:  Yeah.  I was -- when I was working in

15  the restaurant, first I was working as a delivery driver, and

16  then I was working as a cook.

17          So as a cook I think I was making, like -- about $600

18  a week, 4- to $600 a week, the restaurant.  When I start

19  driving a cab, I was making almost, like, 100-something dollars

20  a day, is average.  Of course, that was not a fixed amount if

21  you drive a cab.  So it was, like, 100, $150, maybe, something

22  like that, a day.

23     (Counsel confer.)

24  BY MR. PETTY:

25  Q.    Was $2500 a lot of money to you at that time?

1   A.   $2500?  Yeah.  That was, like -- it was not too little,

2   not too big, but it was -- yeah.

3   Q.   Okay.  Do you recall how much money you made in 1989?

4   A.   I'm sorry?

5   Q.   Do you recall how much money you made in 1989?

6   A.   1989?  How much money?

7   Q.   Yes.

8   A.   What I was making in 1989?

9   Q.   Yes.

10  A.   I have no idea what I -- you know, I was working as a cab

11  driver.

12  Q.   Would it refresh your memory to see the taxes that you

13  filed in 1989?

14  A.   I think I filed it --

15          MR. LAVIGNE:  Objection, again, relevance to 1989.

16  We're talking 1991 -- end of '91 and '92.

17          THE COURT:  All right.  Mr. Petty, where are you

18  going with this one?

19          MR. PETTY:  It goes to the amount of the bond.  The

20  witness has already testified about it being not too much.  I

21  want to put that in context in terms of his overall income.

22          THE COURT:  In 1989 --

23          MR. PETTY:  He's already --

24          THE COURT:  -- for 1991, '92?

25          MR. PETTY:  He's testified that it was -- I believe

1  he testified that his financial situation was somewhat

2  different, but not tremendously different, over the course of

3  those years, given the change in employment.

4           THE COURT:  All right.  The objection is overruled.

5  The question was would something refresh your recollection.

6  What is it, tax returns --

7           MR. PETTY:  Yes, Your Honor.

8           THE COURT:  -- for 1989?

9           MR. PETTY:  Yes.

10           THE COURT:  All right.  Would tax returns from 1989

11  refresh your recollection on how much you were making in that

12  year?

13           THE WITNESS:  I don't remember.

14           THE COURT:  Well, the question was simply would

15  looking at your tax return from 1989 -- would that help you

16  remember what you were making in 1989?

17           THE WITNESS:  Yes.  I mean, I can -- the thing is

18  that I was working as a taxi driver.  The taxi driver's

19  income -- everybody knows is not a steady income.  Sometime --

20  I mean, if you work, you make money.  If you don't work, you

21  don't make money.

22           And sometime you make more money.  Sometimes you make

23  less money.  I mean, this all depend how many hours you put.

24           THE COURT:  Okay.  Which year did you leave -- did

25  you start the taxi business?

1        THE WITNESS:  Taxi -- I left taxi business in 1995.

2        THE COURT:  Which year did you start the taxi

3    business?

4        THE WITNESS:  I don't know exactly.  But before taxi

5    I was working in the restaurant.  Like I said, I think -- I

6    can...

7        I think maybe '88, '89, something -- '90.

8        THE COURT:  All right.  Mr. Petty, he said that

9    wouldn't refresh his recollection.  You can move on, please.

10        MR. PETTY:  Yes, Your Honor.

11    BY MR. PETTY:

12    Q.   How well would you say that you know Parvez Khan?

13    A.   I'm sorry?  Say again.

14    Q.   How well would you say you know Parvez Khan?

15    A.   He's my brother.  I mean, I think I know him well.

16    Q.   How often do you speak with each other?

17    A.   Oh, in these days?

18    Q.   Since he's arrived here.

19    A.   I mean, almost -- sometime every day, because -- like,

20    when he's working with me.  So I have to talk to him -- almost

21    every day.  Not exactly every day, but, yes, almost every day.

22    Q.   And he lived with you for a time, right?

23    A.   In Miami, yes.

24    Q.   And how long did he live with you?

25    A.   He lived with me until 1995.

1  Q.   Did you help -- I believe you testified earlier that you

2  helped him learn English; is that right?

3  A.   Yes.

4  Q.   Okay.  And he's a taxi driver, right -- or he was a taxi

5  driver?

6  A.   Parvez?

7  Q.   Yes.

8  A.   Yes.

9  Q.   Okay.  And you also were a taxi driver, right?

10 A.   Yes.

11 Q.   Did you help him get started driving a taxi?

12 A.   I don't know what you mean by help.  Because if anybody

13 want to drive a cab, just go and pass the exam and get the

14 license.

