United States District Court
Middle District of Florida
Jacksonville Division

**UNITED STATES OF AMERICA,**

> *Plaintiff,*

v.                                                  No. **3:17-cv-965-J-PDB**

**PARVEZ MANZOOR KHAN,**
**A/K/A MOHAMMAD AKHTAR,**
**A/K/A JAWEED KHAN,**

> *Defendant.*

---

## Findings of Fact and Conclusions of Law[1]

The United States seeks denaturalization of Parvez Manzoor Khan, bringing three causes of action against him under 8 U.S.C. § 1451(a). Doc. 1. The Court issues these findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).

### I.   Overview

In an order denying cross motions for summary judgment, the Court found

---

[1] An unredacted version of these findings of fact and conclusions of law is filed separately under seal. The redacted information is only the months and days of birthdates.

The findings of fact and conclusions of law are corrected from the original version, Docs. 65, 68 (sealed), to reflect a witness's correct job title, to reflect the correct subsection of a code citation, and to add language to the last footnote for the sake of completeness. *See* Doc. 69 (government filing with corrections). The corrections are clerical, involve no substantive judgment, are otherwise immaterial to the findings of fact and conclusions of law, and have no effect on the order and judgment, Doc. 66. *See* Fed. R. Civ. P. 60(a) ("The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other parts of the record. The court may do so on motion or on its own, with or without notice."). The Court does not construe the government's filing, Doc. 69, as a motion under Fed. R. Civ. P. 52(b), 59(a)(2), or 59(e).

several facts material and not genuinely in dispute and ruled, under Federal Rule of Civil Procedure 56(g), those facts are treated as established.[2] Doc. 41 at 58. Neither party challenges that finding.

For material disputed facts, the Court conducted a non-jury trial on April 2, 2019. Doc. 51. Afterward, the parties submitted proposed findings of fact and conclusions of law, and the government added supplemental authority. Docs. 57, 58, 64. The parties presented closing arguments on July 30, 2019. Doc. 61.

At the trial, the government presented testimony of two witnesses: Khan and Lisa Pellechia (an Immigration Services Officer). Doc. 52 at 15–245. Khan presented testimony of two witnesses: Betty Louise Khan (his wife) and Suhail Khan (his brother). Doc. 52 at 249–76, 279–319.

The Court admitted into evidence two joint exhibits: an A-File for Khan with personal identifiers and sensitive information redacted (Jt. Ex. 1; Docs. 51-1–51-4); and the same A-File without the redactions (sealed Jt. Ex. 2; Doc. 54).[3] Doc. 52 at 9.

Without objection, the Court admitted into evidence fourteen exhibits offered by the government: a transcript and a video recording of a deposition of Xiomara Flores (a U.S. Customs and Border Protection [CBP] Officer) (Pl. Exs. 1 & 2; Docs. 51-5, 51-6); a transcript and a video recording of a deposition of Eduardo Reveles (a CBP Officer) (Pl. Exs. 3 & 4; Docs. 51-7, 51-8); a transcript and a video recording of a deposition of Sarah Wescott (a CBP Officer) (Pl. Exs. 5 & 6; Docs. 51-9, 51-10); a certified copy of Khan's Form N-400 (sealed Pl. Ex. 7; Doc. 55); a certified copy of

---

[2]A citation to a fact earlier found material, not genuinely in dispute, and treated as established under Rule 56(g) is to the order on the cross motions for summary judgment where the finding was made, which is "Doc. 41." The order contains additional citations to evidence establishing the fact.

[3]Unless otherwise indicated, a citation to a page in an exhibit is to the Bates number or page number on the exhibit rather than the page number "stamped" at the top through CM/ECF.

Khan's Form I-485 (sealed Pl. Ex. 8; Doc. 56);[4] a stipulation (Pl. Ex. 9; Doc. 51-13); a completed Form I-877 (Pl. Ex. 10; Doc. 51-14);[5] a "Warning as to Rights" and a "Health Questionaire" [sic] (Pl. Ex. 11; Doc. 51-15);[6] a laboratory report (Pl. Ex. 12; Doc. 51-16); and affidavits of Khan and Suhail Khan (Pl. Exs. 13, 14; Docs. 51-17, 51-18). Doc. 52 at 10–14, 20, 303.

Without objection, the Court admitted into evidence three exhibits offered by Khan: filings in the Supreme Court of California (Def. Ex. 2; Doc. 51-19);[7] a news release by the U.S. Department of Justice (Def. Ex. 3; Doc. 51-20); and a report by the Office of Inspector General for the U.S. Department of Homeland Security (Def. Ex. 4; Doc. 51-21). Doc. 52 at 321–23.

At the close of the government's case, Khan moved to dismiss, arguing the government had not proved any omission would have caused him to be denied lawful permanent residency or citizenship. Doc. 52 at 246. The Court took the motion under advisement. Doc. 52 at 248. The Court denies the motion for reasons that follow.

---

[4]The certified copies of Khan's N-400 and I-485 are sealed because they include personal identifiers. Redacted versions are in Khan's redacted A-File, Jt. Ex. 1, on the public docket at Docs. 51-1–51-4.

[5]The completed Form I-877, Pl. Ex. 10, Doc. 51-14, is an exhibit to Wescott's deposition transcript, Pl. Ex. 5, Doc. 51-9. The exhibit is not with the deposition transcript. Pl. Ex. 5.

[6]The "Warning as to Rights" and "Health Questionaire" [sic], Pl. Ex. 11, Doc. 51-15, are exhibits to Flores's deposition transcript, Pl. Ex. 1, Doc. 51-5, and Reveles's deposition transcript, Pl. Ex. 3, Doc. 51-7. The exhibits are also with the deposition transcripts, Pl. Exs. 1 & 3.

[7]Khan offered defendant's exhibit 1. Doc. 52 at 206–11. The government objected to its admission because Khan had not provided a foundation for its admission. Doc. 52 at 208. The Court reserved ruling on the objection. Doc. 52 at 208–09. The Court sustains the objection. What the document is, why the document was made, and where the document came from remain unclear. The witness through whom Khan tried to offer the exhibit—Pellechia—testified she had never seen the document, does not know why it was created, and does not really know what it is. Doc. 52 at 236–37.

## II.   Findings of Fact

The findings of fact are from credibility findings; from the facts found material, not genuinely in dispute, and treated as established under Rule 56(g) in the order on the cross motions for summary judgment, Doc. 41; and from the evidence admitted at trial.

The Court's credibility findings are based on the witness's tone and demeanor, the witness's opportunity to know about the topic of the testimony, the witness's ability to remember, the witness's interest in the outcome, the witness's familial or other bias, the incredibility of the witness's testimony given documentary and other evidence, and other reasons specified in the footnotes that follow.

Considering those indicators of credibility, the Court finds Pellechia's testimony credible and some of Khan's, Betty Khan's, and Suhail Khan's testimony credible. Where a witness testified contrary to a finding of fact, the Court makes a credibility finding against the witness's testimony.

### A.   *Entry, Exclusion Proceedings, and Asylum Request*

Parvez Manzoor Khan was born in Pakistan on ████ 1957, to Manzoor Ahmad Khan and Razia Beguni.[8] Doc. 52 at 16, 45, 274, 283, 291; Jt. Exs. 1 & 2 at 162, 164, 167, 169–70, 173, 176. He has three siblings: Javed (his twin brother), Zubair, and Suhail Khan. Doc. 52 at 17, 280, 281. Javed Khan lives in Pakistan, and Zubair and Suhail Khan live in the United States. Doc. 52 at 17, 291. Khan has never had a serious medical issue or a drug or alcohol problem. Doc. 52 at 17.

On December 7, 1991, Khan, then age 34, arrived in Los Angeles, California,

---

[8]The government contends there is no need to resolve Khan's true identity. Doc. 57 at 1 n.2. Khan testified "Parvez Manzoor Khan" is his real name and he has used that name throughout his life. Doc. 52 at 117–18. Suhail Khan testified his brother's name is "Parvez Manzoor Khan." Doc. 52 at 280. The Court finds this testimony credible, including because of the documents in Khan's A-File supporting his I-485 and N-400 (discussed later).

aboard Korean Airlines on Flight KE002, which was a direct flight from Karachi, Pakistan. Doc. 41 ¶ 2; Doc. 52 at 22–23; Jt. Exs. 1 & 2 at 273. Because he had never traveled outside of Pakistan, the date was significant to him. Doc. 52 at 22.

Khan knew he would need a passport and a visa to travel to the United States but feared he would not get one because of insufficient money and business ties in Pakistan. Doc. 52 at 25, 101, 132–33. In Pakistan, for a couple thousand dollars, he bought a Pakistani passport stamped with a U.S. B-2 Visitor Visa. Doc. 41 ¶ 4; Doc. 52 at 24, 32–33; Jt. Exs. 1 & 2 at 572–91. The passport was issued to and in the name of "Mohammad Akhtar" with a birthdate of ███████ 1958, but Khan's image was inserted for the photograph.[9] Doc. 41 ¶ 4; Doc. 52 at 24; Jt. Exs. 1 & 2 at 585–86.

---

[9]At trial, the following exchange occurred between the government's lawyer and Khan concerning how Khan had obtained the passport:

Q.      [] Do you know Mr. Akhtar personally?

A.      No.

Q.      How did you obtain the passport?

A.      He's some agent there. I paid them the money. They give me the passport. They arrange everything.

Q.      So you paid money to an agent and an agent provided the passport to you?

A.      Yes. Right.

Q.      How much money did you pay the agent?

A.      I don't remember right now.

Q.      Was it a lot of money?

A.      Not really at that time.

Q.      Okay.

A.      But I don't remember. Maybe a couple of thousand.

Q.      A couple of thousand dollars?

A.      Thousand dollars, yes, U.S. dollar. Or—honestly, I don't remember.

Q.      Okay. But you think it might be a couple of thousand U.S. dollars?

A.      Right. Yes. This much money, yes.

Doc. 52 at 32–33.

On landing in the United States, Khan was happy and excited but also worried and scared because he was using someone else's passport. Doc. 52 at 26. He exited the airplane, joined a long line of passengers for an immigration inspection, and waited his turn to be called to a booth. Doc. 52 at 29–31. He saw other passengers called before him being questioned at the booths and understood immigration officers were deciding whether to permit them to enter the United States. Doc. 52 at 30–31.

Khan's Form I-94 (Arrival Record) states his name is "Mohammad Akhtar" and his birthdate is ███ 1958, as represented in the altered passport. Doc. 41 ¶ 3; Jt. Exs. 1 & 2 at 524. He completed a Customs Form 6059B (Customs Declaration) using that name and birthdate, writing his airline/flight number, checking boxes conveying he is not a U.S. citizen and does not reside permanently in the United States, and writing his expected stay is 15 days. Jt. Exs. 1 & 2 at 570–71. But he expected to stay indefinitely.[10]

---

In March 2014, when interviewed by Wescott in Abu Dhabi (discussed later), Khan stated a friend had given him the passport without charge. Doc. 20-24 at 31; Doc. 52 at 149. At trial, the government's lawyer asked Khan, "When you were in Abu Dhabi, do you recall telling [Wescott] that you got Mohammad Akhtar's passport because he was a friend of yours," and Khan responded, "Yes, some friend of—through the friend, yes." Doc. 52 at 149. The government's lawyer then asked Khan, "Do you recall telling the officer that you did not buy it and, in fact, he gave it to you," and he responded, "No, I buy it. I pay." Doc. 52 at 149.

The government proposes the Court find Khan bought the passport from Mohammad Akhtar. *See* Doc. 57 ¶ 10. Khan does not suggest a finding. *See generally* Doc. 58. Because Khan persisted in his testimony that he bought the passport and the government does not argue this testimony is not credible, the Court finds this testimony credible.

Khan testified he had thought the United States would deny him a visa in his own name because he had insufficient money or business ties in Pakistan. Doc. 52 at 132–33. The government proposes the Court find this testimony credible, citing 8 U.S.C. § 1184(b), which addresses "section 214(b) visa denials." Doc. 57 ¶ 8. Without evidence to the contrary and because the government does not argue his testimony is not credible, the Court finds this testimony credible. But the Court observes Khan provided a different reason in his I-589 asylum application (discussed later), explaining he did not obtain a visa "[b]ecause I was running and did not have time to do so." Jt. Exs. 1 & 2 at 555. Khan's differing reasons why he did not try to obtain a visa in his own name negatively affect his credibility suggesting he adjusts his answers depending on the purpose for which he gives them.

[10]Khan testified he had not written "15 days." Doc. 52 at 128. Later, he testified he had traveled to the United States to see his brother and had not planned to stay, but when

When Khan's turn arose, he was called to a booth, where he presented the passport to an immigration officer. Doc. 52 at 30–31. He knew the passport was issued to someone else but the photo was of himself, and he understood by handing the officer the passport, he was asking the officer for permission to enter the United States. Doc. 52 at 32–33, 101. The officer asked him where he had obtained the passport. Doc. 52 at 31–32. He responded, "This is my passport." Doc. 52 at 32. The officer replied no and called over someone who led Khan to secondary inspection for questioning. Doc. 52 at 32, 33; Jt. Exs. 1 & 2 at 242.

Immigration officers determined the passport had been altered. Doc. 41 ¶ 5; Jt. Exs. 1 & 2 at 253, 515. According to a memorandum prepared at the time:

> The photograph on page 03 was substituted into the passport that the subject presented for inspection. The wet seal located on the page runs under the photo and is of uneven dimension, the inside line is smaller than the line outside the picture.