15 Q.   Did you help him get the license?

16 A.   To teach him, yes.

17 Q.   Did you help him get just an ordinary driver's license

18 when he got here?

19 A.   Yes.  I brought a book for him and he study.  And I help

20 him, because his English was very poor.  I mean, he did not

21 know.  And I was teaching him English and...

22 Q.   Do you recall submitting an affidavit for this case?

23 A.   I do not get it.

24 Q.   Do you recall submitting an affidavit for this case?

25 A.   Yes.  Uh-huh (affirmative).

1   Q.   Okay.

2        (Counsel confer.)

3   BY MR. PETTY:

4   Q.   Okay.  I'm going to hand you what's been marked as

5   Plaintiff's Exhibit 14.

6   A.   You said number 14?

7   Q.   Mr. Khan, do you recognize this document?

8   A.   Yes, I do.

9   Q.   Is that your signature on the last page?

10  A.   I'm sorry?

11  Q.   Is that your signature on the last page?

12  A.   Yes.  Uh-huh (affirmative).

13  Q.   Is this a copy of the affidavit that you submitted in this

14  case?

15  A.   Yes.

16        MR. PETTY:  All right.  Your Honor, I'd ask

17  Plaintiff's Exhibit 14 be admitted into evidence.

18        THE COURT:  Mr. Lavigne, any objection?

19        MR. LAVIGNE:  No.  We've already provided it to the

20  Court, so...

21        THE COURT:  All right.  Plaintiff's 14 is admitted.

22     (Plaintiff's Exhibit 14 received into evidence.)

23  BY MR. PETTY:

24  Q.   You said in your affidavit, quote, I paid the $2500 to

25  Howard George Johnson for the $2500 bond he gave to INS in

1    January of 1992 so my brother could be released to me while his

2    asylum application was being processed.  The bond papers had my

3    correct address in Miami where they -- where my brother was

4    going to live.

5              Is that still your testimony today?

6    A.    Yes.

7    Q.    So you understood at the time, back in 1991, that your

8    brother had been detained, right?

9    A.    Yes.

10   Q.    And you knew that he had been detained in Los Angeles,

11   right?

12   A.    Yes.

13   Q.    Okay.  And you were asking for him to be released while

14   the asylum application was processing; is that right?

15   A.    What I remember, yes, that's right.  He -- you know, he

16   asked me for the $2500 for the bond.  And he said that this

17   is -- we going to release him -- we're going to release him

18   from that detention center.

19   Q.    Okay.  But leaving aside the release from the detention

20   center, you understood at the time that he had an asylum

21   application pending, right?

22   A.    Yes.

23   Q.    Okay.  And you understood that there had been no final

24   decision on that yet, right?

25   A.    Yes.  I mean, I did not know this is a final decision or

1   not, because I was also not very familiar with the -- with

2   the -- with the law and -- the court law, like, whatever, you

3   know, Mr. Johnson told me -- he said that if you -- if you pay

4   this much bond money and he good to go and then we will see,

5   like, I don't know -- it was like a process was going on,

6   asylum process, and -- like, I did not know anything, like -- I

7   mean, not too much about those things.

8   Q.   Okay.  Did you understand the purpose of the bond?

9   A.   To release him.

10  Q.   Okay.  Was it your understanding that if he attended the

11  court date that he had to go to that you would get the money

12  back?

13  A.   To be honest with you, no, I did not know about that --

14  that, you know, he has to go back or get the money back.  I

15  remember -- you know, by my memory.  Maybe he told me that.  I

16  don't remember.

17  Q.   Okay.  So you don't remember whether you thought this was

18  a payment that you were not getting back or collateral that you

19  would get back if everything went as it was supposed to?

20  A.   Yes.

21  Q.   Okay.  You say that you know for a fact that neither you

22  nor your brother were ever given or received any letter or

23  notice to appear before the immigration court or before INS

24  after his release on January 7th, 1992.

25        Is that still your testimony?

1   A.   Yes.

2   Q.   Okay.  But you did have a job at that time, right?

3   A.   Me?

4   Q.   Yes.

5   A.   Yeah.  I was -- I was driving a cab at that time.

6   Q.   Okay.  And being a cab driver, that meant you had to leave

7   your house to do that job, right?

8   A.   Say again.  I'm sorry?

9   Q.   You can't -- you -- you had to leave your house to do your

10  job as a cab driver, right?