> The signature of the issuing officer on the subject's picture was tampered with and a different ink was used which is easily detected when compared to the original signature on the cover page and page 32.

> On page 19 the maceration "PHOTOGRAPH ATTACHED FOREIGN SERVICE UNITED STATES OF AMERICA" which is placed from the photo onto the page has no similarities and are not uniformed [sic].

Doc. 41 ¶ 5; Jt. Exs. 1 & 2 at 253, 515.

---

he arrived, he liked the country, thought he could have a better life here, and decided to stay. Doc. 52 at 133. In his I-589 asylum application, he stated he did not want to return to Pakistan out of fear. Jt. Exs. 1 & 2 at 556.

Suhail Khan testified he had known Khan was going to visit him but had had no idea what Khan's intention was in coming to the United States. Doc. 52 at 288. Suhail Khan further testified Khan had bought no return ticket to Pakistan. Doc. 52 at 289.

The Court finds Khan's testimony that he had not written "15 days" not credible, including because he provided no testimony that someone else had completed the Customs Declaration for him and because of the difficulty in remembering precise information conveyed almost 30 years ago. The Court finds Khan's testimony that he had not planned to stay not credible, including because he had no return ticket.

The memorandum states Khan speaks Punjabi and explains, "No statement was taken from subject due to the subject[']s inability to speak and understand sufficient English, and the lack of a translator."[11] Doc. 41 ¶ 6; Jt. Exs. 1 & 2 at 242, 253. Another memorandum prepared at the time repeats that Khan speaks Punjabi. Doc. 41 ¶ 7; Jt. Exs. 1 & 2 at 511. Khan's native language is Urdu. Doc. 52 at 18.

On the day of his arrival, Khan, in the name "Mohammad Akhtar," was personally served with a Form I-122 (Notice to Applicant Detained for Hearing Before Immigration Judge), which initiated exclusion proceedings against him.[12] Doc. 41 ¶ 12; Jt. Exs. 1 & 2 at 513. The notice charged him with inadmissibility under three provisions of the Immigration and Nationality Act, stating, "You do not appear to me to be clearly and beyond a doubt entitled to enter the United States as you may come within the exclusion provisions of Section[s] 212(a)(5)(A)(i); 212(a)(6)(C)(i) and 212(a)(7)(A)(i)(I) of the … Act[.]"[13] Doc. 41 ¶ 13; Jt. Exs. 1 & 2 at 262–63. The notice

_____

[11]Khan testified he had not been offered or given a translator when he was in Los Angeles. Doc. 52 at 120–21. The Court finds this testimony credible to the extent it concerns the initial proceedings because the contemporaneous memorandum corroborates the testimony but not to the extent it concerns later events in Los Angeles, including because Khan provided a lengthy explanation of why he was seeking asylum, and that explanation was translated into English (discussed later), showing a translator or interpreter was available to him at least once when he was in Los Angeles. Doc. 41 ¶ 6; *see* Jt. Exs. 1 & 2 at 537–40.

[12]Khan testified he had never received a copy of the I-122. Doc. 52 at 124, 127. The Court finds this testimony not credible, including because of the unlikelihood of remembering documents in English provided to him almost 30 years ago and the likelihood of the government providing him the I-122.

[13]The notice sets forth the cited provisions: § 212(a)(5)(A)(i) ("Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor, unless the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (I) there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of aliens who are members of the teaching profession or who have exceptional ability in the sciences or the arts), and are available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (II) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."); § 212(a)(6)(C)(i) ("Any alien who, by fraud or willfully representing a material fact, seeks to procure, or has sought to procure or has procured a visa, other documentation, or entry into the United States or other benefit provided under this Act is excludable."); § 212(a)(7)(A)(i)(I)

8

continues, "Therefore you are detained under the provisions of Section 235(b) … for a hearing before [an] Immigration Judge to determine whether or not you are entitled to enter the United States or whether you shall be excluded and deported." Doc. 41 ¶ 14; Jt. Exs. 1 & 2 at 262–63.

An alien can be detained without a formal criminal charge. Doc. 52 at 232. Khan was detained and transported for exclusion proceedings in Los Angeles. Doc. 41 ¶ 15; Doc. 52 at 33; Jt. Exs. 1 & 2 at 513, 516. He was fingerprinted under the name on the altered passport, "Mohammad Akhtar." Doc. 41 ¶ 16; Jt. Exs. 1 & 2 at 565.

On December 12, 1991 (five days after arrival), Khan appeared for a hearing before an immigration judge at his detention center. Doc. 52 at 40–41, 43–44; Jt. Exs. 1 & 2 at 533, 540. Khan recalls appearing before a judge in a courtroom-like setting. Doc. 52 at 41.

Khan remained in jail for a month. Doc. 52 at 33–35, 37. He recalls he was placed in a locked cell, watched over by guards, and could not leave. Doc. 52 at 33–34. Fellow detainees spoke Hindi or Punjabi, but none spoke Urdu, his native language. Doc. 52 at 34–35.

While in his cell, Khan met Howard George Johnson, a lawyer who was there

---

("Except as otherwise specifically provided in the Act, any immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by this Act, and a valid unexpired passport, or other suitable travel document, or other document of identity and nationality, if such document is required under the regulations issued by the Attorney General[.]"). Doc. 41 ¶ 13 n.6.

Through defendant's exhibit 1, on which the Court sustains the government's objection, *see* footnote 7 of this order, Khan suggests the no-valid-immigrant-visa charge (§ 212(a)(7)(A)(i)(I)) ultimately was sustained but the fraud-or-willful-misrepresentation charge (§ 212(a)(6)(C)(i)) and the failure-to-meet-labor-certification-requirements charge (§ 212(a)(5)(A)(i)) ultimately were not sustained. Without more factual and legal development of the issue, whether the charges were sustained at the agency level has no bearing on the findings or conclusions here.

assisting others. Doc. 52 at 37–38. To help Khan communicate with Johnson, an Indian detainee who spoke Hindi or Punjabi translated for him. Doc. 52 at 121–22. Khan also knew some basic English words.[14] Doc. 52 at 28.

Suhail Khan retained Johnson, and Johnson filed papers on Khan's behalf: Forms G-28 (Notice of Entry of Appearance as Attorney or Representative), one dated December 10, 1991, and one dated December 22, 1991; a Form I-589 (Request for Asylum in the United States) dated December 18, 1991, and received December 23, 1991; and a Form G-325A (Biographic Information) dated December 17, 1991. Doc. 41 ¶¶ 18, 19, 26; Jt. Exs. 1 & 2 at 527–28, 530–31, 533–36, 541, 543.

In the earlier-dated G-28, Johnson states he is representing "Shawn" (Suhail Khan's nickname) at 12320 Northeast 4th Court, #5, North Miami, Florida 33161, in the matter of "Mohamad Akhtar." Doc. 41 ¶ 18; Doc. 52 at 252, 290; Jt. Exs. 1 & 2 at 527. In the later-dated G-28, Johnson states he is representing Suhail Khan at 4275 NW 18th Street, Miami, Florida, 33126, in the matter of "Jaweed Khan a/k/a Mohammad Akhtar." Doc. 41 ¶ 18; Doc. 52 at 252, 290; Jt. Exs. 1 & 2 at 530. In letters, Johnson represents that his client "Jaweed Khan" has "no previous immigration or criminal history." Jt. Exs. 1 & 2 at 529, 542.

The I-589 and G-325A state Khan's name is "Jaweed Khan" (a different first

---

[14]Suhail Khan testified Khan had not been able to speak any English when Khan arrived in the United States. Doc. 52 at 284. To the extent Suhail Khan meant to suggest Khan could speak no English whatsoever, the Court finds this suggestion not credible, including because Khan testified he had been able to speak some basic English words, a report card shows he studied English in intermediate school in Pakistan (albeit long ago and with a possibly poor grade—evidence about the caliber of the grade is lacking, though his English grade is higher than his Urdu grade), and he signed his name in his I-589 asylum application (discussed later) in Roman script used for English as opposed to Arabic script used for Urdu. Doc. 41 ¶ 22; Doc. 52 at 18, 29, 46; Jt. Exs. 1 & 2 at 166, 168.

The government asks the Court to find, "Khan credibly testified that he speaks only Urdu, not Punjabi." *See* Doc. 57 ¶ 22. The Court rejects the request to the extent Khan himself testified fellow detainees who spoke Hindi or Punjabi had helped him translate, Doc. 52 at 121–22, establishing he knew enough Hindi or Punjabi to communicate with Johnson through someone who spoke Hindi or Punjabi.

name from his actual first name and without his actual middle name) his birthdate is ▮▮▮▮ 1958 (a different day and year from his actual birthdate), and only "Mohammad Akhtar" as all other names used (leaving out his actual first and middle names). Doc. 41 ¶¶ 20a–20c, 27a, 27b, 27d; Doc. 52 at 39, 52, 283; Jt. Exs. 1 & 2 at 533–36, 541. The G-325A also states his mother's name is Rehana Begum (it is Razia Beguni). Doc. 41 ¶¶ 27a, 27b, 27d; Doc. 52 at 52; Jt. Exs. 1 & 2 at 162, 164, 167, 169–70, 173, 541.

Other information in the I-589 and G-325A is correct, including, in one or both, Khan's sex, marital status, nationality, ethnicity, religion, languages spoken, arrival details, address in the United States, name of a relative in the United States other than an immediate family member, and Khan's father's name. Doc. 41 ¶¶ 20d–20j, 27c, 27d; Doc. 52 at 42–46, 53; Jt. Exs. 1 & 2 at 533–34, 541. Boxes indicating Khan arrived as a "Visitor," "Student," "Stowaway," or "Crewman" are left blank, while a box for "Other (Specify)" is checked, with "Deferred Inspection" specified. Doc. 41 ¶ 20; Jt. Exs. 1 & 2 at 533.

Khan reviewed the I-589 and signed it under penalty of perjury, declaring "the … [information] and all accompanying documents are true and correct to the best of my knowledge and belief." Doc. 41 ¶ 21; Jt. Exs. 1 & 2 at 557. As instructed by Johnson, Khan signed the I-589 "Mohammad Akhtar," even though Khan knew that was not his name and that the I-589 was submitted under the name "Jaweed Khan":[15]

---

[15]There is no testimony on why Johnson would have told Khan to sign his name "Mohammad Akhtar"—the name in the passport that did not belong to Khan—though that is the name under which Khan was fingerprinted and the name in the I-122 notice of hearing. Doc. 41 ¶¶ 12, 16; Jt. Exs. 1 & 2 at 57–58, 251, 513, 565. Because there is no evidence to the contrary and the government does not argue this testimony is not credible, the Court finds this testimony credible. *See* Doc. 57 ¶ 34.



(Signature of Applicant)

Doc. 41 ¶ 22; Doc. 52 at 38, 46, 52; Jt. Exs. 1 & 2 at 557. Khan intended to sign the I-589 and was under no duress or coercion when he signed it. Doc. 52 at 46–47.

Attached to the I-589 was a four-page typed declaration in the name "Jaweed Khan" detailing in English why Khan sought asylum. Doc. 41 ¶ 24; Jt. Exs. 1 & 2 at 537–40. Khan signed the declaration on December 16, 1991, under penalty of perjury, declaring, "I certify under penalty of perjury that the above is true and correct, and that [sic] has been read to me in my native language."[16] Doc. 41 ¶ 25; Jt. Exs. 1 & 2 at 540. Had Khan been granted asylum, he would have been eligible to apply for permanent-resident status one year later. Doc. 52 at 178.

Suhail Khan gave Johnson $2500 for bond so Khan could be released to Suhail

---

[16]At trial, Khan testified he had provided Johnson his correct and complete name and did not realize the forms contained incorrect information because they were in English and he could not read them. Doc. 52 at 27, 38, 117. Khan further testified his twin brother is named Javed, implying confusion on Johnson's part. Doc. 52 at 117; *see also* Doc. 52 at 280 (correct spelling of Javed). Khan's lawyer also asked him, "Were you given a chance to read this I-589 form, this asylum application? Did you read that before it was submitted?" Doc. 52 at 318. Khan answered, "No. I did not receive any kind of paper from Mr. Johnson." Doc. 52 at 319.

To the extent Khan testified he had provided Johnson correct information and he did not realize the forms contained incorrect information, the Court finds this testimony not credible, including because Suhail Khan also had interaction with Johnson, Khan provided a signature in Roman script and knew some basic English words, a translator must have been involved in light of Khan's lengthy declaration to support asylum, written in English, *see* Jt. Exs. 1 & 2 at 537–40, and the only incorrect information in the I-589 and G-325A—his name, his use of any other name, his birthdate, and his mother's name—was the important information necessary to identity him. To the extent Khan claimed Johnson never provided him the I-589, the Court finds the claim not credible, including because Khan would have had to have the I-589 to sign it.

Suhail Khan testified he had talked to Johnson about the spelling of "Parvez" but does not recall seeing or receiving any papers from Johnson. Doc. 52 at 318–19. The Court does not find the testimony about talking to Johnson about the spelling of "Parvez" credible, including because of the unlikelihood of remembering spelling a name for a lawyer almost 30 years ago.