11  A.   Leave my job to --

12  Q.   No.  You had to leave your -- your home --

13  A.   Yes, yes.

14  Q.   -- to go do that job?

15  A.   Right, right.  Exactly, of course.

16  Q.   Okay.  So you can't be at your house all the time, right?

17  A.   Yes.

18  Q.   So you don't actually know whether any notice was ever

19  received by your brother at a time when you weren't there?

20  A.   Yeah.  Possible.

21  Q.   You say in your affidavit that had you been notified as to

22  the reasons to revoke the bond -- I would have had my brother

23  file a motion to reopen his asylum case.

24       Is that still your testimony?

25  A.   Yes.

1  Q.    How did you become familiar with motions to reopen?

2  A.    I mean, this is -- this is the -- like, technical words.

3  But normally, in the simple language, yes, I have to go to the

4  court, or maybe hire a lawyer, and, you know, do the other

5  things like -- if anything -- if we need any help legally.

6  Q.    So you testified before that you don't really know asylum

7  law very well; is that correct?

8  A.    Yes.   That's true.

9  Q.    Okay.

10 A.    But only basic things, like if you are -- if you are in

11 trouble or if you need any help -- like, still now, after 32

12 years, I don't know too much about the law.

13        But if I need any help -- this thing I know

14 generally, if I need any help, of course, I will go to the --

15 to the lawyer, and get the consultation from him, or her.

16 Q.    So when you say, I would have had my brother file a motion

17 to reopen, you don't ascribe any particular meaning to that?

18 You just mean, I'd get him more help?

19 A.    Yeah.   My -- the meaning of this -- that -- yes, I will go

20 to the lawyer and get help from them.

21 Q.    Okay.   Did you know that your brother wrote in his

22 affidavit that he thought he'd been granted asylum?

23 A.    Say again.   I'm sorry?

24 Q.    Were you aware that your brother wrote in his affidavit

25 that he thought he had been granted asylum?

1  A.    Yes.  Because he -- let me explain you this way.  When my
2  brother came to me and he told me that -- I said, Do you have
3  anything else, like to do, anything?  Are you good to go?  He
4  said, Yeah.  He said Howard Johnson told him, You are good to
5  go.
6            So I was expecting that -- I thought maybe he's okay,
7  he's fine.  I mean, it's -- I mean, he's free.
8  Q.    Okay.  But you -- you testified before, when Mr. Lavigne
9  was standing here, that you never saw any order from the
10 immigration court or any immigration authority granting asylum?
11 A.    No, no.  I'm still saying the same thing.  No, I did not.
12 I did not see any paper or any notice, any things from -- from
13 Mr. Howard Johnson or from INS or from any other department.
14 Q.    Okay.  So you were aware that Mr. Khan thought he had been
15 granted asylum, never having seen any documentation of that
16 effect?
17 A.    No, I did not see any documentation.
18 Q.    Do you think, having just been detained for a month, that
19 your brother's immigration status was something of importance
20 to him?
21 A.    In which sense?
22 Q.    In the sense of not being detained again.
23 A.    I'm sorry?  Could you repeat your question again, please?
24 Q.    Do you think, having just been detained for a month, that
25 your brother's immigration status was an issue of importance to

1   him?

2   A.    In my opinion, I don't know.  What can I say?  I mean...

3   Q.    You said in your affidavit, and you said just a few

4   moments ago, that your brother has a good reputation for

5   telling the truth; is that right?

6   A.    Yes.

7   Q.    Did you know that he used an altered passport to enter the

8   United States?

9   A.    Yes.

10  Q.    You knew that he used a passport where his photograph was

11  inserted in place of the photo to whom the passport had

12  actually been issued?

13  A.    Yes, literally.  Yes.

14  Q.    You knew that was not his own passport?

15  A.    Yeah.  When he came to Miami and -- you know, and I asked

16  him, then he told me that.

17  Q.    Okay.  And you knew that he knew that it was not his

18  passport, because he told you that, right?

19  A.    Yeah.

20  Q.    And you knew that Mohammed Akhtar is not your brother's

21  real name?

22  A.    I don't know -- of course his name is not Mohammed Akhtar.

23  Q.    Did you know that later on in a document that he

24  subscribed to under oath that your brother failed to disclose

25  that alias, despite being asked whether he'd ever used any

1  other names?

2  A.   Can you repeat your question, please?

3  Q.   Did you know that later on, in a document he subscribed to

4  under oath, that he failed to disclose that alias, despite

5  being asked whether he had ever used any other names?

6  A.   No, I don't know about that.

7  Q.   Did you know that in a document he subscribed to under

8  oath he said he entered the United States in Miami, rather than

9  in Los Angeles, where he actually entered?