Khan as the obligor pending a decision on Khan's asylum application. Doc. 41 ¶ 29; Doc. 52 at 281, 286, 304–05; Jt. Exs. 1 & 2 at 234, 235, 525, 529, 532, 542. Suhail Khan was working at a restaurant or as a taxicab driver, and the amount was not insubstantial to him. Doc. 52 at 298–301. Suhail Khan possessed familiarity with immigration matters: within a span of six months beginning in September 1991 (a few months before Khan's arrival), he became a permanent resident through marriage to Elizabeth Bernice Byrd, he applied for naturalization, he divorced Byrd, he married Huma Khan, and his naturalization oath was scheduled.[17] Doc. 52 at 283, 292–94, 296–97.

On January 7, 1992, Khan was released from custody on bond pending exclusion proceedings. Doc. 41 ¶ 31; Doc. 52 at 282; Jt. Exs. 1 & 2 at 232, 239–41, 509, 532. A related memorandum names Akhtar, Mohammad, "AKA Khan, Jaweed," and provides as his new address of record, "c/o Howard George Johnson[,] 1406 South Union Ave[.,] LA, CA 90015," which was Johnson's law office. Doc. 41 ¶ 32; Doc. 52 at 118–19. The I-589 and bond application provide the Miami 33126 address of Suhail Khan where Khan would be staying. Doc. 41 ¶ 33; Jt. Exs. 1 & 2 at 532, 533.

Khan was released during the night, placed in a van with six or seven other releasees, and given only a white card. Doc. 52 at 41–42; Pl. Ex. 13 ¶ 29. He followed other releasees to a motel, where someone helped him get a taxicab. Doc. 52 at 41–42; Pl. Ex. 13 ¶ 29. He stayed overnight, and, the next day, one of the releasees helped him get a taxicab to a Greyhound bus station and buy a ticket to Miami. Doc. 52 at

---

[17]The government questioned Suhail Khan about his naturalization and used his papers to refresh his recollection about dates. Doc. 52 at 293–94. Khan's lawyer objected "to this whole line of questioning, going on his paperwork," arguing the paperwork had not been disclosed and "it's totally intimidating to try to scare the witness from saying anything." Doc. 52 at 294. The Court reserved ruling on the objection. Doc. 52 at 295. The Court overrules the objection to the extent it was based on the government's failure to disclose Suhail Khan's paperwork before trial because the government did not seek its admission, instead offering it solely to refresh his recollection about dates. The Court overrules the objection to the extent it was based on the government's asserted scare tactic because the government undertook the line of questioning not to scare but to show Suhail Khan was familiar with immigration matters near the same time Khan arrived with an altered passport and applied for asylum.

41–42; Pl. Ex. 13 ¶ 29.

Khan traveled on a Greyhound bus from Los Angeles to Miami, changing buses three or four times. Doc. 52 at 26–27, 283. The journey lasted four or five days and was unpleasant because he could not shower and rest. Doc. 52 at 27. Once he arrived in Miami, he lived with Suhail Khan. Doc. 24 ¶ 30; Doc. 52 at 281. Miami was the last city in the United States he went to in 1992 and the first place he lived in the United States. Doc. 24 ¶ 32; Doc. 52 at 111, 289.

On February 3, 1992, an immigration court clerk sent Johnson at his Los Angeles 90015 address a U.S. Department of State advisory opinion on Khan's application for asylum and advised Johnson a hearing would be conducted on February 18, 1992. Doc. 41 ¶ 35.

On February 26, 1992, Immigration Judge Roy J. Daniel entered an "IN ABSENTIA DECISION AND ORDER" in which he ordered Khan excluded and deported from the United States based on his failure to appear at the hearing or reasonably explain the failure after having been "duly notified" of the date, time, and place. Doc. 41 ¶ 36; Jt. Exs. 1 & 2 at 227, 238. On the same day, a copy of the order was mailed to Johnson at his Los Angeles 90015 address with a notice that the decision was final unless an appeal was taken by March 10, 1992. Doc. 41 ¶ 37. No appeal was taken. Jt. Exs. 1 & 2 at 504.

One year later, on February 8, 1993, a Form I-166 (Notice to Appear for Removal) was issued. Doc. 41 ¶ 38; Jt. Exs. 1 & 2 at 501. The notice was addressed to "Jaweed Khan" at Johnson's Los Angeles 90015 address and included a stamp, "CERTIFIED RETURN RECEIPT REQUESTED." Doc. 41 ¶ 38. The I-166 explained that based on Judge Daniel's order, Immigration and Naturalization Services (INS)[18]

---

[18]On March 1, 2003, INS ceased existence as an independent agency of the Department of Justice (DOJ) and most of its functions were transferred to the newly formed U.S. Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451, 471, 116 Stat. 2135 (Nov. 25, 2002). INS was divided into three agencies within DHS: U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and

had arranged for Khan's departure to Pakistan by commercial transportation on February 19, 1993. Doc. 41 ¶ 39. On the same day, a Form I-296 (Notice to Alien Ordered Excluded by Immigration Judge) was issued to "Khan, Jaweed." Jt. Exs. 1 & 2 at 236. The I-296 explains,

> An immigration judge has ordered that you be excluded from admission into the United States, and that you be deported from the United States.
>
> If after your deportation is effected, you desire to reenter the United States within one year from the date of such deportation, you must, prior to commencing your travel to this country, request permission from the Attorney General to reapply for admission into the United States. …
>
> Your reentry within one year of the date of your deportation without the express permission of the Attorney General will subject you to prosecution as a felon and, if convicted therefor, you could be sentenced to imprisonment for not more than two years or fined not more than $1000, or both.

Jt. Exs. 1 & 2 at 236.

The next day, on February 9, 1993, a Form I-340 (Notice to Deliver Alien) was issued to Johnson at his Los Angeles 90015 address. Jt. Exs. 1 & 2 at 237. The I-340 states, "Pursuant to the terms of the bond posted by you for the release from custody of [Jaweed Khan], demand is hereby made upon you to surrender such alien" on February 19, 1993, at 10:00 a.m. at the Deportation Branch in Los Angeles. Jt. Exs. 1 & 2 at 237.

Khan failed to report for his departure, causing breach of the bond on which he had been released. Doc. 41 ¶ 40; Jt. Exs. 1 & 2 at 231, 238–40, 503. The notice of the breach of the bond was sent to Johnson at his Los Angeles 90015 address. Doc. 41 ¶ 41.

After Khan moved to Miami, neither he nor Suhail Khan received papers from

---

Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE). USCIS assumed asylum and naturalization authority from the INS. *See id.* at § 451.

Johnson.[19] Doc. 52 at 115, 119, 120, 127, 284–85, 305–06, 308. For later immigration proceedings, Khan used preparers other than Johnson. Doc. 52 at 103–04. Johnson is now deceased. Doc. 41 ¶ 49.

Khan lived with Suhail Khan in Miami at 4275 NW 18th Street until 1995. Doc. 52 at 39, 116, 280, 282, 301. Suhail Khan helped him with English. Doc. 52 at 302. Both drove taxicabs. Doc. 52 at 297, 302, 306. Suhail Khan also worked for the U.S. Department of Defense as a contractor on and off from 2001 to 2013. Doc. 52 at 315–16.

In 1995, Khan was arrested on a charge of soliciting a prostitute. Doc. 52 at 36;

---

[19]The papers show the government sent the papers to Johnson at his Los Angeles 90015 address, and the evidence suggests Johnson did not forward them to Khan. Johnson possessed two different Miami addresses for Khan. Jt. Exs. 1 & 2 at 527, 530. Johnson moved offices and was disciplined by the California State Bar for unprofessional behavior in 1991 and 1992. Def. Ex. 2.

Specifically, on March 25, 1998, the California Bar suspended Johnson from the practice of law for one year, stayed the suspension, and placed him on probation for three years. Doc. 41 ¶ 44; Def. Ex. 2 at ECF 3. The suspension and probation were initiated with a "Notice to Show Cause" alleging four counts of wrongful conduct based on Johnson's representation of four clients (not Khan or Suhail Khan) in 1991 and 1992. Doc. 41 ¶ 45; Def. Ex. 2 at ECF 58–64. Ultimately, the suspension and probation were for "misconduct in two client matters involving the failure to perform legal services competently and the failure to communicate with clients." Doc. 41 ¶ 46; Def. Ex. 2 at ECF 4–25.

The first matter involved a personal injury case for which Johnson's representation began in April 1991. Doc. 41 ¶ 47; Def. Ex. 2 at ECF 5–7. His client complained that from around April 1991 to May 1992, Johnson had not responded to many attempts to communicate with him and had not informed her he had changed his address. Doc. 41 ¶ 47; Def. Ex. 2 at ECF 5–7. The second matter involved a landlord/tenant case for which Johnson's representation began in December 1991. Doc. 41 ¶ 48; Def. Ex. 2 at ECF 7–9. Johnson failed to appear at a court proceeding and failed to keep his client informed. Doc. 41 ¶ 48; Def. Ex. 2 at ECF 7–9.

The government asks the Court to find Suhail Khan never heard from Johnson after Khan was released from custody. Doc. 57 ¶ 47. Suhail Khan's failure to follow up with Johnson would have been peculiar, particularly because Suhail Khan had possessed then-recent experience with immigration matters and had paid Johnson an amount not insubstantial to him. *See* Doc. 52 at 298–301. Still, because Johnson exhibited less than professional conduct with other clients during the same time period, the Court defers to the government's request to find Suhail Khan credible on this point.

Jt. Exs. 1 & 2 at 294–97, 346–47, 411–14. He spent a few hours in jail and went to court once, and the charge ultimately was nolle prossed. Doc. 52 at 36; Jt. Exs. 1 & 2 at 347–49. That and his one-month immigration detention in Los Angeles were the only times he has been detained.[20] Doc. 52 at 36–37.

**B.    *Adjustment of Status***

Approximately six years after his arrival in the United States, on January 7, 1998, in Miami, Khan married Betty Louise Pope, a U.S. citizen by birth and the younger sister of Suhail Khan's ex-wife through whom Suhail Khan had adjusted his status to permanent resident.[21] Doc. 41 ¶ 50; Doc. 52 at 257–58, 261, 292–93; Jt. Exs. 1 & 2 at 159. English is Khan's and his wife's only common language. Doc. 52 at 47–48, 55, 249–50, 257–58. Before their marriage, they had discussed getting him a green card.[22] Doc. 52 at 275.

A person is eligible to obtain a green card in various ways, including through marriage to a U.S. citizen or by obtaining asylum. Doc. 52 at 177–78. The Khans hired a woman they did not know to help them obtain a green card for Khan, and he provided the information to use. Doc. 52 at 48–49, 57, 135–37, 259–61, 266–67, 276.

On January 10, 1998 (three days after marriage), Ms. Khan signed a Form I-130 (Petition for Alien Relative), seeking to classify Khan as her immediate relative. Doc. 41 ¶ 51; Jt. Exs. 1 & 2 at 146–48, 159. On January 14, 1998 (one week after the

---

[20]In his declaration to support his asylum application, Khan claimed he had been detained in Pakistan. Jt. Exs. 1 & 2 at 97–100. The agency made no finding on this claim, and a finding on this claim is unnecessary now.

[21]The Khans testified they had met in Miami about a year before marrying. Doc. 52 at 134, 250, 258, 266. He was driving taxis; she was working at Domino's Pizza. Doc. 52 at 250; Jt. Exs. 1 & 2 at 146, 151, 185, 351, 417.

[22]Ms. Khan testified she does not remember what she had thought concerning Khan's immigration status when they met. Doc. 52 at 275. She further testified she does not remember discussions about why he needed a green card. Doc. 52 at 275. The Court finds this testimony not credible, including because she remembered details when neutral or beneficial for Khan.

marriage), the I-130 was filed. Doc. 41 ¶ 51.

The I-130 is on behalf of "Parvez Manzoor Khan" and includes Khan's real birthdate. Doc. 41 ¶¶ 52a, 52b; Jt. Exs. 1 & 2 at 146. The I-130 states "NONE" under "Other Names Used" and "12-1990" as the "date arrived." Doc. 41 ¶ 52c; Jt. Exs. 1 & 2 at 146. The I-130 states Khan arrived as a visitor and lost his I-94. Doc. 41 ¶ 52e; Doc. 52 at 112–13; Jt. Exs. 1 & 2 at 146. The I-130 states Khan has worked for "Yellow Cab Co." since 1992.[23] Jt. Exs. 1 & 2 at 146.

Ms. Khan signed the I-130 under penalty of perjury, declaring that "the foregoing is true and correct." Doc. 41 ¶ 54; Doc. 52 at 254, 261–63, 267; Jt. Exs. 1 & 2 at 147. She understood she was signing under penalty of perjury and could be criminally prosecuted if she lied. Doc. 52 at 263, 267–68. She had no firsthand knowledge of the information and therefore relied on him for the information. Doc. 52 at 263, 266. She did not know the information was wrong and would not have signed the I-130 if she had. Doc. 52 at 272–73.