10            MR. LAVIGNE:  Objection.  That is a

11  mischaracterization of the testimony.  The question is where

12  did you last enter -- what city did you last enter?  So I --

13  this is the problem.  The semantics and the language of the

14  forms and everything are all vague.  They're not unequivocal.

15            THE COURT:  All right.

16            MR. PETTY:  Speaking objection.

17            THE COURT:  Okay.  Thank you.  That is a speaking

18  objection.

19            Mr. Petty, do you have the exact language of that

20  question?

21            MR. PETTY:  Do we have 7?

22            THE COURT:  It's on Exhibit 7, right?  Do you

23  remember the number?  Exhibit 8?

24            The question is in the green card application,

25  essentially.  And the question was place of last entry into the

1  U.S., parens, city, slash, state, end parens.  Underneath that

2  is typed Miami, comma, Florida.

3           Ask your question, Mr. Petty.

4  BY MR. PETTY:

5  Q.   Did you know that in a document he subscribed to under

6  oath he wrote Miami, Florida as his last place of entry into

7  the United States?

8  A.   You're talking about -- whose paper, Mr. -- Parvez's

9  paper?

10 Q.   Yes.  Did you know that he wrote that there?

11 A.   Are you asking me a question for Parvez's paper?

12 Q.   Yes.

13 A.   Did I write down anything?

14 Q.   No.  Did you know that he wrote -- or did you know that he

15 signed that paper?

16 A.   I don't know about his papers.  Even that time -- if I see

17 his paperwork, maybe what -- I cannot remember.  But right now,

18 if you -- if you're asking me that I remember I saw his paper

19 and I knew it, I don't know.  I don't -- I don't remember.

20 Q.   Do you not know or do you not remember?

21 A.   I don't remember.

22 Q.   Did you know that in a document he subscribed to under

23 oath he did not list any other names that he had used?

24 A.   Are you asking me anything he write down in his papers --

25 right?  But his -- like, if you ask him about my papers, what I

1   wrote down in my papers, of course, he -- I mean, I don't think

2   he knows anything about my papers.  Or whatever he did in the

3   court, under the oath, in the Immigration -- I was not with him

4   when he went to Immigration.

5   Q.   All right.  So are you saying that you were not aware of

6   what he wrote on the N-400?

7   A.   Yes.

8   Q.   Okay.  And you're not aware of anything that he wrote or

9   omitted from --

10  A.   Exactly particular things, no.  But, overall, generally --

11  like I say, what I know -- you can ask me, you know, generally,

12  like where he came, where he end up -- like, he came to LA, end

13  up in Miami, this I know.

14  Q.   Okay.  And what I'm asking is if he said anything that was

15  incorrect or if he withheld any information on either his

16  application for green card or his application for citizenship,

17  you're not aware of any of those misstatements?

18  A.   In my knowledge -- in my knowledge, that -- anytime after

19  he arrived in LA, he never used another name, he never used

20  another date of birth, he never used any -- anything -- I mean,

21  he never lie.  This is -- I know.  Sure.

22  Q.   Okay.  But that's not what I'm asking you.  I'm asking you

23  are you aware of any misstatements on any forms that he may

24  have filed with the Government?

25  A.   No.

1  Q.   You're not aware?

2  A.   No.

3  Q.   You didn't see them?

4  A.   No, I did not.

5  Q.   So to the extent that there are any misstatements or

6  material omissions, you're not familiar with them?

7  A.   I'm sorry?

8  Q.   To the extent that there are any misstatements or material

9  omissions, you are not familiar with them?

10 A.   No.

11 Q.   Okay.

12         THE COURT:  There's another double negative.

13 BY MR. PETTY:

14 Q.   Are -- is the last statement that I said correct?

15 A.   The last statement was?

16 Q.   That --

17         THE COURT:  Let me -- I have it in front of me here.

18         Do you know of any misstatements or material

19 omissions made by your brother on any immigration documents?

20         THE WITNESS:  No.

21 BY MR. PETTY:

22 Q.   And is that because you have not reviewed those documents?

23 A.   In my knowledge -- in my knowledge, what they were -- I'm

24 not talking the documents, but in --

25 Q.   We're only talking about the documents.  Are you -- have

1   you reviewed the documents?

2   A.   No.

3   Q.   Okay.  So if there is anything in the documents that is

4   wrong or that's missing that should be there, you don't know

5   about it?

6   A.   Exactly.  I don't know about that.

7   Q.   Okay.  I want to draw your attention to one phrase that

8   you used in your affidavit.  You said -- at paragraph 17, My

9   brother has a good reputation for telling the truth when he is

10  given a chance to explain or if he is asked the right

11  questions.