On the same day, Khan filed a Form I-485 (Application to Register Permanent Residence or Adjust Status), seeking to adjust his status to that of a lawful permanent resident. Doc. 41 ¶ 55; Jt. Exs. 1 & 2 at 141–45; Pl. Ex. 8 at 1–5. His I-485 is under the name "Parvez Manzoor Khan" and includes his real birthdate and other correct information, such as his social-security number, his addresses, his cellular telephone number, his occupation, his children, and his mother's and father's names.[24] Doc. 41

---

[23]A letter dated March 10, 1999, from "Yellow Taxi" states Khan "has been associated with the Company as an independent contractor/taxi driver for approximately two years" and elsewhere references the company as "Yellow Cab." Jt. Exs. 1 & 2 at 350. The parties do not address the apparent discrepancy in information provided about Khan's employment—in the I-130 that he has worked for Yellow Cab Co. since 1992 and in the letter that he has worked for Yellow Cab since approximately 1997. The record contains insufficient evidence to draw any finding from the discrepancy.

[24]In his affidavit to support his motion for summary judgment and at trial, Khan stated he could not remember the name "Mohammad Akhtar" when he filed his I-485. Doc. 52 at 113; Pl. Ex. 13 ¶ 48. In the affidavit, he stated his failure to remember the name is the reason he provided no alias, Pl. Ex. 13 ¶ 48, but at trial, he testified he does not know why

¶¶ 57a, 57b, 57c; Doc. 52 at 55–56, 59; Jt. Exs. 1 & 2 at 141–42, 162, 164, 167, 169–70, 173, 174, 176; Pl. Ex. 8 at 1–2. To complete the statement, "I am applying for adjustment to permanent resident status because," his I-485 has a mark next to "My spouse … applied for adjustment of status" and not next to "I was granted asylum." Jt. Exs. 1 & 2 at 141; Pl. Ex. 8 at 1.

Khan's I-485 states "12-1990" as his "Date of Last Arrival" and states "Miami, Florida" as his "Place of last entry into the U.S."[25] Doc. 41 ¶¶ 57d, 57e; Jt. Exs. 1 & 2 at 141; Pl. Ex. 8 at 1. "Yes" is checked for the question, "Were you inspected by a U.S. Immigration Office," but "Visitor" is replaced with "EWI" (entry without inspection) for the question "In what status did you last enter? (Visitor, Student, exchange alien, crewman, temporary worker, without inspection, etc.)." Doc. 41 ¶¶ 57d, 57e; Jt. Exs. 1 & 2 at 142; Pl. Ex. 8 at 2.

Answering "EWI" may be a way to avoid questions about whether an applicant was issued a visa. Doc. 52 at 234. Entering Miami without inspection would be peculiar because an alien presumably would enter by port or airport and be inspected there. Doc. 52 at 216–17. The I-94 Khan represented he lost would have shown he was paroled pending exclusion proceedings, not that he had entered without inspection. Doc. 52 at 218–19; Jt. Exs. 1 & 2 at 524. That an alien was paroled into the United States would not prevent him from adjusting to permanent-resident status. Doc. 52 at 219.

In his I-485, Khan answered "No" to these and other questions:

---

"none" was written for other names used. Doc. 52 at 142. His differing testimony negatively affects his credibility.

[25]Khan admitted the answers to "Date of Last Arrival" and "Place of last entry into the U.S." were incorrect and had no explanation for why. Doc. 52 at 56, 138. The Court finds this testimony not credible to the extent Khan suggests the date and place are mistakes by others unattributable to him, including because 1990 appears more than once in the papers, Jt. Exs. 1 & 2 at 141, 146, indicating it was not a mere typographical error; because he provided the information to complete the form; and because he signed the form under penalty of perjury, attesting to the truth of the information (discussed later).

"1. Have you ever, in or outside the U.S.: a. knowingly committed any crime of moral turpitude or a drug-related offense for which you have not been arrested? b. been arrested, cited, charged, indicted, fined, or imprisoned for breaking or violating any law or ordinance, excluding traffic violations? c. been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency or similar action? and d. exercised diplomatic immunity to avoid prosecution for a criminal offense in the U.S.?"

"9. Have you ever been deported from the U.S. or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings?"

"10. Are you under a final order of civil penalty for violating section 274C of the Immigration Act for use of fraudulent documents, or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit?"

Doc. 41 ¶¶ 57g, 57i, 57j; Doc. 52 at 235; Jt. Exs. 1 & 2 at 143 (Part 3, Questions 1, 9, & 10); Pl. Ex. 8 at 3 (Part 3, Questions 1, 9, & 10).

With his I-485, Khan submitted a new G-325A (Biographical Information) under the name Parvez Manzoor Khan. Doc. 41 ¶¶ 60, 61a; Doc. 52 at 49; Jt. Exs. 1 & 2 at 495. The G-325A presents correct information about Khan but states "NONE" under "All Other Names Used" and states his mother's name is "Razi Begum" (it is Razia Beguni). Doc. 41 ¶¶ 61b, 61c 61d; Jt. Exs. 1 & 2 at 162, 164, 167, 169–70, 173, 176, 495.

Khan read and signed his I-485 under penalty of perjury, declaring that "this application, and the evidence submitted with it, is all true and correct."[26] Doc. 41 ¶ 58;

---

[26]Khan testified he cannot read English well because he has not gone to school in decades and learned English only through his wife. Doc. 52 at 102–03. The Court finds this testimony credible except to the extent he was suggesting he had not been able to read the words on his I-485 or understand what the preparer had asked him to obtain information to complete his I-485, including because he had lived in the United States for six years when he signed the form.

Khan testified he had not read his I-485 before signing it. Doc. 52 at 101–02. He initially testified he had known he was signing it under penalty of perjury, but then he

Doc. 52 at 54–55, 190–91; Jt. Exs. 1 & 2 at 144; Pl. Ex. 8 at 4.

When Khan signed his I-485 and submitted the paperwork, he knew when and where he had entered the United States, he knew he had used someone else's passport and visa to enter the United States, he knew the passport had been altered to include his photograph, he knew he had applied for asylum using an incorrect name and birthdate, and he knew he had been detained for a month by immigration officers. Doc. 52 at 58, 59, 64–66, 142–43.

In 2000 and 2001, while the I-130 and I-485 were pending, Khan applied for and was granted advance parole to allow him to return to the United States after travel to Pakistan. Doc. 52 at 98–99; Jt. Exs. 1 & 2 at 433, 435, 437–39, 442–44, 461, 468, 469, 473–75. On an application, he checked a box indicating he was not in exclusion or deportation proceedings. Jt. Exs. 1 & 2 at 437. He and an immigration officer (a different officer for each authorization) signed documents indicating Khan's status at entry and to the present were "EWI." Doc. 52 at 99–100; Jt. Exs. 1 & 2 at 435, 472.

On November 7, 2001, Khan was examined for his I-485.[27] Doc. 41 ¶ 57k; Doc. 52 at 58, 256; Jt. Exs. 1 & 2 at 141, 416; Pl. Ex. 8 at 1. He confirmed most of his answers but changed his answer to question 1, claiming one arrest. Doc. 41 ¶¶ 57g, 57h; Doc. 52 at 138–39; Jt. Exs. 1 & 2 at 143; Pl. Ex. 8 at 3.

On the same day, the I-130 and I-485 were approved, adjusting Khan's status

---

testified he had "had no idea" he was signing it under penalty of perjury. Doc. 52 at 101–03. The Court finds his testimony he had not read his I-485 before signing it and did not know he was signing it under penalty of perjury not credible, including because he changed his testimony after admitting his I-485 contained inaccuracies.

[27]The information in the boxes on his I-485 is typed, but there are marks in red ink on his I-485, and some of the typed words are crossed through and replaced with handwriting in red ink. Doc. 41 ¶ 56. Based on the agency's practice of using red ink to differentiate an applicant's responses from an examiner's notations, the Court finds the examiner wrote in red ink what Khan had said. *See* Doc. 52 at 163.

to permanent resident. Doc. 41 ¶ 62; Jt. Exs. 1 & 2 at 135–38. The approval took four years because of a backlog. Doc. 52 at 197–98. For his I-485 and resulting Form I-551 (Permanent Residence Card/Green Card), he was fingerprinted under the name "Parvez Manzoor Khan."[28] Doc. 41 ¶ 63; Jt. Exs. 1 & 2 at 104.

## C.   *Naturalization*

Four years after Khan's status was adjusted to permanent resident, on

---

[28]Khan's lawyer asked him, "Were you knowingly or intentionally trying to mislead Immigration when you made your application for a green card?" Doc. 52 at 131. He answered no. Doc. 52 at 131. The Court finds this testimony not credible, including because of his shifting testimony and the quantity and substance of the errors made.

Khan testified he had not written "EWI" on his I-485, the examiner had not asked him any questions about "EWI," and he does not know what "EWI" means. Doc. 52 at 111–12, 150. The Court finds his testimony that he had not written "EWI" on his I-485 credible to the extent the preparer may have written "EWI" in black ink and the examiner wrote "EWI" in red ink. But the Court finds his testimony not credible to the extent he suggests he did not convey the information to the preparer and examiner that caused them to write "EWI," including because "EWI" is on the papers Khan later separately submitted for advance parole. Doc. 52 at 99–100; Jt. Exs. 1 & 2 at 435, 472.

Khan testified he had been arrested twice, referring to his detention for a month upon his arrival in the United States and his later arrest on the charge of soliciting a prostitute. Doc. 52 at 63. He testified he had told the examiner only about his arrest on the charge soliciting a prostitute because the interviewer had not asked him about the other arrest. Doc. 52 at 63, 64. He later testified he had been detained but not arrested in Los Angeles. Doc. 52 at 131. He later testified he had been arrested twice and told the examiner that information. Doc. 52 at 139. The Court finds his testimony he told the examiner about his earlier detention not credible, including because of his differing testimony and because, as the government observes, Doc. 57 at 14 n.5, question 1 on his I-485 does not call for a response that includes his earlier detention.

In his affidavit to support his motion for summary judgment and at trial, Khan testified he had thought he was granted asylum when he was released in Los Angeles during the night in 1992 and that is the reason he disclaimed being in exclusion or deportation proceedings. Doc. 24 ¶ 51; Doc. 52 at 42–43, 63–64. Later at trial, he testified he does not remember that testimony and testified he had not applied for asylum and all he knew is that he was set free. Doc. 52 at 77–80. Shown his papers for advance parole, he testified he had not thought he received asylum at that time. Doc. 52 at 100–01. Later asked what "asylum" means to him, he testified he does not know what it means. Doc. 52 at 135. The Court finds his testimony he thought he had been granted asylum not credible, including because of his shifting testimony, because he had not sought to adjust his status much earlier based on asylum, and because of his representations in his advance parole papers.

December 12, 2005, he filed a Form N-400 (Application for Naturalization). Doc. 41
¶ 64; Pl. Ex. 7. Khan again paid a woman (different from the woman who had
prepared the I-130, I-485, and more recent G-325A) to complete the paperwork based
on information he provided her. Doc. 52 at 144–45. Khan did not use a lawyer. Doc.
52 at 104.

Khan's N-400 is under the name "Parvez M. Khan" and includes his real
birthdate and other correct information, including his country of birth, country of
nationality, race, hair color, and eye color. Doc. 41 ¶¶ 65a; Jt. Exs. 1 & 2 at 91–100.
Handwritten strikethroughs in black ink indicating none are under the instruction,
"If you have ever used other names, provide them below":



Doc. 41 ¶ 65b; Doc. 52 at 145; Jt. Exs. 1 & 2 at 91.

As information for Khan's eligibility, a mark is next to, "I have been a Lawful
Permanent Resident of the United States for at least 3 years, AND I have been
married to and living with the same U.S. citizen for the last 3 years, AND my spouse
has been a U.S. citizen for the last 3 years." Jt. Exs. 1 & 2 at 91. Only his wife's middle
and last names are included. Jt. Exs. 1 & 2 at 94.

Khan's N-400 has marks in "No" boxes next to these and other questions under
the section on "Good Moral Character":

"15. Have you **EVER** committed a crime or offense for which you were
NOT arrested?"

"16. Have you **EVER** been arrested, cited, or detained by any law

23

enforcement officer (including INS and military officers) for any reason?"

"17. Have you **EVER** been charged with committing any crime or offense?"

"18. Have you **EVER** been convicted of a crime or offense?"

"20. Have you **EVER** received a suspended sentence, been placed on probation, or been paroled?"

"21. Have you **EVER** been in jail or prison?"

"22. Have you **EVER** … b. been a prostitute, or procured anyone for prostitution?"

"23. Have you **EVER** given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?"

"24. Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?"

Doc. 41 ¶¶ 66c, 66d, 66e; Jt. Exs. 1 & 2 at 98 (Part 10, Section D, Questions 15–18, 20–24).

Khan's N-400 has marks in "No" boxes next to these questions under the section on "Removal, Exclusion, and Deportation Proceedings":

"25. Are removal, exclusion, recession or deportation proceedings pending against you?

"26. Have you **EVER** been removed, excluded, or deported from the United States?"[29]

"27. Have you **EVER** been ordered to be removed, excluded, or deported from the United States?"[30]

"28. Have you **EVER** applied for any kind of relief from removal,

---

[29]For the questions, "removal," "exclusion," "deportation," and "admission" each has a different meaning. Doc. 52 at 227.

[30]Whether an applicant has been ordered to be deported asks whether a judge has issued a formal deportation order against him. Doc. 52 at 227–28.

exclusion, or deportation?"

Doc. 41 ¶¶ 66f, 66g; Jt. Exs. 1 & 2 at 99 (Part 10, Section E, Questions 25–28).