12          Is that still your testimony?

13  A.   Yes.

14  Q.   Okay.  I'd like to show you Plaintiff's Exhibit 7.

15  A.   Okay.

16  Q.   Do you see question 3, where it says if you have ever used

17  other names, provide them below?

18  A.   Question number 3 you said?

19  Q.   Yes.

20  A.   Okay.

21          THE COURT:  You're sure it's question 3?

22          MR. PETTY:  Is it --

23          THE COURT:  There's parts in here and then under the

24  parts there's letters.

25  BY MR. PETTY:

1    Q.    1(c).

2    A.    Part 1, section (c), right?

3    Q.    Yes.

4    A.    Yeah.

5    Q.    Do you find anything confusing about that?

6    A.    Yeah.  Because, I mean, he did not -- because he think

7    that he's not -- he did not use it --

8    Q.    No, no, no.  Do you find anything confusing about the

9    question?

10   A.    No, I don't see anything over here.

11   Q.    Okay.  Thank you.

12           You said in your affidavit that you worked for the

13   Department of Defense.

14   A.    Yes.

15   Q.    When did that take place?

16   A.    When what?

17   Q.    When was that?

18   A.    I started 2001.

19   Q.    Okay.  So that was nine years after your brother arrived

20   to the United States?

21   A.    Yeah.

22   Q.    Were you an employee or a contractor?

23   A.    I was a contractor.

24   Q.    And so that employment had ended before your brother

25   applied for citizenship; is that right?

1  A.    My employment?  My employment ended in 2013.

2  Q.    So what happened in 2001?  Is that when you began work for

3  the DOD?

4  A.    Yeah.  I started in 2001.

5  Q.    Okay.  You started --

6  A.    And that was like on and off.

7  Q.    Okay.  So that entire employment was after your brother

8  had obtained his green card?

9  A.    Yes.  I think so.  If you -- I mean, you have the date.

10  But I don't know -- I mean, I can tell you my date that I

11  started my job, in 2001.

12  Q.    Okay.

13            MR. PETTY:  I have no further questions.

14            THE COURT:  All right.  Mr. Lavigne?

15            MR. LAVIGNE:  Just a few questions, Your Honor.

16                      **REDIRECT EXAMINATION**

17  BY MR. LAVIGNE:

18  Q.    When you worked for the Department of Defense as a

19  contractor, did you have to go through a security clearance?

20  A.    Yes, sir.

21  Q.    Did you have to go through a security clearance for you

22  and your family?

23  A.    Yes.  I mentioned -- yes.

24  Q.    Did you have to disclose your brothers?

25  A.    Yes.

1   Q.   Your mother, your father?

2   A.   Yes, sir.

3   Q.   Your wife?

4   A.   Yes, sir.

5   Q.   Prior wives?

6   A.   Yes.

7   Q.   And did you receive security clearance to do work for the

8   Department of Defense?

9   A.   Yes.  Uh-huh (affirmative).  Yes, sir.

10  Q.   So far as you know -- let me rephrase the question.

11       Have you ever known your brother to use any other

12  name other than Parvez Manzoor Khan?

13  A.   No.

14  Q.   Where was the last city your brother came to in the United

15  States when he came here in 199- -- I think January of '92?

16  A.   Miami, Florida.

17  Q.   Okay.  Do you know whether he even remembered the name on

18  that passport?

19  A.   Which passport?

20  Q.   The passport he had when he came to Los Angeles.

21  A.   No.

22  Q.   Did he ever tell you that -- what the name was?

23  A.   No.

24            MR. LAVIGNE:  One second.

25  BY MR. LAVIGNE:

1   Q.   Your nickname is Shawn?

2   A.   Yes.

3   Q.   Is that -- how do you spell that?

4   A.   S-h-a-w-n.

5   Q.   Okay.  Does your brother, who's with you here today, does

6   he have a nickname, Parvez?

7   A.   No, no.  Just Parvez.

8   Q.   Okay.  Do you recall talking to Mr. Johnson about

9   spellings of names?

10  A.   Yeah, Parvez, of course.

11  Q.   Okay.  Do you recall ever being given any copies of papers

12  that Mr. Johnson submitted on behalf of your brother in

13  Los Angeles?

14  A.   No.

15  Q.   Were you given anything to look at before it was

16  submitted?

17  A.   No.

18  Q.   Were you given a chance to make any correction of any

19  misspellings?

20  A.   No.

21  Q.   Were you given any chance to make any corrections on

22  mistaken birth dates or incorrect birth dates?

23  A.   No.

24  Q.   Were you given a chance to read this I-589 form, this

25  asylum application?  Did you read that before it was submitted?