On December 1, 2005, Khan signed his N-400 under penalty of perjury, affirming "that this application, and the evidence submitted with it, are all true and correct." Doc. 41 ¶ 67; Doc. 52 at 69–70; Jt. Exs. 1 & 2 at 100. He signed intentionally and not under threat. Doc. 52 at 69–70. He understood his N-400 would be used to make the decision on whether he could become a citizen. Doc. 52 at 70.

On March 21, 2006 (three months after Khan submitted his N-400), a "Naturalization Document Request" was sent to him explaining a review of his N-400 "indicates that additional information is required to process your application." Jt. Exs. 1 & 2 at 331. The request explained an FBI background check using his fingerprints revealed he had an arrest record and instructed him to provide information about that and other subjects (his tax returns, his marriage, and his children). Jt. Exs. 1 & 2 at 331.

On May 31, 2006, Pellechia interviewed Khan in Orlando, Florida. Doc. 41 ¶ 69; Doc. 52 at 80, 145, 152, 170–71.

Pellechia has been with U.S. Citizenship and Immigration Services (USCIS) or INS since 1985 and has held positions of immigration inspector, immigration examiner, district adjudications officer, and immigration services officer. Doc. 52 at 152. She has held the position of immigration examiner or district adjudications officer since 1991. Doc. 52 at 152–53.

At the time Pellechia interviewed Khan in May 2006, she was a district adjudications officer, and to the present she maintains the same responsibilities, which include adjudicating applications and petitions for benefits such as citizenship and adjustment of status. Doc. 52 at 153, 156. In May 2006, she was mostly adjudicating applications for citizenship (80 to 90 percent of the applications and petitions) and conducting "roughly" ten interviews a day, three or four days a week,

during eight-hour workdays. Doc. 52 at 154–55, 241. She was familiar with the adjudication process then and remains familiar with it now, having conducted thousands of interviews for naturalization. Doc. 52 at 155, 156.

An N-400 interview is a formal process under which the applicant is placed under oath and swears to respond truthfully to all questions asked under penalty of perjury. Doc. 52 at 157–58. Through the interview, the officer determines whether the applicant is eligible for citizenship. Doc. 52 at 157. Absent a waiver, an applicant must participate in an interview. Doc. 52 at 156–57.

Pellechia has always used the same procedure to interview applicants for naturalization. Doc. 52 at 158. Each workday, she is given a "bundle of interviews." Doc. 52 at 158. For each interview, she obtains the applicant's paperwork (usually the applicant's A-File), reviews it, and calls the applicant into her office. Doc. 52 at 158, 201–02. There, she introduces herself, asks the applicant to take a seat, and confirms the applicant's identity through documentation such as a driver's license, resident card, or passport. Doc. 52 at 158–59. She administers an oath by asking the applicant to raise his right hand and solemnly swear to tell the truth, the whole truth, and only the truth. Doc. 52 at 159–60. If the applicant does not understand the oath, does not take the oath, or does not understand English, she does not proceed. Doc. 52 at 160–62. To put the applicant at ease, she administers written tests on civics, reading in English, and writing in English before proceeding with oral questioning. Doc. 52 at 157, 159, 161–62.

While an applicant is under oath, Pellechia questions the applicant about the information on the applicant's N-400 from start to finish, reviewing each question, following up on an answer as needed, and assessing the applicant's verbal English skills in the process. Doc. 52 at 157, 162–63, 165. If the applicant does not understand a question, she tries to rephrase it. Doc. 52 at 164. The applicant must answer orally, and she will prompt the applicant to do so if he does not. Doc. 52 at 166. Applicants sometimes get confused, getting caught up in "legal phrase terminology." Doc. 52 at

227.

As part of a nationwide practice, Pellechia always uses red ink to differentiate what she writes from what the applicant wrote (except for after 2018, when she and other adjudicators began using blue or black ink to draw a horizontal line to indicate termination of the interview because the applicant cannot communicate in English). Doc. 52 at 163–64, 167. Next to each question she asks the applicant, she makes a mark in red ink over the response to indicate she asked the question and the applicant answered. Doc. 52 at 165–66. If the applicant answers differently from, needs to change, or wants to clarify the information the applicant wrote on his N-400, she annotates the correction, change, or clarification; numbers the correction, change, or clarification; and totals the number of corrections, changes, or clarifications on the last page of his N-400. Doc. 52 at 168.

At the end of an interview, after Pellechia has reviewed the questions with the applicant, the applicant signs his N-400, attesting under penalty of perjury his responses are true and correct. Doc. 52 at 168–69. At that point, she can approve the application "on the spot" or continue the proceeding to obtain more information. Doc. 52 at 169–70. Denying an application on the spot would be atypical. Doc. 52 at 170. An interview usually lasts 45 minutes to an hour, though a small number may last as little as 30 minutes if, for example, the applicant is a young, native English speaker and therefore readily conversational and without a lengthy personal history. Doc. 52 at 241–42. No end time is set for an interview. Doc. 52 at 189.

Pellechia followed her customary procedure when she interviewed Khan, placing him under oath; ensuring he swore to tell the truth; administering the tests; verbally asking him the questions; obtaining verbal answers from him to the questions; asking him follow-up questions where necessary; making checkmarks in red ink each time she asked a question and his verbal answer was the same as his written answer; and noting in red ink any correction, change, or clarification he

27

made.[31] Doc. 52 at 83–85, 101, 171–73; Jt. Exs. 1 & 2 at 105. He did not request a waiver of the English requirement. Doc. 52 at 83.

Khan understood the oath, understood the interview was part of the formal process to become a citizen, understood he was meeting a government official with USCIS in a government building, understood he had to answer truthfully, and understood his answers would be used to make a decision on his application to become a citizen.[32] Doc. 52 at 80–81, 84, 188. Had he not understood the requirement to answer truthfully, Pellechia would have stopped the interview. Doc. 52 at 188.

Pellechia asked Khan his full legal name. Doc. 52 at 173; Jt. Exs. 1 & 2 at 91 (Part 1, Question A). He answered Parvez Manzoor Khan. Doc. 52 at 173; Jt. Exs. 1 & 2 at 91. She added his complete middle name to the middle initial "M" he had earlier written in his N-400. Doc. 52 at 173; Jt. Exs. 1 & 2 at 91 (Part 1, Question A).

Because Khan had provided no other names used, she did not follow up with him on the instruction, "If you have ever used other names, provide them below." Doc. 52 at 173, 243–44; Jt. Exs. 1 & 2 at 91 (Part 1, Question C). Had he told her he used another name but could not remember the name, she would have written something to the effect of "Claims other names used, can't recall" and might have asked him follow-up questions, like why he had used the other name. Doc. 52 at 175.

Pellechia asked Khan his birthdate. Doc. 52 at 87, 178; Jt. Exs. 1 & 2 at 92

---

[31]The Court reserved ruling on a government objection under Federal Rule of Evidence 407 to questions by Khan's lawyer to Pellechia about the language on new forms, changed since Khan submitted his. Doc. 52 at 225. But Khan's lawyer did not end up asking Pellechia questions about the new forms. *See generally* Doc. 52 at 226–27. The Court therefore finds ruling on the objection unnecessary. The Court considers the language of the versions of the I-485 and N-400 Khan filed in making findings on his willfulness and intent.

[32]Khan initially testified Pellechia never spoke to him. Doc. 52 at 82. But he then testified she had asked him a few questions, though he cannot remember. Doc. 52 at 82. He also testified the interview had lasted five minutes or less. Doc. 52 at 146. The Court finds his testimony that Pellechia asked him only a few questions and the interview lasted five minutes or less not credible, including because of Pellechia's credible testimony to the contrary.

(Part 3, Question B). He answered ████ 1957. Doc. 52 at 178; Jt. Exs. 1 & 2 at 92 (Part 3, Question B). Had he told her he once used a different birthdate, she would have corrected the birthdate he had provided or added the new birthdate on his N-400. Doc. 52 at 178.

Pellechia visually confirmed Khan has black hair and brown eyes.[33] Doc. 52 at 179–80; Jt. Exs. 1 & 2 at 93 (Part 5, Questions F & G).

Pellechia asked Khan questions about when he had become a permanent resident, his birthplace, his citizenship, whether his parents were U.S. citizens, his marital status, his residence, his telephone number, his sex, his height, whether he was Hispanic or Latino, his employment, whether he had taken any trips outside the United States since filing his N-400, his wife's name, their marriage date, whether his wife is a U.S. citizen, how his wife had become a U.S. citizen, how many times his wife had been married, his children and their mothers, and child support. Doc. 52 at 86–90; Jt. Exs. 1 & 2 at 92–96 (Parts 3–9). He verbally answered those questions. Doc. 52 at 86–90; *see* Jt. Exs. 1 & 2 at 92–96 (Parts 3–9).

Pellechia asked Khan whether he had ever been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason. Doc. 52 at 180; Jt. Exs. 1 & 2 at 98 (Part 10, Question 16). He verbally changed his written "No," testifying he had been arrested once in Miami-Dade County and no other times.[34] Doc. 52 at 73, 90–92, 180–81; Jt. Exs. 1 & 2 at 98 (Part 10, Question 16). As

---

[33]Khan testified he had marked his hair is black and his eyes are brown but Pellechia had incorrectly marked his hair is brown and his eyes are blue. Doc. 52 at 110. The Court finds this testimony not credible, including because Pellechia credibly testified her checkmarks indicate she confirmed he has black hair and brown eyes. His N-400 itself clearly indicates Pellechia made red marks next to the "black" hair and "brown" eyes boxes to indicate she confirmed his hair and eye color, not to incorrectly indicate his hair is brown and his eyes are blue. *See* Jt. Exs. 1 & 2 at 93 (Part 5, Questions F & G).

[34]The Court asked Khan, "When you talked to the interviewer for naturalization, did you tell her that you were detained when you first arrived in the United States?" Doc. 52 at 146. Khan answered, "No." Doc. 52 at 146. The Court followed up, "Why not?" Doc. 52 at 146. Khan answered, "She don't ask me." Doc. 52 at 146. The Court finds this testimony not credible to the extent he suggests Pellechia did not ask him if he had ever been arrested,

had been requested before the interview based on the FBI background check, Jt. Exs. 1 & 2 at 331, he provided records of the arrest, Doc. 52 at 125. She corrected his N-400 to reflect what he had told her. Doc. 52 at 85; Jt. Exs. 1 & 2 at 98 (Part 10, Questions 16, 17, 22b).

Pellechia asked Khan whether he had ever been a habitual drunkard, had ever sold or smuggled illegal drugs, had ever helped anyone enter the United States illegally, and had ever illegally gambled or received income from illegal gambling. Doc. 52 at 91–92; Jt. Exs. 1 & 2 at 98 (Part 10, Questions 22a–g). He verbally answered no. Doc. 52 at 91–92; Jt. Exs. 1 & 2 at 98 (Part 10, Questions 22a–g).

Pellechia asked Khan whether he had ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal. Doc. 52 at 92, 183; Jt. Exs. 1 & 2 at 98 (Part 10, Question 23). He verbally answered no. Doc. 52 at 92, 183; Jt. Exs. 1 & 2 at 98 (Part 10, Question 23).

Pellechia asked Khan whether he had ever lied to any U.S. government official to gain entry or admission in the United States. Doc. 52 at 92, 184–85; Jt. Exs. 1 & 2 at 98 (Part 10, Question 24). He verbally answered no. Doc. 52 at 92, 185 (Part 10, Question 24).

Pellechia asked Khan whether he had ever been ordered to be removed, excluded, or deported from the United States. Doc. 52 at 186; Jt. Exs. 1 & 2 at 99 (Part 10, Question 27). He verbally answered no. Doc. 52 at 186–87; Jt. Exs. 1 & 2 at 99 (Part 10, Question 27).

Pellechia asked Khan whether he had ever applied for any kind of relief from

---

cited, or detained by any law enforcement officer (including INS and military officers), including because of Pellechia's credible testimony to the contrary, the writing in red ink on the page, and Khan's failure to disclose any arrest or detention when he completed the written paperwork. *See* Jt. Exs. 1 & 2 at 98 (Part 10, Question 16).

removal, exclusion, or deportation. Doc. 52 at 187; Jt. Exs. 1 & 2 at 99 (Part 10, Question 28). He verbally answered no.[35] Doc. 52 at 187; Jt. Exs. 1 & 2 at 99 (Part 10, Question 28).

At the end of the interview, after asking Khan the questions on his N-400, Pellechia presented his N-400 with her annotations to him and asked him if anything else needed to be added or corrected. Doc. 52 at 93, 188–89; Jt. Exs. 1 & 2 at 100 (Part 13). She witnessed him sign his N-400 under penalty of perjury, swearing and affirming "I know that the contents of this application for naturalization subscribed by me, including corrections number 1 through 11 … are true and correct to the best of my knowledge and belief."[36] Doc. 52 at 93, 189; Jt. Exs. 1 & 2 at 100 (Part 13). Pellechia also signed his N-400. Doc. 52 at 189; Jt. Exs. 1 & 2 at 100 (Part 13). Khan intentionally signed his N-400 and not under coercion or "anything like that." Doc. 52 at 93–94.

On the same day as the interview, Pellechia approved Khan's N-400 based on the information he provided in his N-400 and during the interview. Doc. 41 ¶ 76; Doc. 52 at 189–90. As a result, on July 3, 2006, Khan was administered the oath of allegiance, admitting him to U.S. citizenship, and was issued Certificate of Naturalization Number 29940612. Doc. 41 ¶ 77; Jt. Exs. 1 & 2 at 89, 332.