1   A.   No.  I did not receive any kind of paper from Mr. Johnson.

2   Q.   Did you look at any of the bond terms that you submitted

3   that --

4   A.   No.

5   Q.   -- you were on in your name?

6   A.   No, no.

7   Q.   Did you rely upon Mr. Johnson just to do his job as a

8   lawyer?

9   A.   Yes.  I assumed that he was his lawyer and he was doing

10  his job.

11  Q.   Okay.

12           MR. LAVIGNE:  I don't have any further questions,

13  Your Honor.

14           THE COURT:  All right.  Thank you.

15           Mr. Lavigne, any other witnesses?

16           MR. LAVIGNE:  No, Your Honor.

17           THE COURT:  All right.  Any other evidence you'd like

18  to offer?

19           MR. LAVIGNE:  One moment, Your Honor.

20       (Counsel confer.)

21           MR. LAVIGNE:  Yes, Your Honor, we would like to move

22  into evidence -- but the Court's already made findings of fact.

23  There was a suspension of proceedings on Howard Johnson.

24           THE COURT:  All right.  One second.

25           Mr. Khan, you're done testifying.

1        MR. LAVIGNE:  I believe we can let him go.

2        THE COURT:  Thank you, sir.

3        Does anyone have an issue with Mr. Khan staying in

4   the courtroom for the rest of the proceeding?

5        MR. PETTY:  No, Your Honor.

6        THE COURT:  Mr. Khan, feel free to stay in the

7   courtroom if you'd like, or feel free to leave if you'd like.

8        THE WITNESS:  Thank you.

9     (Witness excused.)

10       THE COURT:  All right.  Mr. Lavigne, you'd like to

11  admit the documents concerning Mr. Johnson's disciplinary

12  issues?

13       MR. LAVIGNE:  Yes.  But you had put it in the order.

14  And I wasn't sure whether it was established as a fact or not.

15  I think it was.

16       THE COURT:  They were established as a fact.  The

17  documents can come in unless Mr. Petty has any objection to

18  those documents coming in.

19       Mr. Petty?

20       MR. PETTY:  No objection, Your Honor.

21       THE COURT:  All right.  We'll just label them --

22  what's your next defense exhibit?

23       MR. LAVIGNE:  The one -- one second, Your Honor.  I

24  have to look at it.  There was two articles.  One was the

25  newspaper release from the Department of Justice and the other

1    was the report on the fingerprinting problem.

2            THE COURT:  And you haven't moved any exhibits into

3    evidence yet except -- all right.

4            MR. LAVIGNE:  That's right.

5            THE COURT:  And so the --

6            MR. LAVIGNE:  Those have already been filed with the

7    Court.

8            THE COURT:  They were filed with the Court, but --

9            MR. LAVIGNE:  And the Court did reference those --

10           THE COURT:  -- you haven't -- all right.  Let's see.

11           You have Defense Exhibit 1.  What would you like to

12   make the disciplinary proceedings against Mr. Johnson?

13           MR. LAVIGNE:  Make that 2.

14           THE COURT:  All right.  That's Defense Exhibit 2, is

15   admitted.

16       (Defendant's Exhibit 2 received into evidence.)

17           THE COURT:  And any other exhibits?

18           MR. LAVIGNE:  3 is simply the article on what's going

19   on.

20           THE COURT:  Pardon me?

21           MR. LAVIGNE:  There was an article.

22           THE COURT:  And you listed that -- do you want all of

23   the exhibits on defense exhibit list admitted?  Is that what

24   you're asking for?

25           MR. LAVIGNE:  No.  Because of some of those are

1   duplicates.  There are a lot of them duplicate.

2          THE COURT:  All right.

3          MR. LAVIGNE:  The last several of them were for --

4   the forms -- the current forms.  But the Court can take

5   judicial notice as to what -- so I don't think we need those.

6          THE COURT:  Okay.  All right.

7          MR. LAVIGNE:  There was just the thing on the

8   fingerprints, to explain what happened.

9          THE COURT:  Okay.

10          MR. LAVIGNE:  So the Court can have a background a

11   little bit.  And just -- there's just a newspaper release from

12   the Department of Justice.

13          THE COURT:  And those were -- you want those Defense

14   Exhibit 3 and 4?  Is that what you want?

15          MR. LAVIGNE:  Correct.  That's correct.

16          THE COURT:  All right.  Mr. Petty, any objection to

17   those?

18          MR. PETTY:  No objection.  I assume we're talking

19   about the Inspector General report?