Had Khan told Pellechia he had used another name and birthdate to enter the

---

[35]Khan testified that the answer "no" in response to whether he had ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal, and the answer "no" in response to whether he had ever applied for any kind of relief from removal, exclusion, or deportation are incorrect because he had used the fraudulent passport to be allowed into the United States. Doc. 52 at 75–76.

[36]Khan testified he had not been worried about signing his I-485 or N-400 because no one had ever told him he had been removed or excluded. Doc. 52 at 148. And Khan answered "No" to whether he had "knowingly or intentionally [tried] to mislead Immigration at the time [he was] applying for citizenship as to [his] background." Doc. 52 at 131. The Court finds this testimony not credible, including because he knew he had entered the United States with someone else's passport and visa.

United States and still another name and birthdate in an asylum application; had been detained by the INS for a month when he arrived in the United States; had given false or misleading information to a U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal; had lied to a U.S. government official to gain entry or admission in the United States; had been ordered removed, excluded, or deported from the United States; or had applied for any kind of relief from removal, exclusion, or deportation, Pellechia would have proceeded differently. Doc. 52 at 174–76, 178–79, 182–88. She would have asked follow-up questions to obtain details, continued the proceedings to research whether other files existed, and would have analyzed the new information to determine its effect on his N-400. Doc. 52 at 174–76, 178–79, 182–88. She would not have denied his N-400 outright. Doc. 52 at 194. Failing to disclose his use of the fraudulent passport and his immigration detention on the I-130 and his I-485 would have indicated to her he is not a lawful permanent resident, warranting denial of his N-400 as "inadmissible at adjustment." Doc. 52 at 238.

## D.   *Interview at San Francisco International Airport*

On November 4, 2013 (approximately seven years after obtaining citizenship), Khan arrived at San Francisco International Airport aboard United Airlines Flight 838 and presented a valid U.S. passport. Doc. 41 ¶ 81; Pl. Ex. 1 at 30.[37] As he passed through the immigration area, CBP Enforcement Officers determined he matched several identities. Doc. 41 ¶ 82; Pl. Ex. 1 at 27.

Eduardo Reveles and Xiomara Flores, CBP Enforcement Officers, interviewed Khan. Doc. 41 ¶ 83; Doc. 52 at 106; Pl. Ex. 1 at 21–22. Under standard procedure, they determined he understood English and was physically well enough to answer their questions, and they completed a health questionnaire. Doc. 41 ¶ 84; Pl. Ex. 1

---

[37]The order on the motions for summary judgment provides Khan arrived on November 13, 2013, Doc. 41 ¶ 81, but the documents indicate he arrived on November 4, 2013, Pl. Ex. 11 at 10, 11. The precise date is immaterial.

(Depo. Ex. 2); Pl. Ex. 3 at 19–27 & Depo. Ex. 2; Pl. Ex. 11 at 11; *see also* Pl. Ex. 1 at 25.

Reveles explained, "Generally at the international airport a lot of our passengers are coming, you know, from a long flight. They're tired. Perhaps they're hungry; so we address that. We address if they need the restroom, water, et cetera. … Are they on medication? We just want to make sure that they're feeling okay. Ultimately the person's health and safety is [sic] more important than, you know, any question we may have[.]" Doc. 41 ¶ 85; Pl. Ex. 3 at 19–20.

Khan responded he was taking no medication, had drunk no alcohol, had used no drugs, and had no health problem. Doc. 41 ¶ 86; Pl. Ex. 1 at 22–23 & Depo. Ex. 2; Pl. Ex. 3 at 23–24 & Depo. Ex. 2; Pl. Ex. 11 at 11. Reveles checked responses on the health questionnaire conveying Khan appeared alert and coherent, answered questions rationally, and did not appear to be under the influence of alcohol or drugs, and Reveles signed the questionnaire. Doc. 41 ¶ 87; Pl. Ex. 1 at 24 & Depo. Ex. 2; Pl. Ex. 3 at 25–26 & Depo. Ex. 2; Pl. Ex. 11 at 11. Khan also signed the questionnaire. Doc. 41 ¶ 88; Pl. Ex. 1 at 23 & Depo. Ex. 2; Pl. Ex. 3 at 24–25 & Depo. Ex. 2; Pl. Ex. 11 at 11.

Khan waived his right to remain silent, and the officers witnessed him sign a waiver form. Doc. 41 ¶ 89; Pl. Ex. 1 at 25 & Depo. Ex. 2; Pl. Ex. 3 at 28 & Depo. Ex. 2; Pl. Ex. 11 at 10. After being apprised of his *Miranda* rights, Khan admitted he had tried to enter the United States with an altered passport in 1991 and had been detained by immigration officers. Doc. 41 ¶ 90; Pl. Ex. 1 at 28, 29; Pl. Ex. 3 at 30, 31. Reveles recalled Khan had been "cordial," was "very friendly and cooperative," was "pretty forthcoming," "wasn't rude," "wasn't unfriendly," and "smiled a lot." Doc. 41 ¶ 91; Pl. Ex. 3 at 39, 40. Reveles could recall no hostility. Doc. 41 ¶ 91; Pl. Ex. 3 at 40. Flores prepared a written memorandum documenting the encounter and recording Khan's admissions. Doc. 41 ¶ 91; Jt. Exs. 1 & 2 at 318–19; Pl. Ex. 1 at 26–27 & Depo. Ex. 3; Pl. Ex. 3 at 25–26 & Depo. Ex. 3.

CBP kept Khan's U.S. passport for about two months and then returned it to him. Doc. 41 ¶ 93; Doc. 52 at 106–07; Jt. Exs. 1 & 2 at 308; Pl. Ex. 3 at 32–36 & Depo. Exs. 4–7.

**E.    *Interview at Abu Dhabi***

On March 2, 2014 (approximately three-and-a-half months after the encounter at the San Francisco airport), Khan presented himself for inspection at Abu Dhabi preclearance with a valid U.S. passport. Doc. 41 ¶ 95; Jt. Exs. 1 & 2 at 280, 281, 305–07. With some exceptions, preclearance is the same immigration-and-customs inspection done at a port of entry in the United States, but the inspection occurs abroad before embarkation. Pl. Ex. 5 at 12–13. Khan was referred to secondary inspection, where Sarah Wescott, a CBP Officer, inspected him. Doc. 41 ¶ 96; Pl. Ex. 5 at 23).

CBP's information revealed Khan's fingerprints were linked to several identities. Doc. 41 ¶ 97; Pl. Ex. 5 at 23, 36. Khan agreed to provide a statement. Doc. 41 ¶ 98; Pl. Ex. 5 at 23. Wescott typed her questions and Khan's answers as they were asked and answered and recorded what was said as close to verbatim as possible. Doc. 41 ¶ 99; Pl. Ex. 5 at 27–28. Wescott recorded the questions and answers on a Form I-877 (Record of Sworn Statement). Doc. 41 ¶ 100; Pl. Ex. 5 at 22–23 & Depo. Ex. 2; Pl. Ex. 10.

Wescott asked Khan whether he had ever been known by any other name, and he answered no. Pl. Ex. 10 at 1. She asked him why the name "Mohammad Akhtar" is associated with him, and he answered he had used a passport with that name when he first arrived in the United States. Doc. 41 ¶ 101; Jt. Exs. 1 & 2 at 282; Pl. Ex. 5 at 25, 26–27; Pl. Ex. 10 at 1. She asked him how he had obtained Mohammad Akhtar's passport, and he answered, "He was a friend of mine." Pl. Ex. 10 at 1. She asked him had he had to buy the passport from Mohammad Akhtar, and he answered, "No he gave it to me." Pl. Ex. 10 at 1. She asked him when he entered with the passport, and he answered, "It was December in the late 1990s." Pl. Ex. 5 at 25; Pl. Ex. 10 at 1. In

response to additional questioning, he told her INS had detained him; he had gone before an immigration judge; he had requested asylum; a judge had released him; he had used the name "Parvez Khan" to obtain his green card; and he had used the name "Parvez Manzoor Khan" to naturalize. Doc. 41 ¶¶ 101–02; Jt. Exs. 1 & 2 at 282; Pl. Ex. 5 at 27, 31–34 & Depo. Ex. 2. She asked him if he would like to add anything to his sworn statement, and he answered, "Make this go away. I am the sole [] bread winner for my family." Doc. 52 at 149; Pl. Ex. 10 at 3.

Wescott recalled the encounter with Khan because he was not unpleasant, which is unusual for someone in secondary inspection. Doc. 41 ¶ 103; Pl. Ex. 5 at 31. She explained, "[S]ometimes in secondary, people aren't pleasant, so when people are pleasant, it's a standout moment. And he wasn't unpleasant to [her]." Doc. 41 ¶ 103; Pl. Ex. 5 at 31.

Wescott later created a Form I-213 (Record of Deportable/Inadmissible Alien). Doc. 41 ¶ 104; Jt. Exs. 1 & 2 at 281–82; Pl. Ex. 5 at 33–34 & Depo. Ex. 3. Wescott summarized her findings on the I-213 and included Khan's photograph and fingerprints of his right and left index fingers. Doc. 41 ¶ 105; Pl. Ex. 5 at 36–37 & Depo. Ex. 3.

## F.    *Initiation of this Lawsuit*

When fingerprints are taken by immigration officers, they ordinarily are submitted to the FBI, and if there are two sets, one is maintained in the A-File. Doc. 52 at 222. The FBI checks the fingerprints against its own database and returns responses. Doc. 52 at 235–36.

Service centers prepare documentation and check fingerprints. Doc. 52 at 199. Khan was fingerprinted when he first came to the United States and later when he submitted his I-485 and N-400, and never refused to provide fingerprints. Doc. 52 at 130. If he was fingerprinted again, his fingerprints would match those taken under

the names Mohammad Akhtar, Jaweed Khan, and Parvez Manzoor Khan.[38] Doc. 41 ¶ 112; Pl. Exs. 9, 12.

On September 8, 2016 (approximately two-and-a-half years after the encounter in Abu Dhabi), the Department of Homeland Security (DHS) Office of Inspector General (OIG) issued a report titled, "Potentially Ineligible Individuals Have Been Granted U.S. Citizenship Because of Incomplete Fingerprint Records." Def. Ex. 4. The report explains,

> USCIS granted U.S. citizenship to at least 858 individuals ordered deported or removed under another identity when, during the naturalization process, their digital fingerprint records were not available. The digital records were not available because although USCIS procedures require checking applicants' fingerprints against both the Department of Homeland Security's and the Federal Bureau of Investigation's (FBI) digital fingerprint repositories, neither contains all old fingerprint records. Not all old records were included in the DHS repository when it was being developed. Further, U.S. Immigration and Customs Enforcement (ICE) has identified[] about 148,000 older fingerprint records that have not been digitized of aliens with final deportation orders or who are criminals or fugitives. The FBI repository is also missing records because, in the past, not all records taken during immigration encounters were forwarded to the FBI. As long as the older fingerprint records have not been digitized and included in the repositories, USCIS risks making naturalization decisions without complete information and, as a result, naturalizing additional individuals who may be ineligible for citizenship or who may be trying to obtain U.S. citizenship fraudulently.
>
> As naturalized citizens, these individuals retain many of the rights and privileges of U.S. citizenship, including serving in law enforcement, obtaining a security clearance, and sponsoring other aliens' entry into the United States. ICE has investigated few of these naturalized citizens to determine whether they should be denaturalized, but is now taking steps to increase the number of cases to be investigated, particularly

---

[38]At trial, after establishing that Khan had never refused to provide fingerprints, Khan's lawyer asked him, "Did you have any reason to try to cover up what happened in Los Angeles with Immigration," and Khan answered, "No." Doc. 52 at 130–31. The Court finds this testimony not credible to the extent Khan suggests he believed the government would use his fingerprints to find all facts about him when deciding his I-485 and N-400, including because the testimony appears driven by his lawyer's arguments.

those who hold positions of public trust and who have security clearances.

Def. Ex. 4 at 4. The report recommends "that ICE finish uploading into the digital repository the fingerprints it identified and that DHS resolve these cases of naturalized citizens who may have been ineligible." Def. Ex. 4 at 4.

One year later, on September 19, 2017, the U.S. Department of Justice (DOJ) Office of Public Affairs published a press release about this lawsuit and two others. Def. Ex. 3. The press release describes the allegations in the lawsuits and provides:

> "The Justice Department is committed to preserving the integrity of our nation's immigration system, and in particular, the asylum and naturalization processes," said Acting Assistant Attorney General Chad A. Reader of the Justice Department's Civil Division. "The civil complaints charge that defendants in these cases exploited our immigration system and unlawfully secured the ultimate immigration benefit of naturalization. The filing of these cases sends a clear message to immigration fraudsters—if you break our immigration laws, we will prosecute you and denaturalize you."

> The three cases, United States of America v. Parvez Manzoor Khan (M.D. Fla.); United States of America v. Rashid Mahmood (D. Conn.); and United States of America v. Baljinder Singh (D.N.J.) were referred to the Department of Justice by USCIS and identified as part of Operation Janus. A Department of Homeland Security initiative, Operation Janus identified about 315,000 cases where some fingerprint data was missing from the centralized digital fingerprint repository. Among those cases, some may have sought to circumvent criminal record and other background checks in the naturalization process. These cases are the result of an ongoing collaboration between the two departments to investigate and seek denaturalization proceedings against those who obtained citizenship unlawfully.