20          THE COURT:  Yes.

21          MR. LAVIGNE:  Correct.

22          MR. PETTY:  No objection to the Inspector General

23   report.  Just a moment.

24          THE COURT:  And the press release was Defense

25   Exhibit 4.

1    MR. PETTY:  No objection to the press release either.

2    THE COURT:  All right.  We'll make those Defense

3  Exhibit 3 and 4.  We don't -- Mr. Lavigne, we don't actually

4  have those right now.  But we'll just make the attachments to

5  your summary judgment motion as Defense Exhibit 3 and 4 --

6    MR. LAVIGNE:  Thank you, Your Honor.

7    THE COURT:  -- for trial purposes.

8    MR. LAVIGNE:  That would do.

9      (Defendant's Exhibits 3 and 4 received into evidence.)

10    THE COURT:  Any other evidence you'd like to

11  introduce, Mr. Lavigne?

12    MR. LAVIGNE:  No.  The others -- like I said, the

13  Court can just take judicial notice of the forms and what's --

14  the requirements for each of these --

15    THE COURT:  Okay.

16    MR. LAVIGNE:  -- the USCIS website, including motions

17  to reopen and going to immigration court.  That's, to me, legal

18  argument mostly.

19    THE COURT:  The -- as I said, the fire alarm is going

20  to go off.  Don't be alarmed when the fire alarm does go off.

21  It's not a fire.  It's just a test.

22    From here the parties will order -- get with

23  Ms. Bishop to order the transcript of today's proceeding.  It's

24  typical that the parties split the cost of that.  You can work

25  with Ms. Bishop on that.

1          MR. LAVIGNE:  Okay.

2          THE COURT:  After the transcript is received,

3     Mr. Petty, how much time do you need for proposed findings of

4     facts and conclusions of law?

5          MR. PETTY:  How long do you anticipate it will take

6     the transcript to be prepared, Your Honor?

7          THE COURT:  Well, it depends on how it's ordered.  If

8     you order regular transcripts -- Ms. Bishop typically works

9     pretty fast.  I can let her answer that.

10          Ms. Bishop, Regular order, not expedited, how long

11    would that take?

12          COURT REPORTER:  Two weeks.

13          THE COURT:  Two weeks?  It may be -- approximately

14    two weeks from its order time.  Let's give her three weeks.

15    And then you would need time after you receive the transcripts

16    for the proposals.

17          Just name your time.  We typically say four weeks.

18    But if you need longer or shorter, that's fine, too.

19          MR. PETTY:  I think four weeks sounds about right.

20          THE COURT:  Four weeks?

21          Mr. Lavigne, does that okay to you?

22          MR. LAVIGNE:  That sounds okay, because I'll be gone

23    April 10th through May 10th out of the country.  So I think by

24    the time I get back, he may have been able to -- maybe not file

25    it yet, but he will soon after that.

1          THE COURT:  Okay.

2          MR. LAVIGNE:  That works out, I believe.

3          THE COURT:  Okay.

4          MR. LAVIGNE:  And I would just ask for 30 days so

5   we'll have the exact number of days.

6          MR. PETTY:  And, Your Honor, just for clarification,

7   these are simultaneous proposed findings of fact and

8   conclusions of law, not briefing?

9          THE COURT:  Correct, from each side.  So they're not

10  joint proposed findings of fact and conclusions of law.  Do you

11  think you'll need more time than that?

12         MR. LAVIGNE:  Oh, yes, because I'm going to be gone

13  through May 10th.  So if she comes out in two weeks and we're

14  given four weeks, I'm really not quite there.

15         THE COURT:  All right.  We'll give you four weeks

16  from May 10th.

17         MR. LAVIGNE:  Okay.

18         THE COURT:  If you need more time --

19         MR. LAVIGNE:  Fine.

20         THE COURT:  Work on that -- work on that deadline.

21  If you need more time, file a motion to explain why that didn't

22  work.  But you were already given a substantial part of the

23  findings of fact based on the summary judgment order.  So it

24  should not take that much longer.

25         In the proposed conclusions of law, please include

1  whatever law you would like me to consider on any defenses,

2  Mr. Lavigne, that you brought up in the pretrial motion, any

3  response to those.

4         You can either make it in a response -- in your

5  conclusions of law, or you can present it at closing arguments,

6  which we'll have after I receive the proposed findings of fact

7  and conclusions of law.

8         You can also put in the proposed conclusions of law

9  what you want to say on the objections that I reserved here

10 today.

11        Once I receive the proposed findings of fact and

12 conclusions of law from each party, I'll set closing arguments.

13 We can have them in person.  I know neither of you is from

14 Jacksonville.  If you prefer to appear by telephone, that's

15 fine, too.