> "Naturalization is one of the most sacred honors bestowed by our nation," said Acting USCIS Director James W. McCament. "USCIS takes great care and responsibility in determining to refer a case for denaturalization proceedings. We do so to send the strong message that individuals who seek to defraud the United States by obtaining naturalization unlawfully will be targeted to have their U.S. citizenship stripped. I am grateful for the USCIS team who devoted countless hours to the painstaking work of uncovering fraud in each of these cases."

Def. Ex. 3 at 3.

### G.     Other

A-Files ordinarily are consolidated when officials verify the files are for the same person. Doc. 52 at 233. Khan did not have a consolidated A-File. Doc. 52 at 233.

Khan remains a naturalized U.S. citizen. Doc. 41 ¶ 78. He is a truck driver for Suhail Khan and lives in Branford, Florida. Doc. 52 at 17, 257, 287, 290. He remains married to Ms. Khan and has two children born in the United States (one to Ms. Khan) and three grandchildren in the United States. Doc. 52 at 17, 249, 251; Jt. Exs. 1 & 2 at 161, 179.

## III.   Conclusions of Law[39]

### A.     *8 U.S.C. § 1451(a)*

The law under which the government sues, 8 U.S.C. § 1451(a), provides:

> It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization **on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation**, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively[.]

8 U.S.C. § 1451(a) (emphasis added). Thus, there are two grounds on which U.S. Attorneys must institute denaturalization proceedings: (1) naturalization was

---

[39]This section includes mixed findings of fact and conclusions of law.

illegally procured; and (2) naturalization was procured by concealment of a material fact or by willful misrepresentation. *Id.* Here, the government proceeds on both grounds, and on the illegal-procurement ground, under two theories.[40]

**B.     Burden of Proof**

"[T]he right to acquire American citizenship is a precious one." *Fedorenko v. United States*, 449 U.S. 490, 505 (1981). "[O]nce citizenship has been acquired, its loss can have severe and unsettling consequences." *Id.*

Considering the importance of the right at stake, the government has a "heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Costello v. United States*, 365 U.S. 265, 269 (1961). The evidence must be "clear, unequivocal, and convincing" and "cannot … leave[] the issue in doubt." *Schneiderman v. United States*, 320 U.S. 118, 125 (1943) (citation and internal quotation marks omitted). The Supreme Court has likened the standard to the beyond-a-reasonable-doubt standard in a criminal case. *Klapprott v. United States*, 335 U.S. 601, 612 (1949). "Any less exacting standard would be inconsistent with the importance of the right that is at stake[.]" *Fedorenko*, 449 U.S. at 505–06. Indeed, "in reviewing denaturalization cases, [the Supreme Court has] carefully examined the record" itself. *Id.* at 505 (citing *Costello*, 365 U.S. 265, *Chaunt v. United States*, 364 U.S. 350 (1960)*, Nowak v. United States*, 356 U.S. 660 (1958), and *Baumgartner v. United States*, 322 U.S. 665 (1944)).

"At the same time, … there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Id.* at 506.

---

[40]In his pretrial statement, Khan suggested a statute-of-limitations defense based on the five-year statute of limitations in 28 U.S.C. § 2462, Doc. 44 at 10, but in his closing argument, his lawyer explained he is not pursuing the defense, Doc. 62 at 50–52. Because Khan has abandoned the defense, the Court need not address it. The Court observes the argument the statute of limitations in § 2462 governs actions under § 1451(a) has been rejected elsewhere. *See, e.g., United States v. Phattey*, 943 F.3d 1277, 1282–83 (9th Cir. 2019).

Failure to comply with a prerequisite "renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside" under § 1451(a). *Id.*

If the government satisfies its burden, the court "lack[s] equitable discretion to refrain from entering a judgment of denaturalization[.]" *Id.* at 517; *accord United States v. Jean-Baptiste*, 395 F.3d 1190, 1192 (11th Cir. 2005). The Supreme Court has explained,

> An alien who seeks political rights as a member of this nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare.
>
> …
>
> No alien has the slightest right to naturalization unless all statutory requirements are complied with; and every certificate of citizenship must be treated as granted upon condition that the government may challenge it … and demand its cancelation unless issued in accordance with such requirements. If procured when prescribed qualifications have no existence in fact, it is illegally procured; a manifest mistake by the judge cannot supply these nor render their existence nonessential.

*United States v. Ginsberg*, 243 U.S. 472, 474–75 (1917). "[I]nsistence on strict compliance with the [prerequisites] is simply an acknowledgment … that Congress alone has the constitutional authority to prescribe rules for naturalization, and the courts' task is to assure compliance with the particular prerequisites to the acquisition of U.S. citizenship by naturalization legislated to safeguard the integrity of this priceless treasure." *Fedorenko*, 449 U.S. at 506–07 (footnote, internal quotation marks, and quoted authority omitted).

In his proposed conclusions of law, Khan reasserts equitable arguments he made during the summary-judgment proceedings: the government is blameworthy for failing to conduct a proper fingerprint check when it processed his applications;

and the government unreasonably delayed suing, causing loss of unidentified "substantial exculpatory evidence." Doc. 58 at 15; *see* Def. Exs. 3, 4. The Court rejects these arguments for the same reasons it rejected them before: equitable defenses are unavailable in a denaturalization proceeding. *See* Doc. 41 at 42, 55; *see also Fedorenko*, 449 U.S. at 517; *Jean-Baptiste*, 395 F.3d at 1192.

## C.    *Grounds*

### 1.    *Illegal Procurement Based on Ineligibility Based on Lack of Good Moral Character*

The government seeks Khan's denaturalization on the ground his naturalization was illegally procured because he was ineligible to naturalize due to his lack of good moral character during the pertinent time period. Doc. 1 ¶¶ 44–53 (count one). The government contends he lacked good moral character during that period because he had provided false testimony during his N-400 interview with Pellechia. Doc. 1 ¶¶ 47–48.

No person may be naturalized unless he "has been and still is a person of good moral character" from the five years immediately preceding the date of filing his N-400 (or from the three years immediately preceding the date of filing his N-400 if his spouse is a U.S. citizen and he has been living in marital union with his spouse during that time period) to his admission to citizenship. 8 U.S.C. §§ 1427(a), 1430(a); 8 C.F.R. §§ 316.2(a)(7), 316.10(a), 319.1(a).

An applicant may not be regarded as or found to be a person with good moral character if, during the pertinent time period, he has given "false testimony for the purpose of obtaining" an immigration or naturalization benefit.[41] 8 U.S.C.

---

[41]Conduct outside the three- or five-year period may be considered under some circumstances: "In determining whether the applicant has sustained the burden of establishing good moral character and the other qualifications for citizenship specified in subsection (a) of this section, the Attorney General shall not be limited to the applicant's conduct during the five years preceding the filing of the application, but may take into consideration as a basis for such determination the applicant's conduct and acts at any time

§ 1101(f)(6); 8 C.F.R. § 316.10(b)(2)(vi). The primary purpose of the requirement "is not … to prevent false pertinent data from being introduced into the naturalization process, but to identify lack of good moral character." *United States v. Kungys*, 485 U.S. 759, 780 (1988).

The false testimony (1) must be oral (neither a written statement nor a concealment qualifies), (2) must be made under oath, and (3) must be made with the subjective intent to obtain an immigration benefit. *Id.* at 779–80; 8 C.F.R. § 316.10(b)(2)(vi). The testimony need not be material "in the sense that if given truthfully it would have rendered [the applicant] ineligible for benefits." 8 C.F.R. § 316.10(b)(2)(vi); *see also Kungys*, 485 U.S. at 780.

"It is only dishonesty accompanied by [subjective intent to obtain an immigration benefit] that Congress found morally unacceptable." *Kungys*, 485 U.S. at 780 (quoted authority omitted). "Willful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, [are not] sufficiently culpable to brand the applicant as someone who lacks good moral character." *Id.* (quoted authority omitted).

Whether someone had possessed the subjective intent to obtain an immigration benefit is a question of fact that must be proven by clear, unequivocal, and convincing evidence that does not leave the issue in doubt. *Id.* at 781. Although the testimony need not be material, "it will be relatively rare that the Government will be able to prove that a misrepresentation that does not have the natural tendency to influence the decision regarding immigration or naturalization benefits was nonetheless made with the subjective intent of obtaining those benefits." *Id.* at 780–81.

Here, the government concedes the shorter three-year period applies, Doc. 57 at 29–30 & n.7, making the pertinent time period December 12, 2002 (three years

---

prior to that period." 8 U.S.C. § 1427(e). Here, the government does not ask the Court to consider anything beyond the three-year period.

before December 12, 2005, when Khan filed his N-400, Doc. 41 ¶ 64; Pl. Ex. 7), to July 3, 2006 (the date on which he took the oath of allegiance and became a U.S. citizen, Doc. 41 ¶ 77; Jt. Exs. 1 & 2 at 89, 332).

The government has satisfied its burden, showing by clear, unequivocal, and convincing evidence that, during the pertinent time period, Khan falsely gave oral testimony under oath with the subjective intent to obtain an immigration benefit, which means he lacked good moral character during the pertinent time period, making him ineligible to naturalize and his citizenship illegally procured.

On May 31, 2006, while under oath during his N-400 interview with Pellechia, Khan orally gave false testimony in at least four ways. First, Khan told Pellechia he had never been detained by any law enforcement officer (including INS and military officers) for any reason except when police officers briefly detained him after his arrest on the charge of soliciting a prostitute in Miami in 1995. His testimony was false. He had been detained by immigration officers for a month upon his arrival in the United States in Los Angeles in 1991.

Second, Khan told Pellechia he had never given false or misleading information to any U.S. government official while applying for any immigration benefit. His testimony was false. He gave false or misleading information to a U.S. government official in his I-485; specifically, that he had entered the United States in Miami in December 1990 (he entered the United States in Los Angeles in December 1991) and that he had never sought to procure or procured a visa, other documentation, entry into the U.S., or any other immigration benefit by fraud or willful misrepresentation of a material fact (he had altered and presented Mohammad Akhtar's passport to gain initial entry into the United States).[42]

---

[42]The government asks the Court to find Khan "indicated that he had never been subject to exclusion proceedings" on his I-485. Doc. 57 at 32. The Court declines to make that finding because the I-485 signed by Khan asks not whether an applicant has ever been subject to exclusion proceedings but whether he had "ever been deported from the U.S., or

Third, Khan told Pellechia he had never lied to any U.S. government official to gain entry or admission into the United States. His testimony was false. He altered Mohammad Akhtar's passport and lied to a U.S. government official when he presented it, with its visa, as his own to gain entry into the United States.

And fourth, Khan told Pellechia he had never applied for any kind of relief from removal, exclusion, or deportation. His testimony was false. Exclusion proceedings had been initiated against him, and to avoid exclusion, he applied for asylum.

Khan made those false statements with the subjective intent to obtain an immigration benefit (citizenship), and any testimony to the contrary is not credible. His statements were many, and they concerned important matters. He understood what Pellechia had asked, he understood and remembered the truth (the circumstances of his entry, his parole, and his unrealized request for asylum), and he did not act out of embarrassment (he did, after all, admit a criminal charge at least as embarrassing). At the time he made the statements, he had lived here for fourteen years, worked as a taxicab driver here for many of those years, met and married a U.S. citizen who speaks only English, had two children here, paid a preparer to help him with the paperwork, and passed the English test for citizenship. He knew Pellechia was conducting a formal interview and that she would use his answers to decide whether his N-400 would be approved. At the end of the interview, he intentionally signed his N-400, attesting under penalty of perjury its contents were true and correct to the best of his knowledge and belief.

In his proposed conclusions of law, Khan reasserts the unsuccessful argument he made during summary-judgment proceedings: the government cannot prove oral

---

removed from the U.S. at government expense, excluded within the past year" or is "now in exclusion or deportation proceedings." Jt. Exs. 1 & 2 at 143 (Part 3, Question 9).

The government does not ask the Court to find other aspects of Khan's testimony false. *See generally* Doc. 57 at 29–33. The Court therefore declines to do so.

testimony without producing transcripts of the testimony. Doc. 58 at 14. The Court again rejects the argument. *See* Doc. 41 at 55. Pellechia's testimony and marks on his N-400 prove he provided oral testimony. *Cf. United States v. Puerta*, 982 F.2d 1297, 1301 n.2 (9th Cir. 1992) (in criminal action under 18 U.S.C. § 1425(a), finding examiner's testimony and marks on N-400 proved defendant had orally testified).

Khan lacked good moral character during the pertinent time period because he provided false testimony during his interview with Pellechia and was thus ineligible to naturalize. Under § 1451(a), the order admitting Khan to citizenship and his certificate of naturalization must be revoked and set aside because they were illegally procured.

2. *Illegal Procurement Based on Ineligibility Based on Unlawful Admission for Permanent Residence*

The government also seeks Khan's denaturalization on the ground his naturalization was illegally procured because he was ineligible to naturalize due to the absence of lawful permanent-resident status. Doc. 1 ¶¶ 54–62 (count two). The government contends he was inadmissible for that status because he had procured an immigration benefit (adjustment of status) by fraud or willful misrepresentation. Doc. 1 ¶¶ 54–62.

No person may be naturalized "unless he has been lawfully admitted to the United States for permanent residence[.]" 8 U.S.C. § 1429; *accord* 8 C.F.R. § 316.2(a)(2). "[L]awfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]" 8 U.S.C. § 1101(a)(20). This definition means not just that the person was granted lawful-permanent-resident status but also that the grant of that status was in substantive compliance with the immigration laws. *Savoury v. U.S. Att'y Gen.*, 449 F.3d 1307, 1317 (11th Cir. 2006).

"The status of an alien who was inspected and admitted or paroled into the United States … may be adjusted by the Attorney General, in his discretion … to that of an alien lawfully admitted for permanent residence" if: "(1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." 8 U.S.C. § 1255(a); *accord* 8 C.F.R. § 245.1(a).

Under 8 U.S.C. § 1182(a)(6)(C)(i), "Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit … is inadmissible." 8 U.S.C. § 1182(a)(6)(C)(i); *accord* 22 C.F.R. § 40.63. Application of § 1182(a)(6)(C)(i) requires: (1) fraud or willful misrepresentation (2) of a material fact (3) to procure an immigration benefit. 8 U.S.C. § 1182(a)(6)(C)(i). Under some circumstances, the Attorney General in his discretion may waive the application of the fraud-or-willful-misrepresentation provision. *See* 8 U.S.C. § 1182(i) (detailing waiver requirements).

A misrepresentation is willful if made deliberately and with knowledge of its falsity. *Azim v. U.S. Att'y Gen.*, 314 F. App'x 193, 194 (11th Cir. 2008) (addressing willfulness for § 1182(a)(6)(C)(i) and relying on *In re Healy & Goodchild*, 17 I. & N. Dec. 22, 28 (BIA 1979), and *In re S & B-C-*, 9 I. & N. Dec. 436, 445 (BIA 1960, A.G. 1961)). "Willfully" may be distinguished from "accidentally, inadvertently, or in a good faith belief that the factual claims are true." U.S. Citizenship & Immigration Services, Policy Manual, Vol. 8, Part J, Ch. 3, § D.1; *accord Emokah v. Mukasey*, 523 F.3d 110, 116 (2d Cir. 2008) (addressing willfulness for § 1182(a)(6)(C)(i)). Willfulness does not require intent to deceive. *Ortiz-Bouchet v. U.S. Att'y Gen.*, 714 F.3d 1353, 1356–57 (11th Cir. 2013) (addressing willfulness for § 1182(a)(6) and relying on *Matter of Kai Hing Hui*, 15 I. & N. Dec. 288, 290 (BIA 1975)); *see also United States v. Ahmed*, 735 F. App'x 863, 868 (6th Cir. 2018) (addressing willfulness for § 1451(a)

and citing several appellate cases to support that a misrepresentation is willful if made deliberately and with knowledge of its falsity and willfulness and does not require intent to deceive).

A fact is material if it has a "natural tendency to influence" the immigration decision. *See Kungys*, 485 U.S. at 772 (addressing materiality under § 1451(a)).[43] To determine the natural tendency of a misrepresentation to affect the decision, "what is relevant is what would have ensued from official knowledge of the misrepresented fact[.]" *Id.* at 775.

The government has satisfied its burden, showing by clear, unequivocal, and convincing evidence that Khan willfully misrepresented material facts to procure an immigration benefit (permanent-resident status), making him inadmissible, making him not lawfully admitted as a permanent resident, making him ineligible to naturalize, and making his citizenship illegally procured.

To procure permanent-resident status, Khan misrepresented he had entered the United States in Miami in December 1990 (he entered the United States in Los Angeles in December 1991), he had entered without inspection (he did not enter without inspection and was paroled), and he had never sought to procure or procured a visa, other documentation, entry into the U.S., or any other immigration benefit by fraud or willful misrepresentation of a material fact (he had sought to procure entry into the United States by misrepresenting he was Mohammad Akhtar and sought

---

[43]The parties do not contend or present any reason why the standards for willfulness and materiality under § 1182(a)(6)(C)(i) and § 1451(a) should be different, and the Court discerns no such reason. *See United States v. Golding*, 162 F. Supp. 3d 1285, 1294 (S.D. Fla. 2016) (accepting government's position that standard for materiality under § 1182(a)(6)(C)(i) and § 1451(a) is same and discerning no reason why they should be different considering both statutes pertain to whether applicant misrepresented material fact in application for immigration benefit).

asylum by misrepresenting personal identifiers).[44]

Khan made the misrepresentations willfully, and any testimony to the contrary is not credible. Like his false statements during his interview with Pellechia for his N-400, his misrepresentations in his I-485 were many, and they concerned important matters. He understood the questions, and he understood and remembered the truth. At the time he made the statements, he had lived here for seven years, worked here for some of those years, met and married a U.S. citizen who speaks only English, and paid a preparer to help him with the paperwork. He intentionally signed his I-485 under penalty of perjury, attesting the information he provided was true and correct.

Khan's misrepresentations were material because they had a natural tendency to influence the examiner, who was tasked with determining his admissibility and thus eligibility for permanent-resident status. *See* 8 U.S.C. § 1182(a)(6)(C)(i); *cf. Esposito v. INS*, 936 F.2d 911, 912 n.1 (7th Cir. 1991) (explaining, in context of 8 U.S.C. § 1182(a)(19), "It is crystal clear that an individual who knowingly enters the United States on a false passport has engaged in willful fraud and misrepresentation of material fact.").

Khan was ineligible to naturalize due to the absence of lawful admission for permanent residence. Under § 1451(a), the order admitting Khan to citizenship and his certificate of naturalization must be revoked and set aside because they were

---

[44]The I-485 asks, "9. Have you ever been deported from the U.S., or removed from the U.S. at government expense, excluded within the past year, or are you now in exclusion or deportation proceedings?" Jt. Exs. 1 & 2 at 143 (Part 3, Question 9); Pl. Ex. 8 at 3 (Part 3, Question 9). The government asks to Court to find Khan willfully misrepresented "he was not in exclusion or deportation proceedings" by answering no. Doc. 57 at 35. Khan contends he "was unaware of such when he answered no." Doc. 58 at 23. The Court declines to make the finding requested by the government. While the Court finds not credible Khan's testimony that he thought he was granted asylum, the status of his exclusion proceedings, which had begun seven years before he filed his I-485, may well have been unclear to him.

illegally procured..

3.    *Procurement by Concealment of a Material Fact or by Willful Misrepresentation*

The government also seeks Khan's denaturalization on the ground he procured his citizenship by concealment of a material fact or by willful misrepresentation. Doc. 1 ¶¶ 63–69 (count three). The government contends he concealed or willfully misrepresented facts on his N-400. Doc. 1 ¶¶ 65–66.

For denaturalization under § 1451(a) based on procurement of naturalization by concealment or misrepresentation, the government must establish "four independent requirements": (1) the naturalized citizen misrepresented or concealed a fact, (2) the misrepresentation or concealment was willful, (3) the fact was material, and (4) the naturalized citizen procured citizenship because of the misrepresentation. *Kungys*, 485 U.S. at 767. The primary purpose of the law is "to prevent false pertinent data from being introduced into the naturalization process []and to correct the result of the proceedings where that has occurred." *Id.* at 780.

Procurement is analytically distinct from materiality. *Id.* at 776. "The requirement demands, first of all, that citizenship be obtained as a result of the application process in which the misrepresentations or concealments were made." *Id.* at 776. Beyond that, "one who obtained his citizenship in a proceeding where he made material misrepresentations was *presumably* disqualified," but, given the "importance of the rights at stake," can rebut the presumption by showing, "through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation *had a natural tendency* to produce a favorable decision was in fact met." *Id.* at 777. The presumption does not arise, however, unless the government produces evidence sufficient to raise a "fair inference of ineligibility." *Id.* at 784 (Brennan J., concurring and providing narrowest holding of fragmented decision); *see United States v. Pirela Pirela*, 809 F.3d 1195, 1200 & n.2 (11th Cir. 2015) (explaining holding of *Kungys* in context of 18 U.S.C. § 1546(a), which criminalizes fraud and

misuse of visas and other documents); *United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009) (explaining holding of *Kungys* in context of 18 U.S.C. § 1425(a), which criminalizes unlawful procurement of citizenship or naturalization).

"[A] person whose lies throw investigators off a trail leading to disqualifying facts gets her citizenship by means of those lies—no less than if she had denied the damning facts at the very end of the trail." *Maslenjak v. United States*, 137 S. Ct. 1918, 1929 (2017) (discussing § 1451(a) in context of § 1425(a)). An "investigation-based theory" requires two showings: (1) "the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials, 'seeking only evidence concerning citizenship qualifications,' to undertake further investigation"; and (2) "the investigation 'would predictably have disclosed' some legal disqualification." *Id.* (quoting *Kungys*, 485 U.S. at 774).

Here, too, the government has satisfied its burden, showing by clear, unequivocal, and convincing evidence that Khan is a naturalized citizen who willfully misrepresented or concealed material facts and procured citizenship because of them.

In his N-400, Khan misrepresented or concealed he had used no other names (he had used Mohammad Akhtar and Jaweed Khan). He misrepresented or concealed he had never been detained by any INS officer (he was detained by immigration officers for a month upon his arrival in the United States in 1991). He misrepresented or concealed he had never given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal (he did so in his I-589 to gain asylum and in his I-485 to change his status to permanent resident). He misrepresented or concealed he had never lied to any U.S. government official to gain entry or admission into the United States (he altered Mohammad Akhtar's passport and lied to a U.S. government official when he presented it as his own to gain entry into the United States). And he misrepresented or concealed he had never applied for any kind of relief from removal, exclusion, or deportation (he had applied for asylum to avoid

exclusion).

Khan made the misrepresentations or concealments willfully, and any testimony to the contrary is not credible. Like his false statements during his interview with Pellechia, and like his misrepresentations in his I-485, his misrepresentations in his N-400 were many, and they concerned important matters. He understood the questions, and he understood and remembered the truth. At the time he made the misrepresentations, he had lived here for thirteen years, worked as a taxicab driver here for many of those years, met and married a U.S. citizen who speaks only English, had two children here, and paid a preparer to help him with the paperwork. He understood his N-400 would be used to make the decision on whether he could be naturalized. He intentionally signed his N-400, attesting under penalty of perjury the application was true and correct.

Khan's misrepresentations or concealments were material because they had a natural tendency to influence the naturalization decision. As Pellechia explained, had Khan revealed the truth in his N-400, she would have investigated further to determine if he met the statutory requirements for naturalization, including possessing the status of lawful permanent resident, instead of granting his N-400 on the spot. The investigation predictably would have disclosed the legal disqualification of the absence of lawful-permanent-resident status.

On procurement, that Khan was actually ineligible to naturalize is fair to infer. At a minimum, as Pellechia explained, his failure to disclose his use of the altered passport and his INS detention on his I-485 would have indicated to her he is not a lawful permanent resident, warranting denial of his N-400 as "inadmissible at adjustment." Doc. 52 at 238.

In his proposed conclusions of law, Khan argues he was eligible to adjust his status to permanent resident because he was paroled into the United States and was in a bona fide marriage to a U.S. citizen. Doc. 58 at 6, 16, 22. He further argues the

immigration judge should have permitted him to reopen his exclusion proceedings because he had received no notice to appear and his lawyer had been ineffective. Doc. 58 at 8–14. Khan's arguments do not prevent denaturalization; he still would have been found inadmissible even considering his parole, his bona fide marriage to a U.S. citizen, and any ability to have reopened his exclusion proceedings.

Khan argues even if the government's allegations are true, the government failed to show a negative effect on his I-485 or his N-400 because Pellechia would need to review his entire A-File to determine if he had been properly approved for his I-485 and his N-400. Doc. 58 at 21. Khan's argument fails because it misconstrues the standards for materiality and procurement. *See Kungys*, 485 U.S. at 772.

Khan argues the evidence shows he tried to enter the United States using someone else's passport—not that he fraudulently procured a visa—and therefore fails to show he falsely answered question 10 on his I-485 asking whether he, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa. Doc. 58 at 24. Khan's argument does not change the result; question 10 includes —besides a visa—"other documentation, entry into the U.S., or any other immigration benefit." *See* Jt. Exs. 1 & 2 at 143 (Part 3, Question 10); Pl. Ex. 8 at 3 (Part 3, Question 10).

Under § 1451(a), the order admitting Khan to citizenship and his certificate of naturalization must be revoked and set aside because they were procured by concealment of a material fact or by willful misrepresentation.

## IV. Conclusion

Khan illegally procured the order admitting him to citizenship and certificate of naturalization and procured them by concealment of a material fact or by willful misrepresentation. The Court will separately enter an order revoking and setting aside the order and certificate in accordance with § 1451(a).[45]

**Ordered** in Jacksonville, Florida, on April 3, 2020.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record

---

[45]During closing arguments, the government's lawyer explained Khan's status upon denaturalization reverts to permanent-resident status, which can be lost only through rescission, which has a five-year statute of limitations from the date of adjustment (here, November 7, 2001), *see* 8 U.S.C. § 1256(a), or through Khan's voluntary absence from the country for an extended time. Doc. 62 at 20–21. The government's lawyer further explained the belief that Judge Daniel's order is no longer valid because it was considered executed when Khan left the country for travel. Doc. 62 at 21–22. The government's lawyer added, "So my understanding is that [Khan] would need to be served a new notice to appear and removal proceedings need to be commenced again." Doc. 62 at 21–22.