16        And then from there I'll issue the findings of fact

17 and conclusions of law and judgment in the case.

18        Mr. Petty, any questions about how we'll proceed, any

19 issues with that?

20        MR. PETTY:  No.  But if we could get a call from your

21 courtroom deputy about setting that, with summer coming up and

22 vacations.

23        THE COURT:  Sure.  We always -- we'll always -- we'll

24 always make accommodation for the lawyer and make sure

25 everybody is available before we even place it on the calendar.

So she'll be in touch with you.

MR. PETTY:  Thank you, Your Honor.

MR. LAVIGNE:  Oh.  Oh, fine.

THE COURT:  All right.  And once the --

MR. LAVIGNE:  But I have no problem coming here for oral argument, because I think sometimes it's better just right here.

THE COURT:  Whatever your preference is.  I'll leave that up to you.

MR. LAVIGNE:  The only question I --

THE COURT:  Yeah.  In person typically is better. But, you know, I'm trying to minimize expense --

MR. LAVIGNE:  Expenses.

THE COURT:  -- in the process.  And I understand that it can be difficult to travel.

Did you have another question, Mr. Petty?

MR. PETTY:  No, Your Honor.  Nothing else.

THE COURT:  All right.  Mr. Lavigne, anything from you?

MR. LAVIGNE:  Would we be allowed to waive the presence of the Defendant at oral argument since he's driving so much?

THE COURT:  Of course.  Yeah.  Mr. Khan can appear or doesn't have to appear.  It's not a criminal proceeding, so it's up to him.  He can do whatever he'd like in that regard.

1    The four weeks from receipt of the court reporter
2  transcript -- I'm changing that because of your May 10th date.
3  And so you -- you get back in the country on May 10th?
4    MR. LAVIGNE:  On the -- May the 10th I'm back.
5    THE COURT:  All right.  We'll just set that as a firm
6  June 10th deadline for both sides.  And that's with the
7  assumption Ms. Bishop doesn't run into any problems.  I don't
8  think she will.
9    All right.  Anything else?
10    MR. LAVIGNE:  My client --
11    THE COURT:  Mr. Petty?
12    Mr. Lavigne, yes, sir?
13    MR. LAVIGNE:  I just have one question.
14    THE COURT:  Yes, sir.
15    MR. LAVIGNE:  He wants to be sure he can travel on
16  his passport to go visit his mother in Pakistan again.  So far
17  as I know, there's nothing there putting any restrictions on
18  his passport for travel.
19    THE COURT:  I have no restrictions on that.
20    MR. LAVIGNE:  Okay.  He doesn't want to go through
21  the same thing coming back the last two times.
22    THE DEFENDANT:  Yeah.
23    MR. LAVIGNE:  Abu Dhabi and --
24    THE COURT:  There's nothing before the Court.  I'll
25  just say that.

1       MR. LAVIGNE:  Okay.

2       MR. PETTY:  Well, Your Honor, my only concern would

3  be that if the Court were to enter an order of

4  denaturalization, and that is something that we have to send to

5  the State Department, he may not be able to re-enter on that

6  passport.  So it sort of depends on the Court's timing.

7       THE COURT:  So -- yeah.  I don't have anything to do

8  with that, frankly.  The timing I do have a lot to do with.

9       MR. PETTY:  Yes.

10      THE COURT:  Whether he gets -- whether he re-enters

11 or not, I have nothing to do with that.  So there's not much I

12 can do, except tell you that my order will come out, you know,

13 within a month or so, I would assume, of closing arguments, or

14 less.  These are not things we want to sit on around here.

15      MR. LAVIGNE:  And I'm assuming we have whatever

16 rights to file motions to stay, any order enforcement, other

17 restrictions or --

18      THE COURT:  File whatever motions you'd like.  Just

19 provide a memorandum of law with it and I'll take it under

20 advisement, after getting a response from the other side.

21      MR. LAVIGNE:  That's fine.

22      THE COURT:  But you can talk to Mr. Petty about any

23 impact of this proceeding on coming and going from the country.

24      All right.  Counsel, thank you for your

25 professionalism --

1          MR. LAVIGNE:  Thank you, Your Honor.

2          THE COURT:  -- and your good presentation.  You did a

3   fine job today.  I appreciate you keeping it within a day.  And

4   so thank you.

5          Court's in recess.

6          MR. LAVIGNE:  Thank you, Your Honor.

7          COURT SECURITY OFFICER:  All rise.

8       (The proceedings concluded at 5:27 p.m.)

9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE</u>

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 10th day of April, 2019.



                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